Roger Flynn (CO Bar # 21078) *(Pro Hac Vice Application Pending)*
Jeffrey C. Parsons (CO Bar #30210) (*Pro Hac Vice Application Pending*)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org

Susan B. Montgomery (AZ Bar # 020595)
Robyn L. Interpreter (AZ Bar # 020864)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milaz.com

*Additional Plaintiffs' Counsel Listed in Signature Block Below*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| ARIZONA MINING REFORM COALITION; INTER TRIBAL ASSOCIATION OF ARIZONA, INC.; EARTHWORKS; CENTER FOR BIOLOGICAL DIVERSITY; ACCESS FUND; and GRAND CANYON CHAPTER OF THE SIERRA CLUB, <br><br> Plaintiffs <br><br> vs. <br><br> UNITED STATES FOREST SERVICE, an agency in the U.S. Department of Agriculture; NEIL BOSWORTH, Supervisor of the Tonto National Forest; and TOM TORRES, Acting Supervisor, Tonto National Forest <br><br> Defendants. | Case No. <br><br> COMPLAINT FOR VACATUR, DECLARATORY AND INJUNCTIVE RELIEF |

1

**INTRODUCTION**

1.      On January 15, 2021, with only five days left in the Trump Administration, the Defendant United States Forest Service ("Forest Service" or "Agency"), Tonto National Forest, issued its Final Environmental Impact Statement ("FEIS") governing its review of the "Resolution Copper Project and Land Exchange" and related Forest Service proposed approvals of pipelines, roads, electrical transmission lines, infrastructure and other uses of federal public land associated with the proposed Resolution Copper Mine.  The Exchange would give to multinational mining conglomerate, London-based Rio Tinto Corp. and related companies ("Rio Tinto," "Resolution," or "Resolution Copper") over 2,400 acres of federal land within the Tonto National Forest.

2.      The Exchange and related Forest Service approvals would facilitate Rio Tinto's proposed mine known as the Resolution Copper Mine ("Resolution Copper Mine," "Project" or "Mine").  The Mine would pump and dewater groundwater and completely obliterate sacred land, Oak Flat, by creating a roughly two-mile-wide and 1,000 foot deep crater from the "block cave" mine operation.  This mining method would involve excavating ore 4,500 to 7,000 feet underground within the exchanged parcel and then collapsing the void areas created by the excavation.  The result would be a massive, permanent crater.  The Mine would transform Oak Flat, which has since time immemorial, been a place of profound religious, cultural, and historical significance, sacred to indigenous people, including the Western Apache and the Yavapai Peoples, into a rubbleized crater, whose steep and unstable slopes would forever remain unsafe for human use.

3.      The faulty FEIS and Project review, hurried through to completion in the waning days of the Trump Administration, is deficient in numerous critical areas, and violates multiple federal laws.  As just one example of its rush-to-complete, the agency completely changed its regulatory structure for reviewing the Project in late 2020 but never provided any public review of the regulatory switch, despite the critical public land issues the 11th-hour reversal raises.

4.      Additional problems with the FEIS include its: legally erroneous "purpose and need" that governed the Forest Service's review of the Project; failure to provide for and analyze a full range of reasonable alternatives; failure to provide a full analysis of the impacts of those alternatives; failure to apply the full scope of federal laws applicable to the Project; improper regulation and review of the Project and infrastructure under erroneous interpretations of federal law; failure to include any information or opportunity to comment on the appraisals that Congress required to be completed (including the additional Non-Federal lands that may be conveyed to the United States based on the appraisals); failure to adequately analyze connected actions and the direct, indirect, and cumulative impacts from the Exchange and Project; and failure to take the required "hard look" under the National Environmental Policy Act ("NEPA"), as well as  otherwise violating federal law as noted herein.

5.



Oak Flat, shown above, is located within the Tonto National Forest east of the town of Superior, Arizona.

6.     The Oak Flat area is a place of profound religious, cultural, and historic significance to the San Carlos Apache Tribe and other Indian tribes, nations, and communities in Arizona, including the White Mountain Apache Tribe, the Tonto Apache Tribe, the Fort McDowell Yavapai Nation and others. *See* Hearing before the Subcommittee on Public Lands and Forests of the Committee on Energy and Natural Resources, United States Senate on S.409, 111th Cong., S. Hrg. 111-65 (June 17, 2009); *see also* Record of Hearing Before Subcommittee on National Parks, Forests and Public Lands in the U.S. House Natural Resources Committee regarding H.R. 3301, 110th Cong., Serial No. 110-52 (November 1, 2007).

7.     Oak Flat lies within the ancestral lands of the San Carlos Apache Tribe, just west of the San Carlos Apache Reservation.  The San Carlos Apache Reservation is home to more than 17,000 enrolled Tribal members.

8.     Apache People call Oak Flat "*Chich'il Bildagoteel,"* or "a Flat with Acorn Trees" and it lies at the heart of *T'iis Tseban* Country, which is associated with at least eight Apache clans, and two Western Apache bands, the Pinal Band and the Aravaipa Band.

9.     Because of its importance to the Apache Tribe and other tribes, nations and communities, Oak Flat is included in the National Register of Historic Places as a Traditional Cultural Property ("TCP") under Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.* ("NHPA"), and it meets the criteria to be identified as a "sacred site" within the meaning of Executive Order 13007, Indian Sacred Sites, May 24, 1996, 61 Fed. Reg. 26771 ("E.O. 13007"), the American Indian Religious Freedom Act, 42 U.S.C. § 1996, *et. seq.* ("AIRFA"), and related laws, regulations and policies.

10.     The religious and cultural importance of the Oak Flat area does not reside in isolated spots, but rather in the area as a whole.  For the Apache People, the area of "Oak

4

Flat" is bounded to the west by (and including) the large escarpment known as "*Dibecho Nadil*" or "Apache Leap" and on to the east by (and including) *Gan Bikoh*, which means "Crowndancers Canyon," though it is often referred to by Apache People as "Ga'an Canyon" and by non-Indians and in the FEIS as "Devil's Canyon."  Oak Flat is bounded to the north by (and including) *Gan Daszin* or "Crowndancer Standing," which is delineated on most maps as "Queen Creek Canyon."

11.



*Ga'an Canyon, as referred to by Apache People, which bounds Oak Flat to the east and would suffer long term loss of water, seeps and springs as a result of Resolution's groundwater pumping.  A large mine waste pipeline would span the Canyon.*

12.     The ancient oak grove at Oak Flat provides an abundant source of acorns that, for many centuries and even today, provides an important traditional food source for the Apache People.  There are also hundreds of plants and other living things in the Oak Flat area that are essential elements of the Apache religion and culture.  Some of these plants are medicines known to and harvested only by gifted Apache herbalists.  Although these plants can be gathered in other areas, Apaches believe that only plants within the Oak Flat area are imbued with the unique power of this area.

13.     Oak Flat is also recognized for its beauty and importance to outdoor enthusiasts, including members of Plaintiff groups who value it for outdoor recreation and as a place of unique biological diversity.  Oak Flat attracts rock-climbers from around the country as it contains numerous large boulders and outcrops.  In the campground and picnic area, ancient oak trees provide shade for hikers, campers, and picnicking families, and give sanctuary to many important bird species.  Sitting at an approximate elevation of 4,200 to 4,600 feet above sea level, Oak Flat is a cool respite for the many travelers and visitors from Phoenix and elsewhere, who often recreate at Oak Flat and in the surrounding Forest Service lands.

14.     Wildlife cameras have documented a wide variety of wildlife at Oak Flat, including mountain lion, bear, and coatimundi.  Nearby lands provide important wildlife habitat for Federally listed endangered and threatened species such as the southwestern willow flycatcher, yellow billed-cuckoo, Gila chub, Arizona hedgehog cactus, and ocelot. Over 170 bird species have been documented at Oak Flat.

15.     The "block-cave" mine method and the resulting crater will forever transform and obliterate Oak Flat:



*Before and After Graphics of Resolution Copper Mine.*[1]

16.     In addition to destroying the sacred lands of Oak Flat, thousands of additional acres would become permanent unlined waste dumps, buried under nearly 1.4 billion tons of toxic waste covering six square miles behind a 490-foot-high dam.  This toxic sludge would travel through 19 miles of pipeline, traversing desert canyons, including Ga'an Canyon, and washes to reach this permanent dump location that is upstream and upgradient of the Gila River southeast of the mining area.  The Project would also include a new 22-mile pipeline to transport the copper ore concentrate west/southwest towards the town of Magma for further processing and shipment. *See generally*, FEIS at 10-11 (Project description).

---

[1] Graphics From Written Testimony of James Wells, PhD, Environmental Geologist, L. Everett & Associates, Environmental Consultants, Testimony before House Natural Resources Subcommittee on Indigenous Peoples of the United States Hearing on "The Irreparable Environmental and Cultural Impacts of the Proposed Resolution Copper Mining Operation" 12 (Mar. 12, 2020) *available at* https://naturalresources.house.gov/download/0312-witness-testimony-dr-wells.

17.     The Project would use massive amounts of water.  The estimated total quantity of water needed for the life of the mine (construction through closure) ranges from up to 677,000 acre-feet ("AF") as analyzed in the FEIS to as much as 786,626 AF predicted in Resolution's mine plan.[2]  The water would be consumed from various sources, including from mine dewatering and groundwater pumping.  Much of the water consumed by the Project would be pumped from the groundwater underlying the heart of the East Salt River Valley.

18.     The Exchange and Project would perpetrate a systematic violation of *Chich'il Bildagoteel* (Oak Flat) through mining, drilling, groundwater pumping (resulting in severe impacts to water resources), grading, construction, road building and expansion, traffic, light and noise pollution, sediment and erosion, and other activities.  These activities would result in the physical destruction of Oak Flat, forever changing the character of Oak Flat relative to its crucial role in Apache religion and culture, and the introduction of auditory, visual and atmospheric disturbances that would profoundly diminish the integrity of this special place (both as a "Traditional Cultural Property" under the National Historic Preservation Act and sacred site) for Tribal members.

19.     The Mine and Exchange have long been opposed by the San Carlos Apache Tribe, whose reservation is located just east of the Exchange area, along with essentially all other Native American Tribes in Arizona, including all of the Member Tribes of Plaintiff, the Inter Tribal Association of Arizona, Inc. ("ITAA"), which, through ITAA or its sister organization, the Inter Tribal Council of Arizona, Inc., has testified in Congress against the Exchange and enacted resolutions in opposition to the Exchange and Mine.

20.     The significance of Oak Flat has been long recognized.  In 1955, 760-acres of Forest Service managed lands that are included in the Exchange and would be permanently damaged by the Mine, were withdrawn from mining and mineral entry by the Eisenhower Administration as the "Oak Flat Withdrawal Area" in Public Land Order 1229.  The withdrawal prevented mining companies, such as Rio Tinto, from conducting mineral

---

[2] An acre-foot of water equals roughly 325,851 gallons.

exploration or other mining-related activities at or underneath the Withdrawal Area.  That withdrawal is still in place today and until the Exchange occurs, no mining on or under these lands can be authorized.

21. After a decade of lobbying to acquire these sacred lands around the copper deposit that Rio Tinto seeks to mine, a rider was added to a must-pass appropriations bill for the Defense Department leading to Congressional authorization of the Exchange.  But Congress expressly conditioned the Exchange on the Forest Service issuing the FEIS in full compliance with the terms of the Act and all applicable laws. *See* Section 3003 of the Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for Fiscal Year 2015 for fiscal year 2015. Pub. L. 113-291 ("NDAA" or "Section 3003").  And it is only after such a lawful document is issued that the Exchange clock could start, providing 60 days for the Secretary of Agriculture to execute the Exchange. §3003(c)(10) ("Not later than 60 days after the publication of the final environmental impact statement, the Secretary [of Agriculture] shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper.").

22. The exchange parcel to be conveyed to Resolution Copper includes not only the Oak Flat Withdrawal Area but also Forest Service surface lands that lie above the copper deposit subsurface.  This collective 2,422-acre tract of land is known as the "Oak Flat Federal Parcel" in the NDAA.

23. Although Congress directed the Forest Service to exchange the federal parcels at and around Oak Flat as described in the NDAA, Congress required all federal agencies to otherwise comply with all applicable laws, for both the review and approval of the Exchange, as well as for Resolution's plans for facilities related to the Mine, such as tailings impoundments, mine shafts, pipelines, electrical transmission lines and facilities, roads, water use, and other activities.

24. The NDAA also placed significant restrictions on the Forest Service's approval of the Exchange and Resolution's mining infrastructure plans, including that a single FEIS that is fully compliant with all federal laws, including the National

Environmental Policy Act ("NEPA"), 42 U.S.C. 4321 *et seq*., is to be the basis for all decisions under federal law related to the Exchange and the Mine. *See* NDAA §3003(c)(9) ("the Secretary shall carry out the land exchange in accordance with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.)."

25.     According to the NDAA:

> Prior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities.

§3003(c)(9).

26.     Thus, the agency cannot defer or postpone the review of any aspect of the Exchange or the Project to a future public or agency process, as Congress directed that all aspects be analyzed in "a single environmental impact statement." Id.  Yet as shown herein, that is what the Forest Service has done, by deferring and postponing full consideration of the baseline conditions, connected actions, direct, indirect, and cumulative impacts, mitigation measures and analysis, and other aspects of the Exchange and Project.

27.     Notably, the NDAA did not authorize, require, or otherwise direct the Forest Service or any other agency to approve the mine plan of operations ("PoO") (also called the General Plan of Operations ("GPO")), Special Uses, Rights-of-Way ("ROWs"), Clean Water Act Section 404 permit, or any other permits or approvals required for the Project's infrastructure and facilities.

28.     Another critical limiting factor for this Exchange is Congress' express requirement that the Forest Service cannot approve the Exchange until the lands to be obtained by Resolution (known as the "Federal Land") and the lands to be obtained by the

federal government (known as the "Non-Federal Land") are subject to completed appraisals.

29.     The FEIS' and the Forest Service's review of the Exchange and Project are legally deficient despite §3003(c)'s requirement that all agencies comply with federal laws including NEPA.

30.     The Forest Service relied on the FEIS to issue, also on January 15, 2021, a Draft Record of Decision ("DROD") for the Project.  As shown herein, the FEIS improperly limited its review based on an incorrect analysis of the Agency's authority over the Project and its related facilities and activities that was the basis for the DROD.

31.     Plaintiffs seek vacatur and declaratory and injunctive relief against the Forest Service and Federal Defendants.  Federal Defendants' actions and decisions fail to comply with applicable law, are arbitrary, capricious, an abuse of discretion, not in accordance with the law, in excess of statutory authority, and without observance of the procedure required by law and, thus, should be set aside. 5 U.S.C. § 706(2).

32.     Recently, two separate lawsuits have been filed in this District challenging the Forest Service's actions and inactions regarding the Exchange and Project. *See* Apache Stronghold v. United States of America, 21-CV-00050-SPL (filed January 12, 2021); San Carlos Apache Tribe v. U.S. Forest Service, 21-CV-00068-DWL (filed January 14, 2021).

**JURISDICTION AND VENUE**

33.     This suit challenges the Forest Service's failure to comply with mandatory procedural and substantive requirements of federal law.  These violations include failure to comply with the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"); Section 3003 of the NDAA; the Forest Service Organic Administration Act of 1897, 16 U.S.C. §§ 475, 478, 551 ("Organic Act"); the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701 *et seq.* ("FLPMA"); the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the implementing regulations and policies of these laws.

34.     Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question), § 2201 (declaratory relief), and § 2202 (injunctive relief).

35.     Venue is properly before the District of Arizona pursuant to 28 U.S.C. §§ 1391 (b) and (e).  The Forest Service office that issued the FEIS and related decisions and the named defendants are located in Arizona.  The Project is located in Pinal and Gila Counties, Arizona.  Plaintiffs' offices and members reside in Arizona.

36.     The requested relief would redress Plaintiffs' actual, concrete injuries caused by the Forest Service's failure to comply with duties mandated by NEPA, the other federal laws noted herein, and their implementing regulations and policies.

37.     The challenged agency actions are subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, & 706.

## PARTIES

38.     Plaintiff Arizona Mining Reform Coalition ("AMRC") works in Arizona to improve state and federal laws, rules, and regulations governing hard rock mining to protect communities and the environment.  AMRC works to hold government agencies and mining operations to the highest environmental and social standards to provide for the long term environmental, cultural, and economic health of Arizona.

39.     Plaintiff Inter Tribal Association of Arizona, Inc. ("ITAA"), is an intertribal, non-profit organization composed of 21 federally recognized Tribes with lands located primarily in Arizona, as well as in California, New Mexico, and Nevada.  The ITAA's Member Tribes have worked together since 1952 to provide a united voice for Tribes on matters of common concern, and have stood in united opposition to the Resolution Copper Mine and Land Exchange Project for over 15 years.  The representatives of ITAA are the highest elected tribal officials from each of the Member Indian Tribes, including tribal chairpersons, presidents, and governors.  ITAA's Member Tribes are the Ak-Chin Indian Community, the Cocopah Tribe, the Colorado River Indian Tribes, the Fort McDowell Yavapai Nation, the Fort Mojave Indian Tribe, the Gila River Indian Community, the Havasupai Tribe, the Hopi Tribe, the Hualapai Indian Tribe, the Kaibab Band of Paiute Indians, the Pascua Yaqui Tribe, the Quechan Tribe, the Salt River Pima-Maricopa Indian Community, the San Carlos Apache Tribe, the San Juan Southern Paiute Tribe, the Tohono

O'odham Nation, the Tonto Apache Tribe, the White Mountain Apache Tribe, the Yavapai-Apache Nation, the Yavapai-Prescott Indian Tribe, and the Zuni Tribe.

40.    Plaintiff Access Fund is the national advocacy organization that works to keep U.S. climbing areas open and conserves the climbing environment.  Founded in 1990, the Access Fund works with more than 135 affiliated local climbing organizations around the country in supporting and representing more than 7 million climbers nationwide in all forms of climbing: rock, ice, mountaineering, and bouldering.

41.    Plaintiff Center for Biological Diversity ("Center") is a non-profit public interest organization with headquarters located in Tucson, Arizona, representing more than 80,000 members dedicated to the conservation and recovery of threatened and endangered species and their habitats.  The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction.  The Center has long-standing interest in projects of ecological significance undertaken in the National Forests of the Southwest, including proposed mining projects.

42.    Plaintiff Earthworks is a nonprofit organization dedicated to protecting communities and the environment from the adverse impacts of mineral and energy development while promoting sustainable solutions.  Earthworks stands for clean air, water and land, healthy communities, and corporate accountability.  Earthworks supports solutions that protect both the Earth's resources and our communities.

43.    Plaintiff Sierra Club is one of the nation's oldest and most influential grassroots organizations whose mission is "to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments."  Sierra Club has more than 2.4 million members and supporters with 35,000 in Arizona as part of the Grand Canyon (Arizona) Chapter.  Its members have long been committed to protecting and enjoying the Tonto National Forest.

