Roger Flynn (CO Bar # 21078) *(pro hac vice)*
Jeffrey C. Parsons (CO Bar #30210) *(pro hac vice)*
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738; wmap@igc.org

Marc D. Fink (MN Bar #343407) *(pro hac vice)*
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539; mfink@biologicaldiversity.org

Allison N. Melton (CO Bar #45088) *(pro hac vice)*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008; amelton@biologicaldiversity.org
*Counsel for All Plaintiffs*

Susan B. Montgomery (AZ Bar # 020595)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825; smontgomery@milawaz.com
*Counsel for Inter Tribal Association of Arizona*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| Arizona Mining Reform Coalition, *et al.*, | Case No.  2:21-cv-00122-DLR |
| Plaintiffs | |
| vs. | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| United States Forest Service, *et al.*, | |
| Defendants. | **ORAL ARGUMENT REQUESTED** |

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 3

STANDARDS FOR PRELIMINARY RELIEF .................................................................. 5

ARGUMENT .......................................................................................................... 6

I.      Plaintiffs Are Likely to Succeed on the Merits ........................................ 6

*The FEIS Violates the Public and Environmental Review*
*Requirements of NEPA and the NDAA.* ......................................................... 6

A.      The NDAA Required the Forest Service to Prepare a Final EIS in
         Compliance with NEPA as a Prerequisite to Approving the Exchange ............. 6

B.      NEPA Statutory Background ............................................................... 8

C.      The Forest Service Failed to Comply with NEPA and the NDAA ....................... 10

        *1.      Failure to Consider, Review, and Provide for Public Comment on,*
               *the Appraisals and Properties to be Exchanged* ........................................ 10

        *2.      The FEIS Fails to Adequately Consider and Disclose the Adverse*
               *Effects of the Massive Amount of Water Required for the Mine* ............... 13

        *3.      The FEIS Fails to Adequately Consider and Disclose the Cumulative*
               *Effects of Water Use in the East Salt River Valley* .................................... 16

        *4.      Failure to Analyze Mitigation for the Massive Groundwater Pumping* .... 21

II.     The Land Exchange Will Result in Immediate Irreparable Harm to
         Plaintiffs' Interests and Uses of Oak Flat and the Surrounding Areas ......... 24

III.    The Balance of Hardships and Public Interest Tip Sharply in Favor
         of Plaintiffs ................................................................................................... 26

A.      The Public Interest Weighs Heavily in Favor of a Preliminary Injunction ......... 26

B.      The Interests of the Forest Service and Resolution Copper Are Not
         Sufficient to Override the Interests of Plaintiffs and the Public ..................... 26

IV.     No More Than a Nominal Bond is Appropriate in this Case ......................... 27

LIST OF EXHIBITS .......................................................................................... 29

# TABLE OF AUTHORITIES

***Federal Caselaw***

Alliance for the Wild Rockies v. Cottrell,
632 F.3d 1127 (9th Cir. 2011) ...................................................................5, 6

Apache Stronghold v. U.S.A.
CV-21-0050-PHX-SPL (D. Ariz. 2021) ........................................................7

Cal. Ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency,
766 F.2d 1319 (9th Cir. 1985) .......................................................................27

Desert Citizens Against Pollution v. Bisson,
231 F.3d 1172 (9th Cir. 2000) ...................................................................2, 24

Friends of the Earth v. Brinegar,
518 F.2d 322 (9th Cir. 1975) .........................................................................27

Great Basin Mine Watch v. Hankins,
456 F.3d 955 (9th Cir. 2006) .........................................................................17

Great Basin Res. Watch v. BLM,
844 F.3d 1095 (9th Cir. 2016) ................................................12, 14, 17, 23

Idaho Sporting Congress v. Thomas,
137 F.3d 1146 (9th Cir. 1998) .........................................................................9

L.A. Mem'l Coliseum Comm. v. NFL,
634 F.2d 1197 (9th Cir. 1980) .......................................................................26

Marsh v. Or. Nat. Res. Council,
490 U.S. 360 (1989) .........................................................................................8

Native Village of Point Hope v. Jewell,
740 F.3d 489 (9th Cir. 2014) .........................................................................16

N. Plains v. Surface Transp. Bd.,
668 F.3d 1067 (9th Cir. 2011) ..............................................................9, 10, 19

Ocean Advocates v. U.S. Army Corps of Engineers,
402 F.3d 846 (9th Cir. 2005) ...........................................................................6

Or. Nat. Desert Ass'n v. Jewell,
823 F.3d 1258 (9th Cir. 2016) .......................................................................10

Or. Nat. Desert Ass'n v. Rose,
921 F.3d 1185 (9th Cir. 2019) ................................................................... 13

Republic of the Phil. v. Marcos,
862 F.3d 1355 (9th Cir. 1988) .................................................................... 5

Se. Alaska Conservation Council v. U.S. Army Corps of Engineers,
472 F.3d 1097 (9th Cir. 2006) ................................................................... 26

Sierra Club v. Bosworth,
510 F.3d 1016 (9th Cir. 2007) ................................................................... 26

S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior,
588 F.3d 718 (9th Cir. 2009 ...............................................................14, 26

Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior,
608 F.3d 592 (9th Cir. 2010) .................................................................... 17

Western Land Exchange Project v. BLM,
315 F.Supp.2d 1068 (D. Nev. 2004) ...............................................2, 7, 24

Winter v. Natural Resources Defense Council,
555 U.S. 7 (2008) ....................................................................................... 5

***Federal Statutes***

Administrative Procedure Act,
5 U.S.C. §§ 704, 706(2)............................................................................. 6

Endangered Species Act,
16 U.S.C. § 1536(a)(2) .............................................................................. 24

Fed. Rule. Civ. Pro. 65(c) .......................................................................... 27

National Environmental Policy Act ("NEPA"),
42 U.S.C. §§ 4321 *et seq.* ...............................................................*passim*

National Historic Preservation Act ("NHPA"),
16 U.S.C. §§ 470 *et seq.* .....................................................................3, 25

Section 3003 of the National Defense Authorization Act for Fiscal Year 2015
("NDAA"), Pub. L. 113-291 .............................................................*passim*

*State Statutes*

Arizona Groundwater Management Act of 1980,
A.R.S. § 45-562 ...........................................................................................14

*Federal Regulations*

40 C.F.R. Part 1500 ......................................................................................9

40 C.F.R. § 1500.1(a) ...................................................................................8

40 C.F.R. § 1500.1(b)...............................................................................8, 12

40 C.F.R. § 1502.2(d) .................................................................................14

40 C.F.R. § 1502.14 ..............................................................................10, 21

40 C.F.R. § 1502.16 ..............................................................................10, 21

40 C.F.R. § 1502.22 ..............................................................................12, 16

40 C.F.R. § 1508.7 ..................................................................................9, 16

40 C.F.R. § 1508.8 ........................................................................................9

40 C.F.R. § 1508.9 ........................................................................................9

40 C.F.R. § 1508.25(a) .................................................................................9

40 C.F.R. § 1508.25(c) .............................................................................9, 16

*Forty Most Asked Questions Concerning CEQ's [NEPA] Regulations*
46 Fed. Reg. 18026, 18031 (March 23, 1981) ............................................22

Executive Order 13007, Indian Sacred Sites
61 Fed. Reg. 26771 (May 24, 1996) .......................................................3, 24

81 Fed. Reg. 14829 (March 18, 2016) ..........................................................7

85 Fed. Reg. 43304-43376 (July 16, 2020)..................................................9

### INTRODUCTION

Plaintiffs, Arizona Mining Reform Coalition ("AMRC"), Inter Tribal Association of Arizona, Inc. ("ITAA"), Access Fund, Center for Biological Diversity, Earthworks, and the Sierra Club – Grand Canyon (Arizona) Chapter, respectfully submit this Motion for preliminary injunction and memorandum in support. This Motion asks this Court to enjoin and stay the Federal Defendants, U.S. Forest Service et al., from issuing or consummating a land exchange of public lands at and around Oak Flat – lands sacred to members of ITAA member Tribes and containing incredibly valuable public resources. Counsel for the Federal Defendants stated to Plaintiffs' counsel their opposition to this Motion.

