Roger Flynn (CO Bar # 21078) (*pro hac vice*)
Jeffrey C. Parsons (CO Bar #30210) (*pro hac vice*)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738; wmap@igc.org

Marc D. Fink (MN Bar #343407) (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539; mfink@biologicaldiversity.org

Allison N. Henderson (CO Bar #45088) (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008; ahenderson@biologicaldiversity.org
*Counsel for Plaintiffs*

Susan B. Montgomery (AZ Bar # 020595)
Robyn L. Interpreter (AZ Bar # 020864)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825; smontgomery@milawaz.com
*Counsel for Inter Tribal Association of Arizona, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| Arizona Mining Reform Coalition, *et al.,* ) | Case No. 2:21-cv-00122-DWL |
| Plaintiffs ) | |
| ) | **PLAINTIFFS' MOTION FOR** |
| vs. ) | **PRELIMINARY** |
| ) | **INJUNCTION** |
| United States Forest Service, *et al.,* ) | |
| Defendants, ) | |
| and ) | |
| Resolution Copper Mining, ) | |
| Defendant-Intervenor. ) | |

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

EXHIBIT LIST .............................................................................................. v

FACTUAL BACKGROUND ................................................................................ 3

STANDARDS FOR PRELIMINARY RELIEF ........................................................... 3

I.    The Privatization of Public Lands Will Result in Immediate
      Irreparable Harm. .............................................................................. 4

II.   Plaintiffs Are Likely to Succeed on the Merits .................................. 7

      A.    The FEIS Violates NEPA and the NDAA. ................................. 7

      B.    The "Equal Value" and Appraisal Standards of the NDAA
            Were Violated.  ...................................................................... 13

III.  The Balance of Hardships and Public Interest Tip Sharply in Favor
      of Plaintiffs.................................................................................16

IV.   No More Than a Nominal Bond is Appropriate in this Case  ........................ 17

## <u>TABLE OF AUTHORITIES</u>

***Federal Caselaw***

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ........................................................... 7

*Apache Stronghold v. United States*,
CV-21-0050-PHX-SPL, 2025 WL 1360694
(D. Az. May 9, 2025) ................................................... 2, 3, 4, 5, 6, 16

*Apache Stronghold v. United States*,
101 F. 4th 1036 (9th Cir. 2023) ........................................ 1, 2, 3, 7, 13

*Apache Stronghold v. United States*,
No. 21-15295, 2021 WL 12295173 (9th Cir. March 5, 2021) ................... 5

*Cal. Ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*,
766 F.2d 1319 (9th Cir. 1985) ......................................................... 17

*Central Or. Landwatch v. Connaughton*,
905 F. Supp. 2d 1192 (D. Or. 2012) ................................................ 17

*Desert Citizens Against Pollution v. Bisson*,
231 F.3d 1172 (9th Cir. 2000) ..................................................... 4, 16

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) ............................................................ 4

*Flathead-Lolo-Bitterroot Citizen Task Force v. Mont.*,
98 F.4th 1180 (9th Cir. 2024) .......................................................... 4

*Friends of the Earth v. Brinegar*,
518 F.2d 322 (9th Cir. 1975) .......................................................... 17

*Great Basin Res. Watch v. BLM*,
844 F.3d 1095 (9th Cir. 2016) .......................................... 8, 11, 12, 13

*Idaho Sporting Congress v. Rittenhouse*,
305 F.3d 957 (9th Cir. 2002) ........................................................... 8

*N. Plains v. Surface Transp. Bd.*,
668 F.3d 1067 (9th Cir. 2011) ...................................................... 7, 12

*Sierra Club. v. Bosworth*,
510 F.3d 1016 (9th Cir. 2007) ...................................................... 16

*S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
588 F.3d 718 (9th Cir. 2009) ....................................................... 16

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
608 F.3d 592 (9th Cir. 2010) ....................................................... 11

*Western Land Exchange Project v. BLM*,
315 F.Supp.2d 1068 (D. Nev. 2004) ............................................... 4

*Winter v. Natural Resources Defense Council*,
555 U.S. 7 (2008) ......................................................................... 4

***Federal Statutes***

Fed. Rule. Civ. Pro. 65(c) .......................................................... 17

National Environmental Policy Act ("NEPA"),
42 U.S.C. §§ 4321 *et seq.* ................................................... 7, 8, 11

16 U.S.C. §539p, Section 3003 of the National Defense Authorization
Act for Fiscal Year 2015 ................................... 1, 5, 7, 13, 14, 15

