**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| San Carlos Apache Tribe,<br><br>               Plaintiff,<br><br>v.<br><br>United States Forest Service, et al.,<br><br>               Defendants. | No. CV-21-00068-PHX-DWL<br><br>**ORDER** |
| Arizona Mining Reform Coalition, et al.,<br><br>               Plaintiffs,<br><br>v.<br><br>United States Forest Service, et al.,<br><br>               Defendants. | No. CV-21-00122-PHX-DWL<br><br>**ORDER** |

Pending before the Court in these related actions are a pair of motions for a preliminary injunction. For the reasons that follow, those motions are denied as premature. The Court will, however, preclude the United States Forest Service ("Forest Service") from proceeding with the challenged land exchange until 60 days after the issuance of the Final Environmental Impact Statement ("FEIS"). During oral argument, the defendants agreed to such a period of delay in order to facilitate further briefing.

**RELEVANT BACKGROUND**

A.    <u>SALECA</u>

In 2014, Congress passed the National Defense Authorization Act for Fiscal Year

2015 ("NDAA").  Section 3003 of the NDAA, known as the Southeast Arizona Land Exchange and Conservation Act ("SALECA"), authorizes the exchange of 2,422 acres of federal land in the Tonto National Forest for land held by a private company, Resolution Copper.  *See generally Apache Stronghold v. United States*, 101 F.4th 1036, 1044-48 (9th Cir. 2024) (en banc).  *See also* 16 U.S.C. § 539p(a) ("The purpose of this section is to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States.").

The federal land to be transferred to Resolution Copper includes an area known as Oak Flat, which "is a site of great spiritual value to the Western Apache Indians" but "also sits atop the world's third-largest deposit of copper ore."  *Apache Stronghold*, 101 F.4th at 1044.  Congress's intent in causing this land to be transferred to Resolution Copper was "[t]o take advantage of that deposit" by enabling Resolution Copper to "mine the ore."  *Id.* Accordingly, "[o]nce the land transfer takes place, Resolution Copper plans to extract the ore by using panel caving, a technique that entails digging a network of shafts and tunnels below the ore body.  Resolution Copper will then detonate explosives to fracture the ore, which will move downward as a result.  That, in turn, will cause the ground above to begin to collapse inward.  Over the next 41 years, Resolution Copper will remove progressively more ore from below Oak Flat, causing the surface geography to become increasingly distorted.  The resulting subsidence will create a large surface crater, which the Forest Service estimates will span approximately 1.8 miles in diameter and involve a depression between 800 and 1,115 feet deep."  *Id.* at 1047 (cleaned up).

As relevant here, "Congress expressly stated that the land exchange would generally be governed by the National Environmental Policy Act ('NEPA').  Thus, § 3003 requires that an environmental impact statement . . . be prepared under NEPA prior to the Secretary executing the land exchange.  Congress supplemented the ordinary NEPA requirements for such statements and required that the [FEIS] for the land transfer also assess the effects of the mining on cultural and archaeological resources in the area and identify measures to minimize potential adverse impacts on those resources.  The [FEIS] was then to form the

1    basis for all decisions under Federal law related to the proposed mine, such as the granting

2    of any permits, rights-of-way, and construction approvals." *Id.* (cleaned up).  "The statute

3    commands that the land transfer take place '[n]ot later than 60 days after' the publication

4    of the [FEIS].  Nowhere in § 3003 does Congress confer on the Government discretion to

5    halt the transfer.  The statute mandates that the Government secure an appraisal of the land;

6    that it prepare the [FEIS]; and that it then transfer the land." *Id.* (cleaned up).

7    II.    <u>Initial Litigation In 2021</u>

8          On January 4, 2021, the Forest Service announced that the FEIS for the land transfer

9    would be published on January 15, 2021.  This announcement prompted three different sets

10   of plaintiffs to file lawsuits in the District of Arizona, each seeking an injunction to bar the

11   land transfer.  The first action, *Apache Stronghold v. United States et al.*, No. 21-cv-50-

12   PHX-SPL (hereinafter, "*Apache Stronghold*"), was assigned to Judge Logan; the second

13   action, *San Carlos Apache Tribe v. United States Forest Service et al.*, No. 21-cv-68-PHX-

14   DWL (hereinafter, "*San Carlos Apache Tribe*"), was assigned to the undersigned judge;

15   and the third action, *Arizona Mining Reform Coalition v. United States Forest Service et

16   al.*, No. 21-cv-122-PHX-DWL (hereinafter, "*Arizona Mining Reform Coalition*"), was

17   originally assigned to Judge Rayes but has since been reassigned to the undersigned judge.

18          During earlier stages of litigation, the plaintiffs filed a motion for a preliminary

19   injunction ("PI") in each case.  (*Apache Stronghold*, Doc. 7; *San Carlos Apache Tribe*,

20   Doc. 29; *Arizona Mining Reform Coalition*, Doc. 9.)  On February 12, 2021, Judge Logan

21   denied the first-filed PI motion.  (*Apache Stronghold*, Doc. 57.)

