Roger Flynn (CO Bar # 21078) (*pro hac vice*)
Jeffrey C. Parsons (CO Bar #30210) (*pro hac vice*)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738; wmap@igc.org

Marc D. Fink (MN Bar #343407) (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539; mfink@biologicaldiversity.org

Allison N. Henderson (CO Bar #45088) (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008; ahenderson@biologicaldiversity.org
*Counsel for Plaintiffs*

Susan B. Montgomery (AZ Bar # 020595)
Robyn L. Interpreter (AZ Bar # 020864)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825; smontgomery@milawaz.com
*Counsel for Inter Tribal Association of Arizona*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| Arizona Mining Reform Coalition, *et al.*, ) | Case No. 2:21-cv-00122-DWL |
| Plaintiffs ) | |
| vs. ) | **PLAINTIFFS' MOTION FOR** |
| ) | **PRELIMINARY** |
| United States Forest Service, *et al.*, ) | **INJUNCTION** |
| Defendants, ) | |
| and ) | |
| Resolution Copper Mining, ) | |
| Defendant-Intervenor. ) | |

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iv

EXHIBIT LIST .................................................................................................. viii

TABLE OF ACRONYMS ...........................................................................................x

STANDARDS FOR PRELIMINARY RELIEF ..............................................................3

I.    **The Privatization of Public Lands Will Result in Immediate
      Irreparable Harm.** ..................................................................................4

II.   **Plaintiffs Are Likely to Succeed on the Merits** ......................................6

A.    **The Appraisal Determinations and Approvals Violate the NDAA** ...............6

1.    Compliance with the NDAA's Appraisal, "Equal Value" and
      Other Mandates Is a Pre-requisite to Approving the Exchange .....................6

2.    The Secretary of Agriculture's Approval of the Appraisals Violates
      §3003, Forest Service Appraisal Regulations, and Federal
      Appraisal Standards ...............................................................................7

      a.    *Resolution's paper mining claims do not render the federal
            minerals valueless.* ..................................................................8

      b.    *The MCZ appraisal failed to include its mineral values,
            as the federal rules and standards required* ...............................9

      c.    *The MCZ appraisal arbitrarily assumed that its "highest and best use"
            was **not** for mining, when that's exactly its intended use.* .......11

      d.    *The MCZ appraisal failed to treat the exchange of the lands and
            minerals as a private-lands transaction, as required by the
            appraisal standards.* ................................................................12

3.    Plaintiffs Have Standing to Challenge the Illegal Appraisals ...........................14

B.    **The FEIS Violates NEPA and the NDAA** ..........................................15

1.    The NDAA Conditions the Exchange on a Legally-Compliant FEIS ..................15

2.    The FEIS Fails to Meet the Strict Requirements of NEPA ...............................17

a.  *The agency reviewed the project under an incorrect legal regime, resulting in an improper statement of the "purpose and need" and range of reasonable alternatives.* ..............................................................18

b.  *The agency failed to properly analyze the project's direct, indirect, and cumulative impacts* ..............................................................20

c.  *The Forest Service failed to meaningfully consider comments from other agencies* ..............................................................22

Bureau of Land Management ..................................................23

Arizona State Land Department ..............................................25

d.  *The agency failed to consider, and require, sufficient mitigation measures* ..............................................................25

C.  **The Proposed Amendments to the Tonto Forest Plan, Without Any Public Review or Prior Notice, Violate the NFMA, NEPA, and the NDAA** .............27

III.  **The Balance of Hardships and Public Interest Tip Sharply in Plaintiffs' Favor** ..............................................................29

IV.  **No More Than a Nominal Bond is Appropriate in this Case** .........................30

1

## **TABLE OF AUTHORITIES**

2

*Federal Caselaw*

3

*Alliance for the Wild Rockies v. Cottrell,*

4

632 F.3d 1127 (9th Cir. 2011) ....................................................................6

5

*Apache Stronghold v. United States,*
CV-21-0050-PHX-SPL, 2025 WL 1360694

6

(D. Az. May 9, 2025) ...........................................................1, 4, 5, 6, 29, 30

7

*Apache Stronghold v. United States,*

8

101 F. 4th 1036 (9th Cir. 2023) ....................................................1, 2, 6, 15

9

*Apache Stronghold v. United States*,
No. 21-15295, 2021 WL 12295173

10

(9th Cir. March 5, 2021) ..............................................................................5

11

12

*Bennett v. Spear,*
520 U.S. 154 (1997) ...................................................................................15

13

14

*Bob Marshall Alliance v. Hodel,*
852 F.2d 1223 (9th Cir. 1988) ...................................................................19

15

16

*Cal. Ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency,*
766 F.2d 1319 (9th Cir. 1985) ...................................................................30

17

18

*Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*,
409 F.Supp.3d 738 (D. Ariz. 2019) .....................................................19, 20

19

20

*Central Or. Landwatch v. Connaughton,*
905 F. Supp. 2d 1192 (D. Or. 2012) ..........................................................30

21

22

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.,*
123 F.3d 1142 (9th Cir. 1997) ...................................................................18

23

24

*County of Okanogan v. Nat'l Marine Fisheries Serv.,*
347 F.3d 1081 (9th Cir. 2003) ..............................................................17, 21

25

26

*Davis v. Mineta,*
302 F.3d 1104 (10th Cir. 2002) .................................................................23

27

*Desert Citizens Against Pollution v. Bisson,*

28

231 F.3d 1172 (9th Cir. 2000) ........................................................4, 11, 14

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) ........................................................ 3

*Flathead-Lolo-Bitterroot Citizen Task Force v. Mont.*,
98 F.4th 1180 (9th Cir. 2024) ...................................................... 4

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*,
426 U.S. 776 (1976). ................................................................. 16

*Friends of the Earth v. Brinegar*,
518 F.2d 322 (9th Cir. 1975) ...................................................... 30

*Great Basin Res. Watch v. BLM*,
844 F.3d 1095 (9th Cir. 2016) ............................................... 20, 26

*Greer Coalition v. U.S. Forest Service*,
No. CV09-8239-PCT-DGC (D. Az., Feb. 16, 2011); 2011 WL 671750 ................... 14

*Idaho Sporting Congress v. Rittenhouse*,
305 F.3d 957 (9th Cir. 2002) ...................................................... 18

*Native Ecosystems Council v. Forest Serv.*,
418 F.3d 953 (9th Cir. 2005) ...................................................... 28

*Nat'l Forest Preservation Group v. Butz*,
485 F.2d 408 (9th Cir. 1973) ...................................................... 14

*Nat. Wild. Fed. v. NMFS*,
184 F.Supp.3d 861 (D. Or. 2016) .................................................. 23

*N. Plains v. Surface Transp. Bd.*,
668 F.3d 1067 (9th Cir. 2011) ............................................... 18, 22

*N. Spotted Owl v. Hodel*,
716 F.Supp. 479 (W.D. Wash. 1988) ................................................ 23

*Restore the N. Woods v. U.S. Dep't of Agric.*,
968 F. Supp. 168 (D. Vt. 1997) ............................................. 4, 9, 16

*San Carlos Tribe v. U.S. Forest Service*,
No. 21-cv- 00068-PHX-DWL ........................................................... 1

*Save Our Cabinets v. U.S. Dep't. of Agric.*,
254 F. Supp. 3d 1241 (D. Mont. 2017) ............................................. 28

*Seven County Infrastructure Coalition v. Eagle County*,
145 S.Ct. 1497 (2025) ........................................................................18, 21

*Sierra Club. v. U.S. Army Corps of Engineers*,
701 F.2d 1011 (2d Cir. 1983 .......................................................................23

*Silva v. Lynn*,
482 F.2d 1282 (1st Cir. 1973) .....................................................................23

*S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
588 F.3d 718 (9th Cir. 2009) .......................................................................30

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
608 F.3d 592 (9th Cir. 2010) .......................................................................20

*U.S. v. Locke*,
471 U.S. 84 (1985) .........................................................................................8

*Westlands Water Dist. v. U.S. Dep't of Interior*,
376 F.3d 853 (9th Cir. 2004) .......................................................................19

*Western Land Exchange Project v. BLM*,
315 F.Supp.2d 1068 (D. Nev. 2004) ......................................................4, 16

*Winter v. Natural Resources Defense Council*,
555 U.S. 7 (2008) ...........................................................................................3

### Federal Statutes

16 U.S.C. §539p, Section 3003 of the National Defense Authorization
Act for Fiscal Year 2015 ("NDAA") ....................................................*passim*

Fed. Rule. Civ. Pro. 65(c) ...........................................................................30

Federal Land Policy Management Act,
43 U.S.C. §§1761-1771 ("FLPMA") ........................................2, 17, 19, 27

National Environmental Policy Act ("NEPA"),
42 U.S.C. §§ 4321 *et seq.* ...................................................................*passim*

National Forest Management Act,
16 U.S.C. §§1601 *et seq.* ("NFMA") ................................................2, 27, 28

*Federal Regulations*

36 C.F.R. Part 219 ...................................................................................28

36 C.F.R. Part 228A .................................................................................19

36 C.F.R. Part 251 ...................................................................................19

36 C.F.R. Part 261 ...................................................................................19

36 C.F.R. Part 254 .................................................................7, 9, 11, 12

77 Fed. Reg. 21195 (April 9, 2012) ..........................................................28

81 Fed. Reg. 14829 (March 18, 2016) ......................................................15

*Other Authorities*

H.R. Rep. No. 113-167 (2013) ...................................................................10

Oversight and Legislative Hearing Before the Subcommittee on Energy and Mineral Resources, Committee on Natural Resources, U.S. House of Representatives, 113th Congress, 1st Session, Serial No. 113-7 (March 21, 2013).  ....................................9, 15