44.    Plaintiffs have long-standing interests in the proper and lawful management of the National Forests, especially the Tonto National Forest near and adjacent to the town

of Superior, including the lands within the Project and Exchange area.  Plaintiffs also have long-standing interests in the proper implementation of NEPA and federal public land management laws.  Members, officers, staff, and supporters of Plaintiffs participate in a wide range of aesthetic, scientific research, recreational, commercial, and traditional, religious and cultural activities on the Tonto National Forest and within and adjacent to the lands proposed to be impacted by the Exchange and Project activities reviewed in the FEIS.

45.     Plaintiffs' members, officers, staff, and supporters hike, rock climb, guide commercial clients, picnic, conduct cultural and religious ceremonies, appreciate scenery, solitude, and quiet, engage in scientific research projects, and view and value wildlife, in the lands at the site of the Exchange, Project operations, and related infrastructure, including waters adversely affected by the Exchange and Project (such as Ga'an Canyon, Queen Creek, Mineral Creek, and springs and seeps that will suffer severe loss or elimination of flows).  Plaintiffs' members, officers, staff, and supporters have concrete plans to continue pursuing these activities on the specific lands and transportation and infrastructure routes impacted by the Exchange and Project operations.  These uses will be immediately and irreparably diminished or eliminated altogether by the Exchange and Project operations.  Many of Plaintiffs' members live in the town of Superior and in Queen Valley near the Project area that will be adversely affected by the Exchange and the Project, while the Mine and all of its infrastructure would exist within the ancestral lands of ITAA's Member Tribes.

46.     Plaintiffs fully participated in the Agency's public review process and submitted detailed comments during the Forest Service review of the Exchange and Project, including hundreds of pages of comments, with exhibits, on the Draft EIS in 2019. Plaintiffs submitted additional comments, information, and exhibits to the Forest Service in 2020 prior to the issuance of the FEIS.  The Forest Service's failure to properly and fully involve the public during the FEIS and Exchange and Project review process has violated Plaintiffs' and their members' procedural rights under NEPA, FLPMA, the APA, Section 3003 of the NDAA, and related laws and regulations.

47.     The interests of Plaintiffs and their members, officers, staff, and supporters in this matter are substantial and are adversely affected by Defendants' failure to comply with NEPA, Section 3003 of the NDAA, FLPMA, the 1897 Organic Act, the APA, and by the Exchange and Project activities.  The requested relief will redress the injuries of the Plaintiffs, and their members, officers, staff, and supporters.

48.     The failure of the Federal Defendants to comply with the public and agency review requirements of NEPA, Section 3003 of the NDAA, FLPMA, Organic Act, and their implementing regulations also adversely affects and injures Plaintiffs and their members' ability to fully participate in the agency's decision-making as mandated by these laws.

49.     Defendant, United States Forest Service, is a federal agency within the U.S. Department of Agriculture.  The Forest Service is responsible for the management of the National Forests, including the Tonto National Forest.  As part of its management responsibility, the Forest Service must ensure that activities it reviews and authorizes on the Tonto National Forest comply with NEPA, FLPMA, the Organic Act, the APA, and the other federal laws noted herein.  On January 15, 2021, the Tonto National Forest issued the challenged FEIS.  Mr. Bosworth and Mr. Torres have management responsibilities for the Tonto National Forest and are responsible for the issuance of the FEIS and Draft ROD, and are sued in their official capacities.

**The Massive Size, Scale, and Impacts of the Resolution Project**

50.     Resolution Copper is proposing to develop one of the largest mining projects in U.S. history.  Resolution's Project includes the mine site itself, as well as associated infrastructure, large power transmission lines, dewatering operations, numerous high-capacity groundwater pumping wells, waste and ore concentrate delivery pipelines, transportation corridors and roads, and a massive tailings waste storage facility.

51.     According to the Forest Service: "it is expected that one of the largest copper mines in the United States would be established on the exchange parcel, with an estimated

surface disturbance of 6,951 acres (approximately 11 square miles).  It would also be one of the deepest mines in the United States, with mine workings extending 7,000 feet beneath the surface." FEIS at 3.

52.    "The project would progress through three distinct phases: construction (mine years 1 to 9), operations, also referred to as the production phase (mine years 6 to 46), and reclamation (mine years 46 to 51–56)." FEIS at ES-3.

53.    Resolution would mine:

> 1.4 billion tons of ore and produce[] 40 billion pounds of copper using a mining technique known as panel caving.  Using this process, a network of shafts and tunnels is constructed below the ore body.  Access to the infrastructure associated with the panel caving would be from vertical shafts in an area known as the East Plant Site, which would be developed adjacent to the Oak Flat Federal Parcel.  This area would include mine shafts and a variety of surface facilities to support mining operations.  This area currently contains two operating mine shafts, a mine administration building, and other mining infrastructure.

FEIS at ES-3.

54.    "The type of copper deposit that would be mined at the East Plant Site is a porphyry deposit, a lower-grade deposit that requires higher mine production rates to be economically viable. The copper deposit that Resolution Copper proposes to mine averages 1.54 percent copper (i.e., every ton of ore would on average contain 31 pounds of copper)." FEIS at ES-7.

55.    Ore processing would take place outside the town Superior, in an area known as the "West Plant Site." FEIS at ES-7.  "Mined ore would be crushed underground and then transported underground approximately 2.5 miles west to an area known as the West Plant Site, where ore would be processed to produce copper and molybdenum concentrates." Id.

56.    As a result, Oak Flat and the entire area:

> would be permanently altered by large-scale ore removal and geological subsidence.  The resulting 7,000-foot-deep area of fractured rock and approximately 1.8-mile-wide subsidence crater at the surface of Oak Flat, together with ongoing mine dewatering, would be likely over time to result

1

in measurable reductions in flows in Devil's Canyon and Queen Creek and the long-term loss of some seeps and springs in the Superior area.

2

FEIS at 41.

3     57.     A massive tailings storage facility would contain the waste material left over

4     after processing.  Under the Agency's chosen alternative for the tailings waste facility and

5     associated infrastructure in an area known as "Skunk Camp," the tailings dump "with the

6     revised pipeline/power line corridor, would include approximately 14,950 acres of

7     disturbance, of which 2,467 acres is NFS [National Forest Service] land, 8,218 acres is

8     ASLD [Arizona State Land Department] managed, and 4,265 acres is private land." FEIS at

9     118.

10    58.     "The tailings storage facility also presents risks to the watershed through the

11    potential for contaminants from metals or chemicals in tailings seepage to escape controls

12    and enter groundwater and/or downstream surface waters, thereby potentially threatening

13    riparian areas and other wildlife habitats, human uses, and waters provided to livestock."

14    FEIS at 41.

15    59.     Pipelines would be constructed to transport the tailings waste from the ore

16    processing facility in the form of a slurry to the tailings storage facility.  Thickened slurry

17    would be pumped in two streams to the tailings storage facility, and a recycled water

18    pipeline would return water to the processing loop at West Plant Site, all within a 19 mile

19    corridor from the West Plant Site to the tailings storage facility. FEIS at 127.

20    60.     On the west side of the Project, the ore concentrate (materials remaining

21    after the tailings waste has been extracted) would be delivered via another large pipeline for

22    further processing.  "Once processed, the copper concentrate would be pumped as a slurry

23    through a 22-mile pipeline to a filter plant and loadout facility located near Florence

24    Junction, Arizona, where copper concentrate would be filtered and then sent to off-site

25    smelters via rail cars or trucks.  The molybdenum concentrate would be filtered, dried, and

26    sent to market via truck directly from the West Plant Site." FEIS at ES-7.

27

28

61.     The FEIS provides an overview map of the Agency's preferred alternative,

showing the massive scale of the overall Project:



FEIS at 120, Figure 2.2.8-1.

62.     Notably, although the Forest Service proposes to issue a Special Use Permit

for the 19-mile pipeline to carry the tailings waste to the Skunk Camp site (towards the

southeast of the Mine site), the Agency is not requiring any such Permit for the 22-mile ore

concentrate pipeline heading southwest past Florence Junction, a large portion of which

crosses Forest Service managed public land.  This is despite the fact that the Agency

required Resolution to obtain a Special Use Permit for the installation of a previous water

pipeline in the same corridor in 2008.

63.     The estimated total quantity of water needed for the life of the mine

(construction through closure) is huge, ranging from up to 677,000 acre-feet ("AF") as

analyzed in the FEIS to as much as 786,626 AF, as shown in Figures 3.6-1a, 3.6-1b, and 3.6-1 of Resolution Copper's original GPO, V-2.

64.     The water would be consumed from various sources over the life of the Mine, including from mine dewatering and groundwater pumping.  Much of the water to be consumed by the Mine (at least 550,000 AF under the Agency's preferred alternative) would be pumped from the groundwater underlying the company's proposed Desert Wellfield to be located in the heart of the East Salt River Valley.

65.     The FEIS does not disclose or analyze how much of the water pumped from the Desert Wellfield will be legally determined to represent the recovery of long term storage credits ("LTSC") or other rights associated with Resolution Copper's banking of Central Arizona Project ("CAP") water or from water stored in the New Magma Irrigation Drainage District's ("NMIDD") groundwater savings facility.

66.      An acre-foot of water equals roughly 325,851 gallons.  Under even the most conservative estimates, under the preferred alternative (Alternative 6) the Mine would consume at least **256 billion gallons** of water.

67.     Arizona has been experiencing decades of drought, with the most intense period of drought experienced in December 2020, with over 70% of Arizona under an "exceptional drought" (the worst drought possible).  Making matters worse, the Colorado River, which provides a primary source of water for Maricopa, Pinal, and Pima Counties through the CAP, is facing significant shortages due to a structural deficit, ongoing drought, and years of declining snowpack in the Colorado River Basin.

68.     Although all mining would be conducted underground, removing the ore would cause the ground surface to collapse, creating a subsidence area at the Oak Flat Federal Parcel.  The crater would start to appear in year six of active mining.  The crater ultimately is projected to be between 800 and 1,115 feet deep and roughly 1.8 miles across. FEIS at 63.  The "Total Area of Subsidence" would be 1,751 acres. FEIS at 63.

69.     The crater would also likely create a pit lake or lakes, resulting in additional losses to the region's groundwater supplies, as water would continuously migrate into the

lake/lakes from the shallow alluvial aquifer and from other sources, and then evaporate over time, likely forever.

70.     The Exchange and Project would, *inter alia*, significantly and irreversibly impact and adversely affect the recreational, scenic, wildlife habitat, conservation, scientific and other related values of this region for all of those who visit, use, and enjoy the Oak Flat and surrounding area, including the members of the Plaintiffs.

71.     Under the Exchange, the Oak Flat federal lands would leave federal jurisdiction, significantly reducing wildlife and other protections on these lands as the National Forest Management Act, Tonto National Forest Land and Resource Management Plan, critical provisions of the Endangered Species Act, and related federal laws would no longer apply. *See* FEIS at 570.

72.     The initial construction of the Mine would also cause impacts to all wildlife groups found within the analysis area (including amphibians, birds, fish, invertebrates, mammals, and reptiles) through the loss, degradation, and fragmentation of breeding, rearing, foraging, and dispersal habitats; collisions with and crushing by construction vehicles; the loss of burrowing animals where grading would occur; increased invasive and noxious weeds; increased edges of vegetation blocks; and impacts from increased noise and vibration levels. FEIS at 573-74.

73.     The operation of the Mine would cause additional impacts to wildlife including impacts associated with subsidence; the reduction in surface water flows and groundwater availability to support riparian habitats; habitat changes from noxious and invasive weed establishment and spread; and the presence of workers and equipment. FEIS at 575.

74.     The massive water needs of the Mine would reduce water throughout regional aquifers and reduce surface water and groundwater levels downstream of the mine in Ga'an Canyon and Queen Creek. FEIS at 575.  Surface water amounts would be reduced, and the timing and persistence of surface water would decrease. Id.  This would, among

other things, reduce or remove wildlife habitat in areas along Ga'an Canyon and Queen Creek, and around springs. Id.

75.   The Forest Service purports in the FEIS that impacts to wildlife would be mitigated by "replacing water sources for any riparian areas associated with springs or perennial streams (groundwater-dependent ecosystems) impacted by the drawdown from the mine dewatering and block caving." FEIS at 598.  Yet, the FEIS only identifies potential actions that could be used to replace water sources and makes these potential actions dependent on "monitoring reach[ing] a specified trigger." FEIS at 598: Appendix J, J-17-18.  This trigger has not been identified, much less analyzed for effectiveness within the FEIS for mitigating impacts anticipated from reduced surface water flows and groundwater level draw down. *See* id.

76.   Moreover, although the FEIS identifies "[a] variety of potential actions that could be used to replace" such water sources, there is no substantive analysis of the effectiveness of such measures despite NEPA requiring as much. *See* id.

77.   The FEIS fails to fully review the impacts from the Project on wildlife and fails to provide any reasonable mitigation plan to prevent these impacts.  For example, the Agency admits that avian species may use the seepage ponds in the Project area. FEIS at 576.  But the concentration of pollution in the seepage ponds is expected to be above chronic exposure limits, and some acute exposure limits, which could result in short- and long-term impacts on avian species, with the impacts the most severe if they are exposed over an extended period of time. Id.

78.   Further, the tailings storage facility recycled water ponds represent large areas with persistent water, which would attract wildlife in the desert environment. FEIS at 583.  The ponds would likely have some constituents with concentrations above Arizona water quality standards for wildlife, and thereby impact wildlife including birds. Id.

79.   The tailings storage facility seepage collection ponds, near the tailings storage facility, would persist for many years or decades after closure of the mine. FEIS at

583-84.  Over time, the water quality in these ponds is expected to worsen, and would be dangerous to wildlife including birds. FEIS at 584.

80.     Uncovered process ponds at the West Plant Site would also represent potential exposure to poor water quality for wildlife species, including primarily birds. FEIS at 584.

81.     For birds, including migratory species, the noise and vibration associated with construction activities could temporarily change habitat use patterns for some species. FEIS at 578.  Raptors could be especially susceptible to noise disturbance early in the breeding season, through nest abandonment and reduction in overall success. Id.

82.     The Project could cause additional harm, disturbance, and death to birds through potential electrocution and from striking electrical distribution lines. FEIS at 578.

83.     Impacts to migratory birds from artificial light increases at night can also cause injury or death from collisions with structures, reduced energy stores due to delays or altered routes, and delayed arrival at breeding grounds. FEIS at 579.

84.     The impacts to migratory birds from the mine construction, mine operation, and maintenance activities would likely impact individual birds and local migratory bird populations. FEIS at 579.  Population-level impacts would likely be greater for species that breed in the analysis area. Id.  The FEIS does not disclose which of the over 170 avian species that have been documented at Oak Flat or which of the 34 special status avian species that would be potentially impacted could fall into this category.  Nor does the FEIS discuss the effectiveness of any proposed mitigation that may be implemented in avoiding or minimizing negative impacts. FEIS at 585-88; id. at 613.

85.     Although the FEIS identifies some potential mitigation measures for avian species, such as rubber balls that could be used to deter or prevent birds from using process water, seepage, and recycled water ponds, there is no substantive analysis as to their effectiveness, instead the FEIS merely asserts, without evidentiary support, their "effectiveness." FEIS at 598-599.  The FEIS repeats this same error for lighting, noise, and

1  other impacts from the proposed mine (identifying mitigation measures, not analyzing
2  them, and then pronouncing them "effective"). FEIS at 598, FS-WI-01.

3      86.    The mine would also cause adverse impacts to fish, including mortality from
4  loss or modification of habitat, due to changes in groundwater elevation and contribution to
5  surface flows. FEIS at 579.  These impacts would have the greatest potential to impact fish
6  species along areas of Ga'an Canyon and Queen Creek that currently have surface flows.
7  Id.

8      87.    The yellow-billed cuckoo, which is designated as threatened with extinction,
9  may occur within the analysis area along Ga'an Canyon and Mineral Creek. FEIS at 591.
10 The Mine could cause a loss of habitat for the cuckoo along Ga'an Canyon and Mineral
11 Creek through reduced surface flows. Id.  Potential habitat changes include the loss of
12 riparian habitat and a conversion of habitat to a drier, xeroriparian habitat (desert washes),
13 which could cause habitat to become unsuitable for nesting by the species. Id.

14     88.    The removal of vegetation and impacts from workers and equipment also
15 could lead to the avoidance of the disturbed area and vicinity by the yellow-billed cuckoo.
16 FEIS at 591.  In addition, the potential impacts on the cuckoo's proposed critical habitat
17 includes the removal of riparian woodlands, including potentially suitable nesting, foraging,
18 and dispersal habitat, and a corresponding reduction in the prey base for the species. Id.

19     89.    The southwestern willow flycatcher is also designated as endangered with
20 extinction under the federal Endangered Species Act and has designated critical habitat in
21 the analysis area that could be impacted by the Project. FEIS at 593.

22     90.    The Gila chub is also designated as endangered with extinction and has
23 designated critical habitat along Mineral Creek. FEIS at 594.  Potential impacts on the Gila
24 chub include habitat modification and potential changes to water quality, and potential
25 impacts on the designated critical habitat includes the reduction of perennial pools. Id.

26     91.    The predicted acres of wildlife that could be impacted by the Project
27 include: 11,846 acres for the threatened western yellow-billed cuckoo; 41,818 acres for the
28 endangered southwestern willow flycatcher; 95,867 acres for the American peregrine

falcon; 86,474 acres for the bald eagle; 77,158 acres for the golden eagle; 27,119 acres for the western burrowing owl; 431 acres for the endangered Gila chub; 95,943 acres for the Monarch butterfly; and 94,381 acres for the Sonoran desert tortoise. FEIS at 585-89.

92.     USFS fails to demonstrate in the FEIS how the Exchange and Mine Project would comply with the Migratory Bird Treaty Act, 16 U.S.C. §§ 703-711, or the Bald and Golden Eagle Protection Act, 16 U.S.C. §§ 668-668c. *See* 40 C.F.R. § 1502.2(d) (requiring an EIS to state how alternatives and decisions "will or will not achieve the requirements of . . . other environmental laws and policies.") as well as Forest Service requirements for wildlife protection under the Organic Act and implementing regulations.

**Statutory and Regulatory Requirements Under NEPA and the NDAA**

93.     NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  NEPA "prevent[s] or eliminate[s] damage to the environment and biosphere by focusing government and public attention on the environmental effects of proposed agency action." Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 371 (1989).

94.     NEPA recognizes that "each person should enjoy a healthful environment," and was enacted to ensure that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences," among other policies. 42 U.S.C. § 4331(b).

95.     By focusing the agency's attention on the environmental consequences of the proposed action, NEPA "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). *See also* 42 U.S.C. § 4332(2)(C).

96.     "NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 CFR § 1500.1(b).  This review must be supported by detailed data and analysis –

unsupported conclusions violate NEPA. *See* Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1150 (9th Cir. 1998); N. Plains v. Surface Transp. Bd., 668 F.3d 1067, 1075 (9th Cir. 2011)(conclusions must be supported by reliable studies).