On January 15, 2021, with only five days left in the Trump Administration, the Forest Service issued its Final Environmental Impact Statement ("FEIS") for its review of the "Resolution Copper Project and Land Exchange" and related Agency proposed approvals of pipelines, roads, electrical transmission lines, and other uses of federal public land associated with the proposed Resolution Copper Mine. The Exchange would give to multinational mining conglomerate, London-based Rio Tinto Corp. ("Rio Tinto," "Resolution," or "Resolution Copper") over 2,400 acres of federal public land.

The Exchange and related Forest Service approvals would facilitate Rio Tinto's proposed Resolution Copper Mine. The Mine would pump and dewater groundwater, deplete surface waters, and completely obliterate sacred land, Oak Flat, by creating a roughly two-mile-wide and 1,000 foot deep crater. The Mine would excavate ore 4,500 to 7,000 feet underground within the exchanged parcel and then collapse the void areas created by the excavation. The Mine would transform Oak Flat, which has since time immemorial been a place of profound religious, cultural, and historical significance, sacred to indigenous people, including the Western Apache and the Yavapai Peoples, into a rubbleized crater.

The Exchange itself would immediately privatize Oak Flat and remove federal protection for the sacred lands and public resources at the site. Current public land uses by Plaintiffs' members at Oak Flat for religious, cultural, spiritual, aesthetic, scientific and recreational purposes would be immediately eliminated and transformed into a situation

requiring Resolution's permission to enter these lands. The emotional and legal effect of the Exchange upon Plaintiffs' members would be immediate and profoundly disturbing.

The Ninth Circuit has held that users of public land would be harmed by the transfer of public land to a private entity, that issuance of an exchange in violation of federal law should be set aside, and that a preliminary injunction against an exchange is proper. "If, by exchange, public lands are lost to those who use and enjoy the land, they are certainly entitled under the APA to file suit to assure that no exchange takes place unless the governing federal statutes and regulations are followed, including the requirement that the land exchange is properly valued by the agency." Desert Citizens Against Pollution v. Bisson, 231 F.3d 1172, 1177 (9th Cir. 2000). "[T]he case is remanded for entry of a preliminary injunction setting aside this land exchange pending further proceedings in accordance with this opinion." Id. at 1188. This applies even when the exchange is ordered by Congress. See Western Land Exch. Project v. U.S. BLM, 315 F. Supp. 2d 1068, 1099 (D. Nev. 2004) ("BLM is enjoined from offering for sale, or issuing patent to, any of Phase I LCLA [Lincoln County Lands Act of 2000, Pub.L.106-298] lands prior to preparing an EIS that complies with the requirements of NEPA and this court's order.").

Here, the faulty FEIS and Project review, hurried through to completion in the waning days of the Trump Administration, is deficient in numerous critical areas, and violates multiple federal laws. As just one example of its rush-to-complete, the Agency failed to properly examine baseline water conditions under the National Environmental Policy Act ("NEPA"), 42 U.S.C. 4321 et seq., and then failed to (1) adequately analyze the immense impacts from the massive groundwater pumping and water depletions by the Mine; and (2) examine or provide any meaningful mitigation for the impacts of this water use, including for the environment and for water users in Arizona. The FEIS also ignored significant other water use and development in the same pumping area, severely low-balling the Mine's impacts, in violation of the NEPA. These omissions were strongly criticized by the State of Arizona, among others.

The FEIS also failed to include any information or opportunity to comment on the

appraisals that Congress required to be completed (including the additional Non-Federal lands that may be conveyed to the United States based on the appraisals), as required by NEPA and the Congressional rider that authorized the Exchange. Due to briefing space limitations, only a subset of the many claims against the FEIS are raised in this motion.

Plaintiffs satisfy the prevailing tests for obtaining a preliminary injunction: (1) the privatization of public lands via the Exchange will result in immediate and irreparable harm to Plaintiffs' and their members' use of the currently public lands; (2) the multiple failures of the FEIS and the proposed Exchange evidence a strong likelihood of success on the merits; (3) the balance of hardships tips overwhelmingly towards Plaintiffs and against the Forest Service; and (4) the public interest will be well served if the Exchange is enjoined while this Court considers the merits of this important case.

## **FACTUAL BACKGROUND**

The significance and importance of Oak Flat is undisputed. In 1955, Oak Flat was withdrawn from mining by the Eisenhower Administration. The Oak Flat area is a place of profound religious, cultural, and historic significance to the San Carlos Apache Tribe and other Indian tribes, nations, and communities in Arizona, including Tribal members of Plaintiff ITAA. Apache People call Oak Flat "*Chich'il Bildagoteel,"* or "a Flat with Acorn Trees" and it lies at the heart of *T'iis Tseban* Country, sacred to Apache Peoples. *See, e.g.*, FEIS at 837-848 (describing importance of Oak Flat and destruction of the sacred site)(Excerpts from the FEIS are compiled in Exhibit 1).

Because of its importance to the Apache Tribe and other tribes, nations and communities, Oak Flat is recognized in the National Register of Historic Places as a Traditional Cultural Property ("TCP") under Section 106 of the National Historic Preservation Act, 16 U.S.C. §§ 470 *et seq.* ("NHPA"), and is identified as a "sacred site" within the meaning of Executive Order 13007, Indian Sacred Sites, May 24, 1996, 61 Fed. Reg. 26771 ("E.O. 13007"), and related laws, regulations and policies.

The religious and cultural importance of the Oak Flat area does not reside in isolated spots, but rather in the area as a whole. For the Apache People, the area of "Oak Flat" is

bounded to the west by (and including) the large escarpment known as "*Dibecho Nadil*" or "Apache Leap" and on to the east by (and including) *Gan Bikoh*, which means "Crowndancers Canyon," though it is often referred to by Apache People as "Ga'an Canyon" and by non-Indians and in the FEIS as "Devil's Canyon." Oak Flat is bounded to the north by (and including) *Gan Daszin* or "Crowndancer Standing," which is delineated on most maps as "Queen Creek Canyon."

The ancient oak grove at Oak Flat provides an abundant source of acorns that, for many centuries and even today, provides an important traditional food source for the Apache People. There are also hundreds of plants and other living things in the Oak Flat area that are essential elements of the Apache religion and culture. Although these plants can be gathered in other areas, Apaches believe that only plants within the Oak Flat area are imbued with the unique power of this sacred place.

Oak Flat is also recognized for its beauty and importance to outdoor enthusiasts, including members of Plaintiff groups who value it for recreation and as a place of unique biological diversity. Oak Flat attracts rock-climbers from around the country for its special attributes. In the campground and picnic area, ancient oak trees provide shade for hikers, campers, and picnicking families, and give sanctuary to many important bird species.

Wildlife cameras have documented a wide variety of wildlife at Oak Flat, including mountain lion, bear, and coatimundi. Lands to be exchanged-away provide important wildlife habitat for Federally listed endangered and threatened species such as the southwestern willow flycatcher, yellow billed-cuckoo, Gila chub, Arizona hedgehog cactus, and ocelot. Over 170 bird species have been documented at Oak Flat. *See generally* FEIS at 573-600 (describing significant and irreversible harm to wildlife from the Project).

In 2014, however, a legislative rider was added to a must-pass appropriations bill, leading to Congressional authorization for a Land Exchange between the Forest Service and Resolution. *See* Section 3003 of the National Defense Authorization Act for Fiscal Year 2015. Pub. L. 113-291 ("NDAA" or "Section 3003") (Exhibit 2).

Pursuant to §3003, the timing of the Land Exchange is triggered by the publication of

4

the Forest Service FEIS: "Title Transfer – Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper." NDAA, § 3003(c)(10). The FEIS was issued on January 15, 2021. Thus, the Land Exchange is set to be executed by March 16, 2021, resulting in the loss of these public lands.

All of the current public lands and uses would be eliminated by the Exchange, and the medicine and culturally important plants and animals that reside at this biologically diverse place will be handed over to a foreign company that will then have the exclusive rights of private ownership, including the right to mine and destroy these lands, thus necessitating an injunction to keep the *status quo* while this Court considers the merits.