***Federal Regulations***

36 C.F.R. Part 254 ................................................................ 14, 15

81 Fed. Reg. 14829 (March 18, 2016)............................................ 7

## EXHIBIT LIST

| | |
|---|---|
| Exhibit 1 | Bureau of Land Management Review of Hydrology Aspects of the Resolution Copper Project, Bureau of Land Management (Lisa Dubas, James Johnsen and Steve Rice) (June 13, 2022) |
| Exhibit 2 | Excerpts from the Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange (January 15, 2021)<br><br>From Volume 1: pages ES-1 to ES-32 (Executive Summary), 118, 314<br>From Volume 2: pages 393, 405, 415-416, 422<br>From Volume 3: pages 966-974<br>From Volume 4: pages H-7 to H-8, J-48<br>From Volume 6: pages R-43 to R-44 |
| Exhibit 3 | Declaration of Maria Dadgar |
| Exhibit 4 | Declaration of Roger Featherstone |
| Exhibit 5 | Declaration of Russ McSpadden |
| Exhibit 6 | Declaration of Erik Murdock |
| Exhibit 7 | Declaration of Sandra Bahr |
| Exhibit 8 | Master Water Plan for Superstition Vistas, Apache Junction, Arizona, Hilgart Wilson, Prepared for D.R. Horton and Brookfield Properties (September 2021) |
| Exhibit 9 | The Treasure of the Superstitions: Scenarios for the Future of Superstition Vistas. Arizona State University, Morrison Institute for Public Policy (April 2006) |
| Exhibit 10 | Robert Anglen, Homebuilders run up price of East Valley land to $245.5M in controversial state auction, AZCentral (Nov. 5, 2020) |
| Exhibit 11 | Jim Poulin, The Path of Progress: Builders pave the way for 270 square miles of development in far East Valley, Phoenix Business Journal (Apr. 23, 2021) |
| Exhibit 12 | Elizabeth Whitman. Ducey and CAP Board Each Pledge $5 Million for Pinal County Farmers, Phoenix New Times (January 3, 2019) |
| Exhibit 13 | Conservation Finance Can Mean Cleaner Air and Water and Healthier Soil, USDA Natural Resources Conservation Service (May 13, 2024) |
| Exhibit 14 | Appraisal Report Summary, Mining Claim Zone MCZ Parcel (Federal). Pinal County, Arizona. Resolution Copper Legisled Land Exchange (Southeast Arizona Land Exchange and Conservation Act, 16 U.S.C. §539p). Marc P. Springer, Spanish Flat Mining Company. (Date of Appraisal Report December 30, 2022) (Date of Appraisal Review January 24, 2023) |
| Exhibit 15 | Appraisal Report Summary, Mineral Withdrawal Area MWA (Federal). Pinal County, Arizona. Resolution Copper Legisled Land Exchange (Southeast Arizona Land Exchange and Conservation Act, 16 U.S.C. §539p). Marc P. Springer, Spanish Flat Mining Company, Evan Mudd, Rock Associates, Ltd. (Date of Appraisal Report January 20, 2023) (Date of Appraisal Review January 25, 2023) |

v

Plaintiffs respectfully submit this Motion for Preliminary Injunction to enjoin Defendants from consummating a federal land exchange ("Land Exchange") following the issuance of a Final Environmental Impact Statement ("FEIS"), which would allow the government to immediately transfer over 2,400 acres of federal public lands at Oak Flat to Resolution Copper Mining ("Resolution") (a joint venture of two foreign mining companies), pursuant to Section 3003 of the National Defense Authorization Act for Fiscal Year 2015 ("NDAA"). 16 U.S.C. § 539p(c)(10).

On January 15, 2021, the Forest Service published the initial FEIS and Draft Record of Decision ("DROD") for the Resolution Copper Mine and Land Exchange. Plaintiffs immediately filed suit and moved for a preliminary injunction. Thereafter, on March 1, 2021, Defendants rescinded the FEIS and DROD. ECF No. 26. Defendants now state that the government will publish the new FEIS/DROD on or about June 16, 2025, and immediately thereafter complete the Exchange. They also acknowledge that the new FEIS will have various changes from the 2021 FEIS, although no details have been provided.

The Exchange would facilitate the proposed Mine, which would pump and dewater massive amounts of groundwater, deplete surface waters, and completely obliterate sacred land, Oak Flat. *See generally Apache Stronghold v. United States*, 101 F. 4th 1036, 1047–48 (9th Cir. 2024) (en banc). More immediately, the Exchange would privatize Oak Flat and adjacent public lands and remove federal protection for the public resources at the site. However, pursuant to Section 3003 of the NDAA, Congress specifically conditioned the Exchange on the Forest Service's compliance with NEPA for both the Exchange, as well as for the Mine. 16 U.S.C. § 539p(c)(9). *See also Apache Stronghold*, 101 F. 4th at 1047.

Throughout this NEPA process Plaintiffs have identified serious concerns with the Forest Service's NEPA compliance, and correspondingly, the NDAA, including issues related to critical water resources and other environmental impacts, which have been largely ignored by the Forest Service.[1]

---

[1] Due to space limitations, only a subset of Plaintiffs' claims are raised in this Motion. Further, because the agency has yet to issue the new FEIS or DROD approving the Mine's

Defendants rescinded the FEIS and DROD in 2021 "to provide an opportunity for the agency to conduct a thorough review based on significant input received from collaborators, partners, and the public since these documents were released. … USDA has concluded that additional time is necessary to fully understand concerns raised by Tribes and the public and the project's impacts to these important resources and ensures the agency's compliance with federal law." ECF No. 26-2. Consistent with this directive, the Bureau of Land Management ("BLM")–a cooperating agency under NEPA–published a 26-page "targeted technical review" in 2022 of the hydrology aspects of the FEIS that detailed extensive failures in the FEIS under NEPA related to, among other things, the Mine's impacts on water and environmental resources. Ex. 1. Presumably, Defendants have spent the past four years out of the public eye attempting to cure these and many other NEPA deficiencies, and now seek to effectuate the Land Exchange **immediately** upon issuance of the new FEIS, allowing no time for the Plaintiffs, the public, or this Court to review the FEIS beforehand.