22          On March 1, 2021, before the other two PI motions became ripe for resolution, the

23   United States Department of Agriculture ("USDA") directed the Forest Service to rescind

24   the FEIS "in order to reinitiate consultation with Tribes and ensure impacts have been fully

25   analyzed." (*San Carlos Apache Tribe*, Doc. 36 at 2.)  In light of this development, the land

26   exchange was postponed.  (*Id.*)  As a result, the plaintiffs in *San Carlos Apache Tribe* and

27   *Arizona Mining Reform Coalition* agreed to withdraw their PI motions.  (*San Carlos

28   Apache Tribe*, Doc. 42; *Arizona Mining Reform Coalition*, Doc. 29.)  Additionally, after

further discussion, the plaintiffs and federal defendants in *San Carlos Apache Tribe* and *Arizona Mining Reform Coalition* agreed that each case could be stayed pending the Forest Service's issuance of a new FEIS and new Draft Record of Decision ("DROD"). (*San Carlos Apache Tribe*, Doc. 46; *Arizona Mining Reform Coalition*, Doc. 33.) The written agreement in each case provided that the Forest Service would "provide at least 60 days' notice to Plaintiff's counsel and the public before any future FEIS and DROD for the subject Land Exchange and Project is issued"; that "[w]ithin ten days of issuance of such notice, the parties will jointly propose a schedule for the filing of Plaintiff's amended or supplemental Complaint and for briefing of any motion for temporary restraining order or preliminary injunction"; and that "[t]he parties will work in good faith to develop a manageable schedule for briefing any motion for preliminary relief with the goal of providing the Court sufficient time to hold oral argument and rule on any such motion prior to the Forest Service's anticipated date of conveyance of the federal lands." (*Id.*) Based on those agreements, both *San Carlos Apache Tribe* and *Arizona Mining Reform Coalition* were stayed beginning in March 2021. (*San Carlos Apache Tribe*, Doc. 47; *Arizona Mining Reform Coalition*, Doc. 35.)

III.     Continued Litigation In *Apache Stronghold*

In the meantime, the plaintiff in *Apache Stronghold* sought review of Judge Logan's order denying the PI motion. (*Apache Stronghold*, Doc. 59.)

In a June 24, 2022 opinion, a three-judge panel of the Ninth Circuit affirmed. *Apache Stronghold v. United States*, 38 F.4th 742, 773 (9th Cir. 2022).

In May 2024, after granting rehearing *en banc*, the Court again affirmed. *Apache Stronghold*, 101 F.4th at 1065.

In September 2024, the plaintiff filed a petition for certiorari in the United States Supreme Court. *Apache Stronghold v. United States*, No. 24-291 (U.S.).

IV.     Recent Developments

On April 17, 2025, the Forest Service filed its 60-day notice of publication of the new FEIS. (*Apache Stronghold*, Doc. 170 at 4; *San Carlos Apache Tribe*, Doc. 70; *Arizona*

*Mining Reform Coalition*, Doc. 59.)  This prompted a flurry of activity in all three cases.

On April 24, 2025, the plaintiff in *Apache Stronghold* filed a motion for a temporary injunction to prohibit the federal defendants from transferring Oak Flat to Resolution Copper during the pendency of the Supreme Court proceedings.  (*Apache Stronghold*, Doc. 150.)

Meanwhile, on May 5, 2025, the Court held a status hearing in *San Carlos Apache Tribe* and *Arizona Mining Reform Coalition* to address how to proceed in light of the notice of publication.  (*San Carlos Apache Tribe*, Doc. 78; *Arizona Mining Reform Coalition*, Doc. 64.)  During the status hearing, the federal defendants took the position, which surprised the Court, that the Forest Service intended to proceed with the land transfer immediately following the anticipated issuance of the FEIS on June 16, 2025, rather than allowing for the filing of amended complaints and new preliminary injunction motions following the FEIS's issuance (as seemingly contemplated in the parties' March 2021 stipulations).  Based in part on that seeming change in position, the Court agreed with the plaintiffs' proposal to lift the stay and authorize the filing of new preliminary injunction motions before the issuance of the new FEIS, albeit while expressing some skepticism regarding that approach.

On May 9, 2025, Judge Logan granted the plaintiff's request for a temporary injunction in *Apache Stronghold*, ruling that "Federal Defendants are enjoined from publishing the [FEIS] and conveying the Federal land described in section 3003 of the [NDAA].  This injunction shall remain in effect until the day after denial of the petition for certiorari in *Apache Stronghold v. United States*, No. 24-291 (U.S.) (should the petition be denied), or the day after the issuance of the Supreme Court's judgment in *Apache Stronghold v. United States*, No. 24-291 (U.S.) (should the petition be granted)."  (*Apache Stronghold*, Doc. 170 at 17-18.)

On May 14, 2025, the plaintiffs in *San Carlos Apache Tribe* and *Arizona Mining Reform Coalition* each filed a new preliminary injunction motion.  (*San Carlos Apache Tribe*, Doc. 82; *Arizona Mining Reform Coalition*, Doc. 68.)

On May 23, 2025, the federal defendants and Resolution Copper filed separate responses in opposition to the motion for preliminary injunction in *San Carlos Apache Tribe*. (*San Carlos Apache Tribe*, Docs. 85, 86.)

On May 27, 2025, the federal defendants and Resolution Copper filed separate responses in opposition to the motion for preliminary injunction in *Arizona Mining Reform Coalition*. (*Arizona Mining Reform Coalition*, Docs. 71, 72.)

That same day, the Supreme Court denied the petition for certiorari in *Apache Stronghold*. *Apache Stronghold v. United States*, __ S.Ct. __, 2025 WL 1496472 (U.S. 2025). Accordingly, on May 28, 2025, the temporary injunction in *Apache Stronghold* expired. (*Apache Stronghold*, Doc. 170 at 18 ["This injunction shall remain in effect until the day after denial of the petition for certiorari . . . ."].)

On May 30, 2025, the San Carlos Apache Tribe ("the Tribe") filed separate replies in support of its motion for preliminary injunction. (*San Carlos Apache Tribe*, Docs. 88, 89.)