Congressional Budget Office Cost Estimate, H.R. 687 Southeast Arizona Land Exchange and Conservation Act of 2013 (*As ordered reported by the House Committee on Natural Resources on May 15, 2013*) (July 11, 2013). ........................10

1

## **EXHIBIT LIST**

Exhibit 1    Bureau of Land Management Review of Hydrology Aspects of the Resolution Copper Project, Bureau of Land Management (Lisa Dubas, James Johnsen and Steve Rice) (June 13, 2022)

Exhibit 2    Final Environmental Impact Statement, Resolution Copper Mine and Land Exchange (June, 2025) (excerpts)

Exhibit 3    June 2025 Draft Record of Decision (2025 DROD)

Exhibit 4    January 2021 Draft Record of Decision (2021 DROD)

Exhibit 5    Declaration of Maria Dadgar

Exhibit 6    Declaration of Roger Featherstone

Exhibit 7    Declaration of Russ McSpadden

Exhibit 8    Declaration of Erik Murdock

Exhibit 9    Declaration of Sandra Bahr

Exhibit 10    Master Water Plan for Superstition Vistas, Apache Junction, Arizona, Hilgart Wilson, Prepared for D.R. Horton and Brookfield Properties (September 2021)

Exhibit 11    Appraisal Report Summary, Mining Claim Zone MCZ Parcel (Federal). Pinal County, Arizona. Resolution Copper Legisled Land Exchange (Southeast Arizona Land Exchange and Conservation Act, 16 U.S.C. §539p). Marc P. Springer, Spanish Flat Mining Company. (Date of Appraisal Report December 30, 2022) (Date of Appraisal Review January 24, 2023)

Exhibit 12    Appraisal Report Summary, Mineral Withdrawal Area MWA (Federal). Pinal County, Arizona. Resolution Copper Legisled Land Exchange (Southeast Arizona Land Exchange and Conservation Act, 16 U.S.C. §539p). Marc P. Springer, Spanish Flat Mining Company, Evan Mudd, Rock Associates, Ltd. (Date of Appraisal Report January 20, 2023) (Date of Appraisal Review January 25, 2023)

Exhibit 13    2023 Real Property Appraisal Report (MWA Parcel)(excerpts)

Exhibit 14    Oversight and Legislative Hearing Before the Subcommittee on Energy and Mineral Resources, Committee on Natural Resources, U.S. House of Representatives, 113th Congress, 1st Session, Serial No. 113-7 (March 21, 2013).

Exhibit 15    Congressional Budget Office Cost Estimate, H.R. 687 Southeast Arizona Land Exchange and Conservation Act of 2013 (*As ordered reported by the House Committee on Natural Resources on May 15, 2013*) (July 11, 2013).

| | | |
|---|---|---|
| Exhibit 16 | Southeast Arizona Land Exchange and Conservation Act of 2013, U.S. House of Representatives, 113th Congress, 1st Session, Report No. 113-167 (July 22, 2013). | |
| Exhibit 17 | Uniform Appraisal Standards for Federal Land Acquisitions (2016). | |
| Exhibit 18 | Resolution Copper General Mining Plan of Operations (GPO)(excerpts) | |
| Exhibit 19 | 2021 FEIS, Appendix J at p. 51-52. | |

1

## **TABLE OF ACRONYMS**

2

3    AF                    Acre-foot (325,851 gallons of water)

4    AMRC                  Arizona Mining Reform Coalition

     ASLD                  Arizona State Lands Department
5
     BLM                   Bureau of Land Management
6
     DROD                  Draft Record of Decision
7
     FEIS                  Final Environmental Impact Statement
8
     FLPMA                 Federal Land Policy and Management Act, 43 U.S.C. §§1761 *et seq.*
9
     GPO                   General (Mining) Plan of Operations
10
     ITAA                  Inter Tribal Association of Arizona, Inc.
11
     MCZ                   Mining Claim Zone (appraised)
12
     MWA                   Mineral Withdrawal Area (appraised)
13
     NDAA                  Section 3003 of the National Defense Authorization Act for Fiscal
14                         Year 2015. 16 U.S.C. §539p

15   NEPA                  National Environmental Policy Act, 42 U.S.C. §§4321 *et seq.*

16   NFMA                  National Forest Management Act, 16 U.S.C. §§1601 *et seq.*

17   UAS                   Uniform Standards of Professional Appraisal Practice

18   UASFLA                Uniform Appraisal Standards for Federal Land Acquisitions

19

20

21

22

23

24

25

26

27

28

x

Plaintiffs Arizona Mining Reform Coalition ("AMRC"), Inter Tribal Association of Arizona, Inc. ("ITAA"), *et al.*, respectfully submit this Motion for Preliminary Injunction to enjoin Defendants during the merits of this case from effectuating the land exchange that would immediately transfer over 2,400 acres of federal public lands at Oak Flat to Resolution Copper Mining ("Resolution")(a joint venture of two foreign mining companies), pursuant to Section 3003 of the National Defense Authorization Act for Fiscal Year 2015 ("NDAA"). 16 U.S.C. §539p (the "Exchange"). This Court's June 9, 2025 Order summarized the procedural history of this and the related cases, *San Carlos Tribe v. U.S. Forest Service,* No. 21-cv-00068-PHX-DWL, and *Apache Stronghold v. United States*, No. 21-cv-50-PHX-SPL. ECF No. 81 at 1-6. On June 20, 2025, the Forest Service published the new Final EIS ("FEIS") and Draft Record of Decision ("DROD").

Plaintiffs face immediate, irreparable harm. The current injunction ends on August 19, 2025, at which time the Exchange is expected to occur. The Exchange would immediately privatize over 2,400 acres of public lands used, enjoyed and valued by Plaintiffs' members for decades. Oak Flat "is a site of great spiritual value" to Tribes in the region. *Apache Stronghold v. U.S.*, 101 F. 4th 1036, 1044 (9th Cir. 2024). The lands to be privatized also contain important public water, wildlife, and recreational values. The mine would result in the "utter destruction" of this sacred site. *See generally Apache Stronghold*, 101 F. 4th at 1047–48; *id.* at 1128 (J. Murguia, dissenting).

Judge Logan, in the related case challenging the Exchange, issued an injunction that had temporarily blocked the FEIS and Exchange. *Apache Stronghold v. U. S.*, CV-21-00050-PHX-SPL, 2025 WL 1360694 (May 9, 2025). Judge Logan found that the transfer of lands would immediately and irreparably harm plaintiffs' uses of the federal lands. *Id*. at *6–7. Judge Logan also held that the balance of hardships and public interest "tip sharply" in favor of blocking publication of the FEIS and the Exchange. *Id*. at *8. Plaintiffs' immediate and irreparable injury from the transfer, and the public interest and balance of hardships, are very similar, and in some situations exactly the same, as in that case.

Plaintiffs are also likely to prevail on the merits. While *Apache Stronghold* concerned

religious freedom claims, Plaintiffs' claims here focus on the legal errors contained in the required appraisals and the FEIS, pursuant to the NDAA, the National Environmental Policy Act ("NEPA"), the Federal Land Policy and Management Act, the National Forest Management Act, and Forest Service regulations. At the very least, Plaintiffs have raised serious questions on the merits, and the injunction should remain in place to allow the Court to rule on the full case prior to the pending drastic change of the *status quo*.

Section 3003 of the NDAA requires the federal and non-federal lands to be independently appraised, "and the value of the exchanged land equalized as set forth in the statute." *Apache Stronghold*, 101 F. 4th at 1046. This "equal value" requirement must be demonstrated by appraisals conducted pursuant to strict standards. 16 U.S.C. §539p(c)(4)(B). However, the appraisal for the 1,655-acre "Mining Claim Zone" ("MCZ"), which overlies the vast majority of the copper ore body, arbitrarily **zeroed-out the mineral value.** Even though Resolution estimates there are 35 billion pounds of copper beneath this parcel, which it maintains is worth tens of billions of dollars, the appraisal erroneously values the mineral estate of this parcel as zero. The appraisal for the MCZ parcel violates the agency's own appraisal regulations, as well as the federal appraisal standards—all of which Congress specifically said must be met before the Exchange could proceed.

Plaintiffs are also likely to prevail on their NEPA claims. First, the agency erroneously believed it had no authority to deny the proposed pipelines, transmission lines, roads, and other facilities. This led to an unreasonably narrow range of alternatives and analysis of effects. Second, despite the massive amount of water required by the Mine, the agency ignored the serious adverse effects that the pumping and mine dewatering will have on already stressed aquifers and surface waters and failed to consider the cumulative impacts of this pumping along with other projects within the same area, affecting the same aquifers. In doing so, the agency failed to respond to the substantial criticisms leveled at the FEIS by "cooperating agencies" including the Bureau of Land Management ("BLM"). Lastly, the agency failed to impose, and even eliminated, previous commitments that are needed to mitigate for the devastating impacts caused by the Exchange and Mine.

Defendants have asserted that the proposed Exchange (and the FEIS) are essentially immune from judicial review, because Congress mandated the Exchange. Yet they ignore the express language in §3003, where Congress specifically conditioned the Exchange on the agency's compliance with NEPA, 42 U.S.C. §4321 *et seq.*, for both the Exchange and the Mine. 16 U.S.C. §539p(c)(9). They also cannot avoid the on-point federal court decisions dealing with congressionally-mandated land exchanges—requiring NEPA compliance as a pre-requisite for approval of the exchange and rejecting the agency's "no discretion" assertions. Defendants cannot escape judicial scrutiny of the FEIS' multiple and serious deficiencies, including critical issues related to water resources, which the Forest Service unreasonably downplayed or ignored.