97.     NEPA requires federal agencies to fully consider the environmental consequences of their actions. *See* 42 U.S.C. § 4331 *et seq.* NEPA ensures that the agency will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to a larger audience to ensure the public can play a role in both the decision making process and the implementation of the agency's decision. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.16. Congress enacted NEPA to ensure that federal agencies, before approving a project, (1) consider and evaluate all environmental impacts of their decisions and (2) disclose and provide an opportunity for the public to comment on such environmental impacts. 40 C.F.R. §§ 1501.2, 1502.5.

98.     NEPA requires federal agencies to prepare a detailed "Environmental Impact Statement" ("EIS") for any major Federal action that may significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). NEPA also requires federal agencies to study, develop, and describe appropriate alternatives to recommended courses of action for any proposal that involves unresolved conflicts concerning alternative uses of available resources. 42 U.S.C. § 4332(2)(E).

99.     The Council on Environmental Quality ("CEQ") promulgated uniform regulations to implement NEPA that are binding on all federal agencies. 40 C.F.R. Part 1500.[3]

100.     NEPA requires that "environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. §1500.1(b). Under NEPA, USFS must consider (1) "the environmental impact of the

---

[3] The CEQ recently revised its national NEPA regulations, which became effective on September 14, 2020. 85 Fed. Reg. 43304-43376 (July 16, 2020). Because USFS conducted its NEPA review for this project before the new regulations became effective, the CEQ NEPA regulations existing prior to September 14, 2020, at 40 C.F.R. Part 1500, apply to the Exchange, Project, and this Court's review.

proposed action," (2) "any adverse environmental impacts that cannot be avoided," (3) "alternatives to the proposed action," (4) "the relationship between local short-term uses . . . and the maintenance and enhancement of long-term productivity," and (5) "any irreversible and irretrievable commitments of resources." 42 U.S.C. § 4332(2)(C).

101.    An EIS is required to "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

102.    An EIS must include a full and adequate analysis of environmental impacts of a project and alternatives and take a "hard look" at the direct, indirect, and cumulative impacts of the project and its alternatives, resulting from all past, present, and reasonably foreseeable future actions. Id. §§ 1508.7, 1508.8, 1508.9, 1508.25(c).  An "effect" as used in NEPA and its implementing regulations "includes ecological . . . , aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8(b).

103.    Direct effects are caused by the action and occur at the same time and place as the proposed project. 40 C.F.R. § 1508.8(a).  Indirect effects are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Id. § 1508.8(b).  Types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." Id.

104.    Cumulative effects/impacts are defined as:

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

105.    "[A]n agency is required to consider more than one action in a single EIS if they are 'connected actions,' 'cumulative actions,' or 'similar actions.'" Kleppe v. Sierra Club, 427 U.S. 390, 408 (1976).  "[P]roposals for . . . actions that will have cumulative or synergistic environmental impact upon a region . . . pending concurrently before an agency . . . must be considered together.  Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action." Kleppe, 427 U.S. at 410. When preparing an EIS, an agency must consider all "connected actions," "cumulative actions," and "similar actions." 40 C.F.R. §1508.25(a).

106.    Here, all of the Project activities and facilities are "connected actions," and/or "cumulative actions" under NEPA and the NDAA.

107.    The requirement that the Forest Service use a single EIS for its review of all aspects of the Exchange and Mine Project is expressly mandated by Congress in § 3003(c)(9)(B) of the NDAA (128 STAT. 3735):

> [p]rior to conveying Federal land under this section, the Secretary [of Agriculture] shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities.

108.    In addition, the establishment of the baseline conditions of the affected environment is a fundamental requirement of the NEPA process, because an inadequate environmental baseline precludes an accurate assessment of project impacts. Or. Nat. Desert Ass'n v. Jewell, 823 F.3d 1258 (9th Cir. 2016).  "[W]ithout [baseline] data, an agency cannot carefully consider information about significant environment impacts.  Thus, the agency fails to consider an important aspect of the problem, resulting in an arbitrary and capricious decision." N. Plains Resource Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1085 (9th Cir. 2011).

109.     NEPA also requires the Forest Service to fully analyze all mitigation measures, their effectiveness, and any impacts that might result from their implementation.  NEPA regulations require that the agency's environmental review: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," 40 C.F.R. § 1502.14(f); and (2) "include discussions of: . . . Means to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." 40 C.F.R. § 1502.16(h).  The FEIS failed to fully evaluate the effectiveness and impacts of mitigation measures for the Exchange and Mine Project.

110.     "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperating agencies . . . ." *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,031 (Mar. 23, 1981). NEPA requires that the Forest Service review mitigation measures as part of the NEPA process—not in some future decision shielded from public review. 40 C.F.R. § 1502.16(h).

111.     NEPA also requires that: "Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act [NEPA] and other environmental laws and policies." 40 C.F.R. § 1502.2(d).

112.     The FEIS fails these duties, as it never determined whether the Project and its alternatives would fully "achieve … all relevant environmental laws and policies."  At a minimum, the FEIS never analyzes: (1) whether, and how, federal public lands would be fully protected under FLPMA's right-of-way provisions and the protection of national forest resources under the Organic Act, and the FLPMA and Organic Act implementing regulations; (2) whether, and how, Native American cultural and religious resources and uses would be protected; (3) whether, and how, there would be enough water available for the Project and other uses in the area, without adversely affecting Arizona water users and resources; (4) whether, and how, the Agency and Resolution would comply with substantive State and Federal laws that mandate protection of wildlife, such as A.R.S. §17-236

(prohibiting the take or injury of any bird), and the federal Migratory Bird Treaty Act; (5) how all Project facilities resulting from issuance of the special use permits comply with all applicable federal and state environmental laws; and (6) how approving Special Use Permits for the Project pipelines, transmission lines, and new roads would be "in the public interest" and comply with the Forest Service Special Use Regulations at 36 C.F.R. Part 251 subpart B and Part 261.

113.    The NDAA also set out specific requirements for the required appraisals for the Exchange.  These appraisals "shall be conducted in accordance with nationally recognized appraisal standards, including – (I) the Uniform Appraisal Standards for Federal Land Acquisitions; and (II) the Uniform Standards of Professional Appraisal Practice." § 3003(c)(4)(B)(i).  "Before consummating the land exchange under this section, the Secretary [of Agriculture] shall make the appraisals of the land to be exchanged (or a summary thereof) available for public review." § 3003(c)(4)(B)(iv).

114.    The "final appraised values of the Federal land and non-Federal land" must be "determined and approved by the Secretary." § 3003(c)(4)(B)(ii).

115.    The NDAA also requires that, based on the appraisals, "The value of the Federal land and non-Federal land to be exchanged under this section shall be equal or shall be equalized in accordance with this paragraph." § 3003(c)(5)(A).

> If the final appraised value of the Federal land exceeds the value of the non-Federal land, Resolution Copper shall – (I) convey additional non-Federal land in the State to the Secretary or Secretary of the Interior, consistent with the requirements of this section and subject to the approval of the applicable Secretary; (II) make a cash payment to the United States; or (III) use a combination of the methods described in subclauses (I) and (II), as agreed to by Resolution Copper, the Secretary, and the Secretary of the Interior.

§ 3003(c)(5)(B)(i).

116.    The Non-Federal Lands to be conveyed to the United States are listed in § 3003(d).  This list does not include the "additional non-Federal land in the State" that may be conveyed to the United States pursuant to § 3003(c)(5)(B)(i).

117.     Conveyance of the currently non-Federal land to the United States pursuant to the Exchange only occurs if "the Secretary determines" the conveyance to each property and interest "to be acceptable." § 3003(d)(1)(A).

118.     The transfer and conveyance of lands and interests pursuant to the Exchange "shall" be done "simultaneously." § 3003(d)(1).

119.     Despite repeated requests from the public and Plaintiffs to provide this mandatory public review of the appraisals and appraisal process as part of the Agency's preparation of the FEIS, the Agency refused to provide any meaningful information on the appraisals to the public prior to issuance of the FEIS.  No information on the appraisals was included in the Draft EIS or FEIS.

120.     There is no discussion in the FEIS regarding the "additional non-Federal land in the State" that may be conveyed to the United States pursuant to § 3003(c)(5)(B)(i).

**The Forest Service's Shifting Review of the Project**

121.     At the 11th-hour, in late 2020 and roughly a year after the Forest Service closed-off public comment on the Project, the Agency abruptly shifted its review and permitting of the Project, from one governed by federal mining laws to one controlled by public land "special use" requirements.  Up until the issuance of the FEIS on January 15, 2021, the public was never informed of this regulatory switch and never had the opportunity to review or comment on the Agency's new permitting regime.

122.     The FEIS summarized the Forest Service's review of the Exchange and Project as initially presented to the public, stating that its review was based on the company's General Mining Plan of Operations:

> The Tonto National Forest, a unit of the Forest Service located in south-central Arizona, prepared this environmental impact statement (EIS) to disclose the potential environmental effects of the Resolution Copper Project and Land Exchange (project).  The project includes (1) the Southeast Arizona Land Exchange (land exchange), a congressionally mandated exchange of land between Resolution Copper Mining, LLC1 (Resolution Copper) and the United States; (2) approval of the "General

Plan of Operations" (GPO) for any operations on National Forest System (NFS) land associated with a proposed large-scale underground mine (Resolution Copper Project); and (3) amendments to the "Tonto National Forest Land and Resource Management Plan" (forest plan) (1985, as amended).

FEIS at 1.

123.    Resolution submitted its GPO application in 2013, and "On March 18, 2016, the Tonto National Forest issued a Notice of Intent to prepare an environmental impact statement for the Resolution Copper Project and Land Exchange." FEIS at 1.  As stated by the Agency, that Notice only considered approving the GPO and the Exchange. Id.

124.    The Agency's Draft EIS, issued in August 2019, continued with this approach, limiting its review to the GPO and Exchange, with the addition of consideration of a permit to "the Salt River Project ["SRP"] to authorize construction and operation of power lines on NFS [National Forest Service] lands." Draft EIS at ES-7.

125.    The issuance of the Draft EIS resulted in a public comment period that ended in November, 2019.  That was the only opportunity for public review and comment on the Agency's review of the Exchange and Project.

126.    Thus, throughout the Agency's public review process, the Forest Service was reviewing Resolution's "General Plan of Operations" for all the Project's facilities and operations, and based the agency's public notices and review on the GPO and under the federal mining laws.

127.    Yet, that is **not** what the Agency **now** presents to the public in the FEIS and Draft ROD.  Instead, the Agency now proposes, via the FEIS and the Draft ROD, not to review or approve the GPO, but rather a series of "Special Use Permits" for the Project's pipelines, transmission lines, and new and reconstructed roads across federal Forest Service managed lands.  This is because, once the Exchange occurs, all of the Company's proposed uses on Forest Service managed lands are no longer related to mining operations on federal land, as the mining would occur on the newly privatized lands.

128.    These "Special Use Permits" were never subject to public review and comment as NEPA and the NDAA require, as the applications were submitted by

Resolution Copper to the Forest Service long after the Draft EIS was issued and public comment was foreclosed.

129.    For example, Resolution only submitted its Special Use Permit application for the tailings pipeline infrastructure on September 7, 2020.  The Agency conducted a cursory review and accepted the application just three weeks later.  "Resolution Copper submitted an SF-299 Special Use Permit application on September 7, 2020.  Tonto National Forest Staff carried out initial and secondary screenings and accepted the application on September 28, 2020." FEIS at Appendix Q-1.

130.    The Forest Service's review of the Salt River Project Special Use Permit for high voltage transmission lines was even faster: "[Salt River Project] submitted an SF-299 Special Use Permit application on November 11, 2020.  Tonto National Forest Staff carried out initial and secondary screenings and accepted the application on November 18, 2020." FEIS at Appendix Q-1.

131.    In its September 28, 2020 letter to Resolution, the Forest Service informed the company that it had accepted the company's Special Use Permit application for the tailings pipeline infrastructure, rather than considering these proposed uses under the GPO. Letter from Neil Bosworth, U.S. Forest Serv., to Resolution (Sept. 28, 2020)(reprinted in Appendix Q).

132.    Defendant Forest Service official Neil Bosworth stated:

> I have reviewed your company's proposal to construct, operate, and reclaim a tailings pipeline infrastructure from Resolution Copper's West Plant Site (WPS) near Superior, Arizona across national forest system (NFS) lands administered by the Tonto National Forest, to the proposed Skunk Camp Tailings Storage Facility located on private and State trust lands in Gila County Arizona.  Based on the initial documents provided (i.e. cover letter, SF-299, and attachment dated 9/07/2020), the proposal passes the first and second level screening criteria as outlined in FSH 2709.11, Chapter 10.  At this time, we are prepared to accept your proposal as a formal application to be fully evaluated pursuant to the National Environmental Policy Act (NEPA), its implementing regulations, and agency NEPA procedures as outlined in FSM 1950 and FSH 1909.15.

Sept. 28, 2020 letter at 1.

133.    The Forest Service issued a similar letter to the Salt River Project on November 18, 2020, signed by Defendant Tom Torres.  In that letter, the Agency further noted that the Salt River Project electrical facilities and corridor still required additional review and its location had not been confirmed.

> It is understood that this proposal is preliminary and additional design, review, and other regulatory processes are required before an authorization will be issued.  It is also understood that the need for this use is reliant on the proposed Resolution Copper Mine and will only be constructed if the need is confirmed.  It is assumed that the proposed high voltage transmission line will be located within the 500 foot wide corridor defined and analyzed in the EIS.  However, if the design and other regulatory processes have been completed and it is determined that the proposed high voltage transmission line cannot be located within the analyzed corridor, SRP shall submit a revised proposal and a complete review will be required.

Nov. 18, 2020 letter at 1 (also reprinted in Appendix Q of the FEIS).

134.    The Forest Service Special Use Regulations require that: "(ii) Federal, State, and local government agencies and the public shall receive adequate notice and an opportunity to comment upon a special use proposal accepted as a formal application in accordance with Forest Service NEPA procedures." 36 C.F.R. § 251.54(g)((2)(ii).

135.    Apparently, sometime between the Forest Service's issuance of the Draft EIS for public review and the publication of the FEIS, the Agency changed its consideration of the Project.  In the DEIS (and even still in the FEIS), as noted above, the Agency stated that the Project would be considered under the GPO submitted under the Agency's mining regulations (36 C.F.R. Part 228A).  Now, the FEIS's review of the Project is under the Agency's Part 251 Special Use regulations.

136.    As the Draft ROD states, the Project activities reviewed in the FEIS are no longer under the Forest Service's review of a GPO pursuant to the Agency's mining regulations at 36 C.F.R. Part 228A.  Instead:

> Any associated uses of [National Forest Service] land for pipelines and utilities are special uses and are regulated under 36 CFR 251.50 because they are associated with mining on private property, and therefore do not involve operations conducted under the United States Mining Laws.

> Authorization for a special use or occupancy of NFS lands requires submittal of a special use application (SF-299). This application process is designed to ensure that authorizations to use and occupy NFS lands are in the public interest (36 CFR 251, Subpart B).

Draft ROD at 4.

137.    None of these "Special Use Permit applications" have been submitted for public review and comment, as required by the Part 251 regulations.

138.    The FEIS does not explain why the Agency refused to submit the 11th hour Special Use Permit applications for public review.

139.    In describing the two Special Use Permit applications, the Forest Service stated: "Rather than submittal of a mine plan, authorization of special use or occupancy on [National Forest Service] lands requires submittal of a special use application (SF-299). This application process is designed to ensure that authorization to use and occupy [National Forest Service] lands are in the public interest (36 CFR 251, Subpart B)." FEIS Appendix Q-1.

140.    The distinction between Forest Service review of a mining GPO and a Special Use Permit is significant. For example, and as discussed further below, the Agency does not consider whether the approval of a GPO is "in the public interest" but is required to do such analysis and issue such a finding under the Part 251 regulations. Additionally, as the Agency alleges (albeit incorrectly with respect to the Mine plan in this case), "there is no discretion or decision to be made with respect to the land exchange or approval of a mine plan," however such discretion **does** exist for Special Use Permit applications as the Forest Service has complete authority to approve or deny such applications. Draft ROD at vi, n. 1; 36 C.F.R. § 251.54(e)(5).

141.    The FEIS does not analyze whether the Project meets the "public interest" test and other requirements under the Part 251 Regulations and their governing statutes, such as FLPMA. The FEIS never reviewed the various Project alternatives under the required "public interest" test. And, as noted, the public was never given an opportunity to

review and comment on the Special Use Permit applications prior to release of the FEIS in contravention of federal laws.

**The Forest Service's Special Use Requirements and Violations**

142.    As noted above, the Forest Service now asserts that the Project (after the Exchange) be solely governed by the Agency's 36 C.F.R. Part 251 regulations governing "Special Uses" of public land.

143.    These regulations place strict requirements on the Agency's review of the Project, including mandatory public review requirements, which were not followed in this case.

144.    The Forest Service's Special Use Regulations require that: "(ii) Federal, State, and local government agencies and the public shall receive adequate notice and an opportunity to comment upon a special use proposal accepted as a formal application in accordance with Forest Service NEPA procedures." 36 C.F.R. § 251.54(g)(2)(ii).

145.    These regulations also require that:

[T]he authorized officer shall screen the proposal to ensure that the use meets the following minimum requirements applicable to all special uses:

(i) The proposed use is consistent with the laws, regulations, orders, and policies establishing or governing National Forest System lands, with other applicable Federal law, and with applicable State and local health and sanitation laws.

(ii) The proposed use is consistent or can be made consistent with standards and guidelines in the applicable forest land and resource management plan prepared under the National Forest Management Act and 36 CFR part 219.

(iii) The proposed use will not pose a serious or substantial risk to public health or safety.

**(iv) The proposed use will not create an exclusive or perpetual right of use or occupancy.**

**(v) The proposed use will not unreasonably conflict or interfere with administrative use by the Forest Service, other scheduled or authorized existing uses of the National Forest System, or use of adjacent non-National Forest System lands.**

…

**(ix) The proposed use does not involve disposal of solid waste or disposal of radioactive or other hazardous substances.**

36 C.F.R. § 251.54(e)(1) (emphasis added).

146.     These regulations require a two-phase "screening process," with a proposed use having to pass both levels.  The first level requires compliance with the above (e)(1) criteria.  If a proposed use satisfies this level, the Agency conducts a "second-level screening of proposed uses."

(5) *Second-level screening of proposed uses.* A proposal which passes the initial screening set forth in paragraph (e)(1) and for which the proponent has submitted information as required in paragraph (d)(2)(ii) of this section, proceeds to second-level screening and consideration.  In order to complete this screening and consideration, the authorized officer may request such additional information as necessary to obtain a full description of the proposed use and its effects.  **An authorized officer shall reject any proposal, including a proposal for commercial group uses, if, upon further consideration, the officer determines that:**

**(i) The proposed use would be inconsistent or incompatible with the purposes for which the lands are managed, or with other uses; or**

**(ii) The proposed use would not be in the public interest;** or

(iii) The proponent is not qualified; or

(iv) The proponent does not or cannot demonstrate technical or economic feasibility of the proposed use or the financial or technical capability to undertake the use and to fully comply with the terms and conditions of the authorization; or

(v) There is no person or entity authorized to sign a special use authorization and/or there is no person or entity willing to accept responsibility for adherence to the terms and conditions of the authorization.