### STANDARDS FOR PRELIMINARY RELIEF

To obtain preliminary relief, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Resources Defense Council, 555 U.S. 7, 20 (2008). Assuming that irreparable harm is sufficiently likely and the public interest favors a stay, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011). "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." Id. at 1131. "Serious questions going to the merits" are defined as: "substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a "fair chance of success on the merits." Republic of the Phil. v. Marcos, 862 F.2d 1355, 1362 (9th Cir. 1988). Plaintiffs satisfy all four parts of this test, and the preliminary injunction should issue in this case.

1

## **ARGUMENT**

2

**I.      Plaintiffs Are Likely to Succeed on the Merits.**

3        Plaintiffs are likely to succeed on all of their claims, although a likelihood of success

4    on any claim warrants relief. At a minimum, an injunction should issue because Plaintiffs

5    have shown "that serious questions going to the merits were raised." Alliance for the Wild

6    Rockies, 632 F.3d at 1134-35. Pursuant to the APA, final agency action is subject to judicial

7    review, and a federal court "shall . . . hold unlawful and set aside agency action, findings,

8    and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise

9    not in accordance with law; [or] . . . (D) without observance of procedures required by law."

10   5 U.S.C. §704, 706(2). In determining whether the Agency's actions violated federal law,

11   "[courts] 'must not 'rubber-stamp' . . . administrative decisions [they] deem inconsistent

12   with a statutory mandate or that frustrate the congressional policy underlying a

13   statute." Ocean Advocates v. U.S. Army Corps of Engineers, 402 F.3d 846, 859 (9th Cir.

14   2005) (citations omitted).

15
16   ***The FEIS Violates the Public and Environmental Review Requirements of NEPA and the NDAA.***

17
18         A.      The NDAA Required the Forest Service to Prepare a Final EIS in Compliance with NEPA as a Prerequisite to Approving the Exchange.

19        Although Congress directed the Forest Service to exchange the federal parcels at and

20   around Oak Flat as described in the NDAA, it did not do so without first requiring that each

21   federal agency involved in the exchange comply with NEPA and all applicable laws, for

22   both the review and approval of the Exchange, as well as for Resolution's plans for

23   facilities related to the Mine, such as the tailings waste impoundment, mine shafts, slurry

24   pipelines, electrical transmission lines and facilities, roads, water use, and other activities.

25        The Forest Service acknowledged this obligation, specifically stating that the FEIS

26   needed to be completed, and comply with NEPA, before the Exchange could be approved.

27   In the Federal Register Notice of Intent to prepare the EIS, the Agency stated:

28

6

DEPARTMENT OF AGRICULTURE Forest Service Tonto National Forest; Pinal County, AZ; Resolution Copper Project and Land Exchange Environmental Impact Statement AGENCY: Forest Service, USDA. ACTION: Notice of intent to prepare an **Environmental Impact Statement for approval of a plan of operations for the Resolution Copper Project and associated land exchange**; request for comments; and notice of public scoping.

SUMMARY: **The Tonto National Forest (TNF) is preparing an Environmental Impact Statement (EIS) to evaluate and disclose the potential environmental effects from**: (1) Approval of the ''General Plan of Operations'' (GPO) submitted by Resolution Copper Mining, LLC (Resolution Copper), for operations on National Forest System (NFS) land associated with a proposed large-scale mine; (2) **the exchange of land between Resolution Copper and the United States**; and (3) amendments to the Tonto National Forest Land and Resource Management Plan (forest plan) (1985, as amended).

Fed. Reg., Vol. 81, at 14829 (March 18, 2016) (emphasis added). Indeed, in a response last month to a public letter to Rio Tinto/Resolution, the company reiterated that the Exchange could not be authorized or approved unless the FEIS was fully compliant with NEPA:

The Resolution land exchange, in contrast to other land exchanges mandated by Congress, is subject to completion of an environmental impact assessment under the National Environmental Policy Act (NEPA) by the US Forest Service.  Other land exchanges mandated by Congress occur 60 days after passage without a review under NEPA.  **Making the Resolution land exchange contingent on a full NEPA review was one of the requirements that bipartisan leaders included in the legislation prior to its passage in 2014.**

Email response from Jakob Stausholm, CEO of Rio Tinto, to Roger Featherstone, Director of Plaintiff AMRC (emphasis added, attached to Featherstone Declaration, Exhibit 3).

In a recent preliminary ruling on a motion to block the publication of the FEIS, on completely different grounds than those raised by Plaintiffs in this case, the Court noted that the FEIS language could be interpreted to say that it was not required prior to the consummation of the Exchange. Order at 20-21, in CV-21-0050-PHX-SPL (Apache Stronghold v. U.S.A.) (Jan. 12, 2021). Under the specific terms of §3003(c)(9), however, the NDAA requires a NEPA-compliant FEIS as one of the prerequisites for approval of the Exchange. *See also* Western Land Exchange Project, 315 F.Supp.2d at 1081-82, holding that congressional language mandating that a land exchange be subject to "other applicable law" required NEPA compliance prior to the exchange. Here, the requirement to comply

with NEPA as a prerequisite to the Exchange is not just implied in the statute, as was the case in <u>Western Land Exchange</u>, but is an express part of the NDAA.

The NDAA placed significant restrictions on the Agency's approval of the Exchange and the proposed Project, mandating an FEIS that is fully compliant with all federal laws, including NEPA, be the basis for all decisions under federal law related to the Exchange and the Mine. §3003(c)(9) ("the Secretary shall carry out the land exchange in accordance with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.)." According to the NDAA:

> Prior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities.

§3003(c)(9).

Thus, the Agency cannot defer or postpone the review of any aspect of the Exchange or the Project to a future public or agency process, as Congress directed that all aspects be analyzed in "a single environmental impact statement." <u>Id.</u> Yet that is what the Forest Service has done, deferring and postponing full consideration of the lands to be exchanged, baseline conditions, direct, indirect, and cumulative impacts, mitigation measures and analysis, and other aspects of the Exchange and Project.

> B.    <u>NEPA Statutory Background</u>

NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA "prevent[s] or eliminate[s] damage to the environment and biosphere by focusing government and public attention on the environmental effects of proposed agency action." <u>Marsh v. Or. Nat. Res. Council</u>, 490 U.S. 360, 371 (1989). "NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. §1500.1(b). This review must

be supported by detailed data and analysis – unsupported conclusions violate NEPA. *See* Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1150 (9th Cir. 1998); N. Plains v. Surface Transp. Bd., 668 F.3d 1067, 1075 (9th Cir. 2011) (conclusions must be supported by reliable studies). The Council on Environmental Quality ("CEQ") promulgated NEPA regulations that are binding on all federal agencies. 40 C.F.R. Part 1500.[1]

Under NEPA, the Forest Service must consider (1) "the environmental impact of the proposed action," (2) "any adverse environmental impacts that cannot be avoided," (3) "alternatives to the proposed action," (4) "the relationship between local short-term uses. . . and the maintenance and enhancement of long-term productivity," and (5) "any irreversible and irretrievable commitments of resources." 42 U.S.C. §4332(2)(C).

An EIS must include a full and adequate analysis of environmental impacts of a project and alternatives and take a "hard look" at the direct, indirect, and cumulative impacts of the project and its alternatives, resulting from all past, present, and reasonably foreseeable future actions. 40 C.F.R. §§1508.7, 1508.8, 1508.9, 1508.25(c). An "effect" as used in NEPA and its implementing regulations "includes ecological . . . , aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." Id. § 1508.8(b). Types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." Id. Cumulative effects/impacts are defined as:

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

Id.. §1508.7. When preparing an EIS, an agency must consider all "connected actions," "cumulative actions," and "similar actions." Id. §1508.25(a).

---

[1] The CEQ recently revised its NEPA regulations, which became effective on September 14, 2020. 85 Fed. Reg. 43304-43376 (July 16, 2020). Because the Forest Service conducted its NEPA review for this project before the new regulations became effective, the CEQ NEPA regulations existing prior to September 14, 2020, at 40 C.F.R. Part 1500, apply here.