Another condition of Section 3003 of the NDAA requires the federal and non-federal lands to be independently appraised, "and the value of the exchanged land equalized as set forth in the statute." *Apache Stronghold*, 101 F. 4th at 1046. This "equal value" requirement must be demonstrated by appraisals conducted pursuant to the strict standards of law. 16 U.S.C. § 539p(c)(4)(B). Instead, the government's appraisal for the "Mining Claim Zone" completely zeroed-out the mineral value of the 1,600+ acres of the currently federal land, which contains, according to Resolution, tens of billions of dollars of copper. Ex. 14.

Judge Logan, in a related case challenging the Exchange, recently issued an injunction blocking the FEIS and Exchange. *Apache Stronghold v. United States*, CV-21-00050-PHX-SPL, 2025 WL 1360694 (May 9, 2025). Judge Logan found that the transfer of lands would immediately and irreparably harm plaintiffs' uses of the currently-federal lands. *Id*. at *6–7. After detailing the competing arguments, Judge Logan also held that the balance of hardships and public interest "tip sharply" in favor of blocking publication of the FEIS

extensive operations on the remaining federal land, Plaintiffs at this time cannot address any errors contained in the new (unreleased) FEIS or DROD for these operations.

2

and the Land Exchange. *Id*. at *8. The "injunction shall remain in effect until the day after denial of the petition for certiorari in *Apache Stronghold v. United States*, No. 24-291 (U.S.) (should the petition be denied), or the day after the issuance of the Supreme Court's judgment in *Apache Stronghold v. United States*, No. 24-291 (U.S.) (should the petition be granted)." *Id*. at *9.

Plaintiffs' immediate and irreparable injury from the transfer, and the public interest and balance of hardships, are very similar, and in some situations exactly the same, as in that case. The merits, however, are different, as Plaintiffs here focus on the various legal and factual errors contained in the FEIS and appraisals under NEPA and the NDAA, rather than the religious freedom claims in *Apache Stronghold*. Thus, if the Supreme Court denies certiorari on those claims, an injunction is needed here to block the Exchange due to the "serious questions" raised on the merits of Plaintiffs' NEPA and NDAA claims.

**FACTUAL BACKGROUND**

The key facts in this case are undisputed. First, Oak Flat "is a site of great spiritual value" to Tribes in the region. *Apache Stronghold*, 101 F.4th at 1044; *see also* San Carlos Apache Tribe's Mot. for Prelim. Inj. at 3–4, No. 21-cv-00068-PHX-DWL, ECF No. 29-1; *see also* Dec. of Dadgar. Ex. 3. Second, the lands to be privatized also contain important public wildlife and recreational values. *See, e.g*., Ex. 2 (FEIS at ES-26 to ES-27); Decls. of Featherstone, McSpadden, Murdock, and Bahr. Exs. 4–7. Third, the Mine would result in the "utter destruction" of this sacred site. *Apache Stronghold*, 101 F.4th at 1128 (J. Murguia, dissenting). Fourth, Defendants intend to consummate the Exchange within hours or days upon issuance of the new FEIS. Finally, and critically, the Exchange would result in the immediate privatization of Oak Flat and the surrounding public lands, eliminating all federal protections, and ending current rights of public access.

**STANDARDS FOR PRELIMINARY RELIEF**

To obtain preliminary relief, a Plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 20 (2008). The Court evaluates these factors on a sliding scale, such that a stronger showing of one element may offset a weaker showing of another. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (en banc). When the balance of equities tips sharply in the plaintiff's favor, the plaintiff must raise only "serious questions" on the merits, which is a lesser showing than likelihood of success. *Id.* "Serious questions" are ones that cannot be resolved one way or the other at the preliminary injunction stage because they require a more deliberative investigation. *Flathead-Lolo-Bitterroot Citizen Task Force v. Mont.*, 98 F.4th 1180, 1192 (9th Cir. 2024). Plaintiffs satisfy all four parts of this test, and the preliminary injunction against the Land Exchange should be issued.

## I.    <u>The Privatization of Public Lands Will Result in Immediate Irreparable Harm.</u>

If the Supreme Court denies certiorari, Defendants intend to publish the new FEIS on or about June 16, 2025, and then immediately transfer title of 2,422 acres of public land to Resolution (ECF No. 61 at 4-5)—irreparably harming Plaintiffs.

> If, by exchange, public lands are lost to those who use and enjoy the land, they are certainly entitled under the APA to file suit to assure that no exchange takes place unless the governing federal statutes and regulations are followed, including the requirement that the land exchange is properly valued by the agency.

*Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1177 (9th Cir. 2000). This applies even when Congress has ordered the exchange, as is the case here. *See W. Land Exch. Project v. U.S. BLM*, 315 F. Supp. 2d 1068, 1099 (D. Nev. 2004).