On June 2, 2025, the plaintiffs in *Arizona Mining Reform Coalition* filed a consolidated reply in support of their motion for preliminary injunction. (*Arizona Mining Reform Coalition*, Doc. 74.)

On June 5, 2025, the Court issued a tentative ruling. (*San Carlos Apache Tribe*, Doc. 93; *Arizona Mining Reform Coalition*, Doc. 76.)

On June 6, 2025, the Court heard oral argument.

## DISCUSSION

I.    Motions For Preliminary Injunction

   A.    **Legal Standard**

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (cleaned up). *See also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (citation omitted).

1    "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to
2    succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of
3    preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction
4    is in the public interest." *Winter*, 555 U.S. at 20. However, "if a plaintiff can only show
5    that there are serious questions going to the merits—a lesser showing than likelihood of
6    success on the merits—then a preliminary injunction may still issue if the balance of
7    hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are
8    satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)
9    (cleaned up). *See also Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031
10   (9th Cir. 2024) ("Serious questions are issues that cannot be resolved one way or the other
11   at the hearing on the injunction because they require more deliberative investigation. Thus,
12   parties do not show serious questions when they raise a merely plausible claim, nor can a
13   district court forgo legal analysis just because it has not identified precedent that places the
14   question beyond debate. This 'less demanding' merits standard requires serious factual
15   questions that need to be resolved in the case.") (cleaned up). Additionally, when, as here,
16   "a government agency is a party," "the final two injunction factors—the balance of equities
17   and the public interest—merge." *Assurance Wireless*, 100 F.4th at 1031.

18   Regardless of which standard applies, the movant "carries the burden of proof on
19   each element of either test." *Env't. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016,
20   1027 (E.D. Cal. 2000).

21   **B.    San Carlos Apache Tribe**

22   "Likelihood of success on the merits is the most important *Winter* factor and is a
23   threshold inquiry." *Roe v. Critchfield*, __ F.4th __, 2025 WL 1486985, *4 (9th Cir. 2025)
24   (cleaned up).

25   In its motion, the Tribe identifies two sets of claims that purportedly satisfy the first
26   *Winter* factor. (*San Carlos Apache Tribe*, Doc. 82.) First, the Tribe argues that it "raises
27   serious questions about the validity of SALECA under RFRA [Religious Freedom
28   Restoration Act], the Apache Treaty of 1852, and the First Amendment." (*Id.* at 11.) The

Tribe contends these claims "are identical in substance" to the claims in *Apache Stronghold*. (*Id. See also id.* at 9 ["The RFRA claims brought by the Tribe and Apache Stronghold share the same legal and factual bases."].)

This argument requires little discussion in light of recent developments. The Ninth Circuit's *en banc* decision in *Apache Stronghold* rejected essentially the same claims the Tribe seeks to advance here. Although the Tribe emphasizes that the *en banc* decision was closely divided, all that matters for present purposes is how the majority ruled. *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981) ("District courts are bound by the law of their own circuit . . . no matter how egregiously in error they may feel their own circuit to be.") (citation omitted). Additionally, although it was reasonable for the Tribe to argue at the time it filed its motion (*i.e.*, May 14, 2025) that the possibility of Supreme Court review created a serious question going to the merits of its RFRA, Apache Treaty, and First Amendment claims (*San Carlos Apache Tribe*, Doc. 82 at 9, 11-12)—which also formed part of the basis for the temporary injunction issued in *Apache Stronghold* on May 9, 2025 (*Apache Stronghold*, Doc. 170 at 7-9 [noting that "there is good reason to anticipate that [the Supreme Court] will grant certiorari, given the fact that the case has been relisted thirteen times for consideration," while also acknowledging that "this Court does not have a crystal ball to determine what the Supreme Court will, let alone should, decide"])—the Supreme Court denied review on May 27, 2025. Thus, under the current legal landscape, the Tribe's RFRA, Apache Treaty, and First Amendment claims are foreclosed by binding Ninth Circuit law, with little reason to believe the Supreme Court will revisit that ruling. Against this backdrop, the Court cannot say that the Tribe's RFRA, Apache Treaty, and First Amendment claims create a likelihood of success on the merits or even raise serious questions going to the merits.

The Tribe's only other merits-based *Winter* argument is that "whether the forthcoming FEIS will violate SALECA, NEPA, and NHPA [National Historic Preservation Act] is a serious question." (*San Carlos Apache Tribe*, Doc. 82 at 14, capitalization omitted.) In support of this argument, the Tribe identifies various perceived

flaws in the EIS issued in January 2021 and argues that "[i]f the forthcoming FEIS is consistent with the 2021 FEIS, then it is subject to the same challenges as before." (*Id.* at 14-18.) However, the Tribe acknowledges that "neither the Tribe nor the Court can assess which shortcoming plagues the forthcoming FEIS until it is published" and that "the Forest Service will not have taken a final action until the FEIS is published." (*Id.* at 14.)