The June 2025 FEIS and DROD also included, for the first time, without any public review, a proposal to substantially weaken the current Tonto National Forest Plan, exempting the mine's pipelines, transmission lines, roads, and other infrastructure from the Plan's requirements protecting cultural resources, wildlife, and other critical public resources. This was a complete reversal from the 2021 FEIS and DROD, which specifically stated that "the authorized uses do not require an amendment to the forest plan." Under the National Forest Management Act ("NFMA") and NEPA, the agency cannot simply bypass public review for these numerous Forest Plan amendments with an 11th-hour reversal of the agency's previous position, especially where there are such serious ramifications.

Plaintiffs are entitled to a preliminary injunction, further enjoining the Exchange pending resolution of this case on the merits.

## STANDARDS FOR PRELIMINARY RELIEF

To obtain preliminary relief, a Plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 20 (2008). The Court evaluates these factors on a sliding scale, such that a stronger showing of one element may offset a weaker showing of another. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of*

3

*Educ.*, 82 F.4th 664, 684 (9th Cir. 2023)(en banc). When the balance of equities tips sharply in the plaintiff's favor, the plaintiff must raise only "serious questions" on the merits, which is a lesser showing than likelihood of success. *Id.* "Serious questions" are ones that cannot be resolved one way or the other at the preliminary injunction stage because they require a more deliberative investigation. *Flathead-Lolo-Bitterroot Citizen Task Force v. Mont.*, 98 F.4th 1180, 1192 (9th Cir. 2024). *See also* Order, at 7 (ECF No. 81)(same). Plaintiffs satisfy all four parts of this test, and a preliminary injunction against the Exchange should issue.

## I.    <u>The Privatization of Public Lands Will Result in Immediate Irreparable Harm.</u>

On August 19, 2025, Defendants intend to transfer title of 2,422 acres of public land to Resolution—immediately and irreparably harming Plaintiffs.

> If, by exchange, public lands are lost to those who use and enjoy the land, they are certainly entitled under the APA to file suit to assure that no exchange takes place unless the governing federal statutes and regulations are followed, including the requirement that the land exchange is properly valued by the agency.

*Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1177 (9th Cir. 2000)(reversing district court dismissal on standing and entering order for preliminary injunction against the exchange). This also applies when Congress has ordered the exchange. *See W. Land Exch. Project v. U.S. BLM*, 315 F.Supp.2d 1068, 1099 (D. Nev. 2004); *Restore the North Woods v. U.S. Dept. of Agriculture*, 968 F.Supp. 168, 178 (D. Vt. 1997).

The Exchange will result in immediate, irreparable harm to Plaintiffs and their members. Judge Logan noted the "various harms [plaintiff] will suffer if the land transfer occurs during the pendency of this appeal, which affect both the balance of equities and the likelihood that it will suffer irreparable harm without an injunction. It is undisputed that if the transfer goes forward and Resolution Copper's mining plans are effectuated, Plaintiff will suffer irreparable harm in the long term." *Apache Stronghold*, 2025 WL 1360694, at *6.

"[O]nce the transfer is complete, Oak Flat will become private property no longer subject to federal law or Forest Service management, which 'gives Resolution power to exclude Apache Stronghold's members from Oak Flat and to restrict the timing and location of religious ceremonies that regularly take place at Oak Flat ....'" *Id.* The fact that Oak Flat

4

1    will become private property will make access restrictions "harder or impossible to

2    challenge." *Id.* (citations omitted). "Once the land is transferred, the Western Apaches will

3    suffer immediate, irreparable harm." *Apache Stronghold v. United States*, No. 21-15295,

4    2021 WL 12295173, *5 (9th Cir. Mar. 5, 2021)(Bumatay, J., dissenting).

5         Of the 2,422 acres of federal public lands to be transferred to Resolution, the NDAA

6    provides for public access to 50 scant acres out of the current Oak Flat Campground after

7    the Exchange, and even that access would remain solely in Resolution's discretion. 16

8    U.S.C. §539p(i)(3). The NDAA only requires that Resolution "provide access to the surface

9    of the Oak Flat Campground to members of the public, including Indian tribes, to the

10   maximum extent practicable, … as determined by Resolution Copper." *Id.*

11        Judge Logan rejected Resolution's argument that its promise to consider allowing

12   public access in the future eliminated the irreparable harm effected by privatization. *Apache*

13   *Stronghold*, 2025 WL 1360694, at *6. Judge Bumatay similarly found that "[t]he Western

14   Apaches would therefore be dependent on the good grace of a private copper-mining

15   venture for any access to their sacred religious site—that is, until the mining companies

16   eviscerate the site altogether. On closer scrutiny, this guarantee of access appears to be a

17   hollow promise." *Apache Stronghold*, 2021 WL 12295173, *5. "The Oak Flat Federal

18   Parcel would leave Forest Service jurisdiction, and with it public access would be lost to the

19   parcel itself, as well as passage through the parcel to other destinations, such as Apache

20   Leap and Devil's Canyon . . . Resolution Copper may keep portions of the property open for

21   public access, as feasible." Ex. 2 (FEIS at 327)(all FEIS excerpts are in Exhibit 2).

22        Although the immediate loss of access for cultural and spiritual purposes for

23   members of Plaintiff ITAA, is profound, the Exchange will also immediately and

24   permanently eliminate the legal ability of members of the other Plaintiff groups to access

25   and use these lands for hiking, rock climbing, appreciating and viewing of wildlife, plants,

26   and waters on these lands, camping, and other recreational and aesthetic purposes. *See*

27   Decls. of Dadgar, Featherstone, McSpadden, Murdock, and Bahr (Exs. 5-9).

28        Additionally, long before full-scale mining would occur, "Resolution Copper will

5

begin 'preparatory activities' such as construction of new roads and buildings that are likely to degrade the Oak Flat environment." *Apache Stronghold*, 2025 WL 1360694, at *7. "In his dissent at the emergency stage, Judge Bumatay argued that '[a]ny of these construction activities may cause irreparable damage to the Oak Flat, even if the site won't be entirely cratered immediately after conveyance.' To that end, many of Defendants' arguments that actual 'subsidence' of the land won't begin to occur for at least six years after transfer are irrelevant." *Id.* (citation omitted).

Once these lands are privatized, all of the protections afforded public land would be gone. Plaintiffs would no longer be notified when harmful activities are proposed on these lands, and would no longer have a role in the oversight of these activities. Thus, to prevent this immediate and irreparable loss of public land uses and values, this Court should maintain the *status quo* and keep these lands public during this litigation.

## II.    Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on all claims, although a likelihood of success on any claim warrants relief. Plaintiffs have shown "that serious questions going to the merits were raised." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

### A.    The Appraisal Determinations and Approvals Violate the NDAA.

1.    Compliance with the NDAA's Appraisal, "Equal Value" and Other Mandates Is a Pre-requisite to Approving the Exchange.

The Exchange cannot occur without the agency's compliance with the strict appraisal, "equal value" and other standards regarding the value of the lands and minerals to be traded. "The land exchange is subject to certain conditions," including appraisal and equalization requirements. *Apache Stronghold v. U.S.*, 101 F.4th at 1046. Section 3003 sets forth mandatory provisions governing the appraisals for the federal and non-federal lands to be exchanged. The Exchange can occur only after "the final appraised values of the Federal land and non-federal land are determined and approved by the Secretary." 16 U.S.C. §539p(c)(4)(B)(ii).[1]

---

[1] Defendants have yet to publicly release the appraisal for the MCZ, or the Secretary's "determination and approval" of any of the appraisals. "Before consummating the land

6

As required by §3003, the appraisals must be conducted in compliance with the Forest Service's appraisal regulations, 36 C.F.R. §254.9. 16 U.S.C. §539p(c)(4)(A). The appraisals must also be conducted "in accordance with nationally recognized appraisal standards, including (I) the Uniform Appraisal Standards for Federal Land Acquisitions; and (II) the Uniform Standards of Professional Appraisal Practice." *Id*. §539p(c)(4)(B). Additionally, the appraisals "shall include a detailed income capitalization approach analysis of the market value of the Federal land which may be utilized, as appropriate, to determine the value of the Federal land." *Id*. §539p(c)(4)(C).

"The value of the Federal land and non-Federal land to be exchanged under this section shall be equal or shall be equalized in accordance with this paragraph." *Id*. §539p(c)(5)(A). If the appraised value of the federal lands and minerals exceeds the value of the non-federal lands, Resolution must either convey additional non-federal land within Arizona to the Secretary of Agriculture or Interior, or make a cash payment to the United States that would be used to acquire additional National Forest System lands within the region. *Id.* §539p(c)(5)(B). But before those considerations may occur, the NDAA's appraisals and equal-value requirements must be legally valid.

2.    <u>The Secretary of Agriculture's Approval of the Appraisals Violates §3003, Forest Service Appraisal Regulations, and Federal Appraisal Standards</u>.