36 C.F.R. § 251.54(e)(5)(emphasis added).

147.     As noted above, and as the Agency stated in the FEIS, it conducted all of this "screening" for both the Salt River Project and Resolution Special Use Permit applications—at both levels—in a matter of days or weeks just before the FEIS was issued.

148.     The FEIS contains, little, if any, analysis as to how the Salt River Project and Resolution Special Use Permit applications comply with each of the many criteria needed

to be accepted by the Agency.  And, as noted, it is undisputed that the Agency never provided for any of the required public review and comment for these applications.

149.    In addition, the FEIS acknowledges that the Project requires the construction and operation of a 22-mile pipeline to transport the ore concentrate to the processing site past Florence Junction, similar to the 19-mile pipeline (in the other direction) to the tailings waste site in Skunk Camp.  "Resolution Copper would then pump the copper concentrate as a slurry through a 22-mile-long pipeline to a filter plant and loadout facility located near Magma Junction near San Tan Valley, Arizona.  They would then filter the copper concentrate and send it to off-site smelters via rail cars or trucks." FEIS at 11.

150.    "Filtered copper concentrate would be loaded and shipped 7 miles along the MARRCO corridor by rail car to Magma Junction where the rail line meets the Union Pacific Railroad.  Final smelter destination is unknown at this time." FEIS at 77 (Table 2.2.2-6 "Existing and proposed mine access roads and traffic").

151.    The FEIS does not discuss or analyze where the smelting would then occur, or any of the impacts (such as air pollution) from the smelting or rail/truck transport, as required by NEPA and the NDAA.

152.    The Agency also did not analyze, much less require as it needed to, that Resolution obtain a Special Use Permits for its copper concentrate slurry pipeline that would be located along an existing right-of-way known as the Magma Arizona Railroad Company ("MARRCO") corridor.

153.    "The MARRCO corridor would also host other mine infrastructure, including water pipelines, power lines, pump stations, and a number of wells for groundwater pumping and recovery…." FEIS at 11.

154.    The FEIS does not analyze this pipeline as a Special Use, as the Forest Service never required Resolution to submit a Special Use Permit application for the approximate 9 mile portion of this pipeline that would cross Forest Service managed public land.  In addition to the pipeline crossing Forest Service managed lands, Resolution would

build a "Construction Laydown Yard" purportedly within the MARRCO corridor on Forest Service lands. FEIS at 73 (Figure 2.2.2-12, MARRCO Corridor facility layout).

155.    Despite all the new infrastructure and facilities proposed to be constructed and used in the MARRCO corridor, "[t]he corridor generally is 200 feet wide."  The FEIS does not explain how all of the existing and new infrastructure and construction yard, plus the access and support roads to service the new facilities, would fit within the mere 200-foot-wide corridor.

156.    Because these new facilities would be located in the old MARRCO right-of-way issued to the railroad company in 1922, the Forest Service needed to analyze and require a Special Use Permit application for these facilities.

157.    Indeed, the Forest Service has in the past required as much, as it previously required Resolution to obtain a Special Use Permit to install and operate a water pipeline within the same MARRCO corridor in 2008.  As the Forest Service stated in 2010:

> The construction and operation of the MARRCO pipeline convey treated water from the No. 9 Shaft to NMIDD [New Magma Irrigation and Drainage District] for irrigation use.  In response to RCM's [Resolution Copper's] submitted request for a special use permit application, the Forest Service recently evaluated information provided by RCM regarding the construction of this pipeline within the MARRCO right-of-way and the dewatering of the No. 9 Shaft. … **The Forest Service recently granted a special use permit for the construction and operation of the MARRCO pipeline** (MES749).

Environmental Assessment ("EA") for the Resolution Copper Mining Pre-Feasibility Activities Plan of Operations signed by Tonto National Forest Supervisor Gene Blankenbaker on May 14, 2010 (emphasis added).

158.    In addition, under FLPMA and federal law, the Agency cannot increase the uses in, and impacts from, the new facilities in the 1922 right of way without undertaking the detailed agency and public reviews and permitting requirements under FLPMA Title V. 43 U.S.C. §§ 1761-1771.  Yet no such FLPMA analysis and review has been done.

**The Forest Service Failed to Comply with NEPA and the NDAA**

*The Agency Reviewed the Project Under an Incorrect Legal Regime and Statement of the "Purpose and Need" for Its Review.*

159.     NEPA requires all EISs to contain a statement that specifies the underlying purpose and need for which the agency is responding to when reviewing the proposed action(s). 40 C.F.R. § 1502.13.  The statement of purpose and need is crucially important because it dictates the scope of the agency review and the range of reasonable alternatives to the proposed action. City of Carmel-By-The-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997).  The purpose and need statement cannot be so narrow as to limit the range of reasonable alternatives. Id. at 1155 ("The stated goal of a project necessarily dictates the range of reasonable alternatives and an agency cannot define its objectives in unreasonably narrow terms."); *see also* Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt., 606 F.3d 1058, 1070 (9th Cir. 2010).

160.     Agencies cannot avoid NEPA's requirements by unreasonably restricting the statement of purpose. Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 196 (D.C. Cir. 1991) ("an agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action").  "[A]n applicant cannot define a project in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable." Sylvester v. U.S. Army Corps of Eng'rs, 882 F.2d 407, 409 (9th Cir. 1989).  Although the Forest Service is permitted to take the applicant's purposes into consideration, it cannot draft a narrow purpose statement that restricts the consideration of alternatives to one motivated by private interests. Nat'l Parks & Conservation Ass'n, 606 F.3d at 1072.

161.     Regarding the FEIS' view of the "purpose and need" for its review of the Exchange and Project, the Agency states that "the purpose and need for this project is twofold: 1. To consider approval of a proposed mine plan governing surface disturbance on NFS lands—outside of the exchange parcels—from mining operations that are reasonably

incident to extraction, transportation, and processing of copper and molybdenum. [and] 2.

To consider the effects of the exchange of lands between Resolution Copper (offering 5,460

acres of private land on eight parcels located throughout Arizona) and the United States

(2,422 acres forming the Oak Flat Federal Parcel) as directed by Section 3003 of PL 1113-

291 [the NDAA]." FEIS at ES-6.

162.     The FEIS then states the Agency's interpretation of the applicable law that it

believed governed its review of the Project:

> The role of the Forest Service under its primary authorities in the Organic
> Administration Act, Locatable Minerals Regulations (36 Code of Federal
> Regulations (CFR) 228 Subpart A), and the Multiple-Use Mining Act is to
> ensure that mining activities minimize adverse environmental effects on
> NFS surface resources and comply with all applicable environmental laws.
> The Forest Service may also impose reasonable conditions to protect
> surface resources.
>
> Through the Mining and Mineral Policy Act, Congress has stated that it is
> the continuing policy of the Federal Government, on behalf of national
> interests, to foster and encourage private enterprise in – the development of
> economically sound and stable domestic mining, minerals, and metal and
> mineral reclamation industries; and orderly and economic development of
> domestic mineral resources, reserves, and reclamation of metals and
> minerals to help ensure satisfaction of industrial, security, and
> environmental needs.
>
> Secretary of Agriculture regulations that govern use of surface resources in
> conjunction with mining operations on NFS lands are set forth under 36
> CFR 228 Subpart A.

FEIS ES-6.

163.     As shown herein, the Agency's view of its authority over the Project

misinterprets federal public land, mining, and environmental law.  Throughout the multi-

year NEPA process, public involvement, and preparation of the EIS, the Forest Service was

under the mistaken belief that its review and approval of Resolution's proposed uses of

federal land, and all of the proposed activities, are solely under the company's GPO and the

Agency's hardrock mining regulations at 36 C.F.R. Part 228A. *See* FEIS at 8.

164.     In its "Purpose and Need" section, the FEIS never mentions, as it now acknowledges in the Draft ROD, that all of the Project facilities on Forest Service managed lands after the Exchange would be governed by the Agency's 36 C.F.R. Part 251 regulations, not the Agency's Part 228A mining regulations.

165.     In addition, the Agency's focus on the need to support mineral development under the 1970 Mining and Mineral Policy Act is misplaced.  First, that Act, which merely notes general principles, creates no controlling statutory mandate on the Agency.  Instead, the Forest Service's primary mandate is to protect the forest from destruction and depredations under the 1897 Organic Act.  The Agency's guiding congressional mandate regarding the national forests is "to regulate their occupancy and use and to preserve the forests thereon from destruction." 16 U.S.C. §551.

166.     In addition, the FEIS never discusses the requirements for public review and protection of public resources for special uses and rights-of-ways under FLPMA Title V, 43 U.S.C. §§1761-1771.

167.     The Agency's reliance on the Multiple-Use Mining Act of 1955 is also legally invalid, as that law does not require that the Forest Service approve operations related to mineral development, including mining of minerals on private lands, without the required evidentiary support in the record to support any assertions of statutory rights against the United States. Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv., 409 F.Supp.3d 738, 759 (D. Ariz. 2019).

168.     Overall, the Agency's legally incorrect view of the "purpose and need" for its review of the Project fatally undermines the entire FEIS.  "No amount of alternatives or depth of discussion could 'foster[ ] informed decision-making and informed public participation' when the Forest Service bases its choice of alternatives on an erroneous view of the law. See Westlands Water Dist. v. U.S. Dep't of Interior, 376 F.3d 853, 868 (9th Cir. 2004)." Ctr. for Biological Diversity, 409 F. Supp. 3d at 766.

169.     If an Agency misconstrues its statutory and regulatory authority, it fails to take "a hard look at all reasonable options before it," and violates NEPA. N.M. ex rel Richardson v. U.S. Bureau of Land Mgmt., 565 F.3d 683, 711 (10th Cir. 2009).

*Failure to Consider and Properly Review All Reasonable Alternatives, Including the No-Action Alternative*

170.     NEPA's  requirement that an agency provide an objective evaluation of a range of reasonable alternatives to the proposed action "is the heart of the NEPA process." 42 U.S.C. § 4332(C)(iii) & (E); 40 C.F.R. § 1502.14.  This provides "a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.  Federal agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives," including "reasonable alternatives not within the jurisdiction of the lead agency." Id.; *see also* id. § 1502.14(c).

171.     As the Ninth Circuit has held:

> NEPA requires that federal agencies consider alternatives to recommended actions whenever those actions "involve[ ] unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E) (1982).  The goal of the statute is to ensure "that federal agencies infuse in project planning a thorough consideration of environmental values."  The consideration of alternatives requirement furthers that goal by guaranteeing that agency decisionmakers "[have] before [them] and take [ ] into proper account all possible approaches to a particular project (including total abandonment of the project ) which would alter the environmental impact and the cost-benefit balance."  NEPA's requirement that alternatives be studied, developed, and described both guides the substance of environmental decisionmaking and provides evidence that the mandated decisionmaking process has actually taken place.  Informed and meaningful consideration of alternatives--including the no action alternative--is thus an integral part of the statutory scheme.

Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1228 (9th Cir. 1988) (citations omitted).

172.     This includes a duty to fully review the No-Action Alternative. Id.  The requirement for the No-Action Alternative exists as a mechanism for comparing the environmental and related social and economic effects of the affected environment in the absence of the proposed action as compared to all of the proposed action alternatives. "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act

Regulations," *Federal Register* Vol. 46, No. 55, March 1981, Question 3, "No Action Alternative."

173.    The FEIS described its view of the No-Action Alternative:

The no action alternative includes the following:

·        The final GPO would not be approved, thus, none of the activities in the final GPO would be implemented, and the mineral deposit would not be developed;

·        The land exchange would not take place;

·        Certain ongoing activities on Resolution Copper private land, such as reclamation of the historic Magma Mine, exploration, monitoring of historic mining facilities such as tailings under existing State programs and permits, maintenance of existing shaft infrastructure, including dewatering, and water treatment and piping of treated water along the MARRCO corridor to farmers for beneficial use, would continue regardless of GPO approval;

·        Ongoing trends not related to the proposed project would continue, such as population growth, ongoing impacts on air quality from fugitive dust and vehicle emissions, human-caused fires from recreation, ranching, and a corresponding increase in use of public lands; and

·        No agency land and resource management plans would be amended for this project."

FEIS at 87-88.

174.    Regarding the No-Action Alternative, the Agency states that: "The no action alternative cannot be selected … because the land exchange was mandated by Congress and the Forest Service does not regulate mining operations on private land." Draft ROD at 26.

175.    Thus, under the Agency's view, the No-Action Alternative cannot be selected because Congress mandated the approval of the Exchange.

176.    But that erroneously links the review and approval of the proposed uses on the remaining federal lands with the approval of the Exchange.  Nothing in the NDAA, or any other federal law, requires the Forest Service (or any other agency such as the Corps of Engineers) to approve anything beyond the Exchange (and that approval is subject to significant constraints as noted herein).

177.    A proper No-Action Alternative, then, must be focused on the company's proposed uses of federal land (and its related impacts to private and state lands) as if all of

the proposed uses on the remaining (non-exchanged) federal lands are denied by the Forest Service or Army Corps of Engineers.  Indeed, as detailed herein, when the Forest Service reviews these proposed uses under the proper regulatory structure, the proposed uses cannot be approved, due to irreparable and devastating impacts that would result from approval of the uses.

178.    Yet, as detailed herein, nothing in the NDAA or any other law requires the agency to approve these uses.  Overall, the agency cannot base its NEPA review, including consideration of the No-Action Alternative, on an incorrect view of the law, or on any presumption that it must approve the proposed uses.

179.    A legitimate and proper No-Action Alternative must, then, consider the conditions that will exist if the agencies deny the proposed uses of federal land.  For example, because Resolution would have no need to continue to pump and dewater groundwater if it was denied its proposed uses (even after the Exchange was completed), because it would not have the support facilities necessary to mine the ore body, the baseline and related conditions that would then exist must be considered as the true No-Action Alternative condition.

180.    The Forest Service incorrectly believes that the dewatering will continue (FEIS at 87-88) even if the proposed uses were not approved. *See also* FEIS at 394 ("Under the no action alternative, which includes continued dewatering pumping of the deep groundwater system…").  But the fact that Resolution would obtain the ore body and surrounding lands via the Exchange does not mean that it would continue groundwater pumping when it could not conduct the proposed uses on the remaining federal lands. Indeed, the previous operator shut down the pumps for approximately ten years in or around 1997.

181.    The FEIS lists several major ongoing actions of Resolution Copper, which the Forest Service improperly included as the environmental baseline, which results in these impacts not being analyzed at any point in the NEPA process.  This includes, but is not limited to, the ongoing and "continued dewatering" of the mine shafts, including shafts No.

9 and No. 10, among other shafts and tunnels.  Other actions and impacts that have been ignored by the Forest Service in the FEIS include "reclamation of the historic Magma Mine; exploration; monitoring of historic mining facilities such as tailings under existing State programs and permits; maintenance of existing shaft infrastructure, including dewatering; and water treatment and piping of treated water along the MARRCO corridor to farmers for beneficial use." FEIS at 87-88.  Regarding this last point, the FEIS unfairly considers Resolution Copper's water recharge efforts, which include delivery of dewatered water to New Magma Irrigation and Drainage District, as an applicant-committed environmental protection measure while failing to analyze the actual environmental impacts of that same dewatering that would occur at the Mine and throughout the well corridor.

182.    In addition, the FEIS fails to consider the reasonable alternative where the land exchange takes place per the NDAA, but the Agency denies some or all of the Special Use Permits for the tailings pipeline and electrical facilities, and/or the Special Use Permit that should have been required for the ore concentrate pipeline and construction laydown yard in and near the MARRCO corridor.

183.    The Agency refused to consider this reasonable alternative because it erroneously believed that "the Forest Service is unable to refuse approval of the GPO within their regulations and guidance." FEIS at 88.  But this is internally contradicted by the FEIS and Draft ROD, where the Agency says that since it does not have discretion to deny the Exchange, all Project facilities on Forest Service managed lands should be regulated under Special Use Permits, not the GPO.  And the Forest Service **does** have the authority and discretion to deny Special Use Permit applications under FLPMA and the Agency's 36 C.F.R. Part 251 and Part 261 regulations.

184.    Indeed, as shown herein, and by the massive destruction to Oak Flat and the surrounding lands and waters that would be made possible by the issuance of the Special Use Permits (i.e., if these Permits are not issued, then the Mine Project could not occur regardless of whether the Exchange takes place), this alternative is the only legally-defensible choice for the Agency, and yet it was not even considered.

1
2
*Failure to Adequately Consider All Direct, Indirect, and Cumulative Impacts, and*
*Connected Actions*

3   185.    The FEIS fails to adequately analyze the direct, indirect, and cumulative

4   impacts from the Exchange and Project on all potentially affected resources, including air

5   quality, water quality and quantity, wildlife, cultural/religious resources, recreation, and

6   economics.

7   **_Water Resources and Mine Water Use_**

8   186.    One of the most glaring inadequacies in the FEIS involves water.  In the

9   company's General Plan of Operations , Resolution Copper provides a number for its total

10   water needs for the life of the mine.  Resolution states, "[a] current estimate of the total

11   quantity of water needed for the life of the mine is 500,000 ac-ft." GPO, Volume 1, Sec.

12   3.6.1, Water Balance, Sources, and Management at 174.

13   187.    However, the FEIS estimates that the total quantity of external water needed

14   for the life of the mine (construction through closure and reclamation) could be as much as

15   590,000 AF. FEIS at ES-25.  The Forest Service notes this water use amount is in addition

16   to the approximate 87,000 AF of water that would be dewatered over the life of the Mine to

17   keep its tunnels, adits, shafts and other underground infrastructure free of water so that

18   mining can occur. FEIS at 405.  This water would be consumed in Mine operations.

19   188.    When combined, these two actions of the Project would consume (deplete)

20   677,000 AF of water from Arizona's limited water sources over the life of the Mine.

21   189.    An analysis of the Tables and Figures contained in Resolution's GPO shows

22   that Resolution's total water usage over the life of the Mine may be even greater—closer to

23   786,626 AF. *See* GPO Figures 3.6-1a, 3.6-1b, and 3.6-1c (Volume 2).

24   190.    The FEIS did not address the clear disconnect between Resolution's own

25   water usage figures contained in the GPO (totaling up to 786,626 AF) and the numbers

26   ultimately analyzed by the Forest Service in the FEIS.

27   191.    The FEIS admits that at least 550,000 AF of "fresh groundwater" would be

28   pumped by Resolution Copper at the Desert Wellfield (the area in the East Salt River

Valley where Resolution will pump the vast majority of the groundwater to support the Mine). FEIS at H-7.