In addition, the establishment of the baseline conditions of the environment is a fundamental requirement of the NEPA process, as an inadequate environmental baseline precludes an accurate assessment of project impacts. Or. Nat. Desert Ass'n v. Jewell, 823 F.3d 1258 (9th Cir. 2016). "[W]ithout [baseline] data, an agency cannot carefully consider information about significant environment impacts. Thus, the agency fails to consider an important aspect of the problem, resulting in an arbitrary and capricious decision." N. Plains Res. Council, 668 F.3d at 1085 (9th Cir. 2011).

NEPA also requires the Forest Service to fully analyze all mitigation measures, their effectiveness, and any impacts that might result from their implementation. NEPA regulations mandate that the agency's environmental review: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," 40 C.F.R. §1502.14(f); and (2) "include discussions of: . . . Means to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." Id. §1502.16(h). NEPA requires that the Forest Service review mitigation measures as part of the NEPA process—not in some future decision shielded from public review. Id. §1502.16(h).

C.    The Forest Service Failed to Comply with NEPA and the NDAA

1.    *Failure to Consider, Review, and Provide for Public Comment On, the Appraisals and Properties to be Exchanged*

The NDAA required that the Exchange be based on the preparation of detailed analysis of the lands to be exchanged, and legally-compliant appraisals for each parcel. Yet none of this information appears in the FEIS or was ever subject to public review and comment, in violation of NEPA and the NDAA. This is despite the Forest Service's acknowledgement that, in reviewing the Exchange proposal, it had "discretion" as directed by the NDAA to "ensure that title to the non-Federal lands offered in the exchange is acceptable; [and] accept additional non-Federal land or cash payment from Resolution Copper to the United States in the event that the final appraised value of the Federal land exceeds the value of the non-Federal land." Ex. 1, FEIS Executive Summary (ES) at ES-9.

Despite this discretion over the appraisals and related lands to be exchanged, the FEIS completely ignores these issues.

Pursuant to the NDAA, the required appraisals "shall be conducted in accordance with nationally recognized appraisal standards, including – (I) the Uniform Appraisal Standards for Federal Land Acquisitions; and (II) the Uniform Standards of Professional Appraisal Practice." §3003(c)(4)(B)(i). "Before consummating the land exchange under this section, the Secretary [of Agriculture] shall make the appraisals of the land to be exchanged (or a summary thereof) available for public review." §3003(c)(4)(B)(iv).

The "final appraised values of the Federal land and non-Federal land" must be "determined and approved by the Secretary." §3003(c)(4)(B)(ii). "The value of the Federal land and non-Federal land to be exchanged under this section shall be equal or shall be equalized in accordance with this paragraph." §3003(c)(5)(A).

> If the final appraised value of the Federal land exceeds the value of the non-Federal land, Resolution Copper shall – (I) convey additional non-Federal land in the State to the Secretary or Secretary of the Interior, consistent with the requirements of this section and subject to the approval of the applicable Secretary; (II) make a cash payment to the United States; or (III) use a combination of the methods described in subclauses (I) and (II), as agreed to by Resolution Copper, the Secretary, and the Secretary of the Interior.

§3003(c)(5)(B)(i).

The Non-Federal Lands to be conveyed to the United States are listed in §3003(d). But this list does not include the "additional non-Federal land in the State" that may be conveyed to the United States pursuant to §3003(c)(5)(B)(i). Conveyance of the currently non-Federal land to the United States pursuant to the Exchange only occurs if "the Secretary determines" the conveyance to each property and interest "to be acceptable." §3003(d)(1)(A). The transfer and conveyance of lands and interests pursuant to the Exchange "shall" be done "simultaneously." §3003(d)(1).

Despite repeated requests from the Plaintiffs to provide for public review of the appraisals and appraisal process as part of the Agency's preparation of the FEIS, the Agency refused to provide any meaningful information on the appraisals to the public prior

to issuance of the FEIS, and has still not done so. There is no discussion in the FEIS

regarding the "additional non-Federal land in the State" that may be conveyed to the United

States pursuant to §3003(c)(5)(B)(i). Indeed, the Agency admits that it does not even know

which lands will be exchanged, as that will only be determined through the future post-

FEIS appraisal process:

> With regard to the land exchange, Section 3003 of PL 113-291 directs the Secretary of Agriculture to convey to Resolution Copper all right, title, and interest of the United States in and to identified Federal land if Resolution Copper offers to convey to the United States all right, title, and interest of Resolution Copper in and to identified non-Federal lands. Note that the acreages shown in this section are those offered by Resolution Copper to the Federal Government, after completion of surveys.  Ultimately, the Federal Government may not accept all portions of these lands. **The exact parcels and acreage would be assessed through the land appraisal process.**

Ex. 1, FEIS at ES-9 (emphasis added).

Under NEPA, however, the Agency cannot simply defer analysis of these critical

appraisal issues until sometime in the future. "NEPA procedures must ensure that

environmental information is available to public officials and citizens *before* decisions are

made and *before* actions are taken." 40 CFR §1500.1(b) (emphasis added). In addition, as

noted above, the NDAA itself requires that all actions associated with the Exchange and

Mine be fully analyzed and subject to full public review in one EIS. §3003(c)(9)(B).

At the very least, NEPA requires the Forest Service to explain in the FEIS why the

appraisals could not be obtained and disclosed. 40 C.F.R. §1502.22. Here, the NDAA,

which was enacted in 2014, required the selection of an appraiser "as soon as practicable."

§3003(c)(4). Six years later, the Forest Service precipitously released the FEIS with no

explanation as to why it could not wait until completion of the appraisals. The only

ascertainable rationale for why the Agency created this untenable situation was to rush out

the FEIS in the final days of the prior Administration.

The Agency cannot fix this after the fact, as "a post-EIS analysis – conducted

without any input from the public – cannot cure deficiencies in an EIS." Great Basin Res.

Watch v. BLM, 844 F.3d 1095, 1104 (9th Cir. 2016). "Such late analysis, 'conducted

without any input from the public,' impedes NEPA's goal of giving the public a role to play in the decisionmaking process and so 'cannot cure deficiencies' in [a NEPA document]." Or. Nat. Desert Ass'n v. Rose, 921 F.3d 1185, 1192 (9th Cir. 2019) (citations omitted).

2.    *The FEIS Fails to Adequately Consider and Disclose the Adverse Effects of the Massive Amount of Water Required for the Mine.*

Although the most immediate effects of the Exchange result from the imminent transfer of public lands to Resolution as detailed above and in Plaintiffs' declarations, the legality of the Agency's actions also depend on whether the FEIS complies with the strict environmental and public review requirements of NEPA. Here, the FEIS fails to adequately analyze the direct, indirect, and cumulative impacts from the Exchange and Project on all potentially affected resources, including water quality and quantity, wildlife, cultural and religious resources, recreation, and economics.

One of the most glaring inadequacies in the FEIS involves water. The FEIS admits that 544,858 - 550,000 AF of "fresh groundwater" would be pumped by Resolution at the Desert Wellfield (the area in the East Salt River Valley where Resolution will pump the vast majority of the groundwater to support the Mine). Ex. 1, FEIS at H-7; *see also* FEIS at 418.[2] This is in addition to the roughly 87,000 AF of water that would be dewatered by the Mine at the site to keep its tunnels, adits, shafts and other underground infrastructure free of water so that mining can occur. Id., FEIS at 405. When combined, these two actions of the Project would consume (deplete) at least 677,000 AF of water from Arizona's limited water sources.

Yet the FEIS fails to provide any meaningful analysis or plan for mitigating the pumping impacts associated with the Desert Wellfield. Instead, the Forest Service relies on future Arizona state water permitting processes to ascertain these critical water issues, as the Agency admits that the actual water use by the Project would be determined by the Arizona Department of Water Resources ("ADWR") in the future, long after the NEPA and NDAA review has been completed. This includes a determination of the "unavoidable

[2] An Acre-Foot (AF) of water is approximately 325,851 gallons.

impacts" and related mitigation measures associated with the massive dewatering of the East Salt River Valley stemming from the Desert Wellfield. Ex. 1, FEIS at 422.