The Exchange will result in immediate, irreparable harm to Plaintiffs and their members. Judge Logan noted the "various harms [plaintiff] will suffer if the land transfer occurs during the pendency of this appeal, which affect both the balance of equities and the likelihood that it will suffer irreparable harm without an injunction. It is undisputed that if the transfer goes forward and Resolution Copper's mining plans are effectuated, Plaintiff will suffer irreparable harm in the long term." *Apache Stronghold*, 2025 WL 1360694, at *6.

Judge Logan agreed "that, once the transfer is complete, Oak Flat will become private property no longer subject to federal law or Forest Service management, which 'gives Resolution power to exclude Apache Stronghold's members from Oak Flat and to restrict the timing and location of religious ceremonies that regularly take place at Oak Flat ….'" *Id*. The fact that Oak Flat will become private property will make such restrictions "harder or impossible to challenge." *Id*. (citations omitted). Ninth Circuit Judge Bumatay previously recognized that "[o]nce the land is transferred, the Western Apaches will suffer immediate, irreparable harm." *Apache Stronghold v. United States*, No. 21-15295, 2021 WL 12295173, *5 (9th Cir. March 5, 2021) (Bumatay, J., dissenting).

Of the 2,422 acres of federal public lands to be transferred to Resolution, the NDAA provides for public access to 50 scant acres at the current Oak Flat Campground after the Exchange, and even that access would remain solely in the discretion of Resolution. 16 U.S.C. § 539p(i)(3). The NDAA only requires that Resolution "provide access to the surface of the Oak Flat Campground to members of the public, including Indian tribes, to the maximum extent practicable, … **as determined by Resolution Copper**." *Id*. (emphasis added).

Judge Logan rejected Resolution's argument that its promise to consider allowing public access in the future eliminated the irreparable harm effected by privatization.

> These assurances are insufficient. Nothing about Resolution Copper's broad "commitment" to public access is legally binding; furthermore, even their statutorily mandated duty to maintain access to the Oak Flat Campground is (1) contingent on their *discretionary* determination that access is "practicable" and "consistent with health and safety requirements," 16 U.S.C. § 539p(i)(3), and (2) fails to account for the fact that the Oak Flat Campground represents only a tiny portion of Oak Flat itself.

*Apache Stronghold*, 2025 WL 1360694, at *6 (emphasis in original). Judge Bumatay similarly found that "[t]he Western Apaches would therefore be dependent on the good grace of a private copper-mining venture for any access to their sacred religious site—that is, until the mining companies eviscerate the site altogether. On closer scrutiny, this guarantee of access appears to be a hollow promise." *Apache Stronghold*, 2021 WL

5

12295173, *5. The Forest Service admits that "[t]he Oak Flat Federal Parcel would leave Forest Service jurisdiction, and with it public access would be lost to the parcel itself . . . Resolution Copper may keep portions of the property open for public access, as feasible." Ex. 2 (FEIS at 314).

Although the immediate loss of access for religious and cultural purposes for Native Americans, including members of Plaintiff ITAA, is profound, the land transfer will also immediately and permanently eliminate the legal ability of members of the other Plaintiff groups to access and use these lands, who value the lands at and around Oak Flat for hiking, rock climbing, appreciating and viewing of wildlife, plants, and waters on these lands, camping, and other recreational and aesthetic purposes. *See* Decls. of Dadgar, Featherstone, McSpadden, Murdock, and Bahr. Exs. 3–7.

As soon as the Oak Flat and the surrounding lands are privatized, Plaintiffs' members would immediately lose the public right to enter, use, and recreate on these lands, leaving it to Resolution's discretion to permit these uses. The emotional and legal effect of the Exchange upon Plaintiffs' members would be immediate and profoundly disturbing. *See* Decls. of Featherstone, Dadgar, McSpadden, Murdock, and Bahr. Exs. 3-7.

Additionally, long before full-scale mining would occur, "Resolution Copper will begin 'preparatory activities' such as construction of new roads and buildings that are likely to degrade the Oak Flat environment." *Apache Stronghold*, 2025 WL 1360694, at *7. "In his dissent at the emergency stage, Judge Bumatay argued that '[a]ny of these construction activities may cause irreparable damage to the Oak Flat, even if the site won't be entirely cratered immediately after conveyance.' To that end, many of Defendants' arguments that actual 'subsidence' of the land won't begin to occur for at least six years after transfer are irrelevant." *Id*. (citation omitted).

Furthermore, once these lands are privatized, all of the protections afforded public land would be gone. Plaintiffs would no longer be notified when harmful activities are proposed on these lands, and would no longer have a role in the oversight of these activities.

The mining ban on Oak Flat, which dates back to 1955, would end, *Apache Stronghold*, 101 F.4th at 1130, as would longstanding federal protections for these lands under the Endangered Species Act and the National Forest Management Act.

Thus, to prevent this immediate and irreparable loss of public land uses and values, this Court should maintain the *status quo* and keep these lands public during this litigation.