Due, at a minimum, to the unusual procedural posture of this case, these arguments also fail to create a likelihood of success on the merits or even serious questions going to the merits. An initial problem is that the Tribe's operative complaint, filed on January 25, 2021, only challenges the EIS that was issued on January 15, 2021. (*San Carlos Apache Tribe*, Doc. 14 ¶ 11 ["The Tribe brings this action because the FEIS and related agency actions violate Section 3003 of the NDAA, the NHPA, and the NEPA, among other requirements detailed herein."]; *id.* ¶ 105 ["The publication of the Final EIS on January 15, 2021 was done prior to its completion according to Section 3003 of the NDAA, the finalization of the § 106 NHPA process, the completion of a legally compliant FEIS and the Agreement to Initiate between the Forest Service, BLM and Resolution."].) Although the Tribe's failure to amend its complaint since January 2021 to account for subsequent developments is understandable—as noted, the Tribe and the federal defendants agreed in March 2021 to stay this action until the issuance of the new FEIS, and under the terms of the stipulation, the Tribe would be allowed to amend its complaint after the new FEIS was issued (*San Carlos Apache Tribe*, Doc. 46)—the Tribe's reliance on its old complaint for purposes of its new request for a preliminary injunction still creates an obstacle to relief. Under Ninth Circuit law, "there must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint. This requires a sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself. . . . Absent that relationship or nexus, the district court lacks authority to grant the relief requested." *Pac. Radiation Oncology, LLC v. Queen's Medical Center*, 810 F.3d 631, 636 (9th Cir. 2015). Thus, even assuming the Tribe could otherwise show that its merits-based challenges to the forthcoming FEIS

provide a pathway for blocking the land exchange—a proposition that the federal defendants and Resolution Copper vigorously dispute, on a variety of grounds, in their motion papers—the Court doubts whether it could grant preliminary injunctive relief to the Tribe on this record.[1]  The more logical and procedurally appropriate approach would be to wait for the new FEIS to be issued, then allow the Tribe to amend its complaint accordingly, and then authorize a new round of preliminary injunction briefing based on the new complaint—an approach that is addressed in Part III *infra*.

A related but distinct problem is that the Tribe's challenges to the forthcoming FEIS—as noted, the Tribe contends the "FEIS will violate SALECA, NEPA, and NHPA"—arise under the Administrative Procedures Act ("APA").  *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1093, 1097 (9th Cir. 2005) (reiterating "that parties are required to proceed under the APA in order to challenge claimed violations of NEPA" and likewise concluding "that NHPA contains no such private right of action"); *Concerned Citizens & Retired Miners Coalition v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 942-43 (D. Ariz. 2017) (rejecting tribal plaintiff's claim "that the Forest Service violated § 3003 of the NDAA" in part because "the Tribe has not shown that this statute provides a cause of action for it").[2]  The Tribe seems to acknowledge this point in its reply.  (*San Carlos Apache Tribe*, Doc. 89 at 5 ["Resolution overlooks that by requiring an EIS 'under the National Environmental Policy Act,' the rights of action in the Administrative Procedure Act . . .

---

[1]    During oral argument, the Tribe identified reasons why, in its view, *Pacific Radiation Oncology* would not preclude the issuance of a preliminary injunction under these circumstances.  Although the Court still has its doubts, it is unnecessary to engage in an extended analysis of *Pacific Radiation Oncology*'s application here because (1) this order also identifies an independent reason why the Tribe has failed, on the current record, to satisfy the first *Winter* factor; and (2) this order effectively allows the Tribe to raise another request for preliminary injunctive relief after the issuance of the FEIS but before the land exchange occurs, and thus the Tribe will not suffer any irreparable injury from the denial of its current request.

[2]    In its reply, the Tribe does not dispute that SALECA itself lacks a private right of action but argues that, under 28 U.S.C. § 1362 and/or the Apache Treaty of 1852, it may assert SALECA-related challenges.  (*San Carlos Apache Tribe*, Doc. 89 at 5 & n.5.)  However, in its motion, the Tribe states that it simply seeks to challenge "SALECA itself under [RFRA], Apache Treaty of 1852, and Free Exercise Clause of the United States Constitution." (*San Carlos Apache Tribe*, Doc. 82 at 7.)  As discussed above, such claims are foreclosed by the Ninth Circuit's *en banc* decision in *Apache Stronghold*.

1    apply in this case.".)

2        Under the APA, "the person claiming a right to sue must identify some 'agency

3    action' that affects him in the specified fashion" and "the 'agency action' in question must

4    be '*final agency action*.'"  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 882 (1990)

5    (citations omitted) (emphasis added).  In their motion papers, the parties disagree about

6    what will constitute the relevant "final agency action" here.  According to the Tribe, the

7    relevant "final action" will occur when "the FEIS is published." (*San Carlos Apache Tribe*,

8    Doc. 82 at 14.)  The federal defendants disagree, arguing that no "traditional judicially

9    reviewable final agency action" will occur until the issuance of "the Record of Decision,

10   which will make decisions on the discretionary portions of the mining project" and "will

11   not be final until more than sixty days after the FEIS is published." (*San Carlos Apache*

12   *Tribe*, Doc. 85 at 14.)  Finally, Resolution Copper argues that "[t]o the extent there is 'final

13   agency action' contemplated by the FEIS or ROD, that final agency action would be other

14   decisions under Federal law related to the proposed mine, such as permits and rights-of-

15   way for power, water, tailings, and other ancillary facilities, not the land transfer. . . .  As

16   to those other, future actions, the Tribe will retain all of its administrative and judicial

17   review rights following the land exchange." (*San Carlos Apache Tribe*, Doc. 86 at 14-15,

18   cleaned up.)