Defendants failed to comply with the mandatory appraisal and equal value requirements in four major ways. First, the appraisal of the MCZ parcel, which overlies the vast majority of the copper ore body, erroneously assumed that the value of the estimated 35 billion pounds of copper is zero, simply because Resolution has filed paper mining claims on these federal lands—misunderstanding federal mining, appraisal, and public land law. Second, the MCZ appraisal contradicts the Forest Service's appraisal regulations, which require that in calculating market value, all values of the exchanged lands must be factored

---

exchange under this section, the Secretary shall make the appraisals of the land to be exchanged (or a summary thereof) available for public review." 16 U.S.C. §539p(c)(4)(B)(iv). The agency proposes to approve the Exchange without ever providing the necessary Secretarial "determination and approval" decisions to this Court or the public.

in, including minerals. In fact, that was exactly what the agency told Congress it must do. Third, the MCZ appraisal erroneously determined that the "highest and best use" of those lands (required by the appraisal rules and standards) was merely for "surface land use in support of a mining operation." This is despite the fact that the intended use of the MCZ is for extracting its copper and other minerals. Lastly, the MCZ appraisal violates the appraisal regulations and standards by failing to treat the Exchange as a private-lands transaction, not as if the lands were still federal (and subject to Resolution's paper mining claims).

The Forest Service prepared two appraisals for the federal lands to be exchanged, one covering the 766-acre "Mineral Withdrawal Area" ("MWA") parcel, and the other covering the 1,655-acre MCZ parcel. Exs. 11 and 12 (Agency Appraisal Summaries). While the appraisal for the MWA parcel included an estimated value of the 5.33 billion pounds of copper under the surface (Ex. 12 at 12), the appraisal for the MCZ parcel arbitrarily failed to include **any** value for the tens of billions of dollars worth of copper, valuing the entire 1,655-acre parcel at less than $2 million. Ex. 11 at 12.

a.    *Resolution's paper mining claims do not render the federal minerals valueless.*

At the outset, the MCZ appraisal is based on the erroneous assumption that the value of the 35 billion pounds of copper on these federal lands is zero, simply because Resolution has filed mining claims on these lands. Because of these claims, the appraiser believed that the government did not own its own mineral estate: "the Federal Property is encumbered by mining claims held by a party other than the United States; said mining claims confer all rights to locatable minerals to that party in accordance with the Mining Law and **are not part of the estate owned by the United States**." Ex. 11 at 3 (emph. added).

The appraiser's assumption contradicts longstanding Supreme Court precedent. Although Resolution has filed mining claims on these lands, the United States undisputedly still owns the mineral estate (as well as the surface estate). While owners of unpatented mining claims hold possessory interests in their claims, these interests are a "unique form of property." *U.S. v. Locke*, 471 U.S. 84, 104 (1985). "The United States, as owner of the underlying fee title to the public domain, maintains broad powers over the terms and

conditions upon which the public lands can be used, leased, and acquired." *Id*. Accordingly, as shown below, the mineral values should have been included in the MCZ appraisal.

b.  *The MCZ appraisal failed to include its mineral values, as the federal rules and standards required.*

Even if Resolution has purported rights in some of these claims (as they assert), that does not mean that the appraisal can simply ignore the mineral values. Forest Service's appraisal regulations require that in estimating market value, **all** values of the exchanged lands must be factored in, including minerals. 36 C.F.R. §254.9(b). Market value "means the most probable price in cash, or terms equivalent to cash, which lands **or interest in lands** should bring in a competitive and open market under all conditions requisite to a fair sale." 36 C.F.R. §254.2 (definitions)(emph. added).

The appraiser must "consider the contributory value of any interest in land such as water rights, **minerals**, or timber, to the extent they are consistent with the highest and best use of the property." 36 C.F.R. §254.9(b)(1)(iv)(emph. added). The current status of the federal lands (whether covered by mining claims or not) is not determinative, because the appraiser must calculate the value of the lands and interests "as if in private ownership and available for sale in the open market." 36 C.F.R. §254.9(b)(1)(ii). All interests and values must be ascertained:

> An appraisal must include "historic, wildlife, recreation, wilderness, scenic, cultural, or other resource values or amenities as reflected in prices paid for similar properties in the competitive market." 36 C.F.R. §254.9(b)(1)(iii). The Forest Service thus has a certain amount of discretion to consider environmental factors in its determination that the lands are equal in value as well.

*Restore the North Woods v. U.S. Dept. of Agric.*, 968 F.Supp. 168, 174, n. 4 (D. Vt. 1997).

In the congressional debate over what became §3003, the Forest Service testified that the appraisals of both the MWA and MCZ parcels *must* include the value of the minerals. "The Bill calls for an equal value exchange in section 4(e). If the value of Federal land (**including the ore body**) to be conveyed exceeds the value of the parcels to be acquired, the Bill would allow for a cash equalization payment by Resolution…." Ex. 14 at 58 (Statement of Assoc. Chief U.S. Forest Serv. Wagner)(emph. added). *See also Id*. at 70.

9

The Congressional Budget Office ("CBO"), tasked with analyzing the financial aspects of the Exchange, agreed. "Those appraisals would determine the relative values of the properties affected by the exchange, **including the value of mineral deposits that underlie the federal land**." Ex. 15 at 1–2 (emph. added). The CBO highlighted the critical importance of the mineral-value appraisals:

> If the value of the federal land were to exceed the value of the company land, Resolution Copper could pay the government a lump sum equal to the difference in property values in the year or two following enactment. That payment might be significant. … In addition, if the company extracts more mineral resources than assumed in the original appraisal, Resolution Copper would make annual payments to the federal government. Such payments might be significant.

*Id. See also* 16 U.S.C. §539p(c)(5)(B)(i)("If the final appraised value of the Federal lands exceeds the value of the non-federal land, Resolution Copper shall – (I) convey additional non-Federal land in the State to the Secretary").

The House Report on the bill that would become §3003 (subject to the important revision requiring a NEPA-compliant FEIS prior to the Exchange), further stressed the need for the two appraisals of the federal parcels to calculate and include the mineral values on the public's lands. "The bill's effect on offsetting receipts would depend on the outcome of formal appraisals of the federal and private properties that would be conducted after enactment. Those appraisals would determine the relative values of the properties affected by the exchange, **including the value of mineral deposits that underlie the federal land**." H.R. Rep No. 113-167 (2013), at 22 (emph. added)(Ex. 16).

This mandate also helps implement subsection (e), which requires that if the mine produces more mineral value than originally calculated in the appraisals "prepared under subsection (c)(4)(C), Resolution Copper shall pay to the United States … a value adjustment payment for the quantity of excess production at the same rate assumed for the income capitalization approach analysis prepared under subsection (c)(4)(C)." §539p(e)(2).

In other words, for the public to be adequately compensated for future mineral production, the mineral values must be appraised/calculated in the first place, in order to gauge whether there was a difference in values after the mine began operations. But under

Defendants' and Resolution's view, the mineral values in the MCZ need not be appraised at all—rendering congressional mandates in subsection (e) meaningless.

Section 3003 directly ties together the future payments in subsection (e) to the mineral values in the initial appraisals: "The appraisal prepared under this paragraph … shall be the basis for calculation of any payment under subsection (e)." §539p(c)(4)(C). Notably, section (e)'s requirement for production revenue from the two federal parcels did not distinguish between the MWA and MCZ parcels, further showing that the mineral values needed to be ascertained for both. Thus, as Congress knew, the fact that the federal lands in the MCZ are subject to Resolution's paper mining claims did not eliminate the agency's duty to include the mineral values as the appraisal standards required.

c.   *The MCZ appraisal arbitrarily assumed that its "highest and best use" was **not** for mining, when that's exactly its intended use.*

The MCZ appraisal also failed to correctly apply the standards and regulations that require a determination of the "highest and best use" of the two federal parcels. The appraiser's first task in estimating market value is to determine "the highest and best use" of the property, which is defined as "the most probable and legal use of a property." 36 C.F.R. §254.9(b)(1)(i); *id.* §254.2.[2] For the MWA parcel, since the purpose of the land exchange is to facilitate the proposed Mine, the appraiser correctly determined that the highest and best use is the "exploration and development of a mineral resource as a portion of the Resolution Copper deposit." MWA appraisal summary at 9, Ex 12.  Yet for the adjacent MCZ parcel, even though it overlies the very same deposit and Resolution is acquiring it for the very same purpose, the appraiser arbitrarily determined that the "highest and best use" of this parcel is somehow **not** to develop the massive mineral deposit, but rather merely for "surface land use in support of a mining operation." MCZ summary at 9, Ex. 11.

This fundamental defect was carried forward when the appraisals considered comparable sales in determining the market value of each federal parcel. For the MWA parcel, the appraiser looked to other sales where the highest and best use was the

---

[2] Failure to properly determine the "highest and best use" of the federal parcel was one of the central flaws in the federal appraisal rejected in *Desert Citizens*, 231 F.3d at 1180-85.

exploration and development of a mineral resource. MWA summary at 9, Ex. 12. In stark contrast, for the MCZ parcel, the appraiser only looked for comparable sales where the buyer was motivated by a surface estate that could support mining operations "with mineral rights not considered important or necessary." MCZ appraisal summary at 10, Ex. 11. Thus, the focus was on surface lands that could be used for industrial uses such as processing facilities. *Id*. In other words, "general rural" lands, in which the underlying mineral estate is irrelevant. *Id*.