192.    The FEIS fails to provide any meaningful analysis demonstrating that the pumping impacts associated with the Desert Wellfield would be fully mitigated and compensated by Resolution.  The Forest Service states that "the entire amount of makeup water needed for the mine was assumed to be physically pumped from the Desert Wellfield." FEIS at 969.

193.    Yet the Forest Service failed to analyze and detail how, and where, all this mitigation water will come from.  Instead, the FEIS relies on future Arizona state water permitting processes to ascertain these critical water issues.

194.    Although the Arizona Department of Water Resources ("ADWR") has been a cooperating agency in the NEPA process, the FEIS fails to adequately analyze the physical availability of Arizona's water resources to be consumed by the Mine —or the direct, indirect, and cumulative impacts that the consumption of such a large volume of water (677,000 AF – 786,626 AF) would have on Arizona's water supplies on a local, regional, or state-wide basis.

195.    The FEIS admits that the actual water use by the Project would be determined by ADWR in the future, long after the NEPA and NDAA review has been completed.  This includes a determination of the "unavoidable impacts" and related mitigation measures associated with the massive dewatering of the East Salt River valley stemming from Resolution Copper's Desert Wellfield. FEIS at 422.

196.    Yet the extent of these "unavoidable impacts" must be determined, analyzed, and subject to full public review during the NEPA process—not during some future state process to which NEPA and the NDAA do not apply.

197.    A determination of all the sources of water, including the availability of the water supply, as well as the location, rate of pumping, and the governing legal authorities should have been made and included in the FEIS for full analysis of baseline conditions, and the Project's direct, indirect, and cumulative impacts, as well as mitigation.

198.    Although the Forest Service cannot rely on future state permitting procedures and reviews to satisfy its NEPA and NDAA analysis requirements (as all analysis needed to be completed in the FEIS), even under state law, the Agency has not demonstrated that the Project would fully mitigate the Project's water depletions.

199.    Under the Arizona Groundwater Management Act of 1980, areas of the state with "heavy reliance on mined groundwater" were designated as Active Management Areas ("AMAs"), and for many AMAs including the Phoenix AMA, the primary management goal is to achieve safe-yield by the year 2025.

200.    The Mine and much of its infrastructure, including mine dewatering infrastructure, "lies almost entirely within the Phoenix AMA." FEIS at 387, n.52.  The Desert Wellfield is located within the East Salt River valley of the Phoenix AMA (FEIS at 416), although the Wellfield is in extremely close proximity to the Pinal AMA, and thus the substantial pumping that would occur at the Desert Wellfield will intersect and deplete groundwater supplies within the Pinal AMA as well.

201.    The Forest Service acknowledges in the FEIS that "ultimately, the mine water supply for each alternative can be reduced to the need for **fresh groundwater** to be pumped or recovered from the Desert Wellfield…", FEIS, Appendix H at H-7) (emphasis added); *see also* FEIS at 385 ("makeup water supply for the mine would come from a series of wells installed within the MARRCO corridor, drawing water from the deep alluvial units of the East Salt River valley.").  The FEIS states this will be at least 544,858 AF, *see, e.g*., FEIS at 414, Figure 3.7.1-7, which is over **177 billion** gallons of water.

202.    The FEIS at ES-24 vaguely concludes that the numerous high-capacity wells to be developed at the Desert Wellfield pumping in the East Salt River Valley along the MARRCO corridor "would incrementally contribute to the lowering of groundwater levels and cumulatively reduce overall groundwater availability in the area."  But the FEIS fails to provide substantive details about these impacts or to meaningfully or objectively consider the direct, indirect, or cumulative impacts of the Desert Wellfield pumping to the

groundwater availability in the area or to local, regional, or state-wide water supplies and the environment overall.

203.    For example, the Forest Service failed to adequately consider or analyze in the FEIS the direct, indirect and cumulative impacts of the large amount of water to be pumped by the Desert Wellfield on the important safe-yield goals of the Phoenix AMA or the Pinal AMA, which should have, in particular, considered the impacts of the massive amount of "fresh groundwater" to be withdrawn from the Desert Wellfield—which will be 544,858 AF under the preferred alternative (the Forest Service sometimes rounds this number up to 550,000 in the FEIS).

204.    The Forest Service failed to adequately consider or analyze in the FEIS the direct, indirect or cumulative impacts on groundwater dependent ecosystems and other resources resulting from the large amount of groundwater to be pumped from the Desert Wellfield, summarily concluding (without any material analysis, surveys or other empirical information) that due to "depths to groundwater" there "are no [groundwater dependent ecosystems] in the East Salt River valley supported by regional groundwater that potentially could be impacted by drawdown from the mine water supply pumping." FEIS at 385.  This is far from the detailed "hard look" required by NEPA.

205.    The Agency states that "the amount of groundwater in storage in the East Salt River valley subbasin (above a depth of 1,000 feet) is estimated to be about 8.1 million acre-feet." FEIS at 415.  The Forest Service provides no basis in the FEIS for this critical assumption and it relies on this unsubstantiated assumption throughout the FEIS.

206.    The Forest Service also fails to make clear: (1) if the 8.1 million AF of groundwater "in storage" it relies upon is in reference to CAP water or other water sources that have been banked or stored in underground storage facilities in the East Salt River valley; (2) if this is in reference to the total amount of natural groundwater in the entire East Salt River valley subbasin; and (3) how much of the 8.1 million AF of groundwater "in storage" is already being utilized or will be utilized by others now or in the future.

207.    In fact, the Forest Service notes in the cumulative effects analysis that "Approximately 7 million acre-feet of long-term storage credits were stored in the entire Phoenix AMA at the end of 2017 (Barter et al. 2020)." FEIS at 971.

208.    Yet, the FEIS does not distinguish these storage credits from the 8.1 million figure, injecting significant uncertainty into the Forest Service's evaluation of the impacts of Resolution's pumping on total stored water available.

209.    The Forest Service also never confirms in the FEIS where this 8.1 million AF estimate comes from, whether it has been independently verified by the Agency, or what the range of uncertainty is associated with this estimate.  This falls far short of the basic requirement for a "hard look" under NEPA.

210.    The FEIS inadequately analyzes the cumulative impacts of the Desert Wellfield pumping and Mine dewatering on regional and local water supplies—supplies that are already being stretched to their limit by drought and existing pumping, with more groundwater demand anticipated in the coming years as discussed herein.

211.    Under NEPA, the Agency must provide the needed information in the Draft and Final EIS and this duty is not excused by a vague allusion to "uncertainties" or because either the Agency or the Project proponent has yet to obtain/compile the needed information.

212.    Thus, the Forest Service failed to provide the required information and analysis on baseline conditions and water impacts as noted herein, and failed to provide the specific justification why this failure is acceptable under NEPA:

> When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.
> (a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

40 CFR § 1502.22.  "If there is 'essential' information at the plan-or site-specific development and production stage, [the agency] will be required to perform the analysis under § 1502.22(b)."  Native Village of Point Hope v. Jewell, 740 F.3d 489, 499 (9th Cir. 2014).

213.    The Forest Service cannot credibly assert that the need to fully understand the direct, indirect and cumulative water impacts of this Project, which could be catastrophic for regional and local water users (and the Phoenix AMA's and Pinal AMA's goal of safe-yield) is not essential to its review of the Project under NEPA.

214.    This includes the obligation to document and verify, among other things: (1) the total amount of water that is physically available for pumping at the Desert Wellfield – beyond an unverified suggestion that there is 8.1 million AF of water in "storage"; (2) the location and size of existing local and regional groundwater wells that might be adversely impacted (and even rendered dry) by the Mine's pumping and water use; and (3) the reasonably foreseeable planned developments in the area, such as the large Superstition Vista  development, among other planned developments.

215.    The Forest Service thus failed to consider the baseline conditions of these above-described areas as well as the direct, indirect, and cumulative impacts of the Mine's projected water use relative to this information and potential mitigation for these impacts.

216.    The Forest Service is required to fully review, verify, and understand any scientific models used in the FEIS.  This includes any groundwater flow models used to examine the direct, indirect, and cumulative impacts of the massive groundwater pumping and mine dewatering requirements of the Mine.

217.     The FEIS, at 378, states (though does not explain) that the groundwater flow model used to predict pumping impacts from the Desert Wellfield was developed by Resolution Copper "from an existing, calibrated, regulatory model prepared by ADWR…".

218.     The record reveals that the Resolution Copper relied upon the 2009 ADWR Salt River Valley flow model as the basis of their groundwater model for the Desert Wellfield.[4]

219.     However, the FEIS fails to provide any information that would assist the public to independently review the accuracy of the Resolution Copper model that was, presumably, built from the ADWR model.

220.     The Forest Service acknowledges in response to public comments that it did not independently review the model:

> These comments indicate that **the separate groundwater model used to predict impacts from the Desert Wellfield was not scrutinized or vetted by the NEPA team, as was the mine-site groundwater model.** This is a correct statement.  Because the model used for the Desert Wellfield is a standard regulatory model prepared and used by the Arizona Department of Water Resources, the same level of evaluation was not deemed necessary.

FEIS at Appendix R at R380 (emphasis added).

221.     Resolution Copper's revisions to the ADWR model were evaluated by BGC Engineering USA, Inc., in its report entitled "Project Memorandum re: Review of the ADWR Salt River Valley Groundwater Model Application for Resolution's Desert Wellfield – FINAL," dated August 3, 2020 (Walser 2020).  Walser 2020 is included in the Project record.

222.     The evaluation by Walser pointed out numerous material concerns with the Resolution Copper model that undermine its reliability.

223.     Walser notes that the ADWR model utilized by Resolution Copper to analyze the impacts of pumping from the Desert Wellfield "was last updated in 2009." Walser at 4.  But, Walser also notes that in 2010 a "refined geology framework was developed for the model area (ADWR, 2010b), however, this framework has not been incorporated in the [Resolution Copper] numerical model." Id.

---

[4] *See* Garrett, C. 2018a. *ADWR/Desert Wellfield Modeling Meeting*. Phoenix, Arizona: SWCA Environmental Consultants. November 9, 2018 ("2018 Modeling Meeting minutes").  https://www.resolutionmineeis.us/documents/garrett-swca-adwr-meeting-2018

224.    In addition, in 2014, ADWR completed a major update to its East Salt River Valley portion of the Salt River Valley model to perform key "structural modifications" related to the simulated thickness of aquifer materials and other matters.  These important structural improvements were also not included in the Resolution Copper model.[5]

225.    Thus, the Forest Service relied on groundwater modeling in the FEIS that was based on an earlier version of the ADWR Salt River Valley that did not have the benefit of ADWR's 2014 updates to correct structural problems.  The FEIS does not explain why the updated model was not used, nor does it explain why the structural problems in the 2009 model can be ignored.

226.    The Forest Service has an independent obligation under NEPA and the NDAA to objectively review, independently verify, and understand the groundwater flow model used by Resolution Copper, regardless of whether it represented a modification of an existing ADWR planning model.  The Forest Service failed to perform its independent obligations relative to the Resolution Copper groundwater flow model for the Desert Wellfield in violation of NEPA.

227.    The Desert Wellfield sits at the boundary of the Phoenix and Pinal AMAs, yet despite the Desert Wellfield's extremely close proximity to the Pinal AMA and the obvious pumping impacts from the Desert Wellfield to groundwater levels in the Pinal AMA, the Resolution Copper groundwater model entirely excludes impacts to groundwater resources in the Pinal AMA, and instead abruptly terminates at the boundaries of the Phoenix AMA without explanation, despite the hydrologic connection between the two AMAs as shown in the FEIS at 368, Figure 3.7.1-2.

228.    The Forest Service ignores this critical failing in its NEPA analysis, despite the fact that the drawdown contours from pumping the Desert Wellfield are shown in the

---

[5] *See* November 9, 2018, Montgomery & Associates Power Point Presentation, attached to the 2018 Modeling Meeting minutes ("Nov. 2018 Power Point") at slide 5 ("Utilize 2009 ADWR SRV model that simulates groundwater flow from 1983 through 2006 (Freihoefer et. al., 2009).").

FEIS to extend down past the southernmost boundary of this model by levels of at least 40 feet or more and into the Pinal AMA model boundary.

229.     Figure 3.7.1-2 from the FEIS, which depicts projected groundwater impacts from Desert Wellfield pumping, has been modified below to illustrate the location of the



Pinal AMA boundary.

230.     As a result, the Forest Service did not identify or consider the direct, indirect and cumulative impacts from the pumping at the Desert Wellfield to groundwater levels or wells within the Pinal AMA, meaning that the FEIS fails to disclose potentially catastrophic impacts from the Desert Wellfield pumping to groundwater resources within the Pinal AMA.

231.     Regarding why this was not considered, the Forest Service says (FEIS at R-342) that the "area for which this model was conducted does not extend as far north as the Desert Wellfield, or as far any substantial drawdown anticipated from the Desert Wellfield."  Given what the Forest Service's own figure above shows, that is not true.

232.      The Pinal AMA groundwater flow model was updated by ADWR in October 2019.[6]

233.     Among other things, the ADWR updates show a **shortfall** of 8 million acre-feet of water between demands and available groundwater resources in the Pinal AMA.

---

[6] *See* http://infoshare.azwater.gov/docushare/dsweb/View/Collection-19686

54

This shortfall was not meaningfully evaluated by the Forest Service in the FEIS as NEPA requires.[7]

234.     In fact, "Modifications in the 2019 Pinal Model domain were concentrated in the northeast corner of the model where it overlaps with the SRV [Salt River Valley] model…"[8]

235.     Given the rampant shortcomings in Resolution Copper's groundwater modeling efforts for the Desert Wellfield, the Forest Service was required to perform an objective and independent analysis of the baseline conditions and of the direct, indirect, and cumulative impacts of pumping from the Desert Wellfield using the most recent modeling available, including the new and updated 2019 Pinal Model.

236.     The results of the Resolution Copper model relied upon by the Forest Service in the FEIS are fundamentally flawed, likely grossly underestimate the decline in regional groundwater supplies in the East Salt River Valley that would be caused by the Desert Wellfield, and cannot be used by the Agency to examine the direct, indirect or cumulative impacts from the Desert Wellfield pumping on individual wells in the area, or the local or regional water supply in the East Salt River Valley under NEPA.

### Additional Flaws in the Direct, Indirect, and Cumulative Effects Analysis

237.     The Forest Service's cumulative effects analysis also fails to adequately consider a number of reasonably foreseeable activities in the East Salt River Valley.  These include the Superstition Vistas mega residential development, other developments planned near Florence, and the planned development of numerous new agricultural production

---

[7] *See* id.; *see also* ADWR, 2019 Pinal Model And 100-Year Assured Water Supply Projection Technical Memorandum (Oct. 11, 2019), available at: http://infoshare.azwater.gov/docushare/dsweb/Get/Document-11793/2019_Pinal_Model_and_100-Year_AWS_Projection-Technical_Memorandum.pdf

[8] Technical Memorandum, Appendix B, p. B-4 available at: (http://infoshare.azwater.gov/docushare/dsweb/Get/Document-11795/Appendix_B_Structural_Modifications_to_the_Pinal_Model.pdf).

(groundwater) wells that will soon be developed due to impending shortages on the Colorado River, among other things.

238.    For example, despite the existence of concrete plans for the 275-square mile Superstition Vistas mega development, located within the Project's analysis and impacts area, the Forest Service declined to consider the development as a reasonable foreseeable action under NEPA, observing (incorrectly, as discussed below) that plans for Superstition Vistas were "conceptual and lack adequate detail to allow substantial analysis of resource effects…" FEIS at 966, and that "no concrete steps have been taken for the auction of this land by the ASLD." FEIS at 971.

239.    The Forest Service acknowledged the planned Superstition Vistas development in the FEIS, at 966, and at other places in its cumulative effects analysis, despite concluding it is not a reasonably foreseeable future activity.  But the Forest Service does not consider or meaningfully analyze the cumulative water impacts of the development on local or regional water supplies as required by NEPA.



240.    The Forest Service violated NEPA and the NDAA when it failed to fully evaluate the planned Superstition Vistas mega development and its substantial water needs as a reasonably foreseeable future action.

241.    As early as 2006, the Arizona State University Morrison Institute for Public Policy issued a study on the Superstition Vistas development ("The Treasure of the Superstition Vistas").[9]

_____

[9] https://morrisoninstitute.asu.edu/sites/default/files/treasure_superstition_vistas.pdf.

242.    Per this report, the 275-square mile planned Superstition Vistas development would cover an area larger than the cities of Mesa, Tempe, Chandler, and Gilbert combined (p.9).  The development is anticipated to have a population at build out of nearly 1 million people (p.13), and would have a minimum water demand of 190,000 AF per year (p.15).

243.    The Desert Wellfield pumping area for the Resolution Project sits at the heart of the 275-square mile Superstition Vistas land (shown in green).  This can be seen in the illustration included above.

244.    The need for the Forest Service to consider the cumulative impacts to water stemming from the Desert Wellfield pumping along-side water demands for the massive Superstition Vistas development has been raised numerous times to the Agency, both in comments by others, including the Arizona State Land Department ("ASLD") (FEIS, Appendix R-43)(the ASLD recently auctioned-off lands paving the way for this development), as well in Plaintiffs' comments on the DEIS.

245.    The Forest Service erroneously concluded that Superstition Vistas is entirely "speculative" and never considered its impacts in the FEIS, believing that the Arizona State Land Department had not taken **any** "concrete steps" to auction the lands needed for the Superstition Vistas development. FEIS at 971.

246.    Yet, to the contrary, documents Plaintiffs provided to the Forest Service detail the progress and advancement of the Superstition Vistas development, including the fact that the Arizona State Land Department just recently auctioned 2,700 acres of State Trust Lands for this very development. *See* Phase I Environmental Site Assessment ASLD Auction Site prepared by Geotek (October 2019); *see also* "Homebuilders run up price of East Valley land to $245.5M in controversial state auction" (AZCentral, Nov. 5, 2020). Thus, plans for the sale and development of additional acres are already underway. Id.

247.    Superstition Vistas has also been anticipated and considered by the Arizona Department of Water Resources in its water models and reports related to this region, and it is considered in other planning documents maintained by Pinal County and numerous local cities and towns. *See* ADWR Pinal Water Model (2019); Pinal County Comprehensive Plan

(2019) & Resolution No. 2020-PZ-PA-004-20 by Pinal County Board of Supervisors Approving Amendment Recorded November 19, 2020.

248.     Indeed, the Arizona State Land Department criticized the Forest Service's Draft EIS for the adverse impacts from Resolution's dewatering on the plans on the Superstition Vistas development.

249.     The Arizona State Land Department filed extensive comments on the DEIS, warning of the significant impacts from Resolution's Desert Wellfield pumping and dewatering on the plans for the Superstition Vistas development, and correspondingly, on the Arizona State Trust that is administered by the Arizona State Land Department under the Arizona Enabling Act.  The State stated: "The greatest potential adverse impact to the [Arizona] Trust will be the water (usage of approximately 600,000 acre-feet (AF) over the LOM [Life of Mine]) that will be extracted from the aquifer beneath the Superstions Vistas Planning Area (SVPA)." FEIS, Appendix R at R-43.