But under NEPA, the extent of these "unavoidable impacts" must be determined, analyzed, and subject to full public review during the NEPA process—not during some future state process to which NEPA and the NDAA do not apply. The Ninth Circuit has rejected an agency's reliance on a future state permitting process as a substitute for the federal public review process under NEPA:

> [A]failure to discuss [environmental impacts] in an EIS was not excused by the fact that the facility 'operate[d] pursuant to a state permit under the Clean Air Act,' because '[a] non-NEPA document ... cannot satisfy a federal agency's obligations under NEPA'). The failure to explain the [environmental] assumption frustrated the BLM's ability to take a 'hard look' at air impacts, and the reference to the Project's Clean Air Act permit did nothing to fix that error.

Great Basin Res. Watch, 844 F.3d at 1104 (9th Cir. 2016), *quoting* S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of the Interior, 588 F.3d 718, 726 (9th Cir. 2009).

Additionally, the Forest Service was required by NEPA to address in the FEIS how the massive water use required by the Project would or would not comply with other laws and policies. 40 C.F.R. §1502.2(d). The FEIS, however, failed to assess whether the Project would comply with applicable state laws regarding groundwater. The Mine and much of its infrastructure, including mine dewatering infrastructure, "lies almost entirely within the Phoenix AMA." Ex. 1, FEIS at 387, n.52. Under the Arizona Groundwater Management Act of 1980, areas of the state with "heavy reliance on mined groundwater" were designated as Active Management Areas ("AMAs"), and for many AMAs including the Phoenix AMA, the primary management goal is to achieve safe-yield by the year 2025, meaning the amount of water pumped out of the ground is the same as what goes back into underground aquifers. *See* A.R.S. §45-562. The FEIS failed to consider or analyze the impacts of the immense amount of water to be pumped by the Desert Wellfield (at least 550,000 acre-feet) on the state's statutory safe-yield goals for the Phoenix AMA.

The Forest Service instead vaguely concluded in the FEIS that the numerous high-

14

capacity wells to be developed at the Desert Wellfield pumping in the East Salt River Valley "would incrementally contribute to the lowering of groundwater levels and cumulatively reduce overall groundwater availability in the area." Ex. 1, FEIS at ES-25. But the FEIS failed to provide substantive details about these impacts or to meaningfully or objectively consider the direct, indirect, or cumulative impacts of the Desert Wellfield pumping to the groundwater availability in the area or to local, regional, and state-wide water supplies and the environment overall.

Additionally, even though the Desert Wellfield is located within the East Salt River Valley of the Phoenix AMA (Ex. 1, FEIS at 415), the Wellfield is in extremely close proximity to the Pinal AMA, and thus the substantial pumping that would occur at the Desert Wellfield will intersect and deplete groundwater supplies within the Pinal AMA as well. The FEIS' groundwater model, however, entirely excludes impacts to groundwater resources in the Pinal AMA, and instead abruptly terminates its review at the boundaries of the Phoenix AMA without explanation, despite the hydrologic connection between the two AMAs as shown in the Plaintiffs' modified FEIS Figure 3.7.1-2 (Exhibit 4). The Forest Service ignored this critical factor in its NEPA analysis, despite the fact that the drawdown contours from pumping the Desert Wellfield are shown in the FEIS to extend down past the southernmost boundary of this model by levels of at least 40 feet or more and into the Pinal AMA model boundary.

The Forest Service also failed to consider in the FEIS the current Pinal AMA groundwater flow model, which was updated by ADWR in October 2019. The ADWR's update shows a **shortfall** of 8 million acre-feet of water between demands and available groundwater resources in the Pinal AMA. Despite the existence of a decade-long drought in Arizona and the need for reliable groundwater supplies to support planned and future growth within this region, the massive shortfall of 8 million acre-feet was not meaningfully evaluated by the Forest Service in the FEIS as NEPA requires.[3]

---

[3] *See* ADWR, 2019 Pinal Model And 100-Year Assured Water Supply Projection Technical Memorandum (Oct. 11, 2019)(Exhibit 5).

Under NEPA, the Agency must provide the needed information in the Draft and Final EIS and this duty is not excused because the Agency and/or Project proponent have yet to obtain and compile this information. The Forest Service failed to provide in the FEIS the required information and analysis on baseline conditions and water impacts, and also failed to provide the specific justification why this failure is acceptable under NEPA:

> If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

40 CFR § 1502.22(a). "If there is 'essential' information at the plan-or site-specific development and production stage, [the agency] will be required to perform the analysis." Native Village of Point Hope v. Jewell, 740 F.3d 489, 499 (9th Cir. 2014).

The Forest Service cannot credibly assert that the need to fully understand the direct, indirect and cumulative water impacts of this Project, which could be catastrophic for regional and local water users (and the Phoenix AMA's and Pinal AMA's goal of safe-yield) is not essential to its review of the Project under NEPA. 40 C.F.R. §1502.22(a). This includes the obligation to document and verify, among other things: (1) the total amount of water that is physically available for pumping at the Desert Wellfield; (2) the location and size of existing local and regional groundwater wells that might be adversely impacted (and even rendered dry) by the Mine's pumping and water use; and (3) the reasonably foreseeable planned developments in the area, such as the large Superstition Vista development, among other planned developments. The Forest Service's issuance of the FEIS without this essential information and relevant factors violated NEPA.

### 3. The FEIS Fails to Adequately Consider and Disclose the Cumulative Effects of Water Use in the East Salt River Valley.

NEPA requires the Forest Service to consider the cumulative impacts of the Resolution Copper Project, 40 C.F.R. §1508.25(c)(3), which is the environmental impact of the proposed action when added to other past, present, and "reasonably foreseeable future actions." 40 C.F.R. §1508.7.  NEPA requires "mine-specific . . . cumulative data," a

16

"quantified assessment of their [other projects] combined environmental impacts," and "objective quantification of the impacts" from other existing and proposed operations in the region. <u>Great Basin Mine Watch v. Hankins</u>, 456 F.3d 955, 971-74 (9th Cir. 2006). "'[I]n a cumulative impact analysis, an agency must take a 'hard look' at *all* actions' that may combine with the action under consideration to affect the environment.' *Te–Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010)." <u>Great Basin Res. Watch</u>, 844 F.3d at 1104 (9th Cir. 2016)(emphasis added by court).

The Forest Service's cumulative effects analysis in the FEIS failed to adequately consider a number of reasonably foreseeable activities in the East Salt River Valley, in violation of NEPA. These include the Superstition Vistas mega residential development, other developments planned near Florence, and the planned development of numerous new agricultural production (groundwater) wells that will soon be developed due to impending shortages on the Colorado River, among other projects.

For example, despite the existence of concrete plans for the 275-square mile Superstition Vistas development, located within the Project's analysis and impacts area, the FEIS declined to consider the development as a reasonable foreseeable action under NEPA, erroneously believing that plans for Superstition Vistas were "conceptual and lack adequate detail to allow substantial analysis of resource effects…" Ex. 1, FEIS at 966, and that "no concrete steps have been taken for the auction of this land by the ASLD." <u>Id.</u>, FEIS at 971.

Yet as early as 2006, Arizona State University issued a study on the Superstition Vistas development ("The Treasure of the Superstition Vistas").[4] Per this report, the 275-square mile planned development would cover an area larger than the cities of Mesa, Tempe, Chandler, and Gilbert combined (p.9). The development is anticipated to have a population at build out of nearly 1 million people (p.13), and would have a minimum water demand of 190,000 AF per year (p.15). The Desert Wellfield pumping area for the Resolution Project sits at the heart of the 275-square mile Superstition Vistas land.

---

[4] The Treasure of the Superstitions: Scenarios for the Future of Superstition Vistas. <u>Arizona State University, Morrison Institute for Public Policy (April 2006).</u> (Ex. 6).

The need for the Forest Service to consider the cumulative impacts to water stemming from the Desert Wellfield pumping along-side water demands for the massive Superstition Vistas development has been raised numerous times to the Agency, both in comments by the Arizona State Land Department ("ASLD") (FEIS at R-43) (the ASLD recently auctioned-off lands paving the way for this development), as well in Plaintiffs' comments on the DEIS.

The Forest Service erroneously concluded that Superstition Vistas is entirely "speculative" and therefore did not consider its impacts in the FEIS, believing that "no concrete steps have been taken for auction of this land by the ASLD." Ex. 1, FEIS at 971. This contradicts the Agency's own prior statement acknowledging the "anticipated development in the Superstitions Vistas planning area." DEIS at 342 (Exhibit 7).