## II.    Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on all claims, although a likelihood of success on any claim warrants relief. Plaintiffs have shown "that serious questions going to the merits were raised." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

### A.    *The FEIS Violates NEPA and the NDAA.*

Congress specifically conditioned the Exchange on the Forest Service's compliance with NEPA for both the review and approval of the Exchange, as well as for the Mine. "Except as otherwise provided in this section, the Secretary shall carry out the land exchange in accordance with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.)." 16 U.S.C. § 539p(c)(9)*; see also Apache Stronghold*, 101 F. 4th at 1131. The agency understood that the Exchange was contingent on a NEPA-compliant FEIS. *See* 81 Fed. Reg. 14829-32 (Mar. 18, 2016) (public notice detailing NEPA requirements). Resolution similarly agreed: "Making the Resolution land exchange contingent on a full NEPA review was one of the requirements that bipartisan leaders included in the legislation prior to its passage in 2014." Email from Jakob Stausholm, CEO of Rio Tinto, to Roger Featherstone, then-Director of AMRC (attached to Featherstone Decl. in 2021, ECF No. 9-3).

"NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). NEPA requires agencies to take a "hard look" at the environmental consequences of proposed actions, including direct, indirect, and cumulative

7

impacts to all potentially affected resources. *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002); 42 U.S.C. § 4332(2)(C). A "critical" part of the "hard look" required under NEPA involves "[e]stablishing appropriate baseline conditions[.]" *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016). NEPA also requires that the FEIS fully analyze mitigation measures as part of the NEPA process—not in some future decision shielded from public review. *Id*. at 1107.

One of the most glaring shortcomings of the FEIS involves **water**. Plaintiffs' Complaint details how the FEIS ignored critical baseline conditions, underestimated the Mine's water uses, and downplayed or ignored the cumulative impacts of other significant water uses in the region. (ECF No. 1 at 46–63). Instead of responding to these issues, as summarized in Plaintiffs' initial preliminary injunction motion (ECF No. 9, 13–24), the agency rescinded the FEIS (ECF No. 26-2).

Based on these critical water issues, in 2022 the BLM conducted what it described as a "high-level review" of the hydrology and water resource aspects of the Mine to assess whether the Forest Service adequately addressed comments related to these aspects received during the FEIS development. Ex. 1 at 1. The BLM concluded it did not. The BLM detailed numerous areas of serious concern with the FEIS that it "believed may be deficient, underdeveloped, or improperly analyzed," observing that significant topics areas in the FEIS "did not meet the analysis standards of NEPA or suffered for insufficient evaluation or unsupported conclusions." *Id*.

Many of the water-related problems the BLM identified validate the concerns Plaintiffs raised during the NEPA process and in their Complaint. For example, the BLM expressed concerns over how the Mine's water impacts and effects were poorly considered in the FEIS or, in some instances, not considered at all. The BLM found that the FEIS failed to address regional pre-mining groundwater conditions and wrongly included ongoing dewatering at the Mine site within the "No Action" alternative, noting that this constituted a failure to meet the NEPA regulatory requirement to assess cumulative impacts. *Id.* at 13.

The BLM also listed other deficiencies in the FEIS' overly narrow assessment of long-term impacts to surface and groundwater resources around the Mine site (*Id.* at 4–5, 13, 21, 25, and throughout), and the Forest Service's deficient analyses of impacts to surface and groundwater resources at the Mine due to inadequate modeling (*Id.* at 3, 5, 13, 22–26, and throughout). Here, the BLM highlighted that various parties prior to the FEIS' publication had identified the same problems with the water modeling, but the Forest Service ignored them and wrongfully categorized them as "General categories of comments received." *Id.* at 24. "Remarkably, many of the same concerns expressed in past assessments of the model were identified by the BLM reviewers, indicating the concerns had never been incorporated into the groundwater model by the time the FEIS was released." *Id.*

After reviewing Plaintiffs' and others' comments on the FEIS related to Arizona's ongoing drought, the impact of shortages on the Colorado River to Arizona's Central Arizona Project ("CAP") entitlements, and the potential of competing water uses in the area of Resolution's Desert Wellfield, the BLM also noted—as Plaintiffs had previously pointed out—that it was "concerned that the FEIS does not adequately account for permitting processes for water use, CAP water availability, partially planned developments, and decreased precipitation (and therefore changes related to drought)." (*Id.* at 15) (parenthetical in original). The BLM (like Plaintiffs) was concerned that "the FEIS treats other water uses as 'speculative', even though there is a high probability that some of these actions will either affect the amount of water available to [Resolution], or the amount of withdrawn by [Resolution] will affect other planned developments," concluding "[t]here are many assumptions in the FEIS regarding water availability to [Resolution], but few assumptions on the availability of water due to the extended drought or other planned projects." *Id.*

In all, the BLM raised dozens of questions and offered a "strong recommendation" for improved data collection and analysis in the FEIS that supports Plaintiffs' water and environmental resource claims. Plaintiffs submit that the BLM's analysis demonstrates—in and of itself—Plaintiffs' likelihood of success on the merits as to the numerous water and

environmental resource failings found in the FEIS as detailed in Plaintiffs' Complaint (at pp. 64-84). Yet Plaintiffs and the public remain in the dark as to whether Defendants have undertaken any efforts to address the BLM's recommendations. Even now, Defendants refuse to provide the Court, the Plaintiffs, or the public with an opportunity to review the new FEIS. Given what we know about the 2021 FEIS, this refusal, in such a high-profile and tremendously consequential project, by itself exceeds the threshold of "serious questions" and warrants a preliminary injunction.