19       At a future stage of this case, the Court may have to decide this complicated and

20   contested issue.[3]  But for now, it is sufficient to note that even under the Tribe's position,

---

21   [3]    The Court notes that, on the one hand, existing Ninth Circuit law seems to support
     the Tribe's position that the issuance of a FEIS may, itself, qualify as final agency action
22   for purposes of an APA claim.  *Envt'l Defense Ctr. v. Bureau of Ocean Energy Mgmt.*, 36
     F.4th 850, 868 (9th Cir. 2022) ("The agencies contend that the programmatic EA and
23   FONSI are not 'final agency actions' because they will still have to approve permits from
     private entities wishing to use well stimulation treatments before the treatments will
24   actually be used in the region.  The agencies would have us wait until the agencies approve
     site-specific permits before Plaintiffs could challenge the agencies' actions under the APA.
25   We disagree and hold that the programmatic EA and FONSI meet both prongs of [the] test
     for final agency action."); *id.* ("We have repeatedly held that final NEPA documents are
26   final agency actions.  We are bound by these decisions and see no reason to depart from
     that principle here.  The NEPA review process concludes in one of two ways: (1) the
27   agency determines through an EA that a proposed action will not have a significant impact
     on the environment and issues a FONSI, or (2) the agency determines that the action will
28   have a significant impact and issues an EIS and record of decision. Final NEPA documents
     constitute 'final agency action' under the APA, whether they take the form of an EIS and

- 11 -

1   no final agency action has yet occurred.  It follows that, on the current record, the Tribe

2   cannot establish a likelihood of success on, or even serious questions going to the merits

3   of, any APA-based challenge.

4       Given these conclusions, it is unnecessary to address the remaining *Winter* factors.

5   *Roe*, 2025 WL 1486985 at *4 ("In the absence of serious questions going to the merits, the

6   court need not consider the other factors.").  On this record, the Tribe has failed to meet its

7   burden of establishing an entitlement to a preliminary injunction.

8                    C.    **Arizona Mining Reform Coalition**

9       In their motion, the plaintiffs in *Arizona Mining Reform Coalition* identify two sets

10  of claims that purportedly satisfy the first *Winter* factor.  (*Arizona Mining Reform*

11  *Coalition*, Doc. 68.)

12      First, the plaintiffs argue they are likely to succeed on their claim that "the FEIS

13  violates NEPA and the NDAA."  (*Id.* at 7, capitalization omitted.)  In support of this

14  argument, the plaintiffs identify various perceived NEPA-related deficiencies in the 2021

15  FEIS, such as the failure to consider certain "critical water issues" and the "failure to

16  adequately analyze the direct, indirect, and cumulative impacts from the Exchange and

17  Mine on all potentially affected resources, including water quality and quantity, wildlife,

18  cultural and religious resources, recreation, and economics."  (*Id.* at 7-13.)

19      An initial difficulty in evaluating these NEPA-related challenges is that on May 29,

20

21  _____

    Record of Decision or an EA and FONSI, because they culminate the agencies'

22  environmental review process.").  On the other hand, the Supreme Court's just-issued

    decision in *Seven County Infrastructure Coalition v. Eagle County, Colo.*, __ S.Ct. __,

23  2025 WL 1520964 (U.S. 2025), may call this line of authority into question.  There, the

    Supreme Court explained that "[b]ecause an EIS is only one input into an agency's decision

24  and does not itself require any particular substantive outcome, the adequacy of an EIS is

    relevant only to the question of whether an agency's final decision (here, to approve the

25  railroad) was reasonably explained."  *Id.* at *6.  The Court added: "The ultimate question

    is not whether an EIS in and of itself is inadequate, but whether the agency's final decision

26  was reasonable and reasonably explained.  Review of an EIS is only one component of that

    analysis.  Even if an EIS falls short in some respects, that deficiency may not necessarily

27  require a court to vacate the agency's ultimate approval of a project, at least absent reason

    to believe that the agency might disapprove the project if it added more to the EIS."  *Id.* at

28  *9.  Although it may be necessary, at a future stage of this case, to determine whether these

    two lines of authority are "clearly irreconcilable," *Tingley v. Ferguson*, 47 F.4th 1055,
    1074-75 (9th Cir. 2022), it is unnecessary to do so now.

1    2025, after the plaintiffs had already filed their motion and both sets of defendants had
2    already filed their responses, the Supreme Court decided *Seven County Infrastructure*
3    *Coalition v. Eagle County, Colo.*, __ S.Ct. __, 2025 WL 1520964 (U.S. 2025).  Among
4    other things, the Supreme Court criticized some lower courts for "engag[ing] in overly
5    intrusive (and unpredictable) review in NEPA cases," which has "slowed down or blocked
6    many projects and, in turn, caused litigation-averse agencies to take ever more time and to
7    prepare ever longer EISs for future projects," and held that "[a] course correction of sorts
8    is appropriate to bring judicial review under NEPA back in line with the statutory text and
9    common sense." *Id.* at *8-9.  Although the parties have scrambled to address this ruling in
10   dueling notices of supplemental authority (*Arizona Mining Reform Coalition*, Docs. 73,
11   75), the better approach would be to re-brief the plaintiffs' NEPA-based challenges in an
12   orderly manner in light of this new authority.

13         Additionally, and more fundamentally, the plaintiffs' first *Winter* argument fails for
14   the same two reasons as the Tribe's arguments regarding SALECA, NEPA, and NHPA—
15   *first*, the operative complaint in this action, filed on January 22, 2021, only challenges the
16   2021 FEIS,[4] not the forthcoming 2025 FEIS, and thus it is questionable under *Pacific*
17   *Radiation Oncology* whether the Court could grant a preliminary injunction based on the
18   claims in the operative complaint; and *second*, even assuming the issuance of the
19   forthcoming 2025 FEIS could qualify as final agency action as required to support a NEPA-
20   based APA claim, the FEIS has not been issued yet, and thus the plaintiffs cannot, on the
21   current record, establish an essential element of such a claim.