That certainly is not accurate for the MCZ parcel. There is simply no rational, economic comparison between the types of nondescript surface lands that the appraiser considered as comparable sales and the invaluable MCZ parcel, which sits atop nearly 90 percent of the world's third-largest known copper deposit (35 of the estimated 40 billion pounds). Resolution has no intention of using these lands for surface facilities such as tailings storage, as these lands would be mined. FEIS at ES-22 (map showing tailings storage facility located on state lands 20 miles away). Indeed, much of the MCZ parcel will be consumed by the massive crater caused by the extraction of the underground minerals—not used for surface mining facilities as presumed in the appraisal. *See* MWA Appraisal Summary, at 4 (Ex. 12), and Resolution mining plan, (figure showing extent of ore body covering most of the MCZ. (Ex. 18).

d.    *The MCZ appraisal failed to treat the exchange of the lands and minerals as a private-lands transaction, as required by the appraisal standards.*

The MCZ appraisal further violates the agency appraisal regulations at 36 C.F.R. §254.9 and "the Uniform Appraisal Standards for Federal Land Acquisitions ["UASFLA"] and the Uniform Standards of Professional Appraisal Practice ["UAS"]" as mandated by §539p(c)(4)(B). These rules and standards require that the appraisals treat the lands and minerals as a private-lands transaction on the open market, not as if the lands were still federal or influenced by paper mining claims. "The federal land is appraised as if in private ownership, to its highest and best use." 36 C.F.R. §254.9(b). "When appraising the federal land portion of the exchange, the regulations require that the appraiser 'estimate the value of

the lands and interests as if in private ownership and available for sale in the open market.'" UASFLA at 53 (citations omitted), Ex. 17. The appraisal for the MWA parcel correctly found that the "highest and best use" was for mining. (Ex. 12).

The appraisal of the MCZ parcel incongruously found the "highest best use" to be for simple "surface use." MCZ appraisal summary, Ex. 11, at p. 9. It was thus valued at a paltry $1,200/acre (*Id*. at p. 12). This violated the federal standards, where "the appraiser must avoid estimating a property-specific investment value to a particular owner instead of developing an opinion of the market value of the property if it were placed for sale on the open market." UASFLA at 47 (Ex. 17). But that is what the MCZ appraisal did—ignoring the fact that, if this was a private transaction between Resolution and another buyer, it would most certainly include the mineral values.

The agency's full appraisal for the MWA parcel (obtained through litigation under the Freedom of Information Act), recognizes that appraisals of the currently federal land must be calculated as if in private ownership, without consideration of its current status as federal land. "[F]or the purposes of this Report, the Subject [parcel] is considered fee simple ownership, as though it is in private ownership, is freely alienable, and zoned consistently with other similarly situated non-Federal properties." January 22, 2023 "Real Property Appraisal Report," sent to Chief Appraiser, USDA Forest Service (excerpts). (Ex. 13).

Thus, under the mandated Forest Service appraisal regulations, the land and minerals must be valued as if the exchange were a private-land, market-based transaction. But here the appraisal of the MCZ parcel assigned a nominal value based only on potential surface uses that will never occur. It defies logic to assume that if Resolution were to offer these same lands for sale on the open market after the Exchange, it would assert that the 35 billion pounds of copper are worthless. Thus, until the appraisals and agency decision-making satisfy the NDAA requirements, the Exchange cannot legally proceed.

3.    <u>Plaintiffs Have Standing to Challenge the Illegal Appraisals.</u>

Plaintiffs have standing to bring this claim. In *Desert Citizens Against Pollution*, the Ninth Circuit held that the plaintiffs had standing to challenge a land exchange where they

argued the agency relied on an appraisal that undervalued the federal lands, and failed the "highest and best use" and "equal value" requirements. 231 F.3d 1172, 1174 (9th Cir. 2000). As here, plaintiffs alleged that their members used the federal lands subject to the exchange, and that the exchange would prevent them from using and enjoying these lands. *Id*. at 1176. "The present challenge to FLPMA's equal-value requirement is not merely a generalized allegation of federal revenue loss at taxpayers' expense. Rather, it is an effort by land users to ensure appropriate federal guardianship of the public lands which they frequent." *Id*. at 1177. *Desert Citizens* relied on *Nat'l Forest Preservation Group v. Butz*, where the Ninth Circuit affirmed standing for recreational users' challenge to the mis-application of the "equal-value requirements" of the exchange statute. 485 F.2d 408, 410 (9th Cir. 1973)(*see Desert Citizens*, 231 F.3d at 1177-78).

More recently, in a challenge to appraisals underlying a Forest Service exchange by a "group of concerned citizens," Judge Campbell quoted *Desert Citizens* to hold that: "If public land will be lost to challengers by an exchange, the challengers have a right to 'assure that no exchange takes place unless the governing federal statutes and regulations are followed, including the requirement that the land exchanged is properly valued by the agency.'" *Greer Coalition v. U.S. Forest Service*, No. CV09-8239-PCT-DGC (D. Az., Feb. 16, 2011); 2011 WL 671750, at *7. Although Judge Campbell ruled against the plaintiffs on the merits, there was no question that the court could adjudicate the appraisal claims.

The same applies here. Challenging the "equal value" and appraisal requirements "is not merely a generalized allegation of federal revenue loss at taxpayers' expense." *Desert Citizens* at 1177. Rather, Plaintiffs' members include recreational, tribal, and other users of these specific public lands that would be exchanged-away, and they are entitled to enforce the NDAA's "equal value" and appraisal requirements. *Id*. As the NDAA mandated, absent compliance with the strict "equal value" and appraisal standards, the Exchange cannot legally occur. It is hard to see a greater benefit to Plaintiffs than the prevention of the Exchange and continuation of public access. As in *Desert Citizens*, this Court's setting aside an illegal exchange that injures Plaintiffs' members establishes redressability. *Id*. at 1178.

As the agency testified to Congress, the equal-value and other appraisal requirements were included in §3003 to protect the public's interest in a fair exchange: "My understanding is that it is the vehicle to protect the interests of the public if the appraisal estimate of material removed from the mine didn't match up with the actual production of the mine." Wagner testimony, Ex. 14 at 70. This Court thus has the authority to adjudicate the legality of the Secretary's acceptance and approval of the appraisals.

**B.    The FEIS Violates NEPA and the NDAA.**

1.    <u>The NDAA Conditions the Exchange on a Legally-Compliant FEIS.</u>

Congress conditioned the Exchange on the Forest Service's compliance with NEPA for both the review and approval of the Exchange, as well as for the Mine. "Except as otherwise provided in this section, the Secretary shall carry out the land exchange in accordance with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.)." 16 U.S.C. §539p(c)(9)*; see also Apache Stronghold*, 101 F. 4th at 1131. The agency has long stated that the Exchange was contingent on a NEPA-compliant FEIS. *See* 81 Fed. Reg. 14829-32 (Mar. 18, 2016)(public notice detailing NEPA requirements). Resolution similarly agreed: "Making the Resolution land exchange contingent on a full NEPA review was one of the requirements that bipartisan leaders included in the legislation prior to its passage in 2014." Email from Jakob Stausholm, CEO of Rio Tinto, to Roger Featherstone, then-Director of AMRC (attached to Featherstone Decl. in 2021, ECF No. 9-3).[3] The FEIS and DROD acknowledge that the FEIS must analyze the impacts from the potential Mine as well as the Exchange. 2025 FEIS ES-6. "The EIS therefore considered the environmental impacts not only of the mining proposal and all connected actions, but also of the land exchange itself." 2025 DROD at v. (Ex. 3).

Courts reviewing challenges to EISs for congressionally-mandated land exchanges have rejected the government's "no discretion" assertions. In similar situations, as long as

---

[3] Contrary to Defendants' previous assertions, issuance of the FEIS is a "final agency action" subject to judicial review as it "mark[s] the consummation of the agency's decision-making process" on the Exchange from which "legal consequences will flow." *Bennet v. Spear*, 520 U.S. 154, 177-78 (1997).

there are some conditions or discretion that govern the agency's review of the proposed exchange, NEPA applies. *See Restore the North Woods*, 968 F.Supp. at 173 (NEPA applied as "Congress has limited, but not eliminated, the Secretary's discretion in this land exchange."); *Western Land Exch. Proj. v. U.S. BLM*, 315 F.Supp.2d 1068, 1082 (D. Nev. 2004)(applying NEPA to exchange, for "[i]f Congress had wanted to expedite the land disposal by exempting BLM from compliance with other applicable environmental laws, it would have done so in [the exchange statute].")). The agency must comply with NEPA "to the fullest extent possible" unless "a clear and unavoidable conflict in statutory authority exists." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 787-88 (1976).

No such "unavoidable statutory conflict" exists here. Indeed, the opposite holds true. First, the agency stopped the Exchange for four years precisely because it needed to conduct additional NEPA review "to provide an opportunity for the agency to conduct a thorough review based on significant input received from collaborators, partners, and the public since these documents were released. … USDA has concluded that additional time is necessary to fully understand concerns raised by Tribes and the public and the project's impacts to these important resources and ensures the agency's compliance with federal law." ECF No. 26-2. The agency cannot now argue that this Court cannot adjudge "the agency's compliance with federal law" based on a new-found "no discretion" assertion.

Second, the Forest Service listed in the FEIS the Exchange pre-conditions subject to NEPA review and its "discretion to (1) address concerns of affected Indian Tribes; (2) ensure that title to the non-Federal lands offered in the exchange is acceptable; (3) accept additional non-Federal land or a cash payment from Resolution Copper to the United States in the event that the final appraised value of the Federal land exceeds the value of the non-Federal land; or (4) address other matters related to the land exchange that are consistent with Section 3003 of PL 113-291." FEIS ES-9 (noting that such discretion was somewhat limited). *See also* §539(c)(5)(B) (authorizing the government to obtain "additional non-Federal land" based on "the requirements of this section," i.e., the FEIS and appraisals).

Third, the agency testified that the FEIS was needed to inform its decision-making on

the Exchange. One of the primary objections from Defendants to the earlier congressional bill proposing §3003 was that it only required the FEIS to be done **after** the Exchange. The Forest Service testified that the FEIS must be required and completed **before** the Exchange, so that it could guide its compliance with §3003. "The Bill should be amended to require the preparation of an environmental analysis *before* the land exchange is completed." Ex. 14 at 59, Statement of Assoc. Chief U.S. Forest Serv. Wagner (emph. in original).