250.      The Arizona State Land Department also observed that, "[b]ased upon the anticipated groundwater requirements contained in the DEIS, the negative impact of the proposed water consumption sourced from the Superstition Vistas Planning Area (SVPA) far outweighs the estimated financial benefits to the Trust resulting from other aspects of the project by a factor of 20:1." Id. at R-44.  The Arizona State Land Department further stated that "…the extraction and transportation of groundwater out of the SVPA [Superstition Vistas Planning Area] greatly compromises the ability to develop these lands to their full planned potential, and as a result, reduces the income and value of the Trust." Id.

251.     The Forest Service specifically acknowledged the "anticipated development in the Superstitions Vistas planning area." DEIS 342.

252.     Under NEPA, the Agency cannot simply ignore cumulative impacts by labeling them as "speculative," especially when planning for these activities is already underway, concrete steps have been taken to facilitate the action, and the action is considered in numerous plans by state and local communities.  "[P]rojects need not be

finalized before they are reasonably foreseeable. 'NEPA requires that an EIS engage in reasonable forecasting. Because speculation is . . . implicit in NEPA, [ ]we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry.'" N. Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1078-79 (9th Cir. 2011) (citations omitted).

253. The Forest Service's decision to ignore this reasonably foreseeable, indeed planned, activity violates NEPA and the NDAA.

254. Water demands for the Superstition Vista development, discussed for well over a decade, have been estimated to be between 100 and 156 gallons per capita per day.[10]

255. The 100 gallons per capita per day estimate reflects a highly aspirational water conservation goal, as the actual water usage may be much higher. Using an average of the current per-capita water usage figures available from ADWR for the towns of Mesa, Gilbert, Chandler and Tempe (approximately 187 gallons per capita per day) shows that Superstition Vistas development is likely to use approximately 210,000 AF of water per year for its an anticipated population of 1 million people (Phoenix AMA Draft 4th Management Plan, January 2020, p. Municipal 5-44).

256. Yet none of the water uses or other impacts associated with the Superstition Vistas development were considered under NEPA by the Forest Service, in violation of NEPA and the NDAA.

257. In contrast to the Forest Service's unsupported claims that the already planned Superstition Vistas development is "speculative," and thus need not be considered, the Agency nevertheless relies on Resolution's hoped-for plans to acquire the state lands at Skunk Camp as the entire basis for its preferred Alternative 6 pipeline and tailings waste approvals.

258. The vast majority of the Skunk Camp area is not owned by Resolution Copper but is instead Arizona State Trust Land that is owned by Arizona and administered

---

[10] See Morrison Institute Report "The Treasure of the Superstitions" (April 2006); see also "Snider: New development will bring water concerns" (inMaricopa.com, Dec. 3, 2011).

by the Arizona State Land Department under the Arizona-New Mexico Enabling Act of 1910 and requirements of Arizona law.  The Forest Service explains that "this alternative is unique in that the tailings storage facility would be located on private lands (after eventual acquisition of Arizona State Trust land)." FEIS at 19; *see also* FEIS at 24, Table 1.5.5-1.

259.    Similarly, the southeastern portion of the area at the East Plant Site is also not owned by Resolution Copper, but rather is State Trust Lands administered by the Arizona State Land Department. FEIS at ES-22, Figure ES-7 (showing the southeastern portion of the subsidence zone encroaching on State Trust Lands).

260.    The Forest Service's preferred alternative for Skunk Camp (upon which the entire FEIS and Draft ROD is premised) and its plans for the development of the East Plant Site are thus "speculative," under the Agency's view, as these plans are based on the marginal possibility of multiple approvals from the Arizona State Land Department that may or may not occur in the future.

261.    Resolution Copper may never have a right to deposit its tailings at Skunk Camp or take, by means of subsidence, State Trust Lands at the East Plant Site, since prior to doing this, Resolution Copper would have to submit a formal application for the acquisition of these lands, meet the Arizona State Land Department's strict screening process, and ultimately outbid any other interested party to acquire these lands at a competitive, public auction.

262.    The FEIS does not disclose that Resolution has performed any concrete steps towards the acquisition of these State Trust Lands and there are no public plans disclosed for the competitive auction of these lands as required by Arizona law.

263.    To acquire these lands in private ownership, Resolution Copper would first have to demonstrate that its acquisition of the Trust Lands would provide value to the Trust and meet all Arizona State Land Department application requirements before the Trust lands could go to public auction, which includes a careful review by Arizona State Land Department of any factors associated with the potential auction of lands, including an analysis of income potential to the Trust; proposed use; impact to adjacent Trust lands;

availability of utilities/infrastructure; access; proximity to existing development; parcel size; and conformance with local jurisdiction regulations.

264.     However, the Arizona State Land Department has already expressed substantial concerns about the Mine, including specifically with regard to the Skunk Camp tailings site vis-à-vis impacts to the Trust: "The [Skunk Camp] location is predominately State Trust land, and it is highly likely that this location will adversely impact the Trust." FEIS at R-42.  Further, based upon its concern about the potential water demand of the Mine, particularly from Desert Wellfield pumping, the Arizona State Land Department has already concluded **that the negative impact of the proposed water consumption for the mine "outweighs the estimated financial benefits to the Trust resulting from other aspects of the project by a factor of 20:1**." Id. at R-44 (emphasis added).

265.     Throughout the NEPA process, the Forest Service has repeatedly dismissed various potential impacts to the environment from the Exchange and Mine as remote or speculative. *See, e.g.*, FEIS at 424 (dismissing the formation of subsidence pit lakes as remote and speculative); Id. at R-177 (dismissing concerns over the block-caving operation as speculative); Id. at R-184 (dismissing concerns about greenhouse gas emissions from the routes of travel and processing location for the copper concentrate as speculative); R-243 (dismissing concerns about Resolution Copper's potential to develop its mineral claims adjacent to the Mine as speculative and therefore, not reasonably foreseeable).

266.     As detailed above, the Forest Service erroneously dismisses as "speculative" the long-planned Superstition Vistas development, concluding that the Arizona State Land Department has not taken any "concrete steps" to auction the lands needed for the Superstition Vistas development, FEIS at 971, though, in fact, ASLD has already auctioned off over 2,700 acres of State Trust lands for this very purpose.

267.     Yet, with regard to the Skunk Camp site and the subsidence area at the East Plant Site (both of which  are owned and administered by the Arizona State Land Department under Arizona law), the Forest Service assumes these truly speculative actions are a given, without the required support, and completely fails to disclose or analyze in the

FEIS the speculative nature of its preferred alternative and the significant hurdles and numerous future actions that are needed for Resolution's potential acquisition of the state lands at Skunk Camp for tailings purposes.  This violates NEPA and the NDAA.

268.    The FEIS also failed to consider and fully analyze as "reasonably foreseeable activities" under NEPA the cumulative impacts from several other planned and reasonably foreseeable housing developments in/near the nearby Town of Florence.  These developments, although well documented, were also dismissed from analysis under the FEIS. FEIS at 966.

269.    Several of those housing developments are under construction and sale right now, and some units have already been completed and sold: Anthem Parkside at Merrill Ranch by D.H. Horton (https://www.drhorton.com/arizona/phoenix/florence/anthem-merrill-ranch); Parkside at Anthem at Merrill Ranch by Pulte Homes (https://www.pulte.com/homes/arizona/phoenix/florence/parkside-at-anthem-at-merrill-ranch-7739); Sun City Anthem at Merrill Ranch by Del Webb (https://www.delwebb.com/homes/arizona/phoenix/florence/sun-city-anthem-at-merrill-ranch-11846); and Crestfield Manor by D.H. Horton (https://www.buzzbuzzhome.com/us/crestfield-manor1).

270.    In addition, regarding overall demands and usage of water in the area, although the Forest Service mentioned Arizona's Drought Contingency Plan and the impending "shortages" on the Colorado River in its cumulative effects analysis section of the FEIS, *see, e.g.*, FEIS at 966, 967-69, the Forest Service declined to consider as reasonably foreseeable activities the plans of farmers in the East Salt River Valley to develop new pumping infrastructure in Pinal County under the Drought Contingency Plan and before 2026 to facilitate the extraction of up to 70,000 AF of groundwater to replace water supplies lost through Drought Contingency Plan agreements and the future cutbacks in CAP water deliveries from the Colorado River.  Id.

271.     The Natural Resource Conservation Service has already committed $10 million dollars to support the development of this new pumping infrastructure.[11]

272.     This new infrastructure will be located within the East Salt River Valley in Pinal County.

273.     The pumping infrastructure and its potential drawdown squarely falls within the area impacted by Resolution's Desert Wellfield pumping.

274.     The Forest Service declined to consider Drought Contingency Plan activities, such as the Pinal County pumping described above, concluding that because the State's Drought Contingency Plan guidelines extend only until 2026, the pumping by Pinal County farmers will also conclude in 2026, and thus, this activity "will expire before Resolution Copper begins pumping groundwater." FEIS at 968.  That is wrong, and completely misunderstands the facts of Arizona water needs and uses.

275.     Under the Drought Contingency Plan, during the period between 2020 and 2026 Pinal County farmers will experience a ramp down in terms of their CAP water deliveries, but they will **ramp up** their groundwater pumping.  The FEIS fails to analyze this reasonably foreseeable scenario.

276.     After 2026, the Pinal County farmers will continue to pump from their groundwater wells and infrastructure – pumping that will continue as long as there is water to pump.  This will span well into the period of Resolution Copper's pumping from the Desert Wellfield.

277.     The Forest Service is also incorrect in the FEIS when it concludes that 70,000 AF in significant new pumping in the region will not have long-term impacts even if the wells are shut down prior to 2026 (which they will not be).  It is well understood that the effects of groundwater pumping and the drawdown associated with groundwater pumping continue for many years after the pumping is completed, which the FEIS did not analyze.

---

[11]  https://kjzz.org/content/1541866/10-million-fund-pinal-county-water-infrastructure#:~:text=Water%20conservation%20is%20getting%20new,Arizona%20Regional%20Irrigation%20Efficiency%20project.

278.    Thus, the impacts from new Pinal County farmers' pumping will continue into the period of time that Resolution is extracting massive quantities of water from the Desert Wellfield.

279.    This reasonably foreseeable future activity was not analyzed in the FEIS as a cumulative impact.  This violates NEPA and the NDAA.

280.    As with the other inadequacies noted herein, the FEIS does not meaningfully address the direct, indirect, and cumulative impacts to Arizona's water supplies and to Arizona's water users stemming from Resolution's water pumping in the context of the past, present and reasonably foreseeable actions required for a cumulative impacts analysis.

281.    In addition, the cumulative impacts from the nearby Florence Copper Project were not analyzed in the FEIS.  Located near the town of Florence, a demonstration project has been in operation since 2019 and the Arizona Department of Environmental Quality is in the process of amending the Aquifer Protection Permit for the project to allow a total of 1,765 injection and recovery wells, 90 perimeter wells and approximately 45 observation wells.  The project calls for additional drawdown of groundwater in the impact area of the Desert Wellfield.  In addition to adding to water quantity drawdown, the mine project could potential render unusable a large quantity of groundwater surrounding the project.

### *Additional Critical Issues Ignored by the FEIS*

282.    Regarding the lands to be exchanged between Resolution and the United States, the FEIS states that it does not know which lands will be exchanged, as that will only be determined through the appraisal process:

> With regard to the land exchange, Section 3003 of PL 113-291 directs the Secretary of Agriculture to convey to Resolution Copper all right, title, and interest of the United States in and to identified Federal land if Resolution Copper offers to convey to the United States all right, title, and interest of Resolution Copper in and to identified non-Federal lands.  Note that the acreages shown in this section are those offered by Resolution Copper to the Federal Government, after completion of surveys.  Ultimately, the Federal Government may not accept all portions of these lands.  **The exact parcels and acreage would be assessed through the land appraisal process.**  With regard to the land exchange, Section 3003 of PL 113-291

directs the Secretary of Agriculture to convey to Resolution Copper all right, title, and interest of the United States in and to identified Federal land if Resolution Copper offers to convey to the United States all right, title, and interest of Resolution Copper in and to identified non-Federal lands. Note that the acreages shown in this section are those offered by Resolution Copper to the Federal Government, after completion of surveys. Ultimately, the Federal Government may not accept all portions of these lands. **The exact parcels and acreage would be assessed through the land appraisal process.**

FEIS at ES-9 (emphasis added).

283.    However, as noted above, the Agency refused to include any detailed information on the appraisals in the FEIS, and the public has been left in the dark as to the actual lands, and values, to be exchanged.  This violates the Agency's public review requirements in NEPA and the NDAA.

284.    Other critical direct, indirect or cumulative impacts completely ignored in the FEIS are the impacts (and baseline conditions) associated with the smelting/processing of the ore concentrate.

285.    "Filtered copper concentrate would be loaded and shipped 7 miles along the MARRCO corridor by rail car to Magma Junction where the rail line meets the Union Pacific Railroad. **Final smelter destination is unknown at this time**." FEIS at 77 (Table 2.2.2-6 "Existing and proposed mine access roads and traffic") (emphasis added).

286.    The Agency refused to review these impacts, saying they are "speculative."

Post-sale delivery, smelting, and use of copper or molybdenum concentrates similarly cannot be analyzed without knowing the transport route or end location.  The use of trucks to transport molybdenum concentrate from the West Plant Site is incorporated into the EIS analysis for those highways and routes in the immediate vicinity of the mine; **movement beyond these routes is speculative at this time**.  The delivery of concentrate from the filter plant and loadout facility to the railhead near Magma Junction is incorporated into the EIS analysis; **movement beyond this point is speculative at this time.**  Similar to power use, the exception is estimation of greenhouse gas production.  As a global issue, the specific transport routes are not necessary to estimate greenhouse gas production.

FEIS at 12 (emphasis added).  But the smelting/processing of mineral ores, necessary for any mining operation, are not "speculative," as they are a fundamental and necessary part of any mining project.

287.    The FEIS does not discuss or analyze where the smelting would then occur, or the full and anticipated impacts (such as air pollution) from the smelting or rail/truck transport, as required by NEPA and the NDAA.

288.    Here, the Agency proposes approving an Exchange and mine Project when it has no idea where the company will further process the minerals.  In essence, it reviewed only part of the mine Project, for without smelting, the entire mine Project could not occur.

289.    But the Agency cannot meet its NEPA duties with such blinders on.  An EIS for a mining operation must fully review the impacts from off-site ore processing and transportation. S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of the Interior, 588 F.3d 718, 725 (9th Cir. 2009).  "[T]he air quality impacts associated with transport and off-site processing of the five million tons of refractory ore are prime examples of indirect effects that NEPA requires be considered." Id.  The Ninth Circuit has also rejected an argument that the agency can avoid reviewing impacts simply because the mining company did not provide the necessary information.  "[I]nsofar as [the agency] has determined that it lacks adequate information on *any* relevant aspect of a plan of operations, [the agency] not only has the authority to require the filing of supplemental information, it has the obligation to do so." Ctr. for Biological Diversity v. U.S. Dep't of Interior, 623 F.3d 633, 644 (9th Cir. 2010)(emphasis in original).

290.    "The Forest Service says that cumulative impacts from non-Federal actions need not be analyzed because the Federal government cannot control them.  That interpretation is inconsistent with 40 C.F.R. §1508.7, which specifically requires such analysis." Ctr. for Biological Diversity v. NHTSA, 538 F.3d 1172, 1217 (9th Cir. 2008).

291.    Thus, the Agency's failure to obtain this critical information, simply because Resolution refused to provide it, is not an excuse to violate NEPA's public information and review mandates.

*The Failure to Consider the Avoidance, Minimization or Mitigation for Impacts from the Desert Wellfield Pumping*

*Water Impacts – East Salt River Valley*

292.    In addition to the Forest Service's failure to comply with its NEPA and NDAA mandates to review the baseline conditions and all direct, indirect, connected, and cumulative impacts from the Project, the Agency failed to meets its NEPA and NDAA requirements to fully analyze all potential mitigation measures, and the effectiveness of any such mitigation measures, on water quantity, water quality, and other resources in the region.

293.    Even with the limitations identified above, pertaining to Resolution Copper's dewatering in the Desert Wellfield, which (among other things) grossly underestimates declines in groundwater levels in the East Salt River Valley, and in the case of the Pinal AMA, ignores groundwater declines completely, the Forest Service still predicts substantial groundwater declines in the region stemming from the Desert Wellfield pumping.

294.    The FEIS estimates that the "[p]rojected drawdown [in the East Salt River Valley] would be greatest in the center of the Desert Wellfield, reaching a maximum drawdown of 228 feet, as shown in figure 3.7.1-2. FEIS at 415.  "At the north and south ends of the wellfield, maximum drawdown ranges from 109 to 132 feet, and farther south, within NMIDD [New Magma Irrigation and Drainage District], maximum drawdown is roughly 49 feet (Bates et al. 2018; Garrett 2018a)." Id.

295.    The significant decline in groundwater levels resulting from drawdowns from the Desert Wellfield would adversely impact individual wells throughout the East Salt River Valley, in both the Phoenix AMA and the Pinal AMA, as well as the associated environmental values the agency cannot allow to be so damaged.

296.    The Forest Service acknowledges that this drawdown could impact individual wells, rendering shallow wells dry or requiring other well owners to deepen their wells. FEIS at 393; *see also* FEIS at 973 ("[T]here likely would be certain areas that

experience lack of well capacity and groundwater shortages, particularly around the edges of the basin.").

297.    The Forest Service also admits the "overall the cost of pumping would increase as groundwater deepens, and infrastructure costs would increase as wells and pumps need to be lowered or replaced." Id.  Yet the FEIS did not analyze these financial and infrastructure impacts, nor analyze mitigation measures to compensate for the impacts.

298.    NEPA was enacted to promote efforts that will prevent or eliminate damages to the human environment.  This can be accomplished by (1) avoiding an impact by not taking certain actions or parts of actions; (2) minimizing an impact by limiting the degree or magnitude of the action and its implementation; (3) rectifying an impact by repairing, rehabilitating, or restoring the affected area; or (4) by replacing or providing substitute resources or environments. 40 C.F.R. § 1508.20.

299.    The selection of appropriate mitigation measures is one of the components of the alternatives analysis required by the NEPA process. 40 C.F.R. § 1502.14.  The agency must state whether all practicable means to avoid or minimize harms from the alternative selected have been adopted, and if not, why not. Id. at 1505.2(c).

300.    In this case, the Forest Service readily acknowledges that (1) Resolution Copper would consume from the Desert Wellfield at least "550,000 acre-feet over the life of the mine" under the preferred alternative, FEIS at 418 (enough to meet the water demand for 2.2 million households in Arizona for a year); (2) the Wellfield would reduce groundwater levels by at least 228 feet; and (3) the pumping by Resolution Copper at the Desert Wellfield would adversely impact individual groundwater wells and the needed water supply for the region and the State of Arizona overall.  Nevertheless, the Agency failed to meaningfully consider or analyze any ways to avoid or minimize these substantial and adverse water impacts.