Plaintiffs provided the Agency detailed documents showing the progress of the Superstition Vistas development, including the fact that the Arizona State Land Department recently did, in fact, auction 2,700 acres of State Trust Lands for this very development. *See* Phase I Environmental Site Assessment ASLD Auction Site prepared by Geotek (October 2019)(Exhibit 8); *see also Homebuilders run up price of East Valley land to $245.5M in controversial state auction*, AZCentral, (Nov. 5, 2020)(Exhibit 9). Thus, "concrete steps" for the sale and development of Superstition Vistas are already underway. Id. Despite this, the FEIS admitted that its "quantitative analysis [of water impacts] … does not include development in the Superstitions Vistas planning area." Ex. 1, FEIS at 973.

Superstition Vistas has also been anticipated and considered by the Arizona Department of Water Resources in its water models and reports. *See* ADWR Pinal Water Model Technical Memorandum (Ex. 5). In addition, the ASLD filed extensive comments on the DEIS, warning of the significant impacts from the Desert Wellfield pumping and dewatering on the plans for the Superstition Vistas development, and correspondingly, on the Arizona State Trust that is administered by the ASLD under the Arizona Enabling Act: "The greatest potential adverse impact to the [Arizona] Trust will be the water (usage of approximately 600,000 acre-feet (AF) over the LOM [Life of Mine]) that will be extracted

from the aquifer beneath the Superstitions Vistas Planning Area (SVPA)." Ex. 1, FEIS at R-43. "[B]ased upon the anticipated groundwater requirements contained in the DEIS, the negative impact of the proposed water consumption sourced from the Superstition Vistas Planning Area (SVPA) far outweighs the estimated financial benefits to the Trust resulting from other aspects of the project by a factor of 20:1." Id. at R-44. "[T]he extraction and transportation of groundwater out of the SVPA [Superstition Vistas Planning Area] greatly compromises the ability to develop these lands to their full planned potential, and as a result, reduces the income and value of the Trust." Id.

Under NEPA, the Agency cannot simply ignore cumulative impacts by labeling them as "speculative," especially when planning for these activities is already underway, concrete steps have been taken to facilitate the action, and the action is considered in numerous plans by state and local communities. "[P]rojects need not be finalized before they are reasonably foreseeable. 'NEPA requires that an EIS engage in reasonable forecasting. Because speculation is . . . implicit in NEPA, [ ]we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry.'" N. Plains Res. Council, 668 F.3d at 1078-79 (9th Cir. 2011) (citations omitted). The Forest Service's decision to ignore this reasonably foreseeable, indeed planned, activity violates NEPA and the NDAA.

The FEIS also failed to analyze as "reasonably foreseeable activities" under NEPA the cumulative impacts from several other planned and reasonably foreseeable housing developments in and around the nearby Town of Florence, which are within Resolution's groundwater pumping area. Several of those housing developments are under construction and sale right now, and some units have already been completed and sold: Anthem Parkside at Merrill Ranch by D.H. Horton; Parkside at Anthem at Merrill Ranch by Pulte Homes; Sun City Anthem at Merrill Ranch by Del Webb; and Crestfield Manor by D.H. Horton (development websites excerpts collected as Exhibit 10). These developments, although well documented, were dismissed from analysis in the FEIS. Ex. 1, FEIS at 966.

In addition, regarding overall demands and usage of water in the area, although the

Forest Service mentioned Arizona's Drought Contingency Plan ("DCP") and the impending "shortages" on the Colorado River resulting from years of drought and declining snowpack in its cumulative effects analysis section of the FEIS, *see, e.g.*, Ex. 1, FEIS at 966-69, the Forest Service refused to consider the plans of irrigators in the East Salt River Valley to develop new pumping infrastructure in Pinal County under the DCP to facilitate the extraction of up to 70,000 AF of groundwater to replace water supplies lost through DCP agreements and the future cutbacks in CAP water deliveries from the Colorado River. Id.

The Natural Resource Conservation Service has already committed $10 million dollars to support the development of this new pumping infrastructure.[5] This new pumping will be located within the same East Salt River Valley, and its drawdown squarely falls within the area impacted by Resolution's Desert Wellfield pumping. The Forest Service ignored these DCP activities, such as the Pinal County pumping described above, concluding that because the State's DCP guidelines extend only until 2026, the pumping by Pinal County farmers will also conclude in 2026, and thus, this activity "will expire before Resolution Copper begins pumping groundwater." Ex. 1, FEIS at 968.

That is wrong, and completely misunderstands Arizona water needs and uses. Under the Drought Contingency Plan, during the period between 2020 and 2026 Pinal County farmers will experience a ramp down in terms of their CAP water deliveries, but they will **ramp up** their groundwater pumping. The FEIS fails to analyze this reasonably foreseeable scenario. And after 2026, the Pinal County irrigators will continue to pump from their groundwater wells – pumping that will continue as long as there is water to pump. This will span well into the period of Resolution's pumping from the Desert Wellfield.

The Forest Service is also incorrect when it concludes that 70,000 AF in significant new pumping in the region will not have long-term impacts even if the wells are shut down prior to 2026 (which they will not be). It is well understood that the effects of groundwater pumping and the associated drawdown and environmental impacts continue for many years

---

[5]  Heather van Blokland, *$10 Million To Fund Pinal County Water Infrastructure,* KJZZ.org (April 24, 2020) (Exhibit 11).

after the pumping ends, which the FEIS did not analyze, despite the Forest Service's own acknowledgment of this basic hydrological principle in the FEIS. *See* Ex. 1, FEIS at 375 (observing that "maximum drawdown or impact [from pumping] for any given GDE does not occur at the end of mining.  Rather, it takes time for the full impacts to be observed – decades or even centuries."). Thus, the impacts from new Pinal County farmers' pumping will continue into the period of time that Resolution is extracting massive quantities of water from the Desert Wellfield. This reasonably foreseeable future activity was not analyzed in the FEIS as a cumulative impact, in violation of NEPA and the NDAA.

In addition, the cumulative impacts from the nearby Florence Copper Project were not analyzed in the FEIS. Located near the town of Florence (well within the groundwater depletion area caused by the Mine), a project has been in operation since 2019 and the Arizona Department of Environmental Quality is in the process of amending the Aquifer Protection Permit to allow a total of 1,765 injection and recovery wells, 90 perimeter wells and approximately 45 observation wells.[6] The project calls for additional drawdown of groundwater in the impact area of the Desert Wellfield. In addition to adding to water quantity drawdown, the mine project could potentially render unusable a large quantity of groundwater surrounding the project.

In sum, the Forest Service failed to consider and disclose the overall cumulative impacts of the proposed action along with all other past, present, and reasonably foreseeable actions within the East Salt River Valley, in violation of NEPA and the NDAA.

   4.     *Failure to Analyze Mitigation for the Massive Groundwater Pumping*

NEPA requires that an FEIS: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," 40 C.F.R. § 1502.14(f); and (2) "include discussions of: . . . Means to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." 40 C.F.R. § 1502.16(h). "All relevant, reasonable mitigation measures

---

[6] Indeed, the company recently stated that "it could start construction of the commercial operation this year, with first production in late 2022." Daniel Gleeson, *Taseko Mines starts commercial construction move at Florence ISR copper project*, International Mining (February 11, 2021) (Exhibit 12).

that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperating agencies . . . ." *Forty Most Asked Questions Concerning CEQ's [NEPA] Regulations*, 46 Fed. Reg. 18,026, 18,031 (Mar. 23, 1981). Here, in addition to the NEPA failures detailed above, the Agency failed to fully analyze all potential mitigation measures, and the effectiveness of such mitigation measures, on water quantity, water quality, and other resources in the region.