Plaintiffs' Complaint highlights numerous issues under NEPA pertaining to the Forest Service's failure to adequately analyze the direct, indirect, and cumulative impacts from the Exchange and Mine on all potentially affected resources, including water quality and quantity, wildlife, cultural and religious resources, recreation, and economics. Consistent with the points BLM raised on water, Plaintiffs briefly highlight here several of the more egregious aspects of the FEIS's failure to take a "hard look" at the Exchange and Mine.

For example, the Forest Service did not, among other things, meaningfully disclose and analyze the direct and indirect effects of the planned Desert Wellfield as NEPA required. Once constructed by Resolution, the Desert Wellfield would utilize multiple groundwater wells to pump at least 544,000 acre-feet ("AF")[2] of "fresh groundwater" for the Mine from the East Salt River Valley in the Phoenix AMA. Ex. 2 (FEIS at H-8). Pumping from the Desert Wellfield would be in addition to the roughly 87,000 AF of water that will need to be pumped for "mine dewatering purposes" at the Mine site to keep its underground infrastructure water-free so that mining can occur. Ex. 2 (FEIS at 405). When combined, these two Project actions would consume (deplete) at least 631,000 AF of water from Arizona's limited water sources. To put this in perspective, this is roughly enough water to support the population of the city of Mesa (500,000+) for nearly 8 years.

The FEIS also failed to adequately consider multiple reasonably foreseeable activities that, along with pumping from Resolution's Desert Wellfield, will cumulatively

---

[2] One AF is 325,851 gallons of water, which roughly supports 4 homes for an entire year.

and significantly impact available water in the East Salt River Valley. Under NEPA, the Forest Service should have analyzed "(i) the reasonably foreseeable environmental effects of the proposed agency action [and] (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C). This includes considering the impacts of other activities in the region that will cumulatively add to the impacts from the Exchange and Mine. *See Te–Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010); *Great Basin Res. Watch*, 844 F.3d at 1104.

One of the more glaring failures in this regard is the Forest Service's seemingly deliberate ignorance to the 275-square mile Superstition Vistas development (some of which have now been built)[3] on Arizona State Trust Land ("ASLD") in the East Salt River Valley, which will use groundwater resources in the same proximity as the Desert Wellfield. Ex. 8 at 17–18. The Forest Service declined to consider this mega-development as a reasonably foreseeable action under NEPA, concluding—despite Plaintiffs' comments and abundant evidence to the contrary—that plans for Superstition Vistas were "conceptual and lack adequate detail to allow substantial analysis of resource effects…" FEIS at 966.

However, as early as 2006, Arizona State University issued a study on the Superstition Vistas development that contained significant details about the development (Ex. 9), explaining (among other things) that the development would have a population at buildout of nearly 1 million people (*id*. at 13-14), and will have a minimum water demand of 190,000 AF per year (*id*. at 15). The FEIS also concluded, relative to Superstition Vistas, that "no concrete steps have been taken for the auction of this land by the ASLD." Ex. 2 (FEIS at 971). Yet, by 2020, the ASLD was in fact auctioning lands in the Superstition Vistas planning area for development. Exs. 10–11.

---

[3] *See* Ex. 8 (Master Water Plan for Superstition Vistas (September 2021)). This document was provided to the Agencies by Plaintiffs in a supplemental index in April 2025 as one of the many direct, indirect, and cumulative effects to be considered in the FEIS.

The ASLD was so concerned with the cumulative impacts of Resolution's Desert Wellfield on its plans for Superstition Vistas that it warned the Forest Service during the NEPA process: "[T]he extraction and transportation of groundwater out of the [Superstition Vista Planning Area] greatly compromises the ability to develop these lands to their full planned potential, and as a result, reduces the income and value of the Trust." Ex. 2 (FEIS at R-43 to R-44). These concerns were ignored. Despite ASLD's protests and the trove of available information about the Superstition Vistas development, the Forest Service erroneously concluded that Superstition Vistas is entirely "speculative," Ex. 2 (FEIS at 966), and refused to analyze it in the FEIS—in violation of NEPA and the NDAA.

Along a similar line, the Forest Service also refused to consider other reasonably foreseeable activities in the project area, including for example, plans of large-scale irrigators in the East Salt River Valley to develop new pumping infrastructure in the same proximity as the Desert Wellfield so they could pump approximately 70,000 acre-feet of additional groundwater to replace water supplies lost due cutbacks in CAP water deliveries from the Colorado River. Exs. 12–13. This pumping will span well into the period of Resolution's pumping from the Desert Wellfield. Ex. 2 (FEIS at 118, 966, H-7 to H-8).

Under NEPA, the Forest Service cannot ignore cumulative impacts by labeling them as "speculative," or otherwise rationalizing them away, especially when planning for these activities is already underway, concrete steps have been taken to facilitate the projects, and they are considered in numerous plans by state and local communities. *N. Plains Res. Council*, 668 F.3d at 1078-79.