22         The plaintiffs' only other merits-based *Winter* argument is that "[t]he 'equal value'
23   and appraisal standards of the NDAA were violated." (*Arizona Mining Reform Coalition*,
24   Doc. 68 at 13, capitalization omitted.)  According to the plaintiffs, "[t]he government's
25   appraisal for the 'Mining Claim Zone' parcel (which was only first provided, in summary
26   form, to the public in March 2025) is based on the erroneous legal assumption that the

---

27,28   [4]    *Arizona Mining Reform Coalition*, Doc. 1 ¶ 3 ("The faulty FEIS and Project review, hurried through to completion in the waning days of the Trump Administration, is deficient in numerous critical areas, and violates multiple federal laws.").

- 13 -

value of the estimated 35 billion pounds of copper on these federal lands is zero, simply because Resolution filed mining claims on these federal lands." (*Id.* at 14.) The plaintiffs contend this assumption is incorrect because "[t]he United States, as owner of the underlying fee title to the public domain, maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired" and "the government's exchange and appraisal regulations" require that the appraiser take into account the value of minerals when determining the land's fair market value. (*Id.* at 14-16.) The plaintiffs also contend that, under *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000), they "are entitled to enforce the law's 'equal value' requirement, such as mandated by the NDAA." (*Arizona Mining Reform Coalition*, Doc. 68 at 16.)

Although the defendants identify an array of reasons why, in their view, any appraisal-related claim will be unavailing, it is only necessary to address one of those reasons here because it is dispositive. As the federal defendants correctly note, "Plaintiffs' appraisal claim under the Land Exchange Act fails at the threshold because it was not plead[ed] in the complaint." (*Arizona Mining Reform Coalition*, Doc. 71 at 1.) Indeed, although the plaintiffs' operative complaint, filed on January 22, 2021, mentions the topic of appraisals, it only criticizes the Forest Service for failing to "provide any meaningful information on the appraisals to the public prior to issuance of the FEIS" and failing to include any "information on the appraisals . . . in the Draft EIS or FEIS." (*Arizona Mining Reform Coalition*, Doc. 1 ¶ 119.) Thus, the only appraisal-related claim articulated in the complaint is that the January 2021 FEIS was "inadequate" due to its "failure to include any information or opportunity to comment upon the appraisals (including the additional Non-Federal lands that may be conveyed to the United States based on the appraisals)." (*Id.* ¶ 404.) This claim is entirely different from the claim advanced in the motion for preliminary injunction, which is that the appraisal methodology the Forest Service recently disclosed to the public in March 2025 is substantively flawed. As discussed in earlier portions of this order, the Court doubts that it has authority under *Pacific Radiation*

1  *Oncology* to issue a preliminary injunction under these circumstances.[5]

2      In their reply, the plaintiffs do not dispute that their complaint "did not detail

3  specific problems with the appraisals" but attempt to provide an explanation for this

4  approach—namely, "the appraisals were not completed when the FEIS was issued, even

5  though § 3003 required it." (*Arizona Mining Reform Coalition*, Doc. 74 at 9.)  The plaintiffs

6  further contend that, under the circumstances, it would be unfair to deny them a chance to

7  pursue the substantive claim of appraisal inadequacy advanced in their motion simply

8  because it was not pleaded in the complaint: "[The federal defendants] want their cake and

9  eat it too—issuing the Exchange right after the FEIS is released, based on the appraisals

10  (that still have not been fully released to the public), but preventing this Court from

11  considering the appraisals' legality before the Exchange occurs.  Such legal manipulations

12  should be rejected."  (*Id.*)  The plaintiffs add: "Defendants' argument, if accepted, would

13  lead to absurd results.  It would require initial complaints to provide specificity about

14  documents and information not even in existence in 2021."  (*Id.* at 10.)  The Court agrees

15  with these sentiments, but the solution is not to ignore *Pacific Radiation Oncology*—rather,

16  it is to allow amendment and then further briefing following the upcoming issuance of the

17  FEIS, as outlined in Part III *infra*.

18      Given these conclusions, it is unnecessary to address the remaining *Winter* factors.

19  *Roe*, 2025 WL 1486985 at *4 ("In the absence of serious questions going to the merits, the

20  court need not consider the other factors.").  On the current record, the plaintiffs have failed

21  to meet their burden of establishing an entitlement to a preliminary injunction.

22      …

23      …

24

25  [5]    The Court acknowledges that the plaintiffs attempt to explain, in their reply, why

26  *Pacific Radiation Oncology* would not preclude the issuance of a preliminary injunction
based on the appraisal-related claim set forth in the current complaint (*Arizona Mining
Reform Coalition*, Doc. 74 at 9-10), but the Court finds this argument unpersuasive for the

27  reasons outlined above.  At any rate, as discussed in footnote 1, the plaintiffs will not suffer
any irreparable harm from the denial of their current request for injunctive relief, given that

28  they will have the opportunity to file another such request following the upcoming issuance
of the new FEIS.

- 15 -

III.    60-Day Delay To Allow Further Amendment And Motion Practice

As noted, in March 2021, the plaintiffs and federal defendants in *San Carlos Apache Tribe* and *Arizona Mining Reform Coalition* agreed that each case "should be stayed pending the Forest Service's issuance of a future FEIS and DROD." (*San Carlos Apache Tribe*, Doc. 46; *Arizona Mining Reform Coalition*, Doc. 33.) The written agreement in each case further provided that the Forest Service would "provide at least 60 days' notice to Plaintiff's counsel and the public before any future FEIS and DROD for the subject Land Exchange and Project is issued"; that "[w]ithin ten days of issuance of such notice, the parties will jointly propose a schedule for the filing of Plaintiff's amended or supplemental Complaint and for briefing of any motion for temporary restraining order or preliminary injunction"; and that "[t]he parties will work in good faith to develop a manageable schedule for briefing any motion for preliminary relief with the goal of providing the Court sufficient time to hold oral argument and rule on any such motion prior to the Forest Service's anticipated date of conveyance of the federal lands." (*Id.*)

Each filing prompted the Court to take action. In *San Carlos Apache Tribe*, the filing took the form of a "joint motion for a stay of proceedings," which the Court granted. (*San Carlos Apache Tribe*, Docs. 46, 47.) In *Arizona Mining Reform Coalition*, the filing was styled as a "joint status report and proposed case schedule," which the Court treated as a stay request and proceeded to grant. (*Arizona Mining Reform Coalition*, Docs. 33, 35.)