Lastly, the FEIS must also consider the effects of approving the 2,400+ acres of the Project's pipelines, transmission lines, roads, and other infrastructure that the DROD proposes to approve. *See* DROD at 3-4 (Ex. 3). Such permits are authorized by the Federal Land Policy Management Act, 43 U.S.C. §§1761—1771 ("FLPMA"). The Forest Service may only grant a right-of-way/special use permit if it, "(4) will do no unnecessary damage to the environment." 43 U.S.C. §1764(a). A FLPMA special use permit "shall contain terms and conditions which will … (ii) minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment." *Id*. §1765(a). *See also* 43 U.S.C. §1765(b)(additional protection requirements).

FLPMA does not limit the agency's review or authority to just prohibiting damage to the land within the permit corridor, as the overall effects of granting the permits on cultural, environmental and other values must be evaluated and these resources protected. The agency not only has the mandate to fully consider the adverse impacts on lands outside the immediate right-of-way corridor, it must protect these resources under FLPMA. *See County of Okanogan v. Nat'l Marine Fisheries Serv.*, 347 F.3d 1081 (9th Cir. 2003)(affirming imposition of off-site mandatory minimum stream flows as a condition of granting a right-of-way for a water pipeline across Forest Service land). FLPMA's required impact analysis is thus in addition to the required NEPA analysis.[4]

2.    The FEIS Fails to Meet the Strict Requirements of NEPA.

"NEPA's purpose is twofold: (1) to ensure that agencies carefully consider

---

[4] Although these permits may not be approved until the Final ROD is issued, because the NDAA mandated that the Exchange and all permits be evaluated by a "single" EIS, 16 U.S.C. §539p(c)(9)(B), the EIS-based claims under FLPMA and NEPA are ripe for review.

information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). NEPA requires agencies to take a "hard look" at the environmental consequences of proposed actions, including direct, indirect, and cumulative impacts to all potentially affected resources. *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002); 42 U.S.C. §4332(2)(C). A "critical" part of the "hard look" required under NEPA involves "[e]stablishing appropriate baseline conditions" associated with the no-action alternative. *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016). NEPA also requires that the FEIS fully analyze mitigation measures as part of the NEPA process—not in some future decision shielded from public review. *Id.* at 1107.

The Supreme Court's recent decision in *Seven County Infrastructure Coalition v. Eagle County*, 145 S.Ct. 1497 (2025), noted that "[c]ourts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 1513. The guiding principle for judicial review "inherent in NEPA … is a 'rule of reason.'" *Id.* (citations omitted). As shown below, the FEIS fails this "reasonableness" test on numerous grounds.

a.      *The agency reviewed the project under an incorrect legal regime, resulting in an improper statement of the "purpose and need" and range of reasonable alternatives.*

As an overarching requirement, EISs are governed by the underlying "purpose and need" for the project. That is vitally important because it dictates the scope of the agency's review of baseline conditions and the range of reasonable alternatives to the proposed action. *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). "[A]n agency cannot define its objectives in unreasonably narrow terms." *Id*.

The FEIS states that "the purpose and need for this project is twofold: 1. To consider approval of a proposed GPO [General Plan of Operations] governing surface disturbance on NFS lands—outside the exchange parcels—from mining operations that are reasonably incident to extraction, transportation, and processing of copper and molybdenum. [and] 2. To consider the effects of the exchange of lands between Resolution Copper and the United

18

States as directed by Section 3003 of PL 1113-291 [the NDAA]." FEIS at ES-6.

The agency was thus under the mistaken belief that its review and approval of Resolution's uses was under the company's initial GPO and the agency's mining regulations at 36 C.F.R. Part 228A. FEIS at ES-6. The agency believed it had no authority to deny the proposed pipelines, transmission lines, roads, and other facilities: "The no action alternative cannot be selected in this Draft ROD because the land exchange was mandated by Congress." DROD at 35.

The FEIS repeated this fundamental legal error, refusing to consider an alternative of "A fully executed land exchange, but no approval of the GPO," FEIS at 92, because it based the FEIS on a view that it had no authority to reject any aspect of the Project: "The first combination was not carried forward as the Forest Service is unable to refuse approval of the GPO within their regulations and guidance." *Id*.

But the agency's truncated view of its authority over the Project misinterprets federal law and contradicts its own position, where it acknowledged that the only uses considered in the DROD are the uses of public land **after** the Exchange, which are under the totally-discretionary FLPMA special use permitting rules at 36 C.F.R. Parts 251 and 261 (the 228A rules do not apply). DROD at v-vi. "Informed and meaningful consideration of alternatives – including the no action alternative – is thus an integral part of the statutory scheme." *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988)(citations omitted).

The FEIS does not analyze and ensure the protection of public resources for these uses required by FLPMA, 43 U.S.C. §§1761–1771; 36 C.F.R. Parts 251/261. By applying an incorrect view of public land law, the agency failed to meet its duty to analyze "a reasonable range of alternatives" including a proper "no action alternative." 42 U.S.C. §4332(2)(C)(iii). Overall, this legally incorrect view of the "purpose and need" and Project alternatives fatally undermines the FEIS. "No amount of alternatives or depth of discussion could 'foster[ ] informed decision-making and informed public participation' when the Forest Service bases its choice of alternatives on an erroneous view of the law. *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004)." *Ctr. for*

1    *Biological Diversity v. U.S. FWS*, 409 F.Supp.3d 738, 766 (D. Ariz. 2019).

2    b.    *The agency failed to properly analyze the project's direct, indirect, and cumulative*
      *impacts.*

3

4          Based on this improperly truncated scope of review, the FEIS failed to adequately

5    analyze the direct, indirect, and cumulative impacts from the Exchange and Mine on affected

6    resources, including water, wildlife, cultural and religious resources, and economics. For

7    example, despite the massive amount of water that the Mine would require, the Forest

8    Service did not meaningfully disclose and analyze the direct and indirect effects of the

9    planned Desert Wellfield as NEPA required. Once constructed by Resolution, the Desert

10   Wellfield would utilize at least 30 groundwater wells to pump at least 544,000 acre-feet

11   ("AF")[5] of "fresh groundwater" for the Mine from the East Salt River Valley. Table H-10,

12   FEIS at H-8. Pumping from the Desert Wellfield would be in addition to the roughly

13   87,000 AF of water that will need to be pumped for "mine dewatering purposes" at Oak

14   Flat to keep its underground infrastructure water-free. FEIS at 428.

15         The FEIS also failed to adequately consider reasonably foreseeable activities that,

16   along with immense pumping from the Desert Wellfield, will cumulatively and

17   significantly impact available water in the East Salt River Valley. Under NEPA, the FEIS

18   should have analyzed "(i) the reasonably foreseeable environmental effects of the proposed

19   agency action [and] (ii) any reasonably foreseeable adverse environmental effects which

20   cannot be avoided should the proposal be implemented." 42 U.S.C. §4332(2)(C). This

21   includes considering the impacts of other activities in the area that will cumulatively add to

22   the impacts from the Exchange and Mine. *See Te–Moak Tribe of W. Shoshone of Nev. v.*

23   *U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010); *Great Basin Resource Watch v.*

24   *BLM*, 844 F.3d 1095, 1104 (9th Cir. 2016).

25         FLPMA also requires a broad analysis of effects resulting from the approval of the

26   pipelines, such as the impacts from the pumping of the water sent (partially) through the

27   pipelines. Such analysis is needed to ensure the agency meets its substantive environmental

28

---

[5] One AF is 325,851 gallons of water, which roughly supports 4 homes for an entire year.

protection requirements as part of its discretionary review and approval of the infrastructure permits. *See* 43 U.S.C. §§1764-65; *County of Okanogan*, 347 F.3d at 1085.

One of the larger failures in this regard is the FEIS's downplaying the cumulative impacts from the Mine along with the 275-square mile Superstition Vistas development (some of which has now been built) on Arizona State Trust Land in the East Salt River Valley, which will use groundwater resources in the same area as the Desert Wellfield. *See* Master Water Plan for Superstition Vistas (2021), Ex. 10 at 17–18.[6]

Although the FEIS now claims to have included Superstition Vistas in the regional cumulative effects groundwater model (FEIS at 987), the "cumulative water use" maps in the new FEIS (at 985-86) are the **exact** same from the 2021 FEIS (contained in ECF No. 68-1, PDF pp. 78-79). As the recent *Seven County* decision held, "projects that are separate in time and place" need not be analyzed under NEPA. 145 S.Ct. at 1511. However, NEPA review may still be required for "other projects [that] may be interrelated and close in time and place to the project at hand." *Id*. at 1517.[7]

That is the case here, as the Forest Service admits that it must review the combined impacts from the Superstition Vistas and other pumping along with the Mine's pumping. "The Superstition Vistas development area **would likely overlap in both space and time** with the Resolution Copper Project's operational pumping." FEIS at 977 (emph. added). But it then unreasonably concluded that most of those projects were "speculative." "[T]he development plans are conceptual and lack adequate detail to allow substantial analysis of resource effects and thus normally would be considered speculative, not reasonably foreseeable." FEIS at 977.

---

[6] Plaintiffs provided this document to the agency on April 11, 2025 as one of the many direct, indirect, and cumulative effects that the FEIS should have considered.

[7] In *Seven County*, the Court held that an EIS for constructing a railroad spur line in Utah carrying oil did not have to analyze the far-afield and speculative effects of eventually burning that oil in Louisiana, impacts to resources that were not affected by the railroad route. That is a far different situation than here, as the combined effects of the groundwater pumping for the Project will occur in the same area, at the same time, and from the same aquifers as the other East Salt River Valley pumping.