301.    The Forest Service also failed to analyze and require Resolution Copper to mitigate for the substantial and adverse impacts to groundwater levels in the East Salt River valley and, in particular, to offer any form of mitigation for those wells that would need to

be deepened or would go dry as a result of these declines, visiting substantial costs on individuals, entities, and communities in the area.

302.    The Forest Service instead defers this analysis to the Arizona Department of Water Resources, concluding that Resolution Copper will be required to file for various permits with that Department pertaining to the Desert Wellfield pumping.

303.    The USFS concludes: "concerns have been raised regarding drawdown from the Desert Wellfield, in the East Salt River valley. **The permitting process for the wellfield will determine whether there are unavoidable impacts that may need mitigation**, in which case Resolution Copper has indicated a willingness to consider additional measures." FEIS at 422 (emphasis added). *See also* FEIS, Appendix J at J-4 ("While … mitigation is in place for water level declines caused by dewatering near the mine site (see measure FS-WR-01), no such protections are in place for the area near the Desert Wellfield in the East Salt River valley.").

304.    Yet, under NEPA (and the NDAA), the Forest Service cannot defer the analysis of impacts, mitigation measures, and their effectiveness, to some future state permitting process. Great Basin Resource Watch v. BLM, 844 F.3d 1095, 1103-04 (9th Cir. 2016)(federal agency EIS could not rely on future state permitting as substitute for the environmental review requirements under NEPA).

305.    Further, the Forest Service notes that Resolution Copper has not "brought forth voluntary mitigation for impacts to nearby well owners or property owners" in the East Salt River Valley for pumping impacts caused by the Desert Wellfield. FEIS, Appendix R at 354.

306.    In the response to comments, the Forest Service ultimately admits that, "**no specific monitoring or mitigation measures are included in the DEIS specific to the Desert Wellfield in the East Salt River valley**. This groundwater pumping is subject to permitting by the ADWR." FEIS at R-235 (emphasis added).  Relatedly, no specific monitoring or mitigation measures are included by the Forest Service in the FEIS either.

307. NEPA regulations require that the agency's environmental review: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," 40 C.F.R. § 1502.14(f); and (2) "include discussions of: . . . Means to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." 40 C.F.R. § 1502.16(h).

308. "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperating agencies . . . ." *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,031 (Mar. 23, 1981).

309. NEPA further requires that the Forest Service review mitigation measures as part of the NEPA process—not in some future decision shielded from public review. 40 C.F.R. § 1502.16(h).

310. Here, the Forest Service violated NEPA and the NDAA when it left it up to Resolution Copper to decide whether or not it might voluntarily "mitigate" for the potentially catastrophic impacts from the Desert Wellfield on local water supplies and wells, and where the USFS determined in the FEIS to defer to a subsequent ADWR permitting process the determination of (1) whether or not there will be "unavoidable impacts" from the Desert Wellfield (a point that seems clear); and (2) whether or not, and how, these impacts should be mitigated.

*Impacts to Apache Leap*

311. The NDAA established the Apache Leap Special Management Area "to preserve the natural character of Apache Leap; to allow for traditional uses of the area by Native American people; and to protect and conserve the cultural and archeological resources of the area." Section 3003(g)(2)(A)-(C); FEIS at 43. The potential for subsidence from the crater to impact the Apache Leap Special Management Area mandates that the Forest Service require mitigation measures to avoid, minimize, and otherwise mitigate subsidence impacts, and NEPA requires that the Forest Service analyze the effectiveness of such measures in the FEIS. FEIS at 24; Appendix J, J-10 (noting USFS authority under 36 C.F.R. § 251.56 and 36 C.F.R. § 228.8).

312.    The block caving operation is anticipated to create a nearly a 2-mile diameter crater estimated to be between 800 and 1,115 feet deep. FEIS at ES-3, 190.  To accompany proposed monitoring of subsidence, the FEIS unveiled a proposal to establish three tiers of triggers to inform potential mitigation for subsidence, should it be greater than what the modeling anticipated.  These triggers, Level 1, Level 2, and Level 3, if met, may prompt additional monitoring and review and potential responsive actions. FEIS at 188.

313.    Level 1 is triggered if subsidence extends farther than the model results anticipated by less than 30 percent and would prompt only "focus on data validation and more intensive monitoring." FEIS at 188.

314.    Only Level 2 and Level 3 could provide any potential for substantive mitigation in response to larger than intended subsidence, namely in the form of potentially altering the mining operation.  Level 2 is triggered if subsidence extends farther than the model results by 30 to 60 percent and could prompt reduction or modification of the amounts and locations of ore removal. FEIS at 188.  Level 3 is triggered by subsidence that extends farther than the model results by 60 percent, and could include the cessation of mining. FEIS at 188.

315.    Although NEPA requires the Forest Service to analyze the effectiveness of mitigation measures for this anticipated subsidence, and thus the effectiveness of the percentages for triggering mitigation actions, the FEIS is devoid of any such analysis.  Also, these proposed triggers are new since the DEIS and were never provided for public review or comment.

316.    The Forest Service's decision to use a 30 percent increase as the threshold of when substantive mitigation measures may be undertaken, renders the proposed mitigation worthless for protecting Forest Service resources, particularly the Apache Leap Special Management Area.  Apache Leap is less than a quarter-mile away from the modeled upper-end subsidence diameter (1.8 miles).  Thus a 30 percent increase would result in a 2.34 mile wide diameter, and would be the minimum required for Level 2 trigger and could potentially lead to modifications of the mine plan.  But this would be too little too late, as

Apache Leap would already be engulfed.  The lack of analysis of the effectiveness of these triggers for mitigation is a grave error in the Forest Service's NEPA analysis and also violates the NDAA in failing to ensure the very purposes for which the Apache Leap Special Management Area was established will be met and will be protected.

*Land Subsidence and Fissures in the East Salt River Valley*

317.    An additional failure of FEIS involves the long-term extraction of groundwater, which would cause land subsidence and fissures in the earth.  "An important aspect of subsidence is that it is irreversible; once sediment layers collapse when dewatered, they remain collapsed even if water levels recover." FEIS at 412.

318.    These occurrences would be particularly concentrated in the East Salt River Valley subbasin, where at least 544,858 AF of water would be pumped for the Mine Project under the preferred alternative as noted above.

319.    ADWR's Water Planning Atlas states: "Earth fissuring and subsidence have occurred in the ESRV [East Salt River Valley] sub-basin due to localized pumping.  These occurrences are found near Apache Junction and in the vicinities of Queen Creek, North Scottsdale and Paradise Valley (Rascona, 2005)." Arizona Water Atlas Vol. 8, Active Management Area Planning Area, p. 8 (2010).[12]

320.    Based upon estimates of groundwater declines in the area of the Desert Wellfield in a range of 228 feet, FEIS at 415 & Figure 3.7.1-2, the Forest Service acknowledges the potential for significant subsidence, admitting "drawdowns associated with the Desert Wellfield likely would result in subsidence of roughly 24-52 inches." FEIS, V-2 at 412.

321.    Subsidence can be costly to farmers, since it can crack and break irrigation ditches and canals, disturb previously leveled farm fields, and disrupt the flow of irrigation water, among other things.

---

[12] https://infoshare.azwater.gov/docushare/dsweb/Get/Document-10433/Volume_8_final.pdf

322.    Subsidence can also harm groundwater wells and well-casings, result in ruptured water and sewer lines, damage streets, highways and bridges, and damage the foundations of houses and buildings, all requiring costly repairs.

323.    The Forest Service fails to meaningful identify or consider the adverse impacts to the types of infrastructure described above that would result from potentially 52 inches of land subsidence predicted in the FEIS for the East Salt River Valley caused by Resolution's groundwater depletions from the Desert Wellfield.

324.    For example, the Central Arizona Project ("CAP") canal that delivers critical water supplies from the Colorado River all the way to Phoenix, and then down past Tucson, is within approximately 3-miles of the Desert Wellfield, and it is well within the projected subsidence impact area for the Desert Wellfield.  Additionally, at least 20 miles of both the Federal US-60 and another 20 miles of State Route SR-79 are also well within in the projected subsidence impact area for the Desert Wellfield.

325.    The USFS fails to examine or disclose the direct, indirect, and cumulative pumping from the Desert Wellfield on water and other infrastructure in the region.

326.    The FEIS also does not examine how these subsidence impacts could be avoided, minimized, or mitigated under NEPA and the NDAA.

327.    Similarly, the FEIS ignores the likelihood of earth fissuring and its related impacts to these same structures and infrastructure in the area surrounding the Desert Wellfield and within the East Salt River valley.

328.    The failures of the Forest Service to identify and consider the baseline conditions, and the direct, indirect and cumulative impacts from the significant subsidence predicted in the FEIS resulting from the Desert Wellfield pumping, or to consider how these impacts can be avoided, minimize or mitigated, violates NEPA and the NDAA.

### *Water Impacts at the Mine Site Itself*

329.    Over the life of the Mine, groundwater modeling relied on by the Forest Service estimates that 87,000 AF of water will be dewatered (pumped) from the Mine and

from ancillary facilities associated with the Mine. FEIS at 405.  This water will be substantially consumed by mining processes. Id.  This is in addition to all of the massive Desert Wellfield pumping detailed above.

330.    The FEIS acknowledges that Mine dewatering and subsidence will impact or destroy 18 groundwater-dependent ecosystems, including springs and surface water resources throughout the Oak Flat area. *See, e.g.*, FEIS at ES-25; FEIS at 396, Figure 3.7.1-9.

331.    The Forest Service acknowledges, "the fact that even relatively small changes in water levels can have large effects on natural systems." FEIS at 385.

332.    The Forest Service substantially underestimates (and thus fails to meaningfully analyze or consider under NEPA) the direct, indirect, and cumulative impacts of removing (via dewatering) at least 87,000 AF of water on groundwater and surface water quality and on the numerous groundwater-dependent ecosystems in this arid region, including the vitally important springs, seeps, and surface resources of the region.

333.    The work of hydrologist, Dr. Robert Prucha, whose report was attached to Plaintiffs' comments to the DEIS, illustrates the severe failures of the groundwater modeling approach used by the Forest Service to evaluate the adverse impacts of the mine Project, including the mine dewatering activities, predicted subsidence crater(s), and other mine activities.

334.    Dr. Prucha's work proves, among other things: (1) formation of a pit lake or lakes associated with the subsidence at the mine site and thus ongoing impacts to the aquifer post mine-closure were not meaningfully evaluated by the Forest Service; (2) the true range of impacted groundwater-dependent ecosystems was severally underestimated; (3) the Forest Service examined surface water and groundwater in isolation, as if these two water resources are not hydrologically connected in key groundwater-dependent ecosystem locations when they are connected; and (4) the model's evaluations of the relationship between stream flows and aquifer conditions (stream-aquifer flows) was not assessed.

335.     The modeling used by the Forest Service fails to comply with industry standards in the larger modeling community—standards that consider many of the issues and factors outlined in the Prucha report, including the importance of simulating the dynamic interaction between surface and groundwater resources and the critical importance of conducting a predictive uncertainty analysis that would have provided critical information to the Forest Service regarding the range and possible extent of the drawdown (including the worst-case drawdown) and the corresponding impacts to groundwater-dependent ecosystems that would be caused by dewatering at least 87,000 AF of from the Mine, among other impacts.

336.     The failures of the Forest Service's modeling efforts and corresponding failure to take a hard look at the impacts (including a range of impacts) from the Mine dewatering consistent with industry standards violated NEPA.

337.     The Forest Service has also failed to fully analyze or disclose the impacts of ten plus years of ongoing mine shaft dewatering (Shafts 9 and 10) or other mine activities on the numerous springs, seeps in the Oak Flat area, including the many groundwater-dependent ecosystems in the area, as well as surface flows in Queen Creek, Ga'an Canyon, and elsewhere.

338.     The Forest Service concludes in the FEIS that the, "dewatering of the deep groundwater system has taken place since 2009 to allow construction and maintenance of mine infrastructure" and, "[t]his dewatering pumping is legal and has been properly permitted by ADWR" and it will be continued "throughout the mine life." FEIS at 372.

339.     Groundwater levels in the deep groundwater system below Oak Flat (close to the pumping that has been dewatering Shafts 9 and 10) have dropped over 2,000 feet since 2009. FEIS at 387.

340.     As noted above, the Forest Service wrongly includes in its baseline conditions (via the No-Action Alternative) the serious effects of Resolution Copper's ongoing dewatering of the deep groundwater system at Oak Flat—a process it has actively engaged in to support feasibility analysis activities for the Mine Project since at least 2009.

FEIS at 373 ("We confirmed our choice to use the current groundwater conditions at the site as the baseline to which project-related impacts are compared (Garret 2018d)"); FEIS at 396, Figure 3.7.1-9 (No Action to include continued dewatering from Resolution's pre-feasibility operations for Bitter Spring, Bored Spring, Hidden Spring, McGinnel Mine Spring, McGinnel Spring, and Walker Spring); *see also* FEIS at 394.

341. Many of the springs and various other surface water featured were subsequently surveyed by Plaintiffs (including GPS locations), yet this information was also not considered in the USFS' baseline analysis under NEPA.

342. As a result, the direct, indirect, and cumulative impacts to the affected environment, including to numerous groundwater-dependent ecosystems, resulting from Resolution Copper's ongoing dewatering activities (particularly vis-à-vis Shafts 9 and 10) have not been considered by the Forest Service in the FEIS, because numerous groundwater-dependent ecosystems that existed prior to Resolution Copper's dewatering (post 2009) no longer exist today due to this dewatering.

343. In 2008, Resolution Copper applied for, and was granted, a Special Use Permit for the construction and installation of the pipeline within the MARRCO corridor that delivers mine water from Shafts 9 (and now 10) to the New Magma Irrigation District.

344. As part of this Special Use process, Resolution Copper was required by the Forest Service to document the numerous surface water features (groundwater-dependent ecosystems) within the Queen Creek Watersheds and the Ga'an Canyon Watershed, including the estimated minimum observed discharges from various springs and surface water features in the region.

345. In the FEIS, the Forest Service did not consider this information or make a comparison between groundwater-dependent ecosystems that existed at the time of the MARRCO special use permit—which was immediately prior to Resolution Copper's dewatering of Shafts 9 and 10 (2008/09)—and those that exist today when it established the environmental baseline for the FEIS, because the Forest Service concluded, without explanation or support, that, "this was the appropriate approach under NEPA," FEIS at 373,

and because, "selecting past point in time as a baseline does not reflect the environment as it exists today." Id.

346.     Resolution Copper's ongoing pumping, which has been conducted to facilitate the Mine Project currently before the Forest Service in the FEIS, cannot be baked into the environmental baseline without violating NEPA.  The Forest Service must consider the full range of impacts from the entire scope of this Mine Project (including Resolution's ongoing dewatering of Shafts 9/10 since 2009) under NEPA and the NDAA.

347.     The Forest Service's decision to include ongoing dewatering from Shafts 9/10 in the baseline does not represent true baseline environmental conditions as it grossly underestimates the magnitude and extent of mine impacts on the affected environment on the low side, including but not limited to, on groundwater-dependent ecosystems.

348.     At minimum, predicted drawdowns should have been calculated from actual groundwater conditions that existed prior to the dewatering of Shafts 9 and 10 to avoid improper segmentation of Project impacts under NEPA.

349.     The Forest Service also acknowledges that a pit lake could form from the subsidence crater(s) at the Mine site: "We acknowledged in the DEIS that several conditions exist that suggest a lake could form, including the presence of a subsidence crater estimated to be 800 to 1,100 feet deep, recovering groundwater levels in the deep groundwater system after dewatering ends, and a block-cave zone that would hydraulically connect the deep groundwater system to the surface." FEIS, Appendix R at 380.

350.     Yet, the potential for a pit lake to form in the subsidence crater(s) is later dismissed by the Forest Service without basis as speculative. FEIS at 461.

351.     However, Dr. Prucha's work demonstrates that it is reasonably foreseeable that a pit lake would form within the subsidence crater with water from the shallow alluvial aquifer and other sources that would continue to deplete to the local and regional aquifer due to ongoing evaporation and other losses.

352.     The direct, indirect, and cumulative impacts from the pit lake should have been considered by the Forest Service under NEPA.

1    *Water Quality Impacts*

2    353.    The Project would impact groundwater and surface water quality throughout

3    the region.  For example, the exposure of the mined rock to water and oxygen, inside the

4    mine as well as in stockpiles prior to processing, could create depressed pH levels and high

5    concentrations of dissolved metals, sulfate, and dissolved solids. FEIS at 423.  After

6    processing, the tailings would be transported for disposal into the tailings storage facility.

7    Id.  Seepage from the tailings has the potential to enter underlying aquifers and impact

8    groundwater quality. Id.  In addition, contact of surface runoff with mined ore, tailings, or

9    processing areas has the potential to impact surface water quality. Id.

10   354.    Yet, the FEIS contains virtually no information pertaining to the level of

11   contaminants that would be likely to occur from the mine discharges, runoffs, seepage, or

12   other aspects of the Project.  Similarly, the FEIS also does not disclose or consider if or

13   where these contaminants might result in water quality impacts to surface waters and to

14   what levels.

15   355.    The FEIS at ES-25 acknowledges: "[a]ll of the tailings facilities would lose

16   seepage with poor water quality to the environment," but then asserts that seepage from

17   Alternative 6, "does not result in any anticipated water quality problems."

18   356.    The Skunk Camp TSF [Tailings Storage Facility] Seepage Assessment

19   Report[13] contains no information about the possible contaminants in tailings seepage water,

20   and no information on background ground and surface water quality or potential impacts

21   thereto from seepage water contamination, nearby impaired waterways, etc.

22   357.    Rather, the report just vaguely acknowledges that a seepage management

23   plan, "has not been optimized, rather, it is intended to demonstrate that compliance is

24   expected to be achievable for the Skunk Camp TSF.  Future designs and studies will

25   optimize the plan to reduce impacts to groundwater and uncertainties" (p.15).

26

27

28

---

[13] https://www.resolutionmineeis.us/documents/kcb-skunk-camp-seepage-assessment-2020

358.    Yet "future studies" are not permitted under NEPA and the single-EIS requirement of NDAA §3003(c)(9)(B) and therefore were required to have been done already.

359.    The FEIS, at 85, notes that a final post-closure management plan for the tailings storage facility is not completed but rather, "would be determined as the project progresses through NEPA process" at some vague future point in time.  Many sections of the posted Skunk Camp TSF Reclamation Plan document[14] are marked as "preliminary," and references abound throughout to "preliminary estimates" and matters that "will be reviewed in future design stages," all confirming that this is not in final form based on the aforementioned language in the FEIS.