Even with the limitations identified above, pertaining to Resolution's dewatering in the Desert Wellfield, which (among other things) grossly underestimated declines in groundwater levels in the East Salt River Valley, and in the case of the Pinal AMA, ignored groundwater declines completely, the FEIS nevertheless acknowledged that there will be substantial groundwater declines in the region stemming from the Desert Wellfield pumping. "Projected drawdown [in the East Salt River Valley] would be greatest in the center of the Desert Wellfield, reaching a maximum drawdown of 228 feet, as shown in figure 3.7.1-2." Ex. 1, FEIS at 415. "At the north and south ends of the wellfield, maximum drawdown ranges from 109 to 132 feet, and farther south, within NMIDD [New Magma Irrigation and Drainage District], maximum drawdown is roughly 49 feet." Id.

This significant decline in groundwater levels resulting from drawdowns from the Desert Wellfield would adversely impact individual wells throughout the East Salt River Valley, in both the Phoenix AMA and the Pinal AMA, as well as environmental values. The Forest Service acknowledged that this drawdown could impact individual wells, rendering shallow wells dry or requiring other well owners to deepen their wells. Ex. 1, FEIS at 393; *see also* FEIS at 973 ("[T]here likely would be certain areas that experience lack of well capacity and groundwater shortages, particularly around the edges of the basin."). The FEIS also admitted the "overall the cost of pumping would increase as groundwater deepens, and infrastructure costs would increase as wells and pumps need to be lowered or replaced." Ex. 1, FEIS at 973. Yet the Forest Service did not analyze in the FEIS these financial and infrastructure impacts, nor analyze mitigation measures to compensate for the impacts.

The Forest Service also failed to analyze and require Resolution to mitigate for the substantial and adverse impacts to groundwater levels in the East Salt River Valley and, in particular, to offer any form of mitigation for those wells that would need to be deepened or would go dry as a result of these declines, visiting substantial costs on individuals, entities, and communities in the area. The Forest Service instead deferred this analysis to the Arizona Department of Water Resources, concluding that Resolution will be required to file for various permits with that Department pertaining to the Desert Wellfield pumping. Ex. 1, FEIS at 422 ("concerns have been raised regarding drawdown from the Desert Wellfield, in the East Salt River valley. **The permitting process for the wellfield will determine whether there are unavoidable impacts that may need mitigation**, in which case Resolution Copper has indicated a willingness to consider additional measures.") (emphasis added). *See also* <u>Id.</u>, FEIS at J-51 (emphasis added): "While … mitigation is in place for water level declines caused by dewatering near the mine site (see measure FS-WR-01), **no such protections are in place for the area near the Desert Wellfield in the East Salt River valley**." Yet, under NEPA and the NDAA, the Agency cannot defer the analysis of impacts, mitigation measures, and their effectiveness, to some future state permitting process. <u>Great Basin Res. Watch</u>, 844 F.3d at 1103-04 (9th Cir. 2016) (EIS could not rely on future state permitting as substitute for federal NEPA review).

Further, the FEIS admitted that Resolution has not "brought forth voluntary mitigation for impacts to nearby well owners or property owners" in the East Salt River Valley for pumping impacts caused by the Desert Wellfield. Ex. 1, FEIS at R-354. The FEIS admitted that "**no specific monitoring or mitigation measures are included in the DEIS specific to the Desert Wellfield in the East Salt River valley**. This groundwater pumping is subject to permitting by the ADWR." <u>Id.</u>, FEIS at R-235 (emphasis added).

In sum, the Forest Service plainly violated NEPA and the NDAA when it left it up to Resolution to decide whether or not it might voluntarily "mitigate" for the potentially catastrophic impacts from the Desert Wellfield on local water supplies and wells, and when the FEIS deferred to a subsequent ADWR permitting process the determination of (1)

whether or not there will be "unavoidable impacts" from the Desert Wellfield (a point that seems clear); and (2) whether or not, and how, these impacts should be mitigated.

## II.      The Land Exchange Will Result in Immediate Irreparable Harm to Plaintiffs' Interests and Uses in Oak Flat and the Surrounding Areas.

As noted above, the Ninth Circuit has recognized the need to enjoin the exchange of public land when faced with a violation of federal law. "If, by exchange, public lands are lost to those who use and enjoy the land, they are certainly entitled under the APA to file suit to assure that no exchange takes place unless the governing federal statutes and regulations are followed." Desert Citizens Against Pollution, 231 F.3d 1172 at 1177. This applies even when the exchange is authorized by Congress. See Western Land Exchange Project, 315 F. Supp. 2d at 1099 ("BLM is enjoined from offering for sale, or issuing patent to, any of Phase I LCLA lands prior to preparing an EIS that complies with the requirements of NEPA and this court's order.").

The Land Exchange itself would result in immediate, irreparable harm to Plaintiffs and their members. The very moment that the Exchange is executed, Oak Flat would automatically lose the vast majority of its environmental and cultural protections, as well as public involvement and Tribal consultation requirements. Since 1955, Oak Flat has been completely protected from mining and mineral exploration due to Public Land Order 1229 of the Eisenhower Administration, which established the "Oak Flat Withdrawal Area." This 65 years of protection will come to an end on the day of the Exchange.

Additionally, the moment these lands are privatized, the following protections will no longer apply: (1) the environmental review and public participation requirements of NEPA; (2) the Tribal consultation requirements of the National Historic Preservation Act and Executive Order 13007; (3) the substantive and public participation requirements of the National Forest Management Act, including the standards and guidelines of the Land and Resource Management Plan for the Tonto National Forest; and (4) the procedural and substantive requirements of Section 7 of the Endangered Species Act, 16 U.S.C. §

1536(a)(2). The Plaintiffs would no longer be notified when harmful activities are proposed on these lands, and would no longer play a role in the oversight of these activities.

Plaintiffs' declarations set forth the immediate and irreparable harm the Exchange will bring to Plaintiffs and their members. The fact that Resolution may not immediately pursue development of its new private lands does not diminish the immediate impacts of privatization. As soon as the Land Exchange occurs, and Oak Flat and surrounding lands (and the important plants, animals, and cultural places) are privatized, Plaintiffs and their members would immediately lose the public right to use and recreate on these lands, leaving it to the approval and authority of Rio Tinto to permit these uses. As of now, these lands are public and entirely open to Plaintiffs and the public for spiritual and religious purposes, as well as for camping, climbing, hiking, and other forms of recreation. Once privatized, however, public use will be entirely reliant on Rio Tinto. The emotional, and potentially legal, effect of the Exchange upon Plaintiffs' members would be immediate and profoundly disturbing. *See* Decl. of Featherstone, Ex. 3, ¶ 9-11; Dadgar, Ex. 14, ¶ 18-26; Laurette, Ex. 15, ¶ 17-18; Shannon, Ex. 16, ¶ 7; Steuter, Ex. 17, ¶ 20-21.

Indeed, the NDAA only allows public access to 50 scant acres after the Exchange, and even that access would remain solely in the discretion of Rio Tinto. The NDAA only required that, after the Exchange, Resolution "provide access to the surface of the Oak Flat Campground to members of the public, including Indian tribes, to the maximum extent practicable, [and only] until such time as the operation of the mine precludes continued public access for safety reasons, **as determined by Resolution Copper**." §3003(i)(3) (emphasis added). As defined in the NDAA, the "Oak Flat Campground means the approximately 50 acres of land comprising 16 developed campsites." §3003(b)(5). Thus, except for this extremely limited parcel, Plaintiffs and their members will be excluded from the remaining over 2,300 acres of formally public land which would be owned by Rio Tinto.

Thus, to prevent this immediate and irreparable loss of uses, and the emotional and spiritual impacts of privitizing a designated sacred site, this Court should protect and maintain the *status quo* and keep these lands in public ownership while the case proceeds.

### III.   **The Balance of Hardships and Public Interest Tip Sharply in Favor of Plaintiffs.**

A.   The Public Interest Weighs Heavily in Favor of a Preliminary Injunction.

The public interest weighs heavily in favor of preserving the *status quo* and preventing privatization and irreparable environmental and other harms until this Court has reviewed the merits. "The public interest strongly favors preventing environmental harm. Although the public has an economic interest in the mine, there is no reason to believe that the delay in construction activities caused by the court's injunction will reduce significantly any future economic benefit that may result from the mine's operation." Se. Alaska Cons. Council v. U.S. Army Corps of Eng'rs, 472 F.3d 1097, 1101 (9th Cir. 2006). The public interest in favor of a preliminary injunction is especially acute when faced with violations of environmental laws such as NEPA. S. Fork Band Council, 588 F.3d at 718 ("The resulting hardship asserted by [the mining company] and the government is cast principally in economic terms of employment loss, but that may for the most part be temporary."). "The preservation of our environment, as required by NEPA . . . is clearly in the public interest." Sierra Club. v. Bosworth, 510 F.3d 1016, 1033 (9th Cir. 2007). The public also has a strong interest in ensuring that federal agencies comply with laws designed to protect the public waters and lands, and public participation.