The Forest Service also failed to analyze potential mitigation measures in the FEIS, and the effectiveness of these measures *vis-a-vis* the Desert Wellfield's impacts to, among other things, nearby wells. *See Great Basin Res. Watch*, 844 F.3d at 1107 (FEIS must fully analyze mitigation measures as part of the NEPA process). The FEIS (Ex. 2) admitted that there would be substantial regional groundwater declines caused by the Desert Wellfield pumping, FEIS at 415, and that these declines will adversely impact individual wells

12

throughout the East Salt River Valley, rendering shallow wells dry or requiring other well owners to deepen their wells, FEIS at 393; *see also* FEIS at 973. The FEIS also admitted "overall the cost of pumping would increase as groundwater deepens, and infrastructure costs would increase as wells and pumps need to be lowered or replaced." FEIS at 973.

Yet, the FEIS failed to even consider or analyze mitigation measures to compensate for these impacts, including "unavoidable impacts" and related mitigation measures, associated with the Desert Wellfield. FEIS at 422. The FEIS also failed to consider or analyze requiring that Resolution offer other forms of mitigation for wells that would need to be deepened or would go dry as a result of these groundwater declines. The agency instead deferred this analysis to a future Arizona Department of Water Resources ("ADWR") permitting process to ascertain the critical water issues and impacts associated with the construction of the Desert Wellfield, even though this state agency process would be long after the NEPA and NDAA review are completed. FEIS at 422. *See also* Ex. 2 (FEIS at J-48). But ADWR does not have any authority under state law to require such mitigation and, under NEPA and the NDAA, the Forest Service cannot defer the analysis of impacts, mitigation measures, and their effectiveness, to some future state permitting process. *Great Basin Res. Watch*, 844 F.3d at 1103-04. NEPA requires that these unavoidable impacts be analyzed and subject to public review—not deferred to some future state process to which NEPA and the NDAA do not apply. *Id.*

### B. *The "Equal Value" and Appraisal Standards of the NDAA Were Violated.*

The NDAA requires that "[t]he value of the Federal land and non-Federal land to be exchanged under this section shall be equal or shall be equalized in accordance with this paragraph." 16 U.S.C. § 539p(c)(5)(A); *see also Apache Stronghold*, 101 F.4th at 1046 (same). Moreover, the federal and non-federal lands must be independently appraised, in accordance with nationally recognized appraisal standards including the Uniform Appraisal Standards for Federal Land Acquisitions and the Uniform Standards of Professional Appraisal Practice. 16 U.S.C. § 539p(c)(4)(B).

"The appraisal prepared under this paragraph shall include a detailed income capitalization approach analysis of the market value of the Federal land which may be utilized, as appropriate, to determine the value of the Federal land, and shall be the basis for calculation of any payment under subsection (e)." *Id*. § 539p(c)(4)(C). The "appraisals of the Federal land and non-Federal land" must also be "in compliance with the requirements of section 254.9 of title 36, Code of Federal Regulations." *Id*. § 539p(c)(4)(A).

That did not occur here. The Forest Service prepared two appraisals for the federal lands to be exchanged, one covering the 766-acre "Mineral Withdrawal Area" parcel; and the other covering the 1,655-acre "Mining Claim Zone" parcel. Exs. 14–15 (Agency Appraisal Summaries). While the appraisal for the Mineral Withdrawal Area included an estimated value of the 5.33 billion pounds of copper beneath the surface (Ex. 15 at 12), the appraisal for the Mining Claim Zone, which reportedly sits above an estimated 35 billion pounds of copper, arbitrarily failed to include **any** value for the tens of billions of dollars worth of copper. Ex. 14. In essence, the government is giving-away the billions of dollars of public resources underlying the 1,655-acre "Mining Claim Zone" parcel, as the entire 1,655-acre parcel is valued at less than $2 million. *Id*., at 12.

The government's appraisal for the "Mining Claim Zone" parcel (which was only first provided, in summary form, to the public in March 2025) is based on the erroneous legal assumption that the value of the estimated 35 billion pounds of copper on these federal lands is **zero**, simply because Resolution filed mining claims on these federal lands. The appraiser believed that the government did not own its own mineral estate, merely due to Resolution's mining claims on these lands: "the Federal Property is encumbered by mining claims held by a party other than the United States; said mining claims confer all rights to locatable minerals to that party in accordance with the Mining Law and **are *not* part of the estate owned by the United States**." Ex. 14 at 3 (Appraisal Report Summary, Mining Claim Zone) (emphasis added).

The appraiser's assumption flatly contradicts longstanding Supreme Court

precedent. Although Resolution has filed mining claims on these lands, the United States undisputedly owns the mineral estate, contrary to the underlying assumption of the appraisal. Mining claims "are a 'unique form of property.' The **United States, as owner of the underlying fee title to the public domain**, maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired." *U.S. v. Locke*, 471 U.S. 84, 104 (1985) (citations omitted, emphasis added)).