In their motion for preliminary injunction, the Tribe argues in the alternative that "[t]o avoid any prejudice that would result if the Supreme Court decides the petition against Apache Stronghold, this Court should enjoin Federal Defendants from executing the land transfer, consistent with the Parties' stipulation that they will work in good faith, so the Tribe may challenge any FEIS and so this Court can decide that challenge." (*San Carlos Apache Tribe*, Doc. 82 at 13-14.)

Although the federal defendants opposed this approach during the May 5, 2025 status conference, they changed course in their response to the Tribe's motion, stating that

"[s]hould the Court deem it necessary . . . to review the published FEIS before deciding Plaintiff's likelihood of success on the merits of its NEPA or consultation claims, the Government proposes that, upon publication of the FEIS, the parties file short supplemental briefs addressing the content of the FEIS as it relates to Plaintiff's preliminary injunction motion. During such briefing, which the Government requests to be completed within thirty days from the publication of the FEIS, the Government would agree not to convey title to Oak Flat to preserve the status quo." (*San Carlos Apache Tribe*, Doc. 85 at 14.) Additionally, during oral argument, the federal defendants agreed to an even longer period of delay, stating that they would agree to a 60-day period of delay following the issuance of the FEIS to permit further amendment and briefing.

Likewise, Resolution Copper contended in its response that "[i]f the Court felt it absolutely necessary to preserve the status quo, it could conceivably enjoin conveyance of title for 30 days after publication of the FEIS, thereby permitting Plaintiff to renew its motion after seeing the actual document followed by expedited briefing, without disturbing Congress's statutory mandate that conveyance of title occur no more than 60 days following publication. A modest injunction along those lines would fully protect against Plaintiff's asserted harms while also being narrowly tailored as the Supreme Court and the Ninth Circuit require." (*San Carlos Apache Tribe*, Doc. 86 at 2-3.)[6] Additionally, during oral argument, Resolution Copper clarified that, subject to its existing objections, it would not oppose the 60-day period of delay to which the federal defendants had just agreed.

In reply to the federal defendants' response, the Tribe accuses them of a "refusal to honor their 2021 stipulation" and argues that a 30-day period of delay would be "plainly insufficient given the volume and complexity of the FEIS." (*San Carlos Apache Tribe*, Doc. 88 at 2.) The Tribe adds that "[t]his change in position is foreclosed by the doctrine of judicial estoppel." (*Id.* at 3.) The Tribe thus "respectfully requests at least sixty days to prepare its briefing and to allow Federal Defendants as much time as they require to

---

[6]    The defendants made the same representations in their responses to the motion for preliminary injunction in *Arizona Mining Reform Coalition*. (*Arizona Mining Reform Coalition*., Doc. 71 at 15; Doc. 72 at 12 n.5.)

respond before giving this Court adequate time to decide whether to extend any injunction for the pendency of this case." (*Id.* at 12.)  Similarly, in reply to Resolution Copper's response, the Tribe argues that a 30-day period of delay "would be wholly inadequate and would not afford the Tribe and its experts sufficient time to review the voluminous FEIS documents, much less for the Court to decide such [a] motion.  The Tribe respectfully requests at least sixty days to prepare its briefing and to allow Resolution as much time as they require to respond before giving this Court . . . adequate time to decide whether to extend any injunction for the pendency of this case." (*San Carlos Apache Tribe*, Doc. 89 at 11.)  Finally, in their consolidated reply, the plaintiffs in *Arizona Mining Reform Coalition* argue that a 30-day period of delay would not be "a workable solution and directly prejudices Plaintiffs.  This severely hamstrings Plaintiffs', and this Court's, ability to review the new FEIS and supporting documents (including the appraisals which have not been fully produced), which will likely total thousands of pages.  Plaintiffs will then need time to amend their complaint and review the full administrative record (which the agency has had over 4 years to produce but has yet to do).  Defendants/RCM want this Court and Plaintiffs to instead conduct another injunction fire-drill.  Rather, Plaintiffs propose that the Exchange be stayed while the normal judicial review process unfolds.  This case will likely be adjudicated upon motions for summary judgment, based on the administrative record." (*Arizona Mining Reform Act*, Doc. 74 at 11.)

The Court concludes that, under these unusual circumstances, the appropriate course of action is to preclude the Forest Service from proceeding with the land exchange until 60 days after the issuance of the FEIS.  The legal basis for this order is simple—during oral argument, all defendants agreed to (or agreed not to oppose) such a period of delay.[7]  As for the plaintiffs' requests for an even longer period of delay—the Tribe argues the land exchange should be postponed for at least several months after publication of the FEIS

---

[7]    Based on the federal defendants' presentation during oral argument, the Court is satisfied that any earlier disputes over the meaning of the March 2021 stipulations stem from good-faith disagreements over how to interpret those documents.  The government's good faith is further demonstrated by its ultimate decision to agree to the 60-day period of delay being adopted here.