The FEIS limited itself to discussing the groundwater demands of only a small portion of the larger Superstition Vistas project that had obtained an assured water supply designation under Arizona's Groundwater Management Act. "[T]he portion of Superstition Vistas that has a demonstrated source of water has been quantified and included in the regional cumulative effects groundwater model. Other portions of Superstition Vistas without demonstrated water supplies are speculative and not explicitly modeled." FEIS at 987. This is despite the fact that the Forest Service acknowledged that over 900,000 people are slated to live there (all reliant on groundwater). FEIS at 984. These plans are not "speculative," but are already being implemented, *see* Ex. 10, and it was unreasonable for the agency to conclude otherwise.

Along a similar line, the Forest Service also refused to consider other reasonably foreseeable activities in the project area, including plans of large-scale irrigators in the East Salt River Valley to develop new pumping infrastructure in the same proximity as the Desert Wellfield. These would pump approximately 70,000 acre-feet of additional groundwater to replace water supplies lost due to cutbacks in Central Arizona Project water deliveries from the Colorado River. This pumping will span well into the period of Resolution's pumping from the Desert Wellfield. FEIS at 980.

The Forest Service does not have to analyze other activities that are "'speculative' and attenuated from the project at hand." *Seven County*, 145 S.Ct. at 1509. But the agency cannot ignore cumulative impacts by unreasonably labeling them as "speculative," or otherwise rationalizing them away, especially when planning for these activities is already underway, concrete steps have been taken to facilitate the projects, and they are considered in numerous plans by other agencies. *N. Plains Res. Council*, 668 F.3d at 1078-79.

c.    *The Forest Service failed to meaningfully consider comments from other agencies.*

The unreasonableness of the Forest Service's actions and analysis in the FEIS is highlighted by its attempt to bypass the significant criticisms leveled against the FEIS by BLM and the Arizona State Lands Department ("ASLD") on these very issues. Both are "cooperating agencies" on the FEIS (FEIS at ES-5). Where expert agencies, especially

those invited to participate in the review process, level such stinging criticisms questioning

the legitimacy of the FEIS, "[t]here must be good faith, reasoned analysis in response."

*Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973). "[A] reviewing court 'may properly be

skeptical as to whether an EIS's conclusions have a substantial basis in fact if the

responsible agency has apparently ignored the conflicting views of other agencies having

pertinent expertise.'" *Davis v. Mineta*, 302 F.3d 1104, 1123 (10th Cir. 2002) *quoting Sierra

Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1030 (2d Cir.1983). "The Court will

reject conclusory assertions of agency 'expertise' where the agency spurns unrebutted

expert opinions without itself offering a credible alternative explanation." *N. Spotted Owl v.

Hodel*, 716 F.Supp. 479, 483 (W.D. Wash. 1988). *See also Nat. Wild. Fed. v. NMFS*, 184

F.Supp.3d 861, 904 (D. Or. 2016)(same).

<u>Bureau of Land Management</u>

At the Forest Service's request, BLM provided a 26-page "targeted technical

review" of the 2021 FEIS. These extensive comments were prepared by a "team of [BLM]

hydrology specialists" who reviewed a wide range of topics related to "the hydrology and

water resources aspects of the project and assessed whether the FEIS adequately addressed

comments received during the FEIS development." (BLM Review of Hydrology Aspects of

the Resolution Copper Project, June 13, 2022)("BLM Hydrology Review"), Ex. 1.

BLM concluded it did not. BLM detailed "serious concern(s)" with the FEIS that it

"believed may be deficient, underdeveloped, or improperly analyzed," observing that

significant topics areas in the FEIS "did not meet the analysis standards of NEPA or

suffered for insufficient evaluation or unsupported conclusions." *Id*. at 1-2. For example,

BLM expressed concerns over how the mine's water impacts were poorly considered in the

FEIS or, in some instances, not considered at all. BLM found that the FEIS failed to

address regional pre-mining groundwater conditions and wrongly included ongoing

dewatering at the Mine site within the "No Action" alternative, noting that this constituted a

failure to meet the NEPA regulatory requirement to assess cumulative impacts. *Id*. at 13.

BLM also listed other deficiencies in the FEIS' overly narrow assessment of long-

23

term impacts to surface and groundwater resources around the Mine site (*Id*. at 4–5, 13, 21, 25, and throughout), and the Forest Service's deficient analyses of impacts to surface and groundwater resources at the Mine due to inadequate modeling (*Id*. at 3, 5, 13, 22–26). BLM highlighted that various parties prior to the FEIS' publication had identified the same problems with the water modeling, but the Forest Service ignored them and wrongfully categorized them as "General categories of comments received." *Id*. at 24. "Remarkably, many of the same concerns expressed in past assessments of the model were identified by the BLM reviewers, indicating the concerns had never been incorporated into the groundwater model by the time the FEIS was released." *Id*.

Related to Arizona's ongoing drought, the impact of shortages on the Colorado River to Arizona's Central Arizona Project entitlements, and the potential for competing water uses in the area of the Desert Wellfield, BLM also noted—as Plaintiffs had previously pointed out—that "the FEIS does not adequately account for permitting processes for water use, Central Arizona Project water availability, partially planned developments, and decreased precipitation (and therefore changes related to drought)." *Id*. at 15. BLM was concerned that "the FEIS treats other water uses as 'speculative', even though there is a high probability that some of these actions will either affect the amount of water available to [Resolution], or the amount of withdrawn by [Resolution] will affect other planned developments," concluding "[t]here are many assumptions in the FEIS regarding water availability to [Resolution], but few assumptions on the availability of water due to the extended drought or other planned projects." *Id*.

BLM also similarly raised concerns related to the extensive network of springs that the Project's groundwater pumping will deplete, noting that GIS layering they had obtained "shows a lot more springs in the area of interest than are shown in the FEIS." The BLM went on to ask, "Are the rest of these springs/seeps already dry? Why are they not mentioned?" *Id*. at 8. Relatedly, "BLM reviewers believe the characterization of GDEs [Groundwater Dependent Ecosystems] is inadequate." *Id*. at 18.

Despite all of this, the FEIS does not even mention BLM's Report. In fact, the sole

mention of the BLM Report in the entire project record is in two minor documents addressing one mitigation measure, and stormwater design for the tailings facility. But the agency cannot avoid serious critiques from another agency, especially a "cooperating agency" on the FEIS, in such a high-profile project.

Arizona State Land Department

The Arizona State Land Department similarly warned the Forest Service during the NEPA process: "[T]he extraction and transportation of groundwater out of the [Superstition Vista Planning Area] greatly compromises the ability to develop these lands to their full planned potential, and as a result, reduces the income and value of the Trust." (FEIS at R-44). Despite the Department's protests and the trove of available information about the Superstition Vistas development, the Forest Service erroneously concluded that Superstition Vistas is still mostly "speculative," Ex. 2 (FEIS at 987).

The Department also raised serious concerns regarding the socioeconomic impacts by the pumping, especially regarding the impacts to Superstition Vistas: "the loss of 3,440 acres of developable State Trust land represents a minimum potential loss to the Trust of at least $536,640,000 in revenue." FEIS, Appendix R at R-43. These concerns were largely ignored, as the Forest Service erroneously concluded that most of the Superstition Vistas is "speculative," (FEIS 987), and thereby refused to analyze it in the FEIS.

*d.      The Agency failed to consider, and require, sufficient mitigation measures.*

The Forest Service also failed to fully analyze potential mitigation measures in the FEIS, especially regarding the groundwater pumping and transport via the proposed pipelines. *See Great Basin Res. Watch*, 844 F.3d at 1107 (FEIS must fully analyze mitigation measures as part of the NEPA and FLPMA process).

For example, the FEIS admits to substantial regional groundwater declines caused by the Desert Wellfield pumping, FEIS at 448, and that these declines will adversely impact individual wells throughout the East Salt River Valley, rendering shallow wells dry or requiring other well owners to deepen their wells, FEIS at 415-16; *see also* FEIS at 986 (additional "infrastructure costs would increase as wells and pumps need to be lowered or

replaced."); *see also Id.* ("[T]here likely would be certain areas that experience lack of well capacity and groundwater shortages, particularly around the edges of the basin.").

Yet, the FEIS failed to analyze or require any mitigation measures to compensate for these impacts, including wells that would need to be deepened or would go dry as a result of the pumping. The FEIS deferred this analysis to future state permitting. FEIS at J-50; at R-235. But under NEPA and FLPMA, the Forest Service cannot defer the analysis of impacts and mitigation measures to the future. *Great Basin Resource Watch* 844 F.3d at 1103–04 (EIS could not rely on future state permitting as substitute for the environmental review requirements). This is especially true here, as a "single" EIS must analyze all impacts. 16 U.S.C. §539p(c)(9)(B).

In the 2021 FEIS, the Forest Service had analyzed and considered the inclusion of a "Potential Future Measure" (PF-WR-03) to mitigate for effects from groundwater declines in the East Salt River Valley stemming from Desert Wellfield pumping. 2021 FEIS at Appendix J-51/52 (Ex. 19). Under this potential future mitigation measure, Resolution Copper committed to "work with any impacted stakeholder to mitigate effects of water level declines caused by the project." *Id.*

BLM agreed, and stressed that this mitigation measure should be required by the Forest Service. "Measure PF-WR-03 is another 'potential future measure' that should become a required measure." BLM Hydrology Review at 21 (Ex. 1). "If no effects [to wells] are observed, there will be no action necessary, however, the BLM reviewers believe it should be a mandatory mitigation if in fact negative impacts are observed. The uncertainty in occurrence should not preclude the requirement for action should it occur; as such, this should be a required measure." *Id.*

Instead of making PF-WR-03 mandatory, the Forest Service did the opposite— it completely eliminated this mitigation obligation in the 2025 FEIS, shifting all risks and burdens associated with declining groundwater levels from Resolution to individual well owners. The Forest Service admits that "no specific monitoring or mitigation measures are included in the DEIS specific to the Desert Wellfield in the East Salt River valley. This

groundwater pumping is subject to permitting by the ADWR." FEIS at R-235.