360.    This is a violation of the NEPA and the single-EIS requirement of the 2015 NDAA and is not permissible.

361.    Regarding the extremely high temperature of the groundwater encountered at the site, the FEIS does not contain any discussion regarding how the groundwater model was adjusted or corrected in any way when, in 2014, it failed to predict the hot (180-degree F) water encountered while drilling Shaft No. 10.  The Forest Service also failed to include or meaningfully analyze any similar issues of geothermally influenced water circulation or the direct, indirect, or cumulative impacts thereof, including on groundwater dependent ecosystems and water quality, and including within the post-closure subsidence fracture zone/pit lake.

362.    Regarding baseline conditions and impacts closer to the town of Superior, the FEIS states, "groundwater drawdown caused by the mine could affect groundwater supplies for wells that may draw from either the regional Apache Leap Tuff aquifer or the deep groundwater system.  Drawdown from 10 to 30 feet is anticipated in wells in the Superior area and … impacts from 10 to 30 feet could also occur in wells near Top-of-the-World." FEIS at 410-11.

---

[14]  (https://www.resolutionmineeis.us/sites/default/files/references/kcb-skunk-camp-tsf-reclamation-plan-2020.pdf)

363.     Yet the Agency fails to include a detailed analysis of these impacts and purported mitigation for public review as required by NEPA and the NDAA.

364.     Regarding the water resources at the Skunk Camp tailings waste facility, the FEIS states that: "A single downvalley seepage collection pond would be the primary means for seepage and embankment construction and surface water collection during operations, with the collected water then pumped to a recycled water pond located within the operating PAG [Potentially Acid Generating] cell for use as process water at the cyclone house **and/or at the West Plant Site**, or for dust management at the tailings storage facility." FEIS at 126 (emphasis added).

365.     But there is no meaningful analysis of how the tailings seepage water would be transported to the West Plant Site, or consideration of that water use at the West Plant. Further, if the seepage is collected below the tailings facility, the FEIS is devoid of the required analysis of the infrastructure needed for a return pipeline/pump system at the bottom of the facility. *See* FEIS at 121, Figure 2.2.8-2.

366.     Additionally, there is no detailed analysis of the quality of the seepage from the tailings that may be spread on the ground for dust suppression, allowed to reach groundwater at the site, or be transported back to the West Plant site and then discharged as noted above.

367.     Indeed, the Forest Service recently admitted that seepage from the tailings will only meet the applicable, "Arizona numeric aquifer water quality standards in the downgradient aquifer beyond the immediate vicinity of the tailings storage facility." January 10, 2021 letter from Defendant Thomas Torres the Terry Rambler, Chairman of the San Carlos Apache Tribe, at 5.

368.     In other words, because the seepage water quality would exceed the applicable standards at the site, the Agency cannot allow this contaminated water to be used for dust suppression, or transported via the pipeline back for discharge at the West Plant site or beyond.  At a minimum, the FEIS's failure to fully analyze the quality and uses of this contaminated water violates NEPA and the NDAA.

*Failure to Adequately Analyze the Transmission and Power Infrastructure*

369.    Another example of the failure to fully review and analyze (or even fully describe) the impacts from Project facilities, the Draft ROD (p.5) proposes to approve Special Use Authorizations for only two transmission lines: 1) One new 3.6-mile, 230kV power line from the Silver King substation to Oak Flat, and 2) a 16.9-mile, either 69kV or 115kV power line from the Silver King substation to the Skunk Camp tailings storage facility.

370.    However, the USFS failed to conduct a meaningful review and analysis, required by NEPA and the NDAA, of the many direct, indirect, and cumulative impacts from these two transmission line corridors on the human environment.

371.    The FEIS' discussions on Project impacts are highly vague and largely unchanged from the DEIS, despite the recent and "substantial" redesign of the Skunk Camp transmission line corridor (USFS Briefing Paper, 8/20/2020).  Additionally, the new 3.6-mile 230kV transmission line was misleadingly described as merely an "upgrade" of an existing line and as such, no new corridor footprint for this line was ever fully analyzed or provided for public comment as required under NEPA.

372.    Review of the Project record indicates that only a cultural resources report for the 230kV and 115kV lines (Charest 2020) may have been conducted.  And still, only the title page is provided and it is impossible to determine the scope of what this document includes or does not include, or even which exact transmission lines (or design iterations thereof) it purports to address.

373.    In addition, the FEIS contains no other similar report for any of the other myriad environmental impacts of the transmission lines including but not limited to water impacts, impacts to wildlife species, vegetation, visual resources, recreation, air, access, or otherwise.  Any older reviews predating the substantial redesign of Skunk Camp tailings corridor are now outdated and cannot be reasonably relied upon to fulfill the requirements of a full NEPA review.

374.     Separate from these two transmission lines, the FEIS also indicates that there are several more new proposed transmission lines or substations related to this Project and yet, no discussion appears in the FEIS looking at the impacts, baseline conditions, footprints, or otherwise for these new and/or expanded transmission line corridor areas on values such as wildlife and vegetation, visual impacts, cultural resource, air quality, water, or other resources found within these rights-of-way.  This failure to take a hard look at these impacts violates NEPA and the NDAA.

375.     The analysis needed to look at these impacts cannot be done later in time, but rather, must be done now under the single EIS requirement of the NDAA.

376.     For example, the FEIS indicates two new 230kV proposed new transmission lines that appear to cross a portion of Forest Service lands and tie into an existing transmission line (see callout box, Figure 2.2.2-15, FEIS p. 78), but that are never analyzed.[15]

377.     The FEIS indicates two new 69/34.5kV proposed new transmission lines (Figure 2.2.2-15, FEIS p. 78), which also are never analyzed.

378.     The FEIS (p.77) notes that, "[s]ubstations also would need to be upgraded and/or new 230-kV substations would need to be constructed" but fails to ever give any specifics about where a new 230kV new substation (or substations) would be located.

379.     The FEIS indicates two new proposed 69kV power lines, and one new proposed 12kV power line to run from the Abel substation "adjacent to the MARRCO corridor" (not within) (Table 2.2.2-7, FEIS p.79-80).  Yet Figures 2.2.2-12 and 2.2.2-13 (FEIS at 73-74) show only one "Proposed Transmission Line," not the three lines indicated just pages later.

380.     The FEIS admits that "a portion of the MARRCO corridor is located on [National Forest Service] lands and would be subject to Forest Service regulatory

---

[15] This contradicts Figure 2.2.2-9 (West Plant Site facilities overview), which shows these two transmission lines as being on Resolution-owned land).

jurisdiction." FEIS at ES-7.  Yet as noted above, the Forest Service did not consider or analyze the need for a Special Use Permit for these new uses of federal public lands.

381.    The FEIS fails to analyze the obvious, basic requirement that a new substation would also be required at the Skunk Camp tailings site to convert the high-voltage power being transmitted through the new transmission line(s) into distribution voltages for use, as well as the "access roads to service Skunk Camp."  No details or any mention of this necessary facility appear anywhere in the FEIS.

382.    In its November 18, 2020 letter responding to Salt River Project on its Special Use Permit application for the transmission line(s), the Forest Service says that "it is assumed" that the 500-foot corridor would be used.  The agency admits that: "It is understood that this proposal is preliminary and additional design, review, and other regulatory process are required before an authorization will be issued."  The agency then says, "[i]f the design and other regulatory processes have been completed and it is determined that the proposed high voltage transmission line cannot be located within the analyzed corridor, SRP shall submit a revised proposal and a complete review will be required." FEIS, Appendix Q.

383.    Yet under NEPA and the NDAA, such "additional review"  is not allowed, as all aspects of this proposal were required to be contained the FEIS.

384.    The Forest Service's letter further refers to "lines" (plural) in the 500-foot corridor, rather than the single transmission line for Skunk Camp mentioned in the FEIS. To the extent that the application purports to request authorization for multiple transmission lines, this has not been analyzed under NEPA, has not been included in the FEIS, and as such, approval of this application would be contrary to law.

*Failure to Analyze the Baseline Conditions of All Potentially Affected Resources*

385.    The FEIS fails to adequately analyze the affected environment, and baseline conditions, of all potentially affected resources.  As detailed above, this is especially true

regarding the baseline water conditions on and around the lands affected by Project facilities as detailed above.

386.    The late addition of the Skunk Camp site for the tailings waste facility highlights the failure to review the water, wildlife, cultural, and other baseline conditions of areas that may be affected by the Project.  For example, for the Skunk Camp tailings site, the Agency admits that: "Background groundwater quality is derived from a single sample in November 2018 from a well located adjacent to Dripping Spring Wash.  Background surface water quality is derived from a single sample in November 2018 from the Gila River at the confluence with Dripping Spring Wash." FEIS at 437.  The Forest Service has apparently performed some additional water quality modeling (FEIS at 437), but it continues to note this single-sample background data in the FEIS.

387.    The Forest Service also notes elsewhere that 42 groundwater samples and 29 surface water samples were collected (FEIS at 178), but never describes or explains how these additional samples were used or how this changed any analysis or conclusions between the DEIS and FEIS.

388.    The FEIS also fails to adequately analyze the baseline conditions and impacts to wildlife.  For example, the FEIS (Table 3.8.4-2, pp. 585-89) notes that thousands of acres of bird and other species' habitat, "potentially would be impacted under each action alternative," but no analysis in included as to how the Project activities—including but not limited to dewatering and water use and transmission lines—would directly, indirectly, and cumulatively impact wildlife, birds and habitat or the traditional, cultural or religious practices of the Tribes.

389.    Under the Land Exchange, the Oak Flat federal lands would leave Forest Service jurisdiction, which would reduce wildlife protections on these lands as the National Forest Management Act, Tonto National Forest Land and Resource Management Plan, the Organic Act, and provisions of the Endangered Species Act would no longer apply.  *See* FEIS at 570.

**The Agency Failed to Correctly Apply Federal Public Land Law, In Violation of FLPMA, the Organic Act, and the APA**

390.     The Forest Service's authority to regulate activities on national forest lands is governed in part by the Organic Administration Act of 1897 ("Organic Act"), 16 U.S.C. §§ 475, 551, which authorizes the agency to promulgate rules for the national forests, "to regulate their occupancy and use and to preserve the forests thereon from destruction." 16 U.S.C. § 551.  One of the Act's guiding principles is for the agency to "improve and protect" the national forests. 16 U.S.C. §475.  It further requires the Secretary of Agriculture (through the Forest Service) to, "make provisions for the protection [of the lands] against destruction by fire and depredations." 16 U.S.C. § 551.  The Service, "will insure the objects of such [forest] reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction." Id.

391.     The Forest Service regulations implementing these Organic Act mandates are found, in relevant part, at 36 C.F.R. Parts 251 and 261, which govern uses on the national forests.

392.     Here, the Forest Service must regulate the Project under its Part 251/261 special use regulations, as well as FLPMA's Title V Right of Way provisions, and not under the Part 228A regulations under which the agency reviewed the Project under the GPO.

393.     The Agency's authority under the Part 251/261 regulations are very different from, and much more environmentally protective, than the Part 228A regulations that the agency initially used to review the Project.  For example, the Agency must deny the Project if, "[t]he proposed use would not be in the public interest." 36 C.F.R. §251.54(e)(5)(ii).  In violation of these requirements, the USFS did not review the Project under this "public interest" standard.

394.     The Part 251 regulations provide significant authority and discretion to prohibit activity on Forest Service lands.  In addition, under the related Part 261 regulations, the Forest Service is required to prohibit the destruction of cultural resources and other resources on public lands, *see* 36 C.F.R. §§ 261.9(g)-(h), 261.10(a), (b).

395.     The Forest Service failed to properly apply these requirements to the Resolution Project, in violation of NEPA, the NDAA, FLPMA, the Organic Act, and their implementing regulations.

396.     Under FLPMA Title V, the Forest Service may only grant a right-of-way special use permit if it, "(4) will do no unnecessary damage to the environment." 43 U.S.C. § 1764(a). Rights-of-way "shall be granted, issued or renewed … consistent with … any other applicable laws." Id. § 1764(c). A Title V right-of-way special use permit "shall contain terms and conditions which will … (ii) minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment." Id. § 1765(a). In addition, the right-of-way special use permit can only be issued if activities resulting from the right-of-way special use permit:

> (i) protect Federal property and economic interests; (ii) manage efficiently the lands which are subject to the right-of-way or adjacent thereto and protect the other lawful users of the lands adjacent to or traversed by such right-of-way; (iii) protect lives and property; (iv) protect the interests of individuals living in the general area traversed by the right-of-way who rely on the fish, wildlife, and other biotic resources of the area for subsistence purposes; (v) require location of the right-of-way along a route that will cause least damage to the environment, taking into consideration feasibility and other relevant factors; and (vi) otherwise protect the public interest in the lands traversed by the right-of-way or adjacent thereto.

43 U.S.C. § 1765(b).

397.     At least three important substantive requirements flow from the FLPMA's right-of-way special use permit provisions. First, the Forest Service has a mandatory duty under Section 505(a) to impose conditions that, "will minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment." Id. §1765(a). The terms of this section do not limit "damage" specifically to the land within the right-of-way corridor. Rather, the repeated use of the expansive term "the environment" indicates that the overall effects of granting the right-of-way special use permit on cultural, environmental, scenic and aesthetic values must be evaluated and these resources protected. In addition, the obligation to impose terms and conditions that

"protect Federal property and economic interests" in Section 505(b) shows that the Forest Service must impose conditions that protect not only the land crossed by the right-of-way, but **all** federal lands and waters affected by the approval of the right-of-way special use permit .

398.    The Resolution Project could not operate as approved without the use of the tailings and ore concentrate pipelines, electrical transmission lines, roads, and other infrastructure reviewed in the FEIS and proposed to be approved by the upcoming Record of Decision.

399.    Second, the discretionary requirements in Section 505(b) require a Forest Service determination as to what conditions are "necessary" to protect federal property and economic interests, as well as "otherwise protect[ing] the public interest in the lands traversed by the right-of-way or adjacent thereto."  This means that the Agency can only approve the right-of-way special use permit if it "protects the public interest in lands" not only upon which the pipeline/roads/transmission lines would traverse, but also lands and resources adjacent to and associated with the right-of-way special use permit.  Thus, in this case, the Forest Service can only approve the right-of-way special use permits if the operation of the mine itself "protects the public interest."  As shown herein, that clearly is not the case.

400.    Third, the requirement that the right-of-way grant "do no unnecessary damage to the environment" and be "consistent with … any other applicable laws," id. §§ 1764(a)-(c), means that a grant of a right-of-way special use permit leading to the Mine must satisfy all applicable laws, regulations and policies.  Here, because the Project would violate many of these requirements, the agency cannot issue the right-of-way special use permits.

401.    The FEIS never discusses these statutory and regulatory requirements and did not review the Project under these constraints as it was required to do.

402.     Accordingly, the Agency's failure to properly apply FLPMA and the
Agency's right-of-way Special Use Permit regulations violates federal law and is arbitrary
and capricious.

## CLAIMS FOR RELIEF

## Claim 1:  Violation of the National Environmental Policy Act

403.     Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this
Complaint herein by reference.

404.     The Forest Service's actions and decisions in the preparation, issuance, and
reliance upon the inadequate FEIS as part of its review and approval of the Exchange and
the Resolution Project, including: (1) the failure to take the required "hard look" at the
Exchange and the Resolution Project; (2) failure to review the Project under the correct
legal regime, including the failure to have a proper "purpose and need" for its review of the
Project; (3) failure to include any information or opportunity to comment upon the
appraisals (including the additional Non-Federal lands that may be conveyed to the United
States based on the appraisals); (4) failure to fully review and properly analyze all
reasonable alternatives; (5) failure to properly analyze the affected environment and
baseline conditions of all potentially affected resources; (6) failure to properly analyze all
connected and cumulative actions, and all direct, indirect, and cumulative impacts; (7)
failure to properly analyze mitigation measures and their effectiveness; and (8) failure to
comply with the public and agency review requirements under NEPA, are arbitrary,
capricious, an abuse of discretion, contrary to NEPA, and its implementing regulations, not
in accordance with the law, and without observance of procedures required by law, and in
excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA. 5
U.S.C. §§ 701-706.

**Claim 2:  Violation of Section 3003 of the NDAA**

405.    Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this Complaint herein by reference.

406.    The Forest Service's actions and decisions in the preparation, issuance, and reliance upon the inadequate FEIS as part of its review and approval of the Exchange and the Resolution Project, including the failure to fully protect all cultural and Native American resources from the Exchange and the Project and take the required "hard look" at the Exchange and the Resolution Project and comply with the public and agency review requirements under NEPA and Section 3003 of the NDAA, are arbitrary, capricious, an abuse of discretion, contrary to the NDAA and NEPA, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA. 5 U.S.C. §§ 701-706.

**Claim 3  Violation of the Forest Service Organic Act.**

407.    Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this Complaint herein by reference.

408.    The Forest Service's actions and decisions issuing the inadequate FEIS as part of its review and approval of the Exchange and the Resolution Project, are arbitrary, capricious, an abuse of discretion, contrary to the Organic Act and its implementing regulations (including Forest Service Regulations at 36 C.F.R. Parts 251, 261), not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA. 5 U.S.C. §§ 701-706.

**Claim 4:  Failure to Properly Review and Regulate the Resolution Project in Violation of the FLPMA, the Organic Act, and Public Land Laws.**

409.    Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this Complaint herein by reference.

410.     The Forest Service's actions and decisions issuing the inadequate FEIS as part of its review and approval of the Exchange and the Resolution Project, including its failure to properly review and regulate all proposed activities on federal land, are arbitrary, capricious, an abuse of discretion, contrary to the FLPMA, the Organic Act, NEPA, and NDAA, and their implementing regulations (including Forest Service Regulations at 36 C.F.R. Parts 251, 261), not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA.  5 U.S.C. §§ 701-706.

## **REQUEST FOR RELIEF**

For the foregoing reasons, Plaintiffs respectfully request that this court:

A.     Declare that the Forest Service has violated NEPA, Section 3003 of the NDAA, the Organic Act, FLPMA, the other laws noted herein, the APA, and the implementing regulations and policies of these laws;

B.     Set aside and vacate the FEIS and any actions or decisions based on the FEIS;

C.     Enjoin the Forest Service from allowing, authorizing, or approving the Exchange or any aspect of the Exchange or Resolution Project in reliance on the FEIS until the Forest Service has complied with NEPA, Section 3003 of the NDAA, the Organic Act, FLPMA, the other laws noted herein, the APA, and the implementing regulations and policies of these laws;

D.     Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable federal law; and

E.     Grant such additional relief as this court deems equitable, just, and proper.

Respectfully submitted this 22nd day of January, 2021,

*/s/ Roger Flynn*
_____
Roger Flynn (pro hac vice application pending)

Jeffrey C. Parsons (pro hac vice application pending)
WESTERN MINING ACTION PROJECT
P.O. Box 349
440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink (pro hac vice application pending)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
Email: mfink@biologicaldiversity.org

Allison N. Melton (pro hac vice application pending)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
Email: amelton@biologicaldiversity.org

Attorneys for All Plaintiffs

/s/ Susan Montgomery
_____
Susan B. Montgomery (AZ Bar # 020595)
Robyn L. Interpreter (AZ Bar # 020864)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milaz.com

Attorneys for the ITAA