B.   The Interests of the Forest Service and Resolution Copper Are Not Sufficient to Override the Interests of Plaintiffs and the Public.

The Forest Service's interests in this Motion are negligible and do not outweigh the Plaintiffs' and the public's interest in preventing irreparable harm. The speculative temporary economic impacts to Resolution are also not irreparable.

> [T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury . . . The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough.

L.A. Mem'l Coliseum Comm. v. NFL, 634 F.2d 1197, 1202 (9th Cir.1980).

The company recently stated that it has not determined whether the Mine is financially viable, thus further evidencing the lack of any hardship from an injunction

against the Exchange. "Decisions on whether to invest fully in developing the project …
remain subject to further permitting processes and a feasibility study that will be conducted
over several years." Press Release, Rio Tinto, *Resolution Copper project enters next phase
of public consultation*, (January 15, 2021) (Exhibit 17).

　　As detailed above and in Plaintiffs' declarations, the most immediate and irreparable
harm results from the privatization of the lands by the Exchange itself. The fact that mining
may not occur in the near future does not diminish these harms. And regardless of the
company's statement about not starting operations in the coming year, once the lands are
privatized, Resolution may sell the land free of any constraints or obligations to the public
or develop the land for other purposes, as it sees fit.

**IV.** 　**No More Than a Nominal Bond Is Appropriate in this Case.**

　　Under F.R.C.P. 65(c), in order to obtain a preliminary injunction, a plaintiff may be
required to post a bond as the court deems proper. However, the "court has discretion to
dispense with the security requirement, or to request a mere nominal security, where
requiring security would effectively deny access to judicial review." Cal. ex rel. Van de
Kamp v. Tahoe Reg'l Plan. Agency, 766 F.2d 1319, 1325-26 (9th Cir. 1985) (no bond
where plaintiffs were public interest organizations seeking to protect the environment); *see
also* Friends of the Earth v. Brinegar, 518 F.2d 322, 323 (9th Cir. 1975) ($1,000 bond). The
imposition of more than nominal bond works a real financial hardship and prevent Plaintiffs
from vindicating their rights and frustrate judicial review. Decl. of Featherstone, Ex. 3, ¶ 17;
Dadgar, Ex. 14, ¶ 32-35; Dronkers, Ex. 19, ¶ 6; Suckling, Ex. 20, ¶ 10-11; Winter, Ex. 21, ¶
12-13; Isherwood, Ex. 22, ¶ 9-10.

1  Respectfully submitted February 19, 2021.

2  /s/ Roger Flynn

3  _____
   Roger Flynn (Pro Hac Vice)

4  Jeffrey C. Parsons (Pro Hac Vice)
   WESTERN MINING ACTION PROJECT

5  P.O. Box 349
   440 Main St., #2

6  Lyons, Colorado 80540

7  303-823-5738
   wmap@igc.org

8

9  Marc D. Fink (Pro Hac Vice)
   CENTER FOR BIOLOGICAL DIVERSITY

10 209 East 7th Street
   Duluth, Minnesota 55805

11 218-464-0539

12 Email: mfink@biologicaldiversity.org

13
   Allison N. Melton (Pro Hac Vice)

14 CENTER FOR BIOLOGICAL DIVERSITY
   P.O. Box 3024

15 Crested Butte, CO 81224

16 970-309-2008
   Email: amelton@biologicaldiversity.org

17
   Attorneys for All Plaintiffs

18

19 /s/ Susan Montgomery

20 _____
   Susan B. Montgomery (AZ Bar # 020595)

21 Robyn L. Interpreter (AZ Bar # 020864)

22 MONTGOMERY & INTERPRETER, PLC
   3301 E. Thunderbird Rd.

23 Phoenix, AZ 85032

24 (480) 513-6825
   smontgomery@milawaz.com

25 rinterpreter@milaz.com

26 Attorneys for the Inter Tribal Association of Arizona

27

28

28

1

## CERTIFICATE OF SERVICE

2

3 I, Susan Montgomery, attest that in addition to filing the foregoing with this Court's ECF system, I served counsel for the United States Department of Justice representing the
4 Federal Defendants, via email, this 19th day of February, 2021.  The Federal Defendants in this case have yet to make a formal entry of appearance.  The Federal Defendants' attorneys
5 agreed to accept service via email of Plaintiffs' motion and exhibits on behalf of the Federal Defendants in this case.

6

7 */s/ Susan Montgomery*

8

## LIST OF EXHIBITS

9 **Exhibit 1**   Excerpts from the Final Environmental Impact Statement, Resolution Copper
10 Mine and Land Exchange (January 15, 2021)
- From Volume 1: pages ES-1 to ES-32 (Executive Summary)
11 - From Volume 2: pages 368, 375, 387, 393, 405, 415-416, 418, 422, 573-600
12 - From Volume 3: pages 837-848, 966-974
- From Volume 4: pages H-7 to H-8, J-51
13 - From Volume 6: pages R-43 to R-44, R-235, R-354

14

15 **Exhibit 2**   Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, Pub. L. No. 113-291, tit. XXX, § 3003, 128 Stat.
16 3732-3741 (2014) (codified at 16 U.S.C. §§ 539p)

17 **Exhibit 3**   Declaration of Roger Featherstone (February 16, 2021)

18

19 **Exhibit 4**   Plaintiff's Modified Figure 3.7.1-2 from page 368 of the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange (January 15,
20 2021)

21 **Exhibit 5**   2019 Pinal Model and 100-Year Assured Water Supply Projection Technical Memorandum, Arizona Department of Water Resources (October 11, 2019)
22

23 **Exhibit 6**   The Treasure of the Superstitions: Scenarios for the Future of Superstition Vistas. Arizona State University, Morrison Institute for Public Policy (April
24 2006)

25 **Exhibit 7**   Excerpt from the Draft Environmental Impact Statement, Resolution Copper
26 Mine and Land Exchange (August 9, 2019)
- From Volume 1: page 342
27

28

| | |
|---|---|
| **Exhibit 8** | <u>Excerpt</u> from Phase I Environmental Site Assessment, ASLD Auction Site, SEC of East Elliot Road & South Meridian Road, Pinal County, Arizona, GRR Project NO. 1902-PHR, Prepared for Brookfield Residential by GeoTek Residential, LLC (October 22, 2019). |
| **Exhibit 9** | Robert Anglen, *Homebuilders run up price of East Valley land to $245.5M in controversial state auction*, AZCentral (Nov. 5, 2020) |
| **Exhibit 10** | <u>Excerpts</u> from multiple housing development websites |
| **Exhibit 11** | Heather van Blokland, *$10 Million To Fund Pinal County Water Infrastructure,* KJZZ.org (April 24, 2020) |
| **Exhibit 12** | Daniel Gleeson, *Taseko Mines starts commercial construction move at Florence ISR copper project*, International Mining (February 11, 2021) |
| **Exhibit 13** | Declaration of Maria Dadgar (February 18, 2021) |
| **Exhibit 14** | Declaration of Brytnee Laurette (February 10, 2021) |
| **Exhibit 15** | Declaration of Curt Shannon (February 10, 2021) |
| **Exhibit 16** | Declaration of Donald Steuter (February 15, 2021) |
| **Exhibit 17** | Press Release, Rio Tinto, *Resolution Copper project enters next phase of public consultation* (January 15, 2021) |
| **Exhibit 18** | Declaration of Pete Dronkers (February 9, 2021) |
| **Exhibit 19** | Declaration of Kierán Suckling (February 9, 2021) |
| **Exhibit 20** | Declaration of Chris Winter (February 16, 2021) |
| **Exhibit 21** | Declaration of Aaron Isherwood (February 9, 2021) |