The appraiser's assumption also violates the government's exchange and appraisal regulations, at 36 C.F.R. Part 254.9, mandated by the NDAA. 16 U.S.C. § 539p(c)(4)(A). These rules require that all values of the exchanged lands be factored-in, including minerals. An appraisal must provide "the market value of Federal and non-Federal properties involved in an exchange." 36 C.F.R. § 254.9(a)(1). Market value "means the most probable price in cash, or terms equivalent to cash, which lands or interest in lands should bring in a competitive and open market under all conditions requisite to a fair sale, where the buyer and seller each acts prudently and knowledgeably, and the price is not affected by undue influence." § 254.2 (definitions).

> **In estimating market value, the appraiser shall**: (i) Determine the highest and best use of the property to be appraised; (ii) Estimate the value of the lands and interests as if in private ownership and available for sale in the open market; (iii) Include historic, wildlife, recreation, wilderness, scenic, cultural, or other resource values or amenities as reflected in prices paid for similar properties in the competitive market; (iv) **Consider the contributory value of any interest in land such as** water rights, **minerals**, or timber, to the extent they are consistent with the highest and best use of the property.

36 C.F.R. § 254.9(b) (emphasis added).

Thus, under the mandated Forest Service appraisal rules, the land and minerals must be valued as if the exchange were a private, market-based transaction. But here the appraisal of the lands containing the majority of the copper ore completely ignored the tens of billions in mineral value, and assigned a minimal value based only on the surface uses. It defies logic to assume that if Resolution were to offer these same lands for sale on the open market after the Exchange, that it would value its underlying mining claims and the 35

15

billion pounds of copper as **zero**. But that is what the government is attempting to do with these 1,655 acres of federal lands.

Recreational and other users of public lands to be exchanged are entitled to enforce the law's "equal value" requirement, such as mandated by the NDAA. *Desert Citizens*, 231 F.3d at 1177; *supra* at 4. At a minimum, these "serious questions" regarding the "equal value" requirement in the NDAA warrant an injunction blocking the lands transfer.

### III.    The Balance of Hardships and Public Interest Tip Sharply in Favor of Plaintiffs.

"The 'balance of equities' and 'public interest' factors 'merge when the Government is the opposing party.'" *Apache Stronghold*, 2025 WL 1360694, at *5 (citations omitted). Here, as Judge Logan found, "[i]t is abundantly clear" that these factors "tip sharply" in Plaintiff's favor. *Id*. at *9. The Court should therefore preserve the *status quo* by preventing the Exchange until it has reviewed the merits.

As detailed above, the privatization of the 2,400+ acres of currently federal public land will immediately and irreparably harm Plaintiffs and their members. The public interest in favor of a preliminary injunction is especially acute when faced with violations of environmental laws such as NEPA, where the public has a strong interest in ensuring that federal agencies comply with laws designed to protect the public waters and lands, and the right of public participation. *S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009); *see also Sierra Club. v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007).

Regarding the balance of hardships, Resolution's at-most temporary delays do not outweigh the Plaintiffs' and the public's interest in preventing irreparable harm.

> [W]hile an injunction will likely prevent Resolution Copper from beginning its work for a limited time, as Plaintiff points out, it will ultimately "not stop Resolution from mining a single ounce of copper should the transfer ultimately be upheld." The public interests Defendants tout will therefore not be lost because of an injunction, but merely delayed; on the other hand, if the transfer occurs, it "could result in the permanent loss of Apaches' legal rights to access their ancestral sacred site."

*Apache Stronghold*, 2025 WL 1360694, at *8 (citations omitted).

As detailed above and in Plaintiffs' declarations, the most immediate and irreparable harm results from the privatization of the lands by the Exchange itself. The fact that mining may not occur in the immediate future does not diminish these harms. And regardless of Resolution's statement about not starting full operations in the coming years, once the lands are privatized, Resolution will begin disruptive activities, and it will have an exclusive right to use and exclude the lands and sell the land free of any constraints or obligations to the public or develop the land for other purposes.

**IV.     No More Than a Nominal Bond Is Appropriate in this Case.**

Under F.R.C.P. 65(c), in issuing a preliminary injunction, the "court has discretion to dispense with the security requirement, or to request a mere nominal security, where requiring security would effectively deny access to judicial review." *Cal. ex rel. Van de Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985); *see also Friends of the Earth v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975) ($1,000 bond). "It is well established that in public interest environmental cases the plaintiff need not post bonds because of the potential chilling effect on litigation to protect the environment and the public interest." *Central Or. Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012). "Federal courts have consistently waived the bond requirement in public interest environmental litigation, or required only a nominal bond." *Id*. That is the case here, where the imposition of more than a nominal bond would chill Plaintiffs' ability to fulfill their missions as non-profit organizations bringing this case to vindicate the public interest.

Respectfully submitted May 14, 2025.

*/s/ Roger Flynn*
Roger Flynn (Pro Hac Vice)
Jeffrey C. Parsons (Pro Hac Vice)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

17

Marc D. Fink (Pro Hac Vice)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson (Pro Hac Vice)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs*

*/s/ Susan Montgomery*
Susan B. Montgomery (AZ Bar # 020595)
Robyn L. Interpreter (AZ Bar # 020864)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the Inter Tribal Association of Arizona, Inc.*

**CERTIFICATE OF SERVICE**

I, <u>Susan B. Montgomery</u>, attest that I filed the foregoing and all exhibits with this Court's ECF system on this 14th day of May, 2025.

18