1   (with the new preliminary injunction motions not due until 60 days after publication, to be

2   followed by further briefing) while the plaintiffs in *Arizona Mining Reform Coalition* seek

3   a delay until the administrative record can be finalized and motions for summary judgment

4   can be briefed and decided—the problem with these proposals is that they would cause the

5   land exchange to be delayed by more than 60 days even if the plaintiffs ultimately fail to

6   establish a merits-based basis for enjoining it.[8]   Such an outcome would run afoul of

7   Congress's directive that the land exchange take place "[n]ot later than 60 days after the

8   date of publication of the [FEIS]."  16 U.S.C. § 539p(c)(10).  A 60-day period of delay—

9   to which the defendants, to their credit, have now agreed—will best balance the need for

10  an orderly, manageable post-FEIS preliminary injunction briefing schedule and the need

11  to honor the timetable that Congress contemplated.[9]

12  IV.    <u>Conclusion</u>

13          The Court acknowledges that the parties expended substantial time and resources

14  on the preliminary injunction motions being addressed (and denied) in this order.  Those

15  motions were briefed on a compressed timetable.  Further complicating matters, several

16  potentially significant changes to the legal landscape, including the Supreme Court's denial

17  of certiorari in *Apache Stronghold* and issuance of *Seven County Infrastructure Coalition*,

18

19  [8]     The Court notes that, only a few weeks ago, the plaintiffs in *Arizona Mining Reform
    *Coalition* proposed a new amendment and briefing schedule that would enable the new
20  preliminary injunction motions to be resolved within 60 days of the issuance of the new
    FEIS.  (*Arizona Mining Reform Coalition*, Doc. 61 at 3.)

21  [9]     During oral argument, the plaintiffs also asked the Court to issue several discovery-
    related orders so as to minimize their burden during the upcoming preliminary injunction
22  briefing process, including requiring the federal defendants to provide overnighted copies
    of certain documents and to provide a redlined version of the new FEIS that shows how it
23  differs from the 2021 FEIS.  Although those requests are not unreasonable, the Court
    concludes they are unwarranted in light of the federal defendants' representations during
24  oral argument that (1) the new FEIS (and supporting appendix) will be made available on
    the internet on June 16, 2025; (2) plaintiffs will have the ability to download .pdf versions
25  of those documents from the internet site; (3) the new FEIS will not be formally published,
    so as to start the 60-day clock, until June 20, 2025; and (4) with the exception of evidence
26  bearing on any NHPA-related consultation claims, defendants will not rely, during the
    preliminary injunction process, on any documents not available on the aforementioned
27  internet site.  Additionally, as for the request for a redlined version of the new FEIS, the
    Court was persuaded by the federal defendants' argument that, particularly in an APA case,
28  they should not be required as part of the discovery process to create new documents not
    currently in existence.

occurred in the middle of the briefing process.

It is unfortunate that the result of this order will be to force the parties to engage in another stressful, abbreviated round of briefing and litigation activity once the new FEIS is issued.  Nevertheless, for the reasons stated above, it is simply premature to entertain any request for preliminary injunctive relief now, where the operative complaints are four years old and seek to challenge a now-superseded FEIS that will be replaced in the coming days with a new FEIS that will differ in at least some ways from the old one.

Of course, some of defendants' arguments in opposition to the plaintiffs' current requests for injunctive relief do not turn on the substance of the FEIS.  For example, the federal defendants question whether the plaintiffs have Article III standing to challenge the land exchange.  (*San Carlos Apache Tribe*, Doc. 85 at 6-9; *Arizona Mining Reform Coalition*, Doc. 72 at 7-8.)  Even so, it is unnecessary to address those arguments now, where the narrow question before the Court is whether the plaintiffs are entitled to preliminary injunctive relief on the current record.  Resolution of those arguments is better postponed until, if necessary, a future stage of this case.  *See generally Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1288 (9th Cir. 1984) ("To observe judicial restraint and decide no more than we must is the appropriate course here.").

Accordingly,

**IT IS ORDERED** that:

1.     The motions for preliminary injunction (*San Carlos Apache Tribe*, Doc. 82; *Arizona Mining Reform Coalition*, Doc. 68) are **denied**.

2.     The federal defendants are **enjoined** from conveying the federal land described in § 3003 of NDAA until August 19, 2025 (*i.e.*, 60 days after the publication of the FEIS on June 20, 2025).[10]

3.     By July 14, 2025, the plaintiff in *San Carlos Apache Tribe* may file a Second

---

[10]     The dates in this order are based on the federal defendants' representation during oral argument that the FEIS will be made available on the internet on June 16, 2025 but not formally published (so as to start the 60-day clock) until June 20, 2025.  If those dates turn out to be incorrect, the parties must meet and confer and then file a joint notice setting forth how the corresponding dates in this order should be changed.

Amended Complaint and the plaintiffs in *Arizona Mining Reform Coalition* may file a First Amended Complaint.  Plaintiffs shall, consistent with LRCiv 15.1(b), attach a redlined version of the pleading as an exhibit.

4.      By July 14, 2025, the plaintiff in *San Carlos Apache Tribe* and the plaintiffs in *Arizona Mining Reform Coalition* may each file a renewed motion for preliminary injunction.  Each motion may not exceed 30 pages.

5.      By July 28, 2025, the federal defendants and Resolution Copper shall each file a response to any such renewed motion for preliminary injunction.  Each response may not exceed 30 pages.

6.      By August 4, 2025, the plaintiff in *San Carlos Apache Tribe* and the plaintiffs in *Arizona Mining Reform Coalition* may each file a consolidated reply in support of their renewed motion for preliminary injunction.  Each reply may not exceed 20 pages.

7.      The Court will endeavor to hold a hearing on the motions and issue a decision before August 19, 2025.

Dated this 9th day of June, 2025.

Dominic W. Lanza
United States District Judge