In addition to its procedural duties under NEPA, the agency has a substantive duty under FLPMA to protect the environment when it issues the Special Use Permits required for the mine's infrastructure. A special use permit "shall contain terms and conditions which will … (ii) minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment." 43 U.S.C. §1764(a). *See* also 43 U.S.C. §1765(b)(additional public land and resource protection requirements). Thus, in addition to failing to adequately analyze all reasonable mitigation measures, the agency failed to require sufficient mitigation under its FLPMA duties.

**C.    The Proposed Amendments to the Tonto Forest Plan, Without Any Public Review or Prior Notice, Violate the NFMA, NEPA, and the NDAA.**

The June 2025 FEIS and DROD included, *for the first time*, a new proposal to substantially amend the current Tonto National Forest Plan, exempting the Project's pipelines, transmission lines, roads, and other infrastructure from the Plan's current requirements protecting cultural resources, wildlife, recreation, soils, and other critical public resources. *See* new FEIS Appendix T (Ex. 2) and new DROD Section 2.1.4 (Ex. 3). "The Resolution Copper Project preferred alternative (Alternative 6 – Skunk Camp) proposes a multi-component forest plan amendment that would except the Resolution Copper Project from nine guidelines and seven desired conditions." FEIS at T-1. These amendments are needed in order to ensure compliance with the Forest Plan and the NFMA:

> [T]he preferred alternative, as proposed, cannot adhere to nine forest plan guidelines and seven forest plan desired conditions that are intended to protect soil productivity, scenic resources, national scenic trails, recreation resources, wildlife habitat, and cultural resources. … This appendix (appendix T) describes how the Forest Service proposes to … amend the forest plan contemporaneously with the approval of the project so that the project would be consistent with the plan as amended.

FEIS at T-2. *See* new FEIS Appendix T and new DROD Section 2.1.4.

The NFMA established a framework for managing natural resources on National Forest lands, requiring the Forest Service to prepare a land and resource management plan, or "forest plan," for each National Forest. 16 U.S.C. §1604(a). Each plan must include

27

requirements for how the forest shall be managed. 16 U.S.C. §§1604(c), (g)(2), and (g)(3). Once a forest plan is adopted, all permits, contracts, and other instruments for use of the lands must be consistent with the plan. 16 U.S.C. §1604(i). "It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council v. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005); *Save Our Cabinets v. U.S. Dep't. of Agric.*, 254 F. Supp. 3d 1241, 1258-59, (D. Mont. 2017)(Forest Service approval of mining project that would not meet the Forest Plan's "desired conditions" protecting water quality violated the NFMA).

None of these numerous Plan amendments were subject to any public review and opportunities for comment, as they were first disclosed in the June 16, 2025 FEIS and DROD. This was a complete reversal from the 2021 DROD, which specifically stated that: "I find that the authorized uses do not require an amendment to the forest plan." 2021 DROD at 32, (Ex. 4). That has fundamentally changed, as the new Appendix T and the new DROD now say that the sixteen Plan amendments are needed to allow the Project to be approved. Neither the 2025 FEIS or new DROD explain the agency's dramatic departure from its policies and regulation from 2021 to 2025, nor why it failed to provide for public review of these significant amendments, despite having years to do so.

The NFMA's Forest planning regulations, 36 C.F.R. Part 219, require that proposed Forest Plan amendments be subject to public review, comment and notice—which did not occur here. For Plan amendments, "the responsible official shall: … Provide opportunities for public participation as required in § 219.4 and public notification as required in §219.16." 36 C.F.R. §219.13(b)(2). Public "[p]articipation opportunities must be provided throughout all stages of the land management planning process, including during plan revision and amendment." 77 Fed. Reg. 21195 (Apr. 9, 2012)(preamble to current Part 219 rulemaking). Despite this, the proposed significant amendments to the Plan were only first divulged to the public on the agency's website on June 16, 2025.

This is not an idle exercise, as the eliminated Plan requirements were enacted to protect valuable resources such as the recognized Traditional Cultural Property of Ga'an

Canyon (through which the massive waste pipeline would be constructed) as well as wildlife migration routes. The new Appendix T summarizes the important current Plan requirements protecting cultural resources that will be eliminated, including: (1) "Cultural and Historic Resources Desired Condition 01 (CUH-DC-01)(protecting **"**Historic properties, including traditional cultural properties"); (2) "Cultural and Historic Resources Desired Condition 02 (CUH-DC-02)"(same). A number of wildlife protections will also be eliminated: (1) "Fish, Wildlife and Plants Guideline 06 (WFP-G-06); (2) Fish, Wildlife and Plants Guideline 07 (WFP-G-07)**.** FEIS at T-6. The Project's infrastructure would also be exempted from other Forest Plan protections for other public resources. FEIS at T-5 to 7.

The Mine itself, let alone the lands directly affected by the pipelines, transmission lines, roads, and other facilities, will result in significant and devastating effects. Yet, the agency determined that the result of the exemptions and Project approval represented an *insignificant* impact to the environment, cultural resources, and public values. "This amendment applies only to the Resolution Copper Project; therefore, the amendment is not considered a significant change in the plan for the purposes of the NFMA." FEIS at T-36. Yet §3003 said that the infrastructure approvals were "major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." 16 U.S.C. §539p(c)(9).

Thus, the agency's decision to bypass public review and amend the Forest Plan at the expense of irreplaceable public resources violates the substantive and procedural requirements of the NFMA and FLPMA, and the requirements of NEPA and the NDAA.

**III.**     **The Balance of Hardships and Public Interest Tip Sharply in Plaintiffs' Favor.**

The "balance of equities" and "public interest" factors "merge" when the agency is a party. ECF No. 81 at 7. Here, "[i]t is abundantly clear" that these factors "tip sharply" in Plaintiffs' favor. *Apache Stronghold*, 2025 WL 1360694 at *9. The privatization of the 2,400+ acres of currently federal public land will immediately and irreparably harm Plaintiffs and their members. The public interest in favor of a preliminary injunction is

especially acute when faced with violations of environmental laws such as NEPA and FLPMA, where the public has a strong interest in ensuring that federal agencies comply with laws designed to protect the public waters and lands, and the right of public participation. *S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009). Regarding the balance of hardships, Resolution's at-most temporary delays do not outweigh the Plaintiffs' interest in preventing irreparable harm.

> [W]hile an injunction will likely prevent Resolution Copper from beginning its work for a limited time, as Plaintiff points out, it will ultimately "not stop Resolution from mining a single ounce of copper should the transfer ultimately be upheld." The public interests Defendants tout will therefore not be lost because of an injunction, but merely delayed; on the other hand, if the transfer occurs, it "could result in the permanent loss of Apaches' legal rights to access their ancestral sacred site."

*Apache Stronghold*, 2025 WL 1360694 at *8 (citations omitted).

The most immediate and irreparable harm results from the Exchange's privatization of the public lands. The fact that mining may not occur in the immediate future does not diminish these harms. Once the lands are privatized, Resolution will begin disruptive activities, and it will have an exclusive right to use, and exclude the public, and sell the land free of any constraints or obligations to the public or develop the land for other purposes.

## IV.    No More Than a Nominal Bond Is Appropriate in this Case.

Under F.R.C.P. 65(c), in issuing a preliminary injunction, the "court has discretion to dispense with the security requirement, or to request a mere nominal security, where requiring security would effectively deny access to judicial review." *Cal. ex rel. Van de Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985); *see also Friends of the Earth v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975)($1,000 bond). "It is well established that in public interest environmental cases the plaintiff need not post bonds because of the potential chilling effect on litigation to protect the environment and the public interest." *Central Or. Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012). That is the case here, where the imposition of more than a nominal bond would chill Plaintiffs' ability to bring this case to vindicate the public interest.

Respectfully submitted July 14, 2025.

*/s/ Roger Flynn*
Roger Flynn (Pro Hac Vice)
Jeffrey C. Parsons (Pro Hac Vice)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St., #2
Lyons, Colorado 80540
303-823-5738
wmap@igc.org

Marc D. Fink (Pro Hac Vice)
CENTER FOR BIOLOGICAL DIVERSITY
209 East 7th Street
Duluth, Minnesota 55805
218-464-0539
mfink@biologicaldiversity.org

Allison N. Henderson (Pro Hac Vice)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 3024
Crested Butte, CO 81224
970-309-2008
ahenderson@biologicaldiversity.org

*Attorneys for All Plaintiffs*

*/s/ Susan Montgomery*
Susan B. Montgomery (AZ Bar # 020595)
Robyn L. Interpreter (AZ Bar # 020864)
MONTGOMERY & INTERPRETER, PLC
3301 E. Thunderbird Rd.
Phoenix, AZ 85032
(480) 513-6825
smontgomery@milawaz.com
rinterpreter@milawaz.com

*Attorneys for the ITAA*

## CERTIFICATE OF SERVICE

I, Susan B. Montgomery, attest that I filed the foregoing and all exhibits with this Court's ECF system on this 14th day of July, 2025.

*/s/ Susan Montgomery*

31