1   ADAM R.F. GUSTAFSON
2   Acting Assistant Attorney General
    United States Department of Justice
3   Environment and Natural Resources Division

4   ERIKA NORMAN (CA Bar 268425)
5   ANGELA ELLIS (DC Bar 1670713)
    Natural Resources Section
6   150 M St. NE, Third Floor
7   Washington, D.C. 20002
    (202) 305-0475 (Norman)
8   Erika.Norman@usdoj.gov;
9   Angela.Ellis@usdoj.gov

10  *Attorneys for Federal Defendants*

11              **THE UNITED STATES DISTRICT COURT**
12                    **DISTRICT OF ARIZONA**
                      **PHOENIX DIVISION**
13

| | |
|---|---|
| 14  San Carlos Apache Tribe, | NO. CV-21-00068-PHX-DWL |
| 15                  Plaintiff, | |
| 16  v. | **FEDERAL DEFENDANTS'** |
| 17  United States Forest Service, et al., | **OPPOSITION TO MOTION FOR** |
| 18                  Defendants, | **PRELIMINARY INJUNCTION** |
| 19   and | |
| 20  Resolution Copper Mining, LLC. | |
| 21 | |
| 22  Arizona Mining Reform Coalition, et al., | NO. CV-21-00122-PHX-DWL |
| 23                  Plaintiffs, | |
| 24  v. | **FEDERAL DEFENDANTS'** |
| 25  United States Forest Service, et al., | **OPPOSITION TO MOTION FOR** |
| 26                  Defendants, | **PRELIMINARY INJUNCTION** |
| 27   and | |
| 28  Resolution Copper Mining, LLC. | |

1

**TABLE OF CONTENTS**

2

3   INTRODUCTION .................................................................................................. 1

4   FACTUAL AND PROCEDURAL BACKGROUND ........................................... 3

5       I.      The Southeast Arizona Land Exchange and Conservation Act. ............... 3

6       II.     The NEPA Process and Land Exchange Act Implementation .................... 3

7
        III.    Procedural History .................................................................................... 5
8
9   LEGAL STANDARDS ......................................................................................... 5

10  ARGUMENT ........................................................................................................ 6

11      I.      Plaintiffs Cannot Succeed on the Merits Because Their Claims Suffer
                from Numerous Fatal Threshold Deficiencies ......................................... 6
12
13              A.      The Court Lacks Jurisdiction Over Plaintiffs' Claims Because
                        Neither the FEIS nor the Draft ROD Is a Final Agency Action ........ 7
14
15              B.      Plaintiffs Lack Standing to Challenge the Land Exchange
                        Under NEPA and the NHPA Because the Forest Service Must
16                      Transfer Title ................................................................................. 13

17              C.      The Land Exchange Is Not a Reviewable Action Under the
18                      APA ................................................................................................ 17

19              D.      The Land Exchange Act Compels the Transfer of Title
20                      Irrespective of any Legal Challenge to the FEIS ........................... 18

21              E.      Even if Plaintiffs Clear the Hurdles under the APA and Article
                        III, NEPA Does Not Apply to the Non-Discretionary Transfer
22                      of Title ............................................................................................ 22

23      II.     Setting Aside Threshold Deficiencies, Plaintiffs' Claims Fail on the
24              Merits ...................................................................................................... 23

25              A.      The FEIS Complies with NEPA ..................................................... 24

26                      1.      AMRC's NEPA claims lack merit ....................................... 24

27                      2.      The Tribe's NEPA claims lack merit .................................... 30
28

i

B.     AMRC's Appraisal Claims Under the Land Exchange Act Fail ..... 34

1.     AMRC lacks prudential standing to challenge the
appraisals ................................................................................... 35

2.     AMRC's appraisal claims are without merit ....................... 36

C.     AMRC's NFMA Claim Lacks Merit ................................................ 41

D.     The Tribe's NHPA and Consultation claims are without merit ....... 43

III.     The Remaining Preliminary Injunction Factors Do Not Tip Sharply in
Plaintiffs' Favor ............................................................................................. 47

A.     Irreparable Harm Is Not Imminent; It Is Also Mandated By
Congress .......................................................................................... 47

B.     The Balance of Hardships and Public Interest Weigh Against
an Injunction ................................................................................... 49

IV.     Even if the Court Finds for Plaintiffs on any Issue, it Should Not
Vacate the FEIS or Enjoin the Land Exchange .......................................... 50

CONCLUSION ........................................................................................................ 50

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*All. for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) ............................................................ 6

*Am. Motorcyclist Ass'n v. Watt,*
714 F.2d 962 (9th Cir. 1983) ............................................................ 49

*Am. Trucking Ass'ns v. City of Los Angeles,*
559 F.3d 1046 (9th Cir. 2009) .......................................................... 49

*Amoco Prod. Co. v. Vill. of Gambell,*
480 U.S. 531 (1987) ........................................................................ 47

*Apache Stronghold v. United States,*
101 F.4th 1036 (9th Cir. 2024) ......................................................... 5

*Apache Stronghold v. United States,*
145 S. Ct. 1480 (Mem)(2025) ........................................................... 5

*Apache Stronghold v. United States,*
519 F. Supp. 3d 591 (D. Ariz. 2021) ............................................... 15

*Apache Survival Coal. v. United States,*
21 F.3d 895 (9th Cir. 1994) ............................................................. 12

*Bank of Am. Corp. v. City of Miami,*
581 U.S. 189 (2017) ........................................................................ 35

*Bennett v. Spear,*
520 U.S. 154, (1997) ......................................................................... 7

*Bond v. United States,*
572 U.S. 844 (2014) ........................................................................ 19

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.,*
267 F.3d 1144 (D.C. Cir. 2001) ....................................................... 22

*Coal. Against a Raised Expressway, Inc. v. Dole,*
1986 U.S. Dist. LEXIS 30976 (S.D. Ala. Oct. 20, 1986) ................. 46

*Coal. Against a Raised Expressway, Inc. v. Dole,*
835 F.2d 803 (11th Cir.1988) ......................................................... 46

*Concerned Citizens & Retired Miners Coal. v. U.S. Forest Service,*
279 F. Supp. 3d 898 (D. Ariz. 2017) .................................... 7, 44, 46

*Concerned Citizens All., Inc. v. Slater,*
    176 F.3d 686 (3d Cir. 1999) .................................................................. 46

*CTIA - The Wireless Ass'n v. FCC,*
    466 F.3d 105 (D.C. Cir. 2006) ............................................................... 45

*Defend Arlington v. U.S. Dep't of Def.,*
    2023 WL 8600567 (D.D.C. Dec. 12, 2023) ............................................ 17

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004) ................................................................................ 22

*Desert Citizens Against Pollution v. Bisson,*
    231 F.3d 1172 (9th Cir. 2000) ............................................... 15, 36, 37

*Envt'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
    36 F.4th 850 (9th Cir. 2022) ....................................................... 7, 10, 11

*Friedman Bros. Inv. Co. v. Lewis,*
    676 F.2d 1317 (9th Cir. 1982) .............................................................. 10

*Fund for Animals, Inc. v. Lujan,*
    962 F.2d 1391 (9th Cir. 1992) .............................................................. 16

*Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
    462 U.S. 87 (1983) .................................................................................. 21

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC,*
    590 U.S. 432 (2020) ................................................................................ 19

*Hall v. Norton,*
    266 F.3d 969 (9th Cir. 2001) ............................................... 10, 14, 26, 28

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ................................................................................ 17

*Jewel v. NSA,*
    673 F.3d 902 (9th Cir. 2011) ................................................................ 13

*Jones v. Hendrix,*
    599 U.S. 465 (2023) .......................................................................... 20, 33

*Kootenai Tribe of Idaho v. Veneman,*
    313 F.3d 1094 (9th Cir. 2002) .............................................................. 33

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .......................................................................... 13, 14

*M.S. v. Brown,*
    902 F.3d 1076 (9th Cir. 2018) .............................................................. 13

iv

*Mar v. United States*,
   640 F. Supp. 3d 112 (D.D.C. 2022) .......................................................................... 17

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ................................................................................................... 14

*Microsoft Corp. v. i4i Ltd. P'ship*,
   564 U.S. 91 (2011) ..................................................................................................... 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................................................... 17

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
   177 F.3d 800 (9th Cir. 1999) ..................................................................................... 44

*Nat'l Fam. Farm Coal. v. U.S. EPA*,
   966 F.3d 893 (9th Cir. 2010) ..................................................................................... 14

*Nat'l Wildlife Fed'n v. Espy*,
   45 F.3d 1337 (9th Cir. 1995) ..................................................................................... 50

*Native Ecosystems Council v. U.S. Forest Serv.*,
   418 F.3d 953 (9th Cir. 2005) ....................................................................................... 7

*O'Connell v. Pinnacle Gold Mines Co.*,
   140 F. 854 (9th Cir. 1905) ......................................................................................... 38

*Oberdorfer v. Jewkes*,
   583 F. App'x 770 (9th Cir. 2014) .............................................................................. 35

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
   402 F.3d 846 (9th Cir. 2005) ..................................................................................... 35

*Ohio Forestry Ass'n v. Sierra Club*,
   523 U.S. 726 (1998) ................................................................................................... 12

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
   625 F.3d 1092 (9th Cir. 2010) ..................................................................... 8, 9, 11, 12

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
   465 F.3d 977 (9th Cir. 2006) ........................................................................ 11, 26, 28

*Pinal Creek Grp. v. Newmont Mining Corp.*,
   352 F. Supp. 2d 1037 (D. Ariz. 2005) ....................................................................... 33

*Polselli v. IRS*,
   598 U.S. 432 (2023) ....................................................................................... 21, 28, 29

*Quebec v. Harris*,
   729 F.3d 937 (9th Cir. 2013) ....................................................................................... 6

v

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dept. of Agric.*,
  415 F.3d 1078 (9th Cir. 2005) ........................................................................ 36

*Rattlesnake Coalition v. U.S. E.P.A.*,
  509 F.3d 1095 (9th Cir. 2007) ........................................................................ 10

*RESTORE: The North Woods v. U.S. Dep't of Agriculture*,
  968 F. Supp. 168 (D. Vt. 1997) ...................................................................... 23

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ...................................................................... 24, 28, 29, 34

*Romag Fasteners, Inc. v. Fossil, Inc.*,
  590 U.S. 212 (2020) ........................................................................................ 19

*Salmon Spawning & Recovery All. v. Gutierrez*,
  545 F.3d 1220 (9th Cir. 2008) ................................................................... 14, 15

*Sampson v. Murray*,
  415 U.S. 61 (1974) .......................................................................................... 48

*San Carlos Apache Tribe v. United States*,
  417 F.3d 1091 (9th Cir. 2005) .......................................................................... 7

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) .......................................................................... 31

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
  145 S. Ct. 1497 (2025) .............................................................................*passim*

*Sierra Club v. Babbitt*,
  65 F.3d 1502 (9th Cir. 1995) .......................................................................... 22

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  446 F.3d 808 (8th Cir. 2006) .......................................................................... 11

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ........................................................................................ 16

*Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*,
  496 F. App'x 712 (9th Cir. 2012) ............................................................... 33, 34

*Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dep't of Interior*,
  608 F.3d 592 (9th Cir. 2010) .......................................................................... 10

*Territory of Guam v. United States*,
  593 U.S. 310 (2021) ........................................................................................ 20

vi

*Tohono O'odham Nation v. U.S. Dep't of Interior*,
    138 F.4th 1189 (9th Cir. 2025) ................................................................. 13

*United States v. Atl. Rsch. Corp.*,
    551 U.S. 128 (2007) .................................................................... 20, 29

*United States v. Locke*,
    471 U.S. 84 (1985) ............................................................................. 38

*United States v. Oakland Cannabis Buyers' Co-op.*,
    532 U.S. 483 (2001) .................................................................... 47, 49

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ........................................................................... 24

*Western Land Exchange Project v. U.S. Bureau of Land Management*,
    315 F. Supp. 2d 1068 (D. Nev. 2004) ................................................ 23

*Westlands Water Dist. v. U.S. Dep't of the Interior*,
    376 F.3d 853 (9th Cir. 2004) ............................................................. 33

*Wilbur v. United States ex rel. Krushnic*,
    280 U.S. 306 (1930) ........................................................................... 38

*Wild Fish Conservancy v. Jewell*,
    730 F.3d 791 (9th Cir. 2013) ......................................................... 7, 35

*WildEarth Guardians v. USDA*,
    795 F.3d 1148 (9th Cir. 2015) ........................................................... 13

*Wine Educ. Council v. Rangers*,
    2021 WL 1573783 (D. Ariz. Apr. 22, 2021) ..................................... 33

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................*passim*

*Wishtoyo Found. v. U.S. Fish & Wildlife Serv.*,
    2019 WL 6998665 (C.D. Cal. Oct. 16, 2019) ................................... 12

*Yount v. Salazar*,
    2014 WL 4904423 (D. Ariz. Sept. 30, 2014) ................................... 35

*Ysleta Del Sur Pueblo v. Texas*,
    596 U.S. 685 (2022) .................................................................... 21, 31

**Statutes**

16 U.S.C. § 539p ................................................................. 3, 4, 25, 40

16 U.S.C. § 539p(a) ............................................................. 15, 17, 18

vii

16 U.S.C. § 539p(b)(2) ................................................................................................ 3

16 U.S.C. § 539p(c)(1) .............................................................................................. 14

16 U.S.C. § 539p(c)(10) ........................................................................ 5, 17, 18, 19

16 U.S.C. § 539p(c)(3)(B) ........................................................................................ 12

16 U.S.C. § 539p(c)(4) ................................................................................ 35, 37, 47

16 U.S.C. § 539p(c)(9) ................................................................................ 18, 19, 20

16 U.S.C. § 539p(c)(9)(A) ................................................................................ 20, 22

16 U.S.C. § 539p(c)(9)(B) ......................................................................... 9, 15, 18

16 U.S.C. § 539p(c)(9)(C) ..................................................... 22, 25, 44, 47

16 U.S.C. § 539p(i)(3) ............................................................................................... 48

30 U.S.C. § 22 ............................................................................................................. 38

30 U.S.C. §§26 .......................................................................................................... 39

5 U.S.C. § 702 ............................................................................................................ 35

5 U.S.C. § 704 ........................................................................................................ 7, 8

5 U.S.C. § 706(2) ...................................................................................................... 17

54 U.S.C. § 306108 ................................................................................................... 44

Pub. L. No. 106–298, 114 Stat. 1046 (2000) .................................................. 23

Pub. L. No. 114-94, 129 Stat. 1312 (2015) ..................................................... 50

**Regulations**

36 C.F.R. § 218.7 ...................................................................................................... 43

36 C.F.R. § 219.16(b) ....................................................................................... 42, 43

36 C.F.R. § 254.9(b)(1)(iv) .................................................................................... 39

36 C.F.R. § 254.9(c)(4) ........................................................................................... 39

36 C.F.R. § 800.7(a) ................................................................................................ 46

36 C.F.R. §§ 228.1–15 ............................................................................................ 25

36 C.F.R. §§ 251.50–65 .................................................................................. 25, 26

36 C.F.R. §254.9(b)(1) ............................................................................................ 41

36 C.F.R. Part 215 .................................................................................................... 43

36 C.F.R. Part 218 ..................................................................................................... 9, 43

36 C.F.R. Part 219 ................................................................................................... 42, 43

40 C.F.R. § 1502.9 ......................................................................................................... 33

90 Fed. Reg. 13,673 (Mar. 20, 2025) ............................................................................. 49

90 Fed. Reg. 26,287 (June 20, 2025) ................................................................................ 4

INTRODUCTION

Plaintiffs ask this Court to take the extraordinary step of enjoining an act of Congress from more than a decade ago that now requires the Forest Service to complete a land exchange by August 19, 2025. Plaintiffs' request is not based on any substantive attack against the land exchange itself; Congress required the Forest Service to carry out that exchange and the Forest Service lacks any discretion to do otherwise. Instead, Plaintiffs ask the Court to delay the land exchange in the name of "just a little more process." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1514 (2025). In doing so, Plaintiffs seek to transform the procedural statutes that give rise to their claims into "substantive roadblock[s]" to the land exchange that Congress long-ago mandated. *Id.* at 1507. This request must be denied. Plaintiffs fail to show significant questions going to the merits, establish a threat of imminent and irreparable harm in the absence of an injunction, or show that the balance of equities favors an injunction.

The Arizona Mining Reform Coalition Plaintiffs ("AMRC") move for a preliminary injunction under the National Environmental Policy Act ("NEPA"), the appraisal provisions of the Land Exchange Act, and the National Forest Management Act ("NFMA"). Plaintiff San Carlos Apache Tribe ("Tribe") brings NEPA claims, as well as claims under the National Historic Preservation Act ("NHPA").

At the threshold, Plaintiffs' claims fail for a series of interrelated, but independent, jurisdictional reasons. *First,* Plaintiffs fail to identify a judicially reviewable final agency action under the Administrative Procedure Act ("APA"). *Second*, Plaintiffs lack standing to bring their procedural challenges to the land exchange under NEPA and the NHPA, because the injuries they allege related to the privatization of and impacts to the property cannot be redressed through more environmental analysis or consultation. *Third,* the land exchange is a non-discretionary act that is not reviewable under the APA. *Fourth,* the Land Exchange Act is clear that Congress did not intend judicial review of the FEIS, which could take years, to serve as a roadblock to the transfer of title. *Finally*, apart from the requirements of the APA and Article III, NEPA itself does not apply to non-

1

discretionary actions like the transfer of title under the Land Exchange Act.

Plaintiffs' claims also fail on the merits. As to NEPA, the FEIS sufficiently analyzed the environmental impacts, both of the land exchange and the ancillary activities over which the Forest Service has discretion. AMRC's appraisal claims under the Land Exchange Act also fail, both because AMRC's alleged injuries are outside the zone of interests the appraisal provisions were intended to protect and because the Forest Service correctly excluded the value of the locatable minerals from its appraisal of the United States' estate in the Mining Claim Zone ("MCZ") parcel. AMRC's NFMA claim fails because the Forest Service followed all applicable regulations in announcing the project-specific amendments to the Forest Plan in the Draft Record of Decision ("Draft ROD") and providing the public with the ability to review and object to those amendments before they are decided in the Final ROD. Finally, the Tribe's NHPA claims fail because the Forest Service fully complied with its consultation obligations.

As to the remaining preliminary injunction factors, Plaintiffs cannot meet the irreparable harm prong of the *Winter* test, because any injury to Plaintiffs' access interests is not redressable, any injuries supposedly caused by the allegedly defective appraisals are not irreparable, and none of Plaintiffs' alleged environmental injuries are imminent. Finally, with respect to the equities, Congress decided in 2014 that this land exchange should go forward, and the administration has identified the Resolution Copper Project as a priority critical-minerals project that is in the economic and national security interests of the United States. The Court should not stop the transfer of title from occurring within the timeframe Congress required. There will come a time when the Court can adjudicate other NEPA claims that may be brought by Plaintiffs after the agency's issuance of a Final ROD. But Plaintiffs have not presented any viable basis for the Court to enjoin the land exchange from proceeding on the timeframe Congress required.

# FACTUAL AND PROCEDURAL BACKGROUND

## I.    The Southeast Arizona Land Exchange and Conservation Act.

In 2014, Congress made the decision to exchange title to a 2,422-acre parcel of National Forest System land, including a sacred Apache ceremonial ground known in English as "Oak Flat," for 5,459 acres of conservation lands in Arizona, to "carry out mineral exploration activities under the Oak Flat Withdrawal Area." 16 U.S.C. § 539p(b)(2), (c)(6)(A)(i), & (d)(1). The Southeast Arizona Land Exchange and Conservation Act ("Act" or "Land Exchange Act"), 16 U.S.C. § 539p, directs the United States Forest Service to convey "all right, title, and interest" in Oak Flat to Defendant-Intervenor Resolution Copper Mining, LLC ("Resolution Copper") within sixty days of publishing a Final Environmental Impact Statement ("FEIS"). *Id.* § 539p(c)(1), (10).

The Act also requires the Forest Service to: (1) engage in "consultation with affected Indian tribes," *id.* § 539p(c)(3); (2) obtain appraisals of the land to be exchanged, *id.* § 539p(c)(4); (3) issue special use permits to Resolution Copper, *id.* § 539p(c)(6); (4) prepare a FEIS to inform future agency decision making associated with the exchange, *id.* § 539p(c)(9); and (5) convey title to the exchanged land "[n]ot later than 60 days after the date of publication of the [FEIS]" *Id.* § 539p(c)(10). Thus, the Act imposes on the Forest Service a non-discretionary duty to convey title to Resolution Copper within sixty days after it publishes the FEIS.

## II.    The NEPA Process and Land Exchange Act Implementation

The Forest Service initiated a public scoping period for this project in March 2016 by publishing a Notice of Intent to prepare an EIS in the Federal Register.[1] The Forest

---

[1] Ex. 1, Resolution Copper Project and Land Exchange Final Environmental Impact Statement ("FEIS") at ES-9. The Draft ROD, Final EIS, and Draft EIS are available on the Forest Service's website. *See Resolution Copper Project and Land Exchange Documents, U.S. Dep't of Agric.* https://www.resolutionmineeis.us/documents (last visited July 25, 2025). For the Court's convenience, the Government attaches as exhibits the cited portions of the FEIS and Draft ROD ("DROD") documents, along with the title pages and tables of contents.

3

1   Service then held five public scoping meetings between March and June 2016, and

2   received 133,512 public comments, which it summarized in a scoping report in March

3   2017. FEIS at ES-10. The Forest Service then participated in numerous meetings and

4   consultation with key stakeholders, tribes and cooperating agencies. *Id.* In August 2019,

5   the Forest Service published a draft EIS for public review and comment. *Id.* It then

6   conducted six meetings and received over 29,000 comments on the Draft EIS. *Id.*

7       The Forest Service published a final EIS on January 15, 2021, but withdrew it

8   shortly thereafter. *Id.* at ES-3. The Forest Service then reinitiated consultation with

9   affected tribes, including the San Carlos Apache Tribe, to further explore Tribal concerns

10  and potential mitigation measures. *See generally* FEIS at S-85–107.

11      On April 17, 2025, Federal Defendants indicated they would publish a Notice of

12  Availability of the FEIS in the Federal Register no earlier than sixty days from that

13  date—June 16, 2025. Dkt. No. 59 (No. 21-122). The Forest Service published the Notice

14  of Availability of the FEIS in the Federal Register on June 20, 2025, 90 Fed. Reg. 26,287

15  (June 20, 2025), and made the FEIS available on the agency's website on June 16. *See*

16  Project Notice, *U.S. Dep't of Agric.*, https://www.resolutionmineeis.us/ (last visited July

17  25, 2025).

18      The FEIS consists of six volumes. It includes a nine-chapter, 1,000-page body and

19  twenty-one appendices, which together span more than 2,500 pages. FEIS at i-v. Over the

20  course of nearly 400 pages in Appendix R, the FEIS responds to the more than 29,000

21  comments the agency received on the Draft EIS. *See generally*, FEIS at R-1–394.

22      In conjunction with the FEIS, the Forest Service published the Draft ROD, which

23  addresses the discretionary decisions before the Forest Service related to the Resolution

24  Copper Project. Ex. 2, DROD at vi & n.1. The Final ROD will not be signed until after

25  the conclusion of the objection process, which must include a 45-day period to file

26  objections to which the agency must then prepare written responses. *See id.* at 48. This

27  process is unlikely to conclude before the end of 2025.

28      Under the Land Exchange Act, the Forest Service must now convey title to the

4

federal lands to Resolution Copper by August 19, 2025. 16 U.S.C. § 539p(c)(10).

### III.   **Procedural History**

These lawsuits were filed in January 2021 when the Forest Service first published the FEIS. Plaintiffs in both cases filed preliminary injunction motions seeking to stop the land exchange, which they withdrew after the Forest Service withdrew the FEIS. Both cases were then stayed until earlier this year, when the Forest Service provided the parties and the Court with sixty days' notice of publication of the FEIS. [2]

Following Federal Defendants' sixty-day notice, the parties briefed preliminary injunction motions, which the Court denied after issuing a tentative ruling and holding a hearing on June 6, 2025. The Court nevertheless entered an order enjoining the Government, with its agreement, from conveying title to the federal lands until August 19, 2025 (*i.e.*, the last day on which it can convey title under the Land Exchange Act) to allow for a second round of preliminary injunction briefing after publication of the FEIS. In accordance with the schedule set by the Court, Plaintiffs filed their amended complaints and renewed preliminary injunction motions on July 14, 2025.[3]

### LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right."

---

[2] A third case challenging the land exchange, *Apache Stronghold v. United States*, No. 21-cv-50-SPL (D. Ariz. filed Jan. 12, 2021), proceeded on a different path. The district court denied a preliminary injunction motion in February 2021. That decision was appealed to the Ninth Circuit and ultimately affirmed by an en banc panel, which held that Apache Stronghold's Religious Freedom Restoration Act and Free Exercise claims "fail." *Apache Stronghold v. United States*, 101 F.4th 1036, 1043-44 (9th Cir. 2024) (en banc) (per curiam). Apache Stronghold petitioned for a writ of certiorari, which was denied on May 27, 2025. *Apache Stronghold v. United States*, 145 S. Ct. 1480 (Mem) (2025). Apache Stronghold filed a petition for rehearing on June 23, 2025.

[3] A fourth case has been filed in the District of Columbia District Court. *See Lopez v. United States*, 1:25-cv-02408 (D.D.C. filed July 24, 2025). The *Lopez* plaintiffs moved for a preliminary injunction. Resolution Copper moved to intervene and to dismiss, and both the Government and Resolution Copper moved to transfer venue to the District of Arizona.

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a plaintiff must establish that (1) it is likely to prevail on the merits of its substantive claims, (2) it is likely to suffer imminent, irreparable harm absent an injunction, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest. *Id.* at 20, 22-23. Failure to demonstrate any one of the required elements precludes preliminary relief. *Id.* at 23-24. The Ninth Circuit has articulated an alternate formulation of the *Winter* test, where a court may find injunctive relief to be appropriate where plaintiffs can show "serious questions" going to the merits and that "the balance of hardships tips sharply" towards plaintiffs. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (citation omitted).[4] If the Court finds that Plaintiffs have not shown either likelihood of success or serious questions going to the merits, it can deny the motion without addressing the equitable factors. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013).

**ARGUMENT**

I.    **Plaintiffs Cannot Succeed on the Merits Because Their Claims Suffer from Numerous Fatal Threshold Deficiencies.**

Plaintiffs' claims fail on the merits for multiple, independent reasons. To start, this Court lacks jurisdiction over Plaintiffs' claims, because the Forest Service has not issued any final decision related to the Resolution Copper Project and Plaintiffs therefore have not challenged any final agency action under the APA. Even if the Court had jurisdiction, Plaintiffs lack standing to challenge the land exchange because it is congressionally mandated, and thus no amount of additional environmental analysis or consultation can redress their alleged injuries. Nor can Plaintiffs state a cognizable claim against the land exchange under the APA because the Forest Service's transfer of title is non-discretionary and therefore cannot be arbitrary and capricious or in excess of statutory authority. Further, by requiring title to transfer within sixty days of publication of the

---

[4] Federal Defendants preserve their argument that the Ninth Circuit's sliding scale approach is contrary to *Winter*.

FEIS, the text of the Land Exchange Act makes clear that Congress did not intend judicial review of the FEIS to serve as a roadblock to the land exchange. Finally, by requiring the Forest Service to "carry out the land exchange in accordance with the requirements of [NEPA,]" § 539p(c)(9)(A), Congress did not override the general rule that NEPA only applies to discretionary agency actions, not mandatory actions such as the transfer of title here.

### A. The Court Lacks Jurisdiction Over Plaintiffs' Claims Because Neither the FEIS nor the Draft ROD Is a Final Agency Action.

The Court lacks jurisdiction to hear Plaintiffs' challenges to the FEIS because neither the FEIS nor the Draft ROD is a final agency action under the APA. *Envt'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 867 (9th Cir. 2022) (noting APA's final agency action requirement is jurisdictional). NEPA, NHPA, and NFMA claims are all reviewed under the APA. *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1097 (9th Cir. 2005) (NEPA & NHPA); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (NFMA). The same is true of AMRC's appraisal claims brought under the Land Exchange Act.[5]

The APA authorizes judicial review only of "final agency action." 5 U.S.C. § 704. A final agency action must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78, (1997) (citation modified).[6] Both Plaintiffs contend that the FEIS is a final agency action for their NEPA claims, and the Tribe contends that it is also a final agency action for

---

[5] Because the Land Exchange Act lacks any express provision for judicial review, claims under it must proceed under the APA. *See Concerned Citizens & Retired Miners Coal. v. U.S. Forest Service*, 279 F. Supp. 3d 898, 943 (D. Ariz. 2017) ("[T]he Tribe has not shown that [the Land Exchange Act] provides a cause of action for it to challenge."); *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 796 (9th Cir. 2013) (where no private action exists, the APA provides an avenue for review).

[6] AMRC erroneously collapses these distinct prongs into one. Pls.' Mot. for a Prelim. Inj. ("AMRC Br.") 15 n.3, Dkt. No. 87 (No. 21-122).

1    purposes of the NHPA. But the FEIS at issue here, which was issued in conjunction with

2    a Draft ROD subject to administrative objections, does not meet the *Bennett* test.

3            To understand why, it is useful to begin with the purpose of NEPA. NEPA is a

4    procedural statute designed "to inform agency decisionmaking." *Seven Cnty.*, 145 S. Ct.

5    at 1507. The EIS therefore is a procedural tool that informs an agency's final decision; it

6    is not the decision itself. *Id.* at 1514 ("[C]ourts . . . must keep in mind that review of an

7    agency's EIS is not the same thing as review of the agency's final decision concerning

8    the project."); *id.* at 1511 ("Because an EIS is only one input into an agency's decision

9    and does not itself require any particular substantive outcome, the adequacy of an EIS is

10   relevant only to the question of whether an agency's final decision . . . was reasonably

11   explained.").

12           That does not mean that an EIS (or other final NEPA document) is unreviewable.

13   Instead, the APA provides that "preliminary, *procedural*, or intermediate agency action

14   or ruling not directly reviewable is subject to review on the review of the final agency

15   action."[7] 5 U.S.C. § 704 (emphasis added). Thus, an EIS typically is reviewable once an

16   agency makes the final decision the NEPA review was intended to inform. *See, e.g.*, *Or.*

17   *Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1118 (9th Cir. 2010) ("Once

18   an EIS's analysis has been solidified in a ROD, an agency has taken final agency action,

19   reviewable under § 706(2)(A).").

20           Here, the FEIS was published in conjunction with the Draft ROD. As the Draft

21   ROD explains, "[t]he FEIS includes analysis of both the Resolution Copper Mine project,

22   and the congressionally mandated land exchange," but the "Draft ROD addresses

23   decisions only related to the Resolution Copper Mine project." DROD at vi n.1. That is

24   because the Forest Service has "no discretion or decision to be made with respect to the

---

[7] Section 704 of the APA disproves the Tribe's claim that there is no "statutory basis" for the proposition that NEPA challenges must be brought in connection with a "subsequent action." Dkt. No. 105 ("Tribe Br.") at 14. *Seven County* further confirms this, explaining that "the adequacy of an EIS is relevant only to the question of whether an agency's final decision [in that case, a railroad approval] was reasonably explained." 145 S. Ct. at 1511.

1    land exchange." *Id.* The Draft ROD, for its part, is subject to a 45-day "predecisional
2    objection process." *Id.* at vi. Before issuing a Final ROD, the Forest Service must first
3    consider and provide written responses to objections. 36 C.F.R. pt 218 (2025).

4         Under these circumstances, neither the FEIS nor the Draft ROD satisfies the
5    APA's final agency action requirement. The FEIS provides analysis to inform the Forest
6    Service's discretionary decisions; it is not itself a decision document. The text of the Act
7    further confirms this, requiring that the FEIS "be used *as the basis for all decisions* under
8    Federal law related to the proposed mine and the Resolution mine plan of operations." 16
9    U.S.C. § 539p(c)(9)(B) (emphasis added). Likewise, the Draft ROD is what its name
10   suggests: a pre-decisional draft of a decision that is not yet finalized.

11        Thus, both the FEIS and the Draft ROD fail the first prong of the *Bennett* test. To
12   begin, the FEIS's analysis of the land exchange cannot be a final agency action because
13   the agency is not "deciding" to transfer title to the federal lands to Resolution Copper and
14   therefore the FEIS is not the "consummation" of any agency decision-making process.
15   The agency cannot "decide" to transfer title; it is statutorily obligated to do so.

16        As to the discretionary decisions that are before the Forest Service, neither the
17   FEIS nor the Draft ROD represent the consummation of that process. The Forest
18   Service's decision-making process is ongoing and will not be complete until the Final
19   ROD is signed. Any contrary interpretation would render the entire objection process
20   meaningless. For similar reasons, both the FEIS and the ROD also fail the second prong
21   of the *Bennett* test, because legal consequences will not flow until there is a Final ROD.
22   When the Forest Service publishes the Final ROD covering the Forest Service's final
23   decisions about uses of National Forest System lands over which the Forest Service has
24   discretion, the FEIS's analysis will be "solidified," *Or. Nat. Desert Ass'n*, 625 F.3d at
25   1118, and Plaintiffs may bring NEPA challenges to those final agency actions. And any
26   such litigation can be adjudicated in the normal course.

27        The cases cited by the Tribe do not counsel a different result. Tribe Br. 11–12. No
28   case cited by the Tribe held that an EIS like the one here—which was issued in

conjunction with a draft decision document—constituted an independent final agency action separate from the final agency decision. The *Environmental Defense Center* case involved a programmatic EA, which analyzed the environmental effects of well stimulation treatments across forty-three leases and almost two-dozen operating platforms in the Pacific Outer Continental Shelf. 36 F.4th at 866. The Ninth Circuit considered whether the agency's finding of no significant impact in that programmatic EA "constitute[d] agency authorization of that proposed action, even if the agency will have to approve subsequent, individual permits before that action can occur." *Id.* at 864. The Ninth Circuit found that it did, because the finding of no significant impact reflects the agency's determination that future environmental review under the Coastal Zone Management Act is not warranted for well stimulation treatments and that determination would not be revisited. *Id.* at 868–69. The agency had also already issued fifty-one permits authorizing well stimulation treatment activities without environmental review. *Id.* at 869. The agency's finding of no significant impact meant those "already-approved permits [would not] be revisited" and the permitting process for well stimulation treatments—previously under a settlement moratorium—could proceed. *Id.* Plaintiffs were thus able to meet both prongs of the *Bennett* test. *Id.* at 868–70.

To be sure, *Environmental Defense Center* stated broadly that "[f]inal NEPA documents constitute 'final agency action' under the APA[.]"[8] *Id.* at 868. But it would be a mistake to interpret that statement as a categorical holding that every EIS on its own is

---

[8] Each of the four cases that *Environmental Defense Center* relied on for the proposition that the Ninth Circuit has "repeatedly held that final NEPA documents are final agency actions" are also distinguishable from the FEIS here, as all involved a final decision separate from the NEPA analysis. In both *Rattlesnake Coalition v. U.S. EPA* and *Friedman Brothers Investment Co. v. Lewis*, the courts found the agencies' final funding approval to be final agency action. *Rattlesnake*, 509 F.3d 1095, 1104 (9th Cir. 2007); *Friedman*, 676 F.2d 1317, 1318 (9th Cir. 1982). In *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Department of Interior*, the agency had issued both a finding of no significant impact and a "decision record." 608 F.3d 592, 598 (9th Cir. 2010). And in *Hall v. Norton*, the agency had similarly issued a "Decision Record" approving a land exchange. 266 F.3d 969, 973 (9th Cir. 2001).

a final agency action. *Environmental Defense Center* must be read in concert with *Seven County's* reaffirmation that NEPA is "purely procedural" and therefore "an agency's EIS is not the same thing as review of the agency's final decision concerning the project." 145 S. Ct. at 1514. And the Ninth Circuit acknowledged in *Environmental Defense Center* that the test for final agency action under the APA is fact-specific, and "it is 'the effect of the action and not its label that must be considered.'" 36 F.4th at 868 (quoting *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 985 (9th Cir. 2006)). Thus, this Court should not read the holding in *Environmental Defense Center* to extend to circumstances far different than those before the Ninth Circuit in that case.

The facts surrounding the FEIS here are readily distinguishable from *Environmental Defense Center*. Unlike that case, where the agency's determination of no significant impact in the programmatic EA dictated the path forward for both existing and future permits involving well stimulation treatments, the FEIS here was issued in conjunction with a separate Draft ROD that makes it plain that the agency's decision-making is not complete. Also, while the agency decision at issue in *Environmental Defense Center*—the finding of no significant impact—was itself contained in the EA, Plaintiffs here are challenging an action outside the EIS. The facts here are more analogous to those in *Seven County*, where the EIS was "only one input" into the challenged agency decision to approve the railroad. *Seven Cnty.*, 145 S. Ct. at 1511. For this reason, "the adequacy of an EIS is relevant only to the question of whether an agency's final decision . . . was reasonably explained." *Id.*

In arguing for a contrary result, the Tribe relies heavily on *Oregon Natural Desert Ass'n*, 625 F.3d at 1118. Tribe Br. 11-12. But the Tribe misrepresents the holding in that case. It cherry-picks a single parenthetical from a string cite opining that the Supreme Court had (at the time) "strongly signaled" that "an environmental impact statement is a 'final agency action.'" *Id.* at 11 (citation omitted). But that parenthetical was summarizing a decision of the Eighth Circuit; it was not (as the Tribe contends) a holding of the Ninth Circuit that binds this Court. *Id.* at 11-12 (citing *Or. Nat. Desert Ass'n*, 625

1   F.3d at 1118, quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 815 (8th

2   Cir. 2006)).[9] In fact, the sentence in *Oregon Natural Desert Ass'n* that preceded the string

3   cite states: "Once an EIS's analysis has been solidified in a ROD, an agency has taken

4   final agency action, reviewable under § 706(2)(A)." 625 F.3d at 1118. Thus, *Oregon*

5   *Natural Desert Ass'n* directly contradicts the Tribe's assertion that the FEIS is a final

6   agency action subject to review *before* it has been "solidified" in a final ROD. On the

7   contrary, it confirms that the Forest Service has not yet taken a reviewable final agency

8   action under the APA and NEPA.

9        The same is true of the Tribe's claims under the NHPA. The Draft ROD discusses

10  the measures the Forest Service developed as part of its consultation with affected tribes

11  under the Land Exchange Act and the NHPA. DROD Section 7.1 at 37–42. It

12  acknowledges Tribal opposition to the Resolution Copper Project, explains the Forest

13  Service's efforts to consult with affected tribes and as required by the Act, to "consult

14  with Resolution Copper [to] seek to find mutually acceptable measures to address the

15  concerns of the affected Indian tribes," 16 U.S.C. § 539p(c)(3)(B), and "incorporate"

16  those measures into the draft decision. *Id.* at 42. The draft decision is now subject to the

17  objection period, and only once the decisions are finalized and a final ROD is executed

18  will the Forest Service have taken a final agency action subject to review under the APA.

19  *Apache Survival Coal. v. United States*, 21 F.3d 895, 898-900, 907 (9th Cir. 1994)

20  (issuance of permit was "the relevant agency action" for NHPA claim); *Wishtoyo Found.*

21  *v. U.S. Fish & Wildlife Serv.*, 2019 WL 6998665, at *4-5 (C.D. Cal. Oct. 16, 2019) (final

22  agency action under NHPA "did not occur until" agency approved the ROD because

23

24  _____

25  [9] The Eighth Circuit's statement in *Sierra Club* was based on the Supreme Court's
    decision in *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998). But in *Ohio*

26  *Forestry*, the Forest Service had not just completed an EIS; it had also made its final
    decision to approve a management plan for the Wayne National Forest. 523 U.S. at 729,

27  731. Thus, even setting aside *Seven County*'s subsequent clarification of the role and
    nature of an EIS, *Ohio Forestry* does not support Plaintiffs' argument that the FEIS here

28  is a final agency action.

NHP consultation process "was an intermediate procedural step that occurred prior to the ultimate approval of the Record of Decision and the issuance of the [permit]").

The Tribe's reliance on *Tohono O'odham Nation v. U.S. Dep't of Interior*, 138 F.4th 1189 (9th Cir. 2025), is also misplaced. Tribe Br. 13–14. In *Tohono*, the Ninth Circuit found two limited notices to proceed issued by the agency to be final agency actions for purposes of the NHPA. 138 F.4th at 1201–02. But those limited notices to proceed are not analogous to the FEIS and Draft ROD here. The limited notices to proceed "expressly" authorized construction to commence. *See id.* Here, the FEIS describes and analyzes the consultation that occurred, and the Draft ROD identifies the decisions that the Forest Service will make—*but has not yet made*—with respect to mitigation measures. Thus, neither document is a final agency action with respect to the NHPA.

**B. Plaintiffs Lack Standing to Challenge the Land Exchange Under NEPA and the NHPA Because the Forest Service Must Transfer Title.**

Plaintiffs' NEPA and NHPA claims also fail for want of standing because the injury that Plaintiffs trace to the land exchange is not redressable; the Forest Service has a non-discretionary obligation to transfer title.

To have standing under Article III, a plaintiff must have (1) a concrete and particularized injury that is (2) caused by the challenged conduct and (3) likely redressable by a favorable judicial decision. *Jewel v. NSA*, 673 F.3d 902, 908 (9th Cir. 2011). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

To satisfy the redressability prong of the standing inquiry, plaintiffs must show that the relief they seek is both (1) substantially likely to redress their injuries; and (2) within the district court's power to award. *Id*. Redress need not be guaranteed, but it must be more than "merely speculative." *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (quoting *Lujan*, 504 U.S. at 561). Where, as here, a plaintiff asserts a procedural injury under NEPA or the NHPA, the Ninth Circuit applies a "relaxed" redressability

13

1    requirement. *WildEarth Guardians v. USDA*, 795 F.3d 1148, 1154 (9th Cir. 2015)

2    (citation omitted). But relaxed does not mean toothless. *Salmon Spawning & Recovery*

3    *All. v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008). While Plaintiffs "need not show

4    that further [NEPA] analysis by the government *would* result in a different conclusion[,]"

5    they must still show that the Forest Service "*could* be influenced by the environmental

6    considerations that [the statute] requires an agency to study." *Hall*, 266 F.3d at 977

7    (emphasis added). In other words, redressability in a NEPA case derives from the

8    possibility "that the relief requested—that the agency follow the correct procedures—

9    may influence the agency's ultimate decision of whether to take or refrain from taking a

10   certain action." *Nat'l Fam. Farm Coal. v. U.S. EPA*, 966 F.3d 893, 910 (9th Cir. 2010)

11   (quoting *Salmon Spawning*, 545 F.3d at 1226–27). There must be "some possibility that

12   the requested relief [would] prompt the injury-causing party to reconsider the decision

13   that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 517-18, 525-26

14   (2007) (citing *Lujan*, 504 U.S. at 572 n.7).

15          Plaintiffs here cannot meet even this relaxed redressability standard because there

16   is no chance that additional environmental review could prompt the Forest Service to

17   decide not to complete the land exchange to which Plaintiffs trace their injury. The

18   decision to transfer Oak Flat to Resolution Copper was made by Congress, and the Forest

19   Service does not have discretion to take another course. The Land Exchange Act provides

20   that "the Secretary is authorized and *directed* to convey to Resolution Copper, all right,

21   title, and interest of the United States in and to the Federal land." 16 U.S.C. § 539p(c)(1)

22   (emphasis added); *see also id.* § 539p(a) ("The purpose of this section is to authorize,

23   direct, facilitate, and expedite the exchange of land between Resolution Copper and the

24   United States."). Once the FEIS has been published, the United States "shall" transfer

25   title to Resolution Copper within sixty days. *Id.* § 539p(c)(10). Because the Forest

26   Service lacks discretion over the land exchange, the injury caused by the land exchange is

27   not redressable by an order requiring additional NEPA analysis or NHPA consultation,

28   and Plaintiffs thus lack standing to pursue those claims. The District Court acknowledged

14

1    this in the related *Apache Stronghold* case when it recognized that the plaintiff "likely

2    lack[ed] standing to contest the publication of the FEIS." 519 F. Supp. 3d 591, 609 (D.

3    Ariz. 2021); *see also* 16 U.S.C. § 539p(c)(9)(B).

4        The Ninth Circuit's decision in *Salmon Spawning* is illustrative. There, plaintiffs

5    alleged that federal agencies failed to follow proper procedures in consulting under the

6    ESA and sought to invalidate a Biological Opinion for a fishing treaty between the

7    United States and Canada. 545 F.3d at 1226–27. The Ninth Circuit held that plaintiffs did

8    not meet the redressability element of standing because the court could not "undo the

9    Treaty[,]" and setting aside the Biological Opinion would not "remedy the harm

10    asserted." *Id*. at 1227. The court reached the same conclusion regarding a claim that the

11    continued implementation of the Treaty was unlawful. *Id*. at 1228-29.

12        Like *Salmon Spawning*, any decision by this Court that the FEIS is inadequate

13    would not remedy the harms alleged by Plaintiffs from the privatization of the federal

14    lands and their eventual mining because, even if the Forest Service is required to conduct

15    additional analysis, it cannot refuse to transfer the federal lands to Resolution Copper *C.f.*

16    *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1178-79 (9th Cir. 2000)

17    (procedural injury redressable where the federal agency had discretion to disapprove or

18    alter land exchange after a proper valuation); *Seven Cnty.*, 145 S. Ct. at 1514 (vacatur

19    may be inappropriate "absent reason to believe that the agency might disapprove the

20    project if it added more to the EIS."); *see infra* Section IV.

21        AMRC misreads the Act when they argue that "Congress conditioned the

22    Exchange on the Forest Service's compliance with NEPA for both the review and

23    *approval* of the Exchange, as well as for the Mine." AMRC Br. 15 (emphasis added).

24    But Congress has not left the Forest Service room to "approve" or disapprove or choose

25    alternatives to the land exchange. Instead, Congress itself "authorize[d], direct[ed],

26    facilitate[d], and expedite[d] the exchange." 16 U.S.C. § 539p(a); *accord id.* §

27    539p(c)(10). The word "approve" appears only once in the statute, in the context of the

28    Secretary's power to approve the final appraised value for the federal and non-federal

1    parcels. *Id.* § 539p(c)(4)(B)(ii). The Forest Service lacks discretion over whether to
2    transfer title, and a judicial order compelling additional NEPA analysis or NHPA
3    consultation cannot alter that fact.

4        The Tribe contends that its injuries are redressable because enjoining the land
5    exchange would "preserve the *status quo* during which time the Tribe and its members
6    may continue to access the entirety of Oak Flat for important religious and cultural
7    purposes." Tribe Br. 17. That argument conflates the redressability prong of the standing
8    analysis with Plaintiffs' arguments concerning irreparable harm. For purposes of the
9    present motions, Plaintiffs' standing to challenge the land exchange goes to their
10   likelihood of success on the merits, not to the irreparable harm prong of the *Winter* test.
11   Plaintiffs cannot show that they are likely to succeed in establishing their standing to
12   challenge the land exchange on the merits by contending that a preliminary injunction
13   would postpone some unavoidable future irreparable harm.

14       A temporary injunction of the land exchange would only delay the inevitable.
15   Because Congress compelled the Forest Service to transfer Oak Flat to Resolution
16   Copper, any injuries to Plaintiffs that result from that transfer are ultimately unavoidable.
17   The Tribe admits as much, observing that even the ultimate relief it seeks—vacatur of the
18   FEIS—"would mean that Federal Defendants lack authority under SALECA to convey
19   Oak Flat to Resolution, preventing its destruction *for the time being*." *Id.* at 17–18
20   (emphasis added). Enjoining the land exchange now might postpone Plaintiffs' alleged
21   injuries, but it would not redress them.

22       The Tribe also contends that an injunction could redress the Tribe's NHPA and
23   NEPA injuries by providing the Tribe "an opportunity for further consultation" and "the
24   opportunity to comment on and receive responses" on any new EIS. *Id.* at 17. Those
25   alleged procedural injuries alone cannot satisfy Article III. *Summers v. Earth Island Inst.*,
26   555 U.S. 488, 496-97 (2009) ("[D]eprivation of a procedural right without some concrete
27   interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to
28   create Article III standing."); *see also Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391,

16

1    1400 (9th Cir. 1992) ("Merely establishing a procedural violation of NEPA does not

2    compel the issuance of a preliminary injunction."). Plaintiffs must also show that the

3    alleged procedural injuries harmed their concrete interests and that those harms could be

4    redressed by the court. But additional NEPA review cannot address the concrete harms

5    Plaintiffs allege the land exchange will cause. Plaintiffs do not meet the redressability

6    requirements of Article III standing.

7        **C.  The Land Exchange Is Not a Reviewable Action Under the APA.**

8        APA claims under 5 U.S.C. § 706(2) allow a court to set aside agency action,

9    findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or

10   otherwise not in accordance with law." As that standard of review makes clear, a

11   challenge under § 706(2) allows a court to "judge the agency's exercise of discretion."

12   *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *Motor Vehicle Mfrs. Ass'n of U.S.*, *Inc. v.*

13   *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (central question in an APA

14   challenge is whether the agency's decision was "the product of reasoned

15   decisionmaking."). Where, as here, "the government does not have discretion or

16   decisionmaking power, the APA is not the appropriate vehicle for review." *Defend*

17   *Arlington v. U.S. Dep't of Def.*, 2023 WL 8600567, at *12 (D.D.C. Dec. 12, 2023)

18   (dismissing plaintiffs' claims against the Department of Defense because the agency was

19   merely implementing Congress's directive); *see Rancho Vista del Mar v. United States*,

20   640 F. Supp. 3d 112, 122 (D.D.C. 2022) (where agency "followed an unambiguous

21   statutory . . . command . . ., its actions cannot be considered arbitrary or capricious").

22       Congress required the Forest Service to carry out the land exchange. 16 U.S.C. §

23   539p(c)(10). Because the Forest Service lacks discretion with respect to that statutory

24   mandate and is complying with it, Plaintiffs cannot state a cognizable APA challenge to

25   the land exchange.

26       AMRC urges the Court to find that the Forest Service retained some discretion

27   over the land exchange, pointing to the FEIS's recitation of decisions before the Forest

28   Service. AMRC Br. 16 (citing FEIS ES-9). But the land exchange itself is not among the

1   FEIS's list of discretionary actions. *Id.* Nor could it be, as Congress directed the Forest
2   Service to consummate the exchange within sixty days of publishing the FEIS. 16 U.S.C.
3   § 539p(c)(10). AMRC identifies no basis on which the Forest Service's decision to
4   convey title to Oak Flat could be deemed arbitrary or capricious.

5        For its part, the Tribe now disclaims any APA challenge to the land exchange
6   itself. Tribe Br. 14 ("[It] "does not challenge the decision to convey Oak Flat as arbitrary
7   and capricious."). Instead, the Tribe claims it challenges only "the Forest Service's
8   decision to publish the 2025 FEIS, as well as the decisions in it." *Id.* But the Forest
9   Service's *publication* of the FEIS is also compelled by statute. 16 U.S.C. § 539p(c)(9)(B)
10  ("Prior to conveying Federal land under this section, the Secretary shall prepare a single
11  environmental impact statement . . . ."). And as for the decisions over which the Forest
12  Service does have discretion, those decisions will not be finalized until the Forest Service
13  executes the final ROD and therefore cannot be used as a basis to prevent the
14  congressionally mandated land exchange. *See* DROD at 8 (effective date of Forest Plan
15  Amendment), 48-49 (implementation timeline), 38 (implementation of former
16  programmatic agreement measures).

**D.  The Land Exchange Act Compels the Transfer of Title Irrespective of any Legal Challenge to the FEIS.**

Even if the Court finds the FEIS to be a final agency action, the text of the Land
Exchange Act makes clear that Congress never intended judicial review of the FEIS to
serve as a substantive roadblock to the transfer of title. While Congress required the
preparation of an EIS, 16 U.S.C. § 539p(c)(9), the exchange is not contingent on that
analysis. Rather, as the statute makes plain, the FEIS serves:

> as the basis for all decisions under Federal law related to the proposed mine
> and the Resolution mine plan of operations and any related major Federal
> actions significantly affecting the quality of the human environment,
> including the granting of any permits, rights-of-way, or approvals for the
> construction of associated power, water, transportation, processing, tailings,
> waste disposal or other ancillary facilities.

*Id.* § 539p(c)(9)(B).

18

1      The FEIS therefore serves "as the basis" for possible federal decisions "related to
2  the proposed mine and the Resolution mine plan of operations and any related major
3  Federal actions significantly affecting the quality of the human environment," including
4  those specifically enumerated in subpart (B). *Id.* But the land exchange is not among
5  those decisions. And in the Act's following subsection, Congress cabined the agencies'
6  ability to conduct additional review of the land exchange, providing that the agency could
7  "us[e] separate environmental review documents prepared in accordance with [NEPA] or
8  other applicable laws" so long as those reviews did not involve "the land exchange" or
9  "the extraction of minerals in commercial quantities by Resolution Copper on or under
10 the Federal land." *Id.* § 539p(c)(9)(D). In other words, Congress mandated an
11 environmental review for the express purpose of guiding future and ancillary agency
12 decisions where the Forest Service enjoys discretion—*e.g.*, authorizing rights of way and
13 permits for mining-related infrastructure on federal land—not to obviate or constrain the
14 Forest Service's obligation to carry out the exchange itself. That is plain from the text
15 itself, which does not include the land exchange among the list of items for which the
16 environmental review should serve as a basis. *E.g.*, *GE Energy Power Conversion France*
17 *SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 440 (2020) ("[I]n general,
18 'a matter not covered is to be treated as not covered.'" (quoting Antonin Scalia & Brian
19 Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012))). *See also Romag*
20 *Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215 (2020) ("Nor does this Court usually
21 read into statutes words that aren't there.").

22      Congress went even further. Along with omitting the land exchange from the
23 descriptive list in subsection (c)(9)(B), Congress expressly imposed a time limitation on
24 title transfer: it must proceed within sixty days after the Forest Service publishes the
25 FEIS. 16 U.S.C. § 539p(c)(10). The practical effect of that statutory deadline is that title
26 will necessarily be transferred before any judicial challenge to the FEIS could be
27 resolved, or for that matter, before any Final ROD could issue. Congress would have
28 understood this when it enacted the Land Exchange Act. *Bond v. United States*, 572 U.S.

844, 857 (2014) ("Part of a fair reading of statutory text is recognizing that Congress legislates against the backdrop of certain unexpressed presumptions.") (citation modified)). Aware that NEPA challenges are not resolved in a mere sixty days, Congress sought to ensure that the land exchange proceeded expeditiously. Read together, subsections (c)(9) and (c)(10) evince Congress' intent to expedite the land exchange and to prevent an endless series of environmental reviews—and attendant judicial reviews— from frustrating that intent.

Plaintiffs offer no persuasive contrary reading of the statute. Neither makes any attempt to grapple with the statute's express sixty-day deadline for title transfer. In fact, Plaintiffs never mention subsection (c)(10) at all. They focus instead solely on the statute's statements that "the Secretary shall carry out the land exchange in accordance with the requirements of [NEPA]," 16 U.S.C. § 539p(c)(9)(A), and that, "[p]rior to conveying Federal land under this Section, the Secretary shall prepare a single environmental impact statement," *id.* § 539p(c)(9)(B). But those provisions of the statute must be read in concert with the one that immediately follows, and that provision requires title to transfer in sixty days. *Id.* § 539p(c)(10); *see also Jones v. Hendrix*, 599 U.S. 465, 478 (2023) ("Basic principles of statutory interpretation require that we construe the [two provisions] in harmony, not set them at cross-purposes."); *Territory of Guam v. United States*, 593 U.S. 310, 316 (2021) ("[S]tatutes must 'be read as a whole' . . . " (quoting *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 135 (2007)).

Both Plaintiffs contend that the statute requires the Forest Service to prepare "a legally compliant" FEIS before conveying title. Tribe Br. 18; *see also* AMRC Br. 15 ("Congress conditioned the Exchange on the Forest Service's compliance with NEPA."). Of course, the FEIS here complies with NEPA and the specific requirements of the Land Exchange Act. But what Plaintiffs really mean is that Congress conditioned the land exchange on a final judicial finding that the FEIS is sufficient. If that were so, then the land exchange would inevitably be delayed pending the entirety of district court proceedings and any appeal, so long as any party sued over the FEIS. That reading would

render subsection (c)(10) altogether meaningless, because there would be no realistic scenario in which the land exchange could proceed within sixty days of publication of the FEIS. Such an interpretation would violate well settled principles of statutory interpretation that require this Court to "aim to 'giv[e] effect to every clause and word of a statute.'" *Polselli v. IRS*, 598 U.S. 432, 441 (2023) (alteration in original) (quoting *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 106 (2011)); *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698-99 (2022) ("[W]e must normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant.'" (citation omitted)).

AMRC argues that a court-tested, NEPA-compliant FEIS is a condition precedent to title transfer, because the Forest Service commented on the draft law that the statute should require the preparation of an environmental analysis before title is transferred. AMRC Br. 17. But AMRC cites no case law for the unique proposition that an agency's comment on a draft law can evince *Congressional* intent.  And it would be a mistake to read too much into the agency's prepared statement, which reflects a fundamental misunderstanding of the Forest Service's duties under the Act — that the Forest Service "would use the environmental analysis to make a decision on *whether* and how to proceed with the exchange and what mitigation conditions would be required to mitigate the identified impacts." AMRC Br. Ex. 14 at 59–60 (emphasis added), Dkt. No. 87-14. In any event, it makes sense that the Act requires the EIS to be published *before* the exchange and that the Forest Service, which regularly prepares NEPA documents, would support that sequence of events. NEPA is meant to inform the public of the impacts of proposed or *prospective* agency action and its alternatives and is not retroactive. *See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

The best reading of the statute, which takes into account the statute as a whole including both subsections (c)(9) and (c)(10), is that Congress required the Forest Service to publish its FEIS before consummating the land exchange, while expressly seeking to ensure that the land exchange itself would not be delayed by, or be contingent upon,

1    judicial review of the FEIS and all the attendant agency decisions it informed.

2        **E.  Even if Plaintiffs Clear the Hurdles under the APA and Article III, NEPA**
         **Does Not Apply to the Non-Discretionary Transfer of Title.**

3
         The Land Exchange Act directs the Forest Service to "carry out the land exchange
4
     in accordance with the requirements of [NEPA]." 16 U.S.C. § 539p(c)(9)(A). In
5
     interpreting that directive, this Court should look at what NEPA requires. And NEPA
6
     does not apply in the absence of agency discretion. *Dep't of Transp. v. Pub. Citizen*, 541
7
     U.S. 752, 769 (2004) ("NEPA's 'rule of reason' [does not] require an agency to prepare a
8
     full EIS due to the environmental impact of an action it could not refuse to perform.");
9
     *Sierra Club v. Babbitt*, 65 F.3d 1502, 1512–13 (9th Cir. 1995) (NEPA did not apply
10
     where BLM lacked authority to modify the road project); *Citizens Against Rails-to-Trails*
11
     *v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001) ("The touchstone of
12
     whether NEPA applies is discretion."). The 2023 amendments to NEPA codified this rule
13
     by exempting "activities or decisions that are non-discretionary" from NEPA's definition
14
     of a "major federal action." 42 U.S.C. § 4336e(10)(B)(vii).
15
         The mandatory transfer of title is not a major federal action subject to NEPA. To
16
     be sure, the Land Exchange Act requires in a separate paragraph that the EIS "assess the
17
     effects of the mining and related activities," 16 U.S.C. § 539p(c)(9)(C), but Congress's
18
     directive that the Forest Service disclose the environmental effects of the project
19
     holistically—rather than only analyze those discrete actions over which the agency has
20
     discretion—does not turn the non-discretionary act of transferring of title into a major
21
     federal action under NEPA. Congress may impose content requirements for the FEIS on
22
     the Forest Service without transforming an alleged failure to meet that content
23
     requirement into a cognizable NEPA claim against the transfer of title. Indeed, the
24
     statutory text supports that interpretation. *See supra*, Section I.D.
25
         AMRC points to two cases involving judicial review of land transfers as evidence
26
     that this Court may review the land exchange at issue here. AMRC Br. 15–16. But neither
27
     case is binding on this Court and both cases are distinguishable. In *RESTORE: The North*
28

22

1    *Woods v. U.S. Department of Agriculture*, the court found that the statute at issue had

2    "limited, but not eliminated, the Secretary's discretion" because the transfer was

3    contingent on whether the lands to be conveyed to the United States were "'acceptable' to

4    the Secretary," and authorized the Secretary to impose terms and conditions on the

5    conveyance. 968 F. Supp. 168, 173–74 (D. Vt. 1997). Likewise, in *Western Land*

6    *Exchange Project v. U.S. Bureau of Land Management*, 315 F. Supp. 2d 1068, 1099 (D.

7    Nev. 2004), the court found NEPA applied to BLM's disposal of lands under the Lincoln

8    County Land Act of 2000. The statute at issue there afforded the agency greater

9    discretion; while the law delineated the specific federal land to be disposed of, it left to

10   the agency the determination of which "environmentally sensitive land" to acquire.

11   Lincoln County Land Act of 2000, Pub. L. No. 106–298, 114 Stat. 1046, 1046.[10]  AMRC

12   has identified no similar grant of discretionary authority here.

13      **II.     Setting Aside Threshold Deficiencies, Plaintiffs' Claims Fail on the Merits**

14           On their substance, both Plaintiffs' NEPA claims also fail. The Court must defer

15   to the Forest Service's judgment as to the scope and contents of the FEIS so long as the

16   agency's choices were reasonable. The FEIS easily clears that hurdle.

17           AMRC's appraisal claims fail for lack of standing as well as on the merits,

18   because the Forest Service reasonably accounted for Resolution Copper's property rights

19   in the locatable minerals on the MCZ parcel by excluding their value from the appraisal

20   of the United States' estate. AMRC's NFMA claim lacks merit because the Forest

21   Service is providing public notice of the proposed Forest Plan amendments in accordance

22

23   _____

     [10] The court's standing analysis in that case is also flawed, finding plaintiffs satisfied both

24   causation and redressability in a single short paragraph even though plaintiffs "[did] not

25   seek any remedy that would require BLM to withhold the lands from disposal. They seek
     only compliance with NEPA, as contemplated by LCLA itself." *W. Land Exch. Project*,

26   315 F. Supp. 2d at 1080, 1082. As addressed above, this is not enough—there must be a
     *possibility* that the agency would alter its course in a way that could alleviate plaintiffs'

27   injury. Having affirmed that plaintiffs' only claim is the violation of a purely procedural
     right, the court should never have reached the merits. *Id.* at 1082 ("They seek only

28   compliance with NEPA . . . .").

1    with its regulations contemporaneous with the ongoing objection process and the

2    amendments are not final until the Forest Service executes the Final ROD at the end of

3    that process.

4           Finally, the Tribe's NHPA and consultation claims lack merit because the Forest

5    Service engaged in extensive consultation with tribes that met all legal requirements.

6    **A.  The FEIS Complies with NEPA.**

7           NEPA is a "procedural cross-check." *Seven Cnty.*, 145 S. Ct. at 1507. It "does not

8    mandate particular results but simply prescribes the necessary process" by which

9    agencies must consider the environmental impacts of their actions. *Robertson v. Methow*

10   *Valley Citizens Council*, 490 U.S. 332, 350 (1989). "The bedrock principle of judicial

11   review in NEPA cases can be stated in a word: Deference." *Seven Cnty.*, 145 S. Ct. at

12   1515. As the Supreme Court "doubly underscore[d]," a "rule of reason" applies in NEPA

13   cases to the agency's decisions about the scope and contents of the EIS. *Id.* at 1513. And

14   "agencies are not required to analyze the effects of projects over which they do not

15   exercise regulatory authority." *Id.* at 1516. "[T]he role of a court in reviewing the

16   sufficiency of an agency's consideration of environmental factors is a limited one . . . ."

17   *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555

18   (1978). Plaintiffs' NEPA claims must be reviewed against the backdrop of these

19   principles of deference.

20   **1.  AMRC's NEPA claims lack merit.**

21          AMRC makes five main NEPA arguments for why the FEIS violates what AMRC

22   concedes is a "'reasonableness test'." AMRC Br. 18. Each argument fails.[11]

23   _____

24   [11] AMRC sprinkles in references to the Federal Land Policy and Management Act
     ("FLPMA") along with its NEPA arguments, AMRC Br. 17, 19–21, 25–27, but any

25   FLPMA claim is not ripe until the Forest Service issues the special use permits that may
     be governed by FLPMA's provisions. In any event, AMRC's FLPMA arguments

26   targeting the Forest Service's analysis of alternatives (*id.* at 19–20), pipelines and

27   pumping impacts (*id.* at 20–21), and mitigation measures (*id.* at 25-27) would fail for the
     same reasons their NEPA claims do—the Forest Service adequately analyzed these

28   impacts in Chapters 3 and 4 of the FEIS. *See infra*, pp. 25-29.

1    *First*, AMRC challenges the FEIS's purpose and need statement and "no action"

2    alternative. AMRC Br. 18–20. The purpose and need for the project was based on the

3    Act, which not only directed the preparation of an EIS but dictated its scope — that it

4    analyze the effects from "the proposed mine and the Resolution mine plan of operations."

5    16 U.S.C. § 539p 9(c)(9)(B). It was therefore reasonable for the Forest Service to use the

6    mine plan of operations submitted by Resolution Copper as a basis for analyzing the

7    environmental effects for the proposed mine. AMRC also takes issue with the "no action"

8    alternative, which assumes the land exchange does not take place and Resolution's mine

9    plan of operations is not approved. FEIS at 91-92. Instead, AMRC argues the no-action

10    alternative should have assumed the land exchange occurs, but Resolution Copper's mine

11    plan is denied. AMRC Br. 19. While the Forest Service considered this permutation,

12    FEIS at 92, ultimately it did not include it because that scenario could not realistically

13    occur. *Id.* Once the land exchange occurs, Resolution Copper does not need Forest

14    Service approval of the mine plan of operations to mine on what would then be private

15    land. Indeed, the Forest Service has not approved the mine plan of operations and need

16    not ever do so, because none of the mining activities are slated to occur on National

17    Forest System Lands. Instead, through the Final ROD, the Forest Service will authorize

18    mine-related activities on adjacent federal land either under its mineral regulations (36

19    C.F.R. §§ 228.1–15) or its special use regulations (36 C.F.R. §§ 251.50–65) (or some

20    combination thereof), both of which were addressed in the FEIS. *See* FEIS at 20–21. In

21    sum, the agency's "view of its authority over the Project," AMRC Br. 19, is correct.

22    *Second*, AMRC argues that the agency failed to properly analyze the project's

23    direct and indirect effects on the planned Desert Wellfield and consider "reasonably

24    foreseeable activities that, along with immense pumping from the Desert Wellfield, will

25    cumulatively and significantly impact available water in the East Salt River Valley."

26    AMRC Br. 20–22. As a primary matter, it is simply not true that the pumping impacts

27    associated with the Desert Wellfield were not analyzed and disclosed in the FEIS. The

28    six-volume FEIS devotes hundreds of pages, not including appendices and other

1    supporting documents, to impacts on groundwater. The Forest Service quantitatively

2    modeled the physical impact (drawdown of groundwater levels) caused by the removal of

3    100% of the Desert Wellfield groundwater up to 240 years into the future, for each

4    alternative. *See* FEIS at 385, 396-97. Further, the FEIS analyzed several direct pumping

5    impacts for each alternative, including (i) the maximum drawdown at the center of the

6    wellfield, (ii) the drawdown at the north and south ends of the wellfield, (iii) the

7    drawdown near the New Magma Irrigation and Drainage District, and (iv) the long-term

8    drawdown after recovery. *See* FEIS at 444-48.

9        AMRC argues that the Forest Service should have done more to analyze the

10   effects of the mine along with the Superstition Vistas development and plans of large-

11   scale irrigators. AMRC Br. 21–22. The FEIS analyzed reasonably foreseeable future

12   activities first through a screening process for spatial overlap, temporal overlap, and

13   whether there is sufficient information to analyze for impacts, and then, as appropriate,

14   through cumulative effects analyses for different resources where the project and the

15   activity overlap. FEIS at 165, 923, R-243. Separately, in response to concerns about

16   cumulative impacts to regional water supplies, Chapter 4 contains a qualitative or

17   "holistic" discussion of these impacts. *See id.* at 977-989. Superstition Vistas did not pass

18   the Forest Service's initial screening for cumulative effects, *id.* at 977, but the

19   development is nevertheless analyzed in Chapter 4. Planned irrigation wells are covered

20   in the same section. *See id.* at 980.

21       "The portion of Superstition Vistas that has a demonstrated source of water has

22   been quantified and included in the regional cumulative effects groundwater model" to

23   assess the impacts of all known water users and Assured Water Supplies in the East Salt

24   River Valley, together with Resolution Copper's anticipated pumping from the Desert

25   Wellfield. FEIS at 987 (explaining that only the first parcel auctioned by the State in

26   2020 has a "defined water use" and is therefore appropriate for inclusion in the model).

27   The "[o]ther portions of Superstition Vistas without demonstrated water supplies are

28   speculative and not explicitly modeled," *id.*, but they are still analyzed qualitatively in

1   Chapter 4. *See id.* at 977, 984, 987, 989. The Forest Service explains these nuances in its

2   response to comments. *See id.* at R-340.

3       In short, the Forest Service's determination during screening that the Superstition

4   Vistas project was "speculative" due to insufficient information is irrelevant (although

5   reasonable), because the Forest Service nonetheless went on to analyze the cumulative

6   effects of Superstition Vistas and the Mine.[12] *Seven Cnty.* 145 S. Ct. at 1513 ("[C]ourts

7   should defer to agencies' decisions about where to draw the line.").

8       *Third*, AMRC argues that the agency failed to meaningfully consider comments

9   from other agencies including BLM and the Arizona State Lands Department ("ASLD").

10  AMRC Br. 22–27. AMRC leans heavily on a twenty-six-page BLM report to support its

11  arguments that the FEIS's analysis of water impacts falls short under NEPA. *Id.* at 23–24.

12  But the BLM report has significant limitations. Indeed, BLM described the report as

13  "high-level" and admitted its reviewers spent only a "relatively short time" evaluating a

14  "substantial number of supplemental studies." AMRC Ex. 1 at 1, Dkt. No. 87-1. BLM

15  also relied only on the 2021 FEIS and any cited reference materials (*see generally id.*); it

16  therefore did not review the hundreds more documents and data used by the workgroups

17  grappling with the very groundwater issues they were critiquing. In short, BLM's review

18  was superficial relative to the work performed and based on incomplete information.

19      In any event, the Forest Service meticulously reviewed the BLM report and made

20  several major changes to the FEIS since 2021 that respond to the report.[13] The additional

21  cumulative effects analysis in Chapter 4 covers the very issues AMRC asserts BLM said

22

23  ───────────────

    [12] Because the Forest Service analyzed Superstition Vistas, the Court need not reach the

24  question of whether the agency had to do so, given the Forest Service "possesses no
    authority or control" over and "would have no role in approving or regulating" the

25  development, which is "subject to the approval processes of other . . . agencies." *Seven
    Cnty.*, 145 S. Ct. at 1509 (citation modified).

26  [13] Mentioning the BLM report by name in the FEIS is not required under NEPA. It is

27  sufficient that the agency reviewed, considered, and took appropriate action in response
    to that report. A detailed memorandum on the BLM report is part of the administrative

28  record for the project.

1   was missing, for example: Colorado River Shortages (FEIS at 980–81); the Drought

2   Contingency Plan and Central Arizona Project (*id.* at 978–80); and Assured Water

3   Supplies, Future Development, and Competing Uses for Groundwater (*id.* at 981–86).

4   Other changes responsive to BLM's comments include: Additional analysis of Cutter

5   Basin impacts (*id.* at 437–41); additional analysis of impacts to private wells from Desert

6   Wellfield pumping under each alternative (*id.* at 444–48); additional documentation on

7   brownfield tailings storage (*id.* at F8–F9); additional discussion of existing water laws

8   and two new sections on the topic (*id.* at 397–400); and sections on future meteorological

9   trends (*id.* at 992–96). The remaining critiques AMRC highlights from the BLM report

10  topple quickly under pressure. The baseline or "pre-mining" conditions selected by the

11  Forest Service, for example, were the product of extensive analysis and discussion in the

12  workgroups.[14] *See id.* at 390–92; *id.* at 391 (citing Garrett 2018d, "Selection of

13  Appropriate Baseline Conditions for NEPA Analysis," which addresses dewatering at the

14  Mine cite among other issues); *id.* at 383 (citing Garrett 2020j, "Proceedings of the

15  Groundwater Modeling Workgroup and Water Resources Workgroup"). Finally, BLM's

16  apparent confusion over springs/seeps was due to their misunderstanding of the data

17  sources used to develop the springs list. *See id.* at R-380 (explaining that, of the three

18  "missing spring" locations, only one had not been previously included in the DEIS and

19  was added to the FEIS).

20         *Fourth*, AMRC argues that the Forest Service ignored ASLD's concerns about the

21  Superstition Vistas development and socioeconomic impacts from pumping. The idea

22  that the Forest Service ignored these concerns is belied by the record: The Forest Service

23  amended its analysis of impacts to the East Salt River Valley regional water supplies in

24  response to comments from ASLD and others about potential housing developments to

25

26  _____
    [14] The water analysis alone included 38 participants representing the Forest Service and
27  contractors, six cooperating agencies or stakeholders (including Dr. Wells on behalf of
    the San Carlos Apache Tribe), and Resolution Copper and contractors. Three workgroups
28  met from September 2017 to July 2020, involving 25 full workgroup meetings.

1   add a holistic qualitative discussion in Chapter 4 about water sufficiency in addition to

2   the quantitative cumulative groundwater model. *See supra,* pp. 25-26; FEIS at 984, R-

3   287, R-340. Ultimately, the Forest Service concluded that "[g]roundwater modeling,

4   using the best available estimates of all regional groundwater users over the next 100

5   years, indicates that regional groundwater supplies generally are sufficient to satisfy

6   committed demands," FEIS at 986, but that with "potential new future residential demand

7   from Superstition Vistas the cumulative effects modeling suggests that regional water

8   supplies would become more limited and would need to be carefully assessed for

9   sufficiency based on actual development plans for the area." *Id.* at 987.

10      *Fifth*, AMRC argues that the Forest Service failed to fully analyze potential

11  mitigation measures to address regional groundwater declines and impacts to wells.

12  AMRC Br. 25–27. This is false. The Forest Service fully considered mitigation measures

13  for water resources and their effectiveness, proposed the implementation of those

14  measures it has the authority to implement, and disclosed other mitigation measures that

15  will be implemented under other written contractual, financial, or other agreements. *See*

16  FEIS at 135–143 (providing overall framework for mitigation); *id.* at 451–53, 562-65,

17  596-97 (assessing the effectiveness of mitigation measures); *id.* at 428, 487, 575

18  (discussing applicant-committed environmental protection measures for water); *see also*

19  DROD at 23 (setting forth proposed required mitigation measures related to water).

20  Appendix J to the FEIS discloses all the mitigation and monitoring measures the Forest

21  Service considered in its impact analysis and those design features and applicant-

22  committed mitigation measures to be implemented. FEIS at J1-2, J11–50. The Forest

23  Service considered all suggested mitigation and monitoring measures brought forward by

24  the public, including those related to drawdown impacts, but as explained in the response

25  to comments, the Forest Service lacked authority to impose some measures that were

26  suggested by the public. *Id.* at at R-232, R-235, R-255, R-346. The Forest Service

27  discussed mitigation measures it lacked the authority to implement itself with Resolution

28  Copper for potential voluntary agreement. *See id.* at 136–37.

1    AMRC specifically identifies "Measure PF-WR-03" and argues the Forest Service

2    should have made this measure mandatory. AMRC Br. 26. The Forest Service lacks

3    authority to require Resolution Copper to "work with any impacted stakeholder to

4    mitigate effects of water level declines caused by the project[,]"*id.* (citation omitted),

5    because Resolution Copper's recovery wells will not be located on federal land and will

6    be subject to state laws and permits under the jurisdiction of the Arizona Department of

7    Water Resources. *See* FEIS at R-235. Furthermore, water impacts were modeled and

8    analyzed extensively as part of the EIS and will be the subject of other existing

9    monitoring and mitigation plans. *See id.* at J-19–23.

10        **2.  The Tribe's NEPA claims lack merit.**

11    The Tribe contends that the FEIS failed to adequately consider issues related to the

12    tailings storage facilities alternatives, the tailings and concentrate pipelines, water quality,

13    groundwater impacts, and hydrological impacts. Tribe Br. 19-23. It also argues that the

14    changes between the 2021 EIS and the FEIS were "so substantive" that the Forest Service

15    should have published another draft EIS for public comment. The Tribe is incorrect.

16        To begin with, the Tribe improperly relies on two declarations that are, in essence,

17    proffered expert testimony that is outside the record considered by the agency. The first is

18    a declaration from Dr. Steven H. Emerman, a consultant who "specializes in analyzing

19    groundwater and mining." Tribe Br. Ex. 32, Emerman Decl. ¶ 1, Dkt. No. 109-6 (No. 21-

20    68). Dr. Emerman's declaration summarizes a 56-page memorandum that he provided the

21    Tribe on July 13, 2025, and that is attached as an exhibit to his declaration. *Id.* at 7–73.

22    The second is a declaration from James Wells, a geologist, and the president of an

23    environmental consulting firm. Tribe Br. Ex. 33, Wells Decl. ¶1, Dkt. No. 109-7 (No. 21-

24    68). Dr. Well's declaration attaches and summarizes a 23-page memorandum that he

25    provided the Tribe on July 10, 2025. *Id.* at 7–18. Both memorandums post-date the FEIS

26    and thus neither is part of the record that was before the Forest Service. In their

27    memorandums and declarations, Emerman and Wells opine on the sufficiency of the

28    FEIS's analysis, quibble with the weight the FEIS afforded to various studies or factors,

1   and disagree with the Forest Service's conclusions. The Tribe offers the declarations as

2   substantive evidence of the FEIS's alleged insufficiency.

3          As explained in Federal Defendants' accompanying Motion to Strike, these

4   declarations and supporting memorandums are extra-record evidence that this Court

5   should disregard. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602

6   (9th Cir. 2014). Not only would consideration of the proffered opinions of Emerman and

7   Wells violate *Seven County*'s strong admonition that "the central principle of judicial

8   review in NEPA cases is deference," 145 S. Ct. at 1511, it would be unfair in light of the

9   Court's Order that defendants not be permitted to rely on "any documents not available

10  on the [agency] internet site." Order at 19 n.9, Dkt. No. 99 (No. 21-68).

11         Even if the Court does consider the declarations and the arguments the Tribe

12  makes based on them, they do not establish the FEIS is arbitrary or capricious. The Tribe

13  takes issue with three aspects of the FEIS's analysis: (i) the discussion of the impacts of

14  tailings storage facilities and recommendations related to the Skunk Camp alternative;

15  (ii) the analysis of hydrological impacts, and (iii) the Forest Service's decision to issue

16  the FEIS without first circulating a supplemental draft EIS.

17         As to tailings, the FEIS analyzes in detail the risks associated with tailings storage

18  facilities, including concerns expressed by the public throughout the NEPA process. FEIS

19  at 686–737. In fact, the FEIS dedicates more than fifty pages to tailings and pipeline

20  safety. *Id.* The FEIS incorporates a full Failures Modes and Effects Analysis ("FMEA"),

21  which goes beyond the analysis that was done in the DEIS. *Id.* at 690. Based in part on

22  the results of that analysis, the Forest Service considered a range of possible breach

23  scenarios, and then used a worst-case assumption to analyze potential outcomes. *Id.* The

24  FEIS also incorporated a breach analysis to "assess the potential downstream impacts of

25  where the tailings would travel, how far, and how fast." *Id.*

26         The Tribe includes a bulleted list of fourteen supposed deficiencies with the

27  tailings analysis, drawn from the Emerman declaration and supporting memorandum.

28  Tribe Br. 19-22. But that list of criticisms invites precisely the kind of second-guessing of

31

1   the Forest Service's scientific analysis that NEPA has long prohibited, and that *Seven*

2   *County* specifically rebukes courts for engaging in. *See* 145 S. Ct. at 1511 ("When

3   reviewing an agency's EIS, the only role for a court is to confirm that the agency has

4   addressed environmental consequences and feasible alternatives as to the relevant

5   project." (citation modified)); *id.* at 1512 ("[E]xercise of agency discretion . . . should not

6   be excessively second-guessed by a court.").

7       Indeed, the vast majority of the criticisms in the Tribe's list merely disagree with

8   the weight the Forest Service gave to various concerns or the modeling it chose to

9   employ.[15] Those criticisms ignore "[b]lack-letter administrative law" requiring courts to

10  be at their "most deferential" when assessing an agency's "speculative assessments or

11  predictive or scientific judgments[.]" *Seven Cnty.*, 145 S. Ct. at 1512 (citation omitted).

12  The remainder of the arguments claim—incorrectly—that the FEIS failed to consider

13  certain factors or scenarios that the FEIS expressly analyzes.[16] The Tribe's arguments

14  based on Emerman's opinions fail under NEPA's deferential standard of review.

15      The same is true of the Tribe's claims based on the Wells declaration and

16  supporting memorandum. The Tribe makes two arguments based on Wells's opinions:

17  *first*, that the Forest Service should have circulated a supplemental draft EIS before

18  publishing the FEIS, and *second*, that the FEIS "erroneously concludes there would be no

19  acid rock drainage during mine operation," thus compromising the analysis of tailings

20  storage facility safety. Tribe Br. 22–23.

21      Taking the arguments in reverse order, Dr. Wells's criticism of the Forest

22

23  ────────────────────

24  [15] Tribe Br. 20–21, Nos. (1) – (2), (4), (6), (7) – (14) (claiming FEIS "underestimate[s]" various factors, or selects models or methodology different from those Emerman prefers).

25  [16] Tribe Br. 20–21, No. (3) (claiming FEIS "[e]ntirely fails to evaluate the probability of

26  concentrate pipeline failure[,]" but ignoring the analysis of pipeline failure at 708–09; 712–14, 720, 725); No. (5) (claiming FEIS "fails to include a dam breach analysis or

27  emergency preparedness and response plan" but ignoring dam breach analysis at 691–93) and the emergency response and contingency plan (which the Forest Service required as a

28  mitigation measure) discussed at FEIS at J-34–35).

1    Service's conclusions related to the risks of acid rock drainage fails for the same reasons

2    as Dr. Emerman's criticisms: it second-guesses the Forest Service's scientific and

3    technical analysis to which this Court must defer. *Seven Cnty.*, 145 S. Ct. at 1512. The

4    FEIS analyzed the likelihood that oxygen would penetrate the tailings, causing a risk of

5    acid rock drainage (FEIS at 462–63), disclosed uncertainties in the modeling related to

6    this issue (e.g., *id.* at 473), and assessed the reasonableness of various assumptions (*id.*).

7    The Forest Service therefore gave a hard look to the likely effects, and the Tribe fails to

8    show that the FEIS's analysis was arbitrary or capricious.

9         As to whether a supplemental Draft EIS was necessary, the Tribe relies on Dr.

10   Wells contending that the changes to geochemical modelling between the Draft EIS and

11   the 2025 FEIS "were so substantive that the Forest Service was required to issue a

12   supplemental DEIS for public comment."[17] Tribe Br. 22 (citing Wells Decl. ¶¶ 4–7).

13   Wells's proposed interpretation and application of now-rescinded CEQ regulations are

14   inadmissible legal opinion.[18] Still, the Ninth Circuit has held that, "[w]hen new

15   information emerges after the circulation and public comment period of the DEIS, it may

16   be validly included in the FEIS without recirculation." *Westlands Water Dist. v. U.S.

17   Dep't of the Interior*, 376 F.3d 853, 873 (9th Cir. 2004). In fact, "it is not uncommon for

18   changes to be made in a FEIS after receiving comments on a DEIS and further concurrent

19   study." *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1118 (9th Cir. 2002). So

20   long as the "agency takes the requisite 'hard look' and 'determines that the new impacts

21   will not be significant (or not significantly different from those already considered), then

---

[17] Wells's opinion purports to interpret the legal requirements of regulations published by the Council on Environmental Quality (CEQ), 40 C.F.R. § 1502.9 (2024). Wells Decl. at 11–12. (opining, in his "professional opinion," the "[Forest Service] had no discretion under NEPA regulations and should have published a Supplemental Draft EIS."). Wells also appears to assume the CEQ regulations are currently in force and binding, but as the FEIS observes, CEQ rescinded those regulations in February 2025. FEIS at 9.

[18] "[A]n expert witness 'cannot give an opinion as to her legal conclusion." *Wine Educ. Council v. Rangers*, 2021 WL 1573783, at *2 (D. Ariz. Apr. 22, 2021). *See also Pinal Creek Grp. v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1042–44 (D. Ariz. 2005).

33

1  the agency is in full compliance with NEPA.'" *Summit Lake Paiute Tribe of Nev. v. U.S.*
2  *Bureau of Land Mgmt.*, 496 F. App'x 712, 715–16 (9th Cir. 2012).

3  Here, the Forest Service described the changes to its approach for analyzing
4  effects to water resources between the Draft EIS and the FEIS. FEIS. at. 382–83, 388-93,
5  454–56, 488, 500, 551. The FEIS also explains that the Forest Service implemented those
6  changes based on public comments it received on the Draft EIS and further review by the
7  Water Resources Workgroup (of which Dr. Wells was a member). *Id.* at 488; *id.* at 383,
8  1003, R-353 (mentioning Tribe's participation in workgroup). And the FEIS also
9  analyzed operational water quality in the block cave zone through a geochemical model.
10  *See* FEIS at 458-62, 471-73; *see also id.* at R-238, R-256 (addressing comments about
11  need for SEIS). The FEIS's conclusion that the water quality impacts were lessened
12  under the new models is entitled to deference. *Seven Cnty.*, 145 S. Ct. at 1512.

13  Finally, the Tribe claims that the FEIS failed to address hydrological impacts that
14  the Tribe raised in a December 2019 comment letter. Tribe Br. 23. That is incorrect. The
15  Forest Service responded to the Tribe's comments concerning hydrological impacts, both
16  in the body of the FEIS (*see* FEIS at 437–41), and in the responses to comments in
17  Appendix R, (*see id.* at R-356 (noting that agency "received further insights into the
18  concerns raised by the San Carlos Apache Tribe with respect to water impacts," and
19  added an analysis of "cascading regional effects to cause greater groundwater use near
20  Tribal lands" in Section 3.7.1); *see also id.* at R-356, R-379, R-393.

21  **B.  AMRC's Appraisal Claims Under the Land Exchange Act Fail.**

22  AMRC also fails to demonstrate a likelihood of success on their claims
23  challenging the appraisal for the MCZ. At the outset, AMRC lacks prudential standing to
24  challenge the appraisal at all, because its alleged injuries caused by the privatization of
25  and eventual impacts to the federal lands fall outside the zone of interests protected by
26  the Land Exchange Act's appraisal provisions. AMRC's appraisal claims are also without
27  merit because the appraisal of the MCZ parcel properly excluded the value of the
28  locatable minerals in which Resolution Copper already has a property interest.

34

1        **1. AMRC lacks prudential standing to challenge the appraisals.**

2        AMRC lacks prudential standing to challenge the appraisals under the Land

3    Exchange Act. To the extent that judicial review of the appraisal provisions of the Land

4    Exchange Act is available, it must arise under the APA's catch-all review provisions.

5    *Wild Fish Conservancy v. Jewell*, 730 F.3d at 796 (where claims arise under statutes that

6    do not include a private right of action, the APA "provides a cause of action for persons

7    'adversely affected or aggrieved by agency action within the meaning of a relevant

8    statute.'" (quoting 5 U.S.C. § 702)). Parties seeking review under the APA must show

9    their injury falls within the zone of interests protected by the statute they claim was

10   violated. *Id.* at 796-97; *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859

11   (9th Cir. 2005). Further, "the injury that supplies constitutional standing must be the same

12   as the injury within the requisite 'zone of interests' for purposes of prudential standing."

13   *Yount v. Salazar*, 2014 WL 4904423, at *6 (D. Ariz. Sept. 30, 2014) (citation omitted).

14   *See also Oberdorfer v. Jewkes,* 583 F. App'x 770, 773 (9th Cir. 2014) ("[Plaintiff's]

15   economic injury . . . suffices for Article III standing but does not fall within NEPA's zone

16   of interests."). Whether a plaintiff's injury is within a statutory provision's zone of

17   interests is determined using traditional tools of statutory interpretation. *See Bank of Am.

18   Corp. v. City of Miami*, 581 U.S. 189, 197–200 (2017).

19       AMRC's alleged injuries fall outside the zone of interests of the Land Exchange

20   Act's appraisal provisions. 16 U.S.C. § 539p(c)(4), (5). AMRC alleges environmental,

21   recreational, and aesthetic harms from the Land Exchange and future mining activities, as

22   well as harm from the privatization of the federal lands. But the text of the appraisal

23   provisions of the Land Exchange Act makes clear that they are tailored solely to the

24   economic interests of the parties to the exchange transaction. *See, e.g.*, *id.* §

25   539p(c)(4)(B) (establishing appraisal standards), (5)(B) (setting forth a process if the

26   initial exchange turns out to lack the requisite equal value).[19] The statute's appraisal

27   ───────────────

28   [19] The parties will use cash to equalize the parcels as allowed by the statute. 16 U.S.C. §
     539p(c)(5)(B)(i); Resolution Copper Project & Land Exchange EIS Appraisals, *available*

provisions can offer no relief for AMRC's environmentally-focused injuries. *See Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dept. of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005) (plaintiffs lacked prudential standing under NEPA because their economic interests were outside of NEPA's zone of interests). Nor does the statute allow the Forest Service to select different federal lands to be exchanged or forego the exchange altogether.

AMRC argues it has standing to challenge the appraisals, citing *Desert Citizens Against Pollution v. Bisson* and *Greer Coalition v. U.S. Forest Service*, because "[p]laintiffs' members include recreational, tribal, and other users of these specific public lands that would be exchanged-away" and "[i]t is hard to see a greater benefit to Plaintiffs than the prevention of the Exchange and continuation of public access." AMRC Br. 14. What AMRC overlooks, however, is that Congress has not only mandated the exchange, but also identified the specific federal lands to be exchanged. This lawsuit cannot prevent the exchange and it cannot preserve public access: Congress foreclosed both in 2014 when it passed the Act. This case contrasts with *Desert Citizens*, where BLM *decided* to enter the challenged land exchange and plaintiffs brought a challenge under FLPMA's equal-value requirement. While the lower court concluded plaintiffs failed to establish redressability because a proper valuation could only result in additional compensation being offered to BLM, the court of appeals found at least a possibility that the parties would not choose to negotiate a new exchange. *See Desert Citizens*, 231 F.3d at 1179. The land exchange at issue in *Greer Coalition, Inc. v. U.S. Forest Service* was also discretionary on the part of the Forest Service. 2011 WL 671750, at *1 (D. Ariz. Feb. 16, 2011). The Forest Service does not have that discretion here.

## 2. AMRC's appraisal claims are without merit.

AMRC's challenge to the appraisal of the MCZ is without merit in any event.

---

*at* https://www.resolutionmineeis.us/documents?field_file_type_target_id=1028 (appraisals do not include non-federal land reflecting parties' decision to use cash).

1    AMRC raises four main arguments. All of them fail for the fundamental reason that the

2    United States could not as a legal matter convey, by sale or otherwise, the exclusive right

3    to mine the locatable minerals in the MCZ parcel—that claim belongs to Resolution

4    Copper. The United States addresses each argument below.

5        *First,* AMRC argues that the exchange "cannot occur without the agency's

6    compliance with the strict appraisal, 'equal value' and other standards regarding the value

7    of the lands and minerals to be traded," meaning the Court must find the appraisals free

8    of any error before the transfer of title can occur on August 19. AMRC Br. 6.

9        This is incorrect. The transfer of title slated to occur on August 19, can and must

10    occur, regardless of the status of the appraisals, and is not the final "step" in the land

11    exchange transaction. The Act imposes several requirements on the Government

12    regarding the appraisals, but none of them require completion of the appraisals before

13    publishing the FEIS, much less that the appraisals be adjudicated and found free of any

14    error before title must transfer no more than sixty days later under the Act. The Act only

15    requires that *"[b]efore consummating the land exchange* under this section, the Secretary

16    shall make the appraisals of the land to be exchanged (or a summary thereof) available

17    for public review[,]" 16 U.S.C. § 539p(c)(4)(B)(iv) (emphasis added), which the Forest

18    Service has done. "Consummation" is not the same thing as "title transfer" and the final

19    "consummation" of the land exchange transaction does not occur until the United States

20    receives title to the non-federal lands *and* payment in the amount the value of the federal

21    land exceeds that of the non-federal land. *Id.* § 539p(c)(5)(B)(i)(II). Nothing in the Act

22    conditions the transfer of title to the federal lands on the appraisals. Rather, the Act's

23    mandate that title to the federal lands transfer to Resolution Copper "[n]ot later than 60

24    days after the date of publication of the final environmental impact statement" is

25    unconditional. *Id.* § 539p(c)(10). That provision explicitly uses the term "title transfer"

26    and not "consummation." *Id.*

27        *Second*, AMRC argues that the Secretary's approval of the appraisals violates the

28    Land Exchange Act, Forest Service appraisal regulations, and federal appraisal standards

1   because the appraisal of the MCZ "erroneously assumed that the value of the estimated

2   35 billion pounds of copper is zero, simply because Resolution has filed paper mining

3   claims on these federal lands." AMRC Br. 7.

4           AMRC is incorrect both as to the legal significance of what they call Resolution

5   Copper's "paper" mining claims—they constitute a very real and valuable possessory

6   interest—and regarding how that possessory interest should be treated when appraising

7   the property. Resolution Copper owns unpatented mining claims on the MCZ parcel. This

8   fact means that, while the United States owns the land in fee simple, it is encumbered by

9   Resolution Copper's unpatented mining claims and the United States cannot mine the

10  locatable minerals or transfer the right to do so to anyone else.

11          The General Mining Law of 1872 opened federal land to entry for the recovery of

12  "valuable mineral deposits," including metalliferous minerals like copper. 30 U.S.C.

13  § 22. Under the Mining Law, a party that discovers a valuable mineral deposit on lands

14  open to mining obtains a property right to that mineral deposit, and to reasonable use of

15  the land to extract the mineral deposit, without payment to the United States. *Id.* §§ 26,

16  612. Although an individual may "patent" his mining claim by paying a nominal sum and

17  fulfilling certain statutory conditions, "[p]atenting . . . is not required, and an unpatented

18  mining claim remains a fully recognized possessory interest." *United States v. Locke,* 471

19  U.S. 84, 86 (1985). While AMRC may call Resolution Copper's claims "paper mining

20  claims," the Supreme Court has described them as "fully recognized possessory interests"

21  and a "'unique form of property." *Id.* at 104; *see also Wilbur v. United States ex rel.*

22  *Krushnic*, 280 U.S. 306, 316–17 (1930) ("[W]hen the location of a mining claim is

23  perfected under the law it has the effect of a grant by the United States of the right of

24  present and exclusive possession [and] is property in the fullest sense of that term . . .");

25  *O'Connell v. Pinnacle Gold Mines Co.,* 140 F. 854, 855 (9th Cir. 1905) (same).

26           Here, because Resolution Copper discovered a valuable deposit of a locatable

27  mineral—copper—on the MCZ parcel, by consequence, the United States does not own

28  the rights to mine those same locatable minerals. Because the United States cannot

38

convey rights it does not own, the value of those rights belonging to Resolution Copper was excluded from the estate of the United States appraised for the MCZ parcel. This makes sense, because even if Congress had never enacted the Land Exchange Act, Resolution Copper would retain the exclusive rights to exploit the locatable minerals (assuming it paid the annual claim maintenance fee), and those rights would remain an encumbrance on the land owned by the United States.

AMRC is therefore wrong that the value of the minerals within the MCZ should have been included in the appraisal as part of the estate of the United States. AMRC Br. 8–9. The agency's appraisal report correctly states that Resolution Copper holds a property interest in the minerals under the Mining Law. *See* Ex. 3, Appraisal Report Summary for MCZ Parcel at 2–3. As the appraisal summary goes on to explain, the United States' rights to the MCZ do not include the rights to mine any deposits of locatable minerals or the right to prevent the use and destruction of the surface reasonably incident to mining. *Id.* at 3 ("[T]he Federal Property is encumbered by mining claims held by a party other than the United States; said mining claims confer all rights to locatable minerals to that party in accordance with the Mining Law and are not part of the estate owned by the United States, 30 U.S.C. §§26, 181, 611 . . . ."). It was reasonable for the appraisal to exclude the value of those minerals from the United States' estate, because the mining company already had an exclusive possessory interest in the locatable mineral estate. 36 C.F.R. § 254.9(c)(4) (requiring statement of encumbrances).

AMRC is also wrong that the appraisal violated Forest Service and federal appraisal standards and regulations. AMRC cites 36 C.F.R. § 254.9(b)(1)(iv), which requires the appraiser to consider "the contributory value of any interest in land such as water rights, minerals, or timber," but that section does not require the appraiser to consider interests not belonging to the party whose property the appraiser is appraising. AMRC also ignores the Uniform Appraisal Standards for Federal Land Acquisitions ("Yellow Book") and fails to cite the Yellow Book at all. In fact, the Yellow Book provides special considerations for minerals properties, including alerting those

39

1   appraising such properties that "[i]t is fundamental that the property rights and interests

2   in minerals properties are identified as part of the problem identification process" and

3   that "[a]ppraisers valuing mineral properties impacted by the 1872 Mining law are

4   advised to coordinate with client agency staff to clarify the approaches to valuing those

5   interests." Interagency Land Acquisition Conference, *Yellow Book* 45–46 (2016),

6   https://www.justice.gov/d9/enrd/legacy/2015/04/13/uniform-appraisal-standards.pdf.

7   That process was followed here, and the Forest Service reasonably provided legal

8   instruction to the appraiser that Resolution Copper possessed the exclusive right to mine

9   the locatable minerals in the MCZ.

10          General statements made during the Congressional debate over the land exchange

11  Act or in the Congressional Budget Office's short two-page analysis of the bill cited by

12  AMRC have no bearing on whether the subsequent appraisal of the MCZ parcel, prepared

13  long after the passage of the law, by a professional appraiser working with Forest Service

14  staff, reasonably excludes the locatable minerals. Importantly, there was no discussion in

15  the documents AMRC cites (*see* AMRC Br. Exs. 14 and 15, Dkt. Nos. 87-14, 87-15) of

16  Resolution Copper's unpatented mining claims, the legal effect of those claims—that

17  they constituted "property in the fullest sense of the term" under Supreme Court

18  precedent—or, importantly, how the appraisal should take Resolution Copper's rights

19  into account. While the House Report recognizes that "Resolution Copper already has

20  unpatented mining claims that cover about 75% of the parcel," (*see* AMRC Br. Ex. 16 at

21  8, Dkt. No. 87-16) it reflects no Congressional intent that the Forest Service ignore those

22  property rights in the appraisals.

23          Nor does the language of the Act support AMRC's arguments. In fact, 16 U.S.C. §

24  539p (i)(1)(C) recognizes Resolution's unpatented mining claims and their "rights and

25  ability to conduct activities on the Federal land under such unpatented mining claims."

26  Further, accepting AMRC's argument would mean that Resolution Copper would pay the

27  United States for minerals it otherwise could have possessed for free under the Mining

28  Law. It is hard to see how such an arrangement would not disincentivize Resolution

1   Copper from mining this copper deposit and make the venture unprofitable—a result that

2   Congress surely did not intend.

3       *Third*, AMRC is also wrong that the MCZ appraisal incorrectly determined the

4   highest and best use of the parcel was for "surface land use in support of a mining

5   operation." AMRC Br. 11 (citation omitted). The MCZ parcel is encumbered by

6   Resolution Copper's unpatented mining claims and Resolution Copper's possessory

7   interest in the locatable minerals in the MCZ parcel. When determining the highest and

8   best use of that parcel, the appraiser analyzed the highest and best use for the estate of the

9   United States, while considering Resolution Copper's possessory interest in the locatable

10  minerals. Because the United States does not currently possess the right to mine the

11  locatable minerals in the MCZ parcel, the appraiser correctly determined that the highest

12  and best use of the estate the United States' possesses, the surface estate, would be for

13  support facilities for the development of a mine.

14      *Finally*, AMRC is wrong that the appraisal fails to treat the exchange as a private-

15  lands transaction. AMRC Br. 12 (citing 36 C.F.R. §254.9(b)(1)). The appraiser treated

16  the MCZ parcel as a private-lands transaction. If the MCZ lands were in private

17  ownership, the parcel would still be encumbered by Resolution Copper's rights to the

18  locatable minerals like a split estate where one entity owns the mineral estate and another

19  entity owns the surface estate. In that case, the surface owner would only be able to

20  convey its property right, and not the rights of the entity that owns the mineral rights.

21  Including the mineral rights into an appraisal for a private sale of the surface estate would

22  not be appropriate because the surface owner could not convey the mineral rights.

23      **C. AMRC's NFMA Claim Lacks Merit.**

24      AMRC argues that the Forest Service violated NFMA because the FEIS and Draft

25  ROD contain proposed amendments to the Forest Plan that have not (until now) been the

26  subject of public comment. This is not irregular. The Tonto National Forest implemented

27  a new "Tonto National Forest Land Management Plan" (Forest Plan) in December 2023,

28  after the original FEIS was published in 2021. As early as March 2016 the Forest Service

41

1   informed the public that a Forest Plan amendment *could* be needed, although no project-

2   specific Forest Plan amendments were ultimately necessary for the Preferred Alternative

3   at the time the original FEIS was published in 2021.[20]

4          The new FEIS analyzed the project's compliance with the 2023 Forest Plan and

5   determined that, should the Forest Service select the Skunk Camp alternative (the

6   preferred alternative), where the tailings storage facilities will be located off federal

7   lands, that decision would require certain amendments to the Forest Plan.[21] *See generally*

8   FEIS App'x T. The Draft ROD contains the Forest Plan amendments to be approved in

9   the Final ROD, which would apply only to this project. As shown in the summary of the

10  project-specific amendments in Table 1 of the Draft ROD, the proposed amendments

11  relate to the pipeline, electrical transmission line, or mitigation measures that may be

12  adopted in the Final ROD. *See* DROD at 8–9. None of the proposed amendments relate to

13  the federal lands to be exchanged under the Act, which will no longer be federally-owned

14  after title is transferred. They apply to permits and activities that may be authorized (or

15  required, in the case of mitigation measures) on adjacent federal lands under the Final

16  ROD. The Forest Plan amendments themselves will not be effective (if at all) until the

17  Final ROD is issued. DROD at 8.

18         The process the Forest Service has followed to provide the public with the

19  opportunity to review and object to the amendments before they are decided upon in the

20  Final ROD complies with Forest Service Regulations. Forest Plan amendments for

21  specific projects follow the process outlined in 36 C.F.R. pt. 219. Because the Forest Plan

22  amendments apply only to this project, the public notice provision in 36 C.F.R. §

23  219.16(b) applies. That provision states that "[w]hen a plan amendment is approved in a

24

25  [20] *See* U.S. Dep't of Agric., *Request for Comments and Notice of Public Scoping on Resolution Copper Project and Land Exchange EIS* (2016), https://www.resolution

26  mineeis.us/documents/usfs-tonto-legal-notice-scoping-schedule-201603.

27  [21] Plaintiffs do not presently appear to challenge the substance of the amendments. Any such claims are not yet ripe, but Plaintiffs can later raise a proper challenge to the merits

28  of any Forest Plan amendments after the Final ROD issues.

42

decision document approving a project or activity and the amendment applies only to the project or activity, the notification requirements of 36 CFR part 215 or part 218, subpart A, applies instead of this section." 36 C.F.R. § 219.16(b). Part 218, subpart A (*id.* § 218.1–16) sets forth the project-level pre-decisional administrative review or "objection" process the Forest Service is following here. Following publication of the requisite legal notice in the *Arizona Capitol Times* on June 20, 2025, the public has forty-five days to review and submit objections to the Draft ROD, including on the project-specific Forest Plan amendments. 36 C.F.R. § 218.7; *Copper Project and Land Exchange and Project – Specific Forest Plan Amendment*, https://www.resolutionmineeis.us /sites/default/files/feis/arizona-capitol-times-resolution-feis-drod-20250620.pdf. Neither NFMA nor Forest Service regulations require additional public comment on the project-specific Forest Plan amendments beyond what the Forest Service is already providing here through the objection process in 36 C.F.R. Part 218, and the Forest Service's decision to use the objection process to satisfy its notice requirements for Forest Plan amendments under 36 C.F.R. Part 219 is not unusual. *See* DROD at 8.

Finally, there is no conflict or legal violation, as AMRC suggests, between the agency's determination that the Forest Plan amendments—which will be limited in their application and geographic scope—do not reflect a significant change to the Forest Plan under NFMA and the provisions of the Land Exchange Act that identifies the associated agency decisions related to water, power, transportation as "major federal actions" under NEPA. The statute required the agency to analyze the environmental effects of these ancillary decisions under NEPA, and the agency has done so, along with the environmental effects of the proposed Forest Plan amendments.[22]

### D.  The Tribe's NHPA and Consultation Claims are Without Merit.

For nearly eight years, the Forest Service consulted with the Advisory Council on

---

[22] Although AMRC mentions FLPMA and NEPA in passing, AMRC Br. 29, they do not articulate how the procedures the Forest Service is following for the project-specific Forest Plan amendments could violate those statutes—they do not in any event.

1    Historic Preservation ("ACHP"), the Arizona State Historic Preservation Officer, 15

2    tribes (including Plaintiff), representatives of local governments, public utilities, and

3    other federal and state agencies. Among other things, the consultation assessed the likely

4    effects of the Resolution mine project on cultural and archeological resources and sought

5    to identify mutually acceptable measures to the Forest Service and to Resolution Copper

6    to mitigate those effects. That extensive consultation complied with the NHPA, 54 U.S.C.

7    § 306108, and the Land Exchange Act, 16 U.S.C. § 539p(c)(9)(C).

8         The Tribe alleges the Forest Service failed to comply with those obligations

9    because (i) ACHP terminated the NHPA consultation with the Forest Service in 2021,

10   and the consultation therefore did not yield a final, executed programmatic agreement,

11   and (ii) the Forest Service allegedly did not substantively consult with the Tribe about

12   these issues. Tribe Br. 23–24. The Tribe is wrong.

13        The Land Exchange Act directs the Forest Service to "assess the effects of the

14   mining and related activities . . . on the cultural and archeological resources that may be

15   located on the Federal Land[,]" and to "identify measures that may be taken, to the extent

16   practicable, to minimize potential adverse impacts on those resources[.]" 16 U.S.C.

17   § 539p(c)(9)(C). "As part of its efforts" to satisfy that provision of the Land Exchange

18   Act, the Forest Service "engaged in a process under Section 106 of the [NHPA] to

19   develop a Programmatic Agreement (PA) to address mitigation of potential adverse

20   effects to cultural resources." Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. Ex. 1, Ltr. of

21   Sec. Rollins (Apr. 17, 2025), Dkt. No. 85-1 (No. 21-68).

22        Section 106 requires federal agencies to "take into account the effect of [an]

23   undertaking on any historic property." 54 U.S.C. § 306108. In particular, the federal

24   agency must afford ACHP "a reasonable opportunity to comment with regard to the

25   undertaking." *Id.* Like NEPA, "[s]ection 106 of NHPA is a 'stop, look, and listen'

26   provision that requires each federal agency to consider the effects of its programs."

27   *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999). *See*

28   *also Concerned Citizens & Retired Miners Coal. v. U.S. Forest Serv.*, 279 F. Supp. 3d

44

898, 942 (D. Ariz. 2017).

While the Forest Service must "seek" approval from ACHP, it need not receive that approval to comply with Section 106. Nor must it refrain from undertakings that harm historic properties. "The Act does not require a federal agency to engage in any particular preservation activities; rather, Section 106 only requires that the agency consult the State Historic Preservation Office and ACHP and consider the impacts of its undertaking." *CTIA - The Wireless Ass'n v. FCC*, 466 F.3d 105, 107 (D.C. Cir. 2006).

Here, the Forest Service consulted with the required parties and therefore complied with both the NHPA and the Land Exchange Act. *See generally* FEIS at 814–837; FEIS at 998–1000. Consistent with Section 106 of the NHPA, the Forest Service initiated consultation with ACHP and other NHPA consulting parties in 2017. By January 2021, all parties to the agreement except for ACHP had signed the programmatic agreement. In February 2021, ACHP notified the Forest Service that it was terminating consultation because it "believe[d] that further consultation in this case would be unproductive." FEIS at 815; *see also.* Pls.' Mot. for a Prelim. Inj. Ex. 1 Ltr. from ACHP to Torres (Feb. 2, 2021), Dkt. No. 82-2 (No. 21-68). Central to ACHP's decision to terminate was its conclusion that the land exchange "would destroy significant historic properties, including the highly significant Oak Flat," and that the measures contemplated by the programmatic agreement were "not sufficient to adequately resolve those adverse effects." Dkt. No. 82-2 at 1.

Then, in March 2021, the Forest Service withdrew the 2021 FEIS and reinitiated Tribal consultation. FEIS at 999. As part of the reinitiated consultation, the Forest Service held Tribal listening sessions, as well as formal and informal consultation meetings with tribes that might be impacted by the land exchange. *Id.*; *see also* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. Ex. 2 Declaration of Troy Heithecker ¶ 2, Dkt. No. 85-2 (No. 21-68). The Forest Service held a listening session in October 2021 with eight tribes, including Plaintiff. *Id.* ¶ 6. Between 2021 and 2023, the Forest Service engaged directly with Plaintiff's Tribal Council through correspondence and meetings. *Id.* ¶¶ 5–11. That

1   process continued through 2024, when the Forest Service conducted two more formal
2   consultation meetings with the Tribe to discuss its concerns as well as efforts to develop a
3   Memorandum of Understanding concerning consultation. *Id.* ¶¶ 12–16. The consultation
4   with the Tribe between 2021 and 2024 occurred in the broader context of the extensive
5   Tribal consultation undertaken by the Forest Service, which is detailed in Appendix S to
6   the FEIS. *See* FEIS at S-1–110. The full description of the consultation that the Forest
7   Service undertook in connection with this action spans more than 100 pages of the FEIS.
8   *See id.* The consultation was more than sufficient. *See Concerned Citizens*, 279 F. Supp.
9   3d at 942 ("The NHPA does not guarantee actual meaningful consultation, only that the
10  tribe will have a reasonable opportunity for such consultation.").

11          As to the Section 106 process, the Secretary of the U.S. Department of Agriculture
12  responded to ACHP's February 2021 termination letter on April 17, 2025. FEIS at 1000.
13  That response concluded the Section 106 process. *Id.* ACHP's termination of
14  consultation, and the Secretary's response in the April 17 Letter, are consistent with
15  NHPA's statutory scheme. 36 C.F.R. § 800.7(a) (consulting parties "may determine that
16  further consultation will not be productive and terminate consultation."). Under
17  applicable NHPA regulations, termination of consultation by ACHP triggers an
18  obligation by the agency to "take into account [ACHP's] comments in reaching a final
19  decision on the undertaking[,]" and "document this decision." *Id.* § 800.7(c)(4). So long
20  as the Forest Service takes ACHP's comments into consideration, it has complied with
21  the NHPA. *See Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 696 (3d Cir. 1999)
22  ("While the ACHP's recommendations do not and cannot control agency decisionmaking,
23  the relevant agency must demonstrate that it has read and considered those
24  recommendations."); *Coal. Against a Raised Expressway, Inc. v. Dole*, 1986 U.S. Dist.
25  LEXIS 30976, at *46–47 (S.D. Ala. Oct. 20, 1986) (agency complied with Section 106
26  when its responses to ACHP indicated that it considered the comments even though it
27  ultimately disagreed with them), *aff'd*, 835 F.2d 803 (11th Cir.1988).
28          The Forest Service complied with its obligations here. The April 17 Letter

1  demonstrates that the Forest Service considered and responded to ACHP's comments.

2  FEIS at 1000; Dkt. No. 85-1 at 3–6. The Section 106 process is now complete.

3      The Forest Service also complied with the Land Exchange Act. That Act requires

4  the Forest Service to "identify measures that may be taken, to the extent practicable, to

5  minimize potential adverse impacts" to cultural and archeological resources. 16 U.S.C.

6  § 539p(c)(9)(C). The Act notes that some mitigation measures might not be "practicable,"

7  and does not require the Forest Service to resolve all potential impacts. *Id.* Indeed, the

8  April 17 Letter underscores the core conflict at issue: "all consulting parties"—including

9  the Forest Service—recognize "the adverse direct effects on historic properties expected

10 to result from mining after the land exchange takes place[,]" but the agency "cannot

11 prevent the land exchange" because it "was mandated by Congress." Dkt. No. 85-1 at 2,

12 4. It makes sense, then, that even after reinitiating consultation in 2021, "additional

13 consultation with the Tribes has not uncovered other potential mitigation or alternatives

14 that would allow USDA to comply with [the Land Exchange Act] while avoiding adverse

15 impacts to Tribal interests." *Id.* at 4. That unreconcilable conflict is not due to a lack of

16 meaningful consultation. *See* FEIS at 998-1000 (summarizing consultation); *id.* at S-1–

17 110 (consultation history). And no additional consultation would yield a different result.

18 The Tribe is not likely to succeed on the merits of its consultation claims.

19  **III.   The Remaining Preliminary Injunction Factors Do Not Tip Sharply in Plaintiffs' Favor.**

20

21      **A.  Irreparable Harm Is Not Imminent; It Is Also Mandated By Congress.**

22      Plaintiffs have failed to demonstrate that irreparable harm is likely to result in the

23 absence of an injunction. The mere "possibility" of harm is insufficient. *Winter*, 555 U.S.

24 at 22.  This is so even where environmental damage is alleged. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544–45 (1987).

25      Plaintiffs argue first that they are injured because the exchange will terminate

26 federal ownership and the attendant protections for Oak Flat. AMRC Br. 5. This is true,

27 but that decision was made by Congress, and "a court sitting in equity cannot 'ignore the

28 judgment of Congress.'" *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S.

47

483, 497 (2001) (citation omitted). Plaintiffs have not alleged that Congress lacked

authority to dispose of the federal lands at issue or otherwise terminate federal

environmental protections over those lands. Nor can they. U.S. Const., art. IV, § 3, cl. 2

("The Congress shall have Power to dispose of and make all needful Rules and

Regulations respecting the Territory or other Property belonging to the United States . . .

."). So, while the exchanged lands will lose certain environmental protections, Plaintiffs'

rights were accounted for in the constitutional process of bicameralism and presentment.

Nor will the exchange cut off access to all the exchanged lands or cause immediate

environmental injury. The Land Exchange Act requires:

> [a]s a condition of conveyance of the Federal land, Resolution Copper shall
> agree to provide access to the surface of the Oak Flat Campground to
> members of the public, including Indian tribes, to the maximum extent
> practicable, consistent with health and safety requirements, until such time
> as the operation of the mine precludes continued public access for safety
> reasons, as determined by Resolution Copper.

16 U.S.C. § 539p(i)(3). Plaintiffs will thus continue to enjoy access to the Oak Flat

Campground for as long as it is safe. And—as Resolution Copper explained in its

previous Opposition Brief filed in these cases—any environmental injury from mining on

the exchanged parcel is far from imminent. *See* AMRC Br. at 5–6; Def.-Intervenor's

Opp'n to Pls.' Mot. for Prelim. Inj. 14–16, Dkt. No. 72 (No. 21-122).

Further, if the Court finds merit only in AMRC's appraisal claims, any harms that

flow from erroneous appraisals are not irreparable. The Supreme Court has held that

"[m]ere injuries, however substantial, in terms of money, time and energy necessarily

expended … are not [irreparable]." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Plaintiffs argue that this Court should find irreparable harm because another judge

in this District made that finding in the *Apache Stronghold* case. AMRC Br. 5; Tribe Br.

26. But the District Court in *Apache Stronghold* should have never reached the question

of irreparable harm because the Ninth Circuit's holding that Apache Stronghold's RFRA

and Free Exercise claims "fail" foreclosed any likelihood of success or even serious

questions raised as to the merits of those claims. It was a clear error for the district ourt to

find otherwise *after* the Ninth Circuit's en banc decision, based merely on Apache Stronghold having filed a petition for certiorari. *See* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 5–6, Dkt. No. 85 (No. 21-68) (citing binding Ninth Circuit precedent).

Plaintiffs have failed to meet their burden to establish that imminent, irreparable harm is likely in the absence of injunctive relief.

### B.  The Balance of Hardships and Public Interest Weigh Against an Injunction.

In enacting the Land Exchange Act, Congress determined that facilitating copper mining in Arizona and expanding the Tonto National Forest—a Forest that services multiple public purposes including recreation opportunities and habitat conservation—is in the public interest. *See, e.g.*, *Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 967 (9th Cir. 1983) (affirming denial of an injunction on Congressional act concerning public land in California). The equities thus favor Federal Defendants under the principle that "a court sitting in equity cannot 'ignore the judgment of Congress[.]'" *Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 497. When Congress has spoken on a matter, it is in the public interest to not frustrate Congress's intent. *Id.*; *accord Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059–60 (9th Cir. 2009) (court abused discretion by failing to weigh "the public interest represented in Congress' decision.").

Further, transfer of title will facilitate the domestic production of a critical mineral—copper—under the property. Increased domestic mineral production of copper is in the public and national interest. On March 20, 2025, the President issued an Executive Order, Immediate Measures to Increase American Mineral Production, finding that the national and economic security of the country are acutely threatened by the United States' reliance on foreign mineral production, and it is "imperative for our national security that the United States take immediate action to facilitate domestic mineral production to the maximum possible extent." Exec. Order No. 14241, § 1, 90 Fed. Reg. 13673 (Mar. 20, 2025). Under the Executive Order, the Resolution Copper Project was added as a "priority" mineral project on the Permitting Dashboard established

49

under section 41003 of title 41 of the Fixing America's Surface Transportation (FAST) Act, Pub. L. No. 114-94, 129 Stat. 1312, 1748 (2015). *See FAST-41 Transparency Projects*, Permitting Council, https://www.permits.performance.gov/projects/transparency-projects (last visited July 25, 2025).

Publishing the FEIS and conveying title to Oak Flat to Resolution Copper are actions that are in the public interest as determined by Congress and supported by the President's recent actions to increase domestic production of critical minerals.

## IV.    **Even if the Court Finds for Plaintiffs on any Issue, it Should Not Vacate the FEIS or Enjoin the Land Exchange.**

Should the Court find for Plaintiffs on any issue, the Court should remand that issue to the Forest Service *without* vacatur of the FEIS or an injunction against the transfer of title. Vacatur is generally not appropriate in NEPA cases:

> [t]he ultimate question is not whether an EIS in and of itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained. Review of an EIS is only one component of that analysis. Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS.

*Seven Cnty.*, 145 S. Ct. at 1514; *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (decision to grant or deny injunction  "controlled by principles of equity").

Here, there is no "reason to believe that the agency might disapprove the project if it added more to the EIS," with respect to the only agency action Plaintiffs ask this Court to stop: the transfer of title. After the Final ROD is executed, Plaintiffs will have the opportunity to challenge those aspects of the project over which the agency can issue a decision. Those challenges, if they occur, may involve the Court's review of the FEIS in connection with NEPA claims challenging final agency actions in the Final ROD.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motions should be denied.

Submitted July 28, 2025,

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Erika Norman*
ERIKA NORMAN
ANGELA ELLIS
Trial Attorneys
Natural Resources Section
150 M St. NE, Third Floor
Washington, D.C. 20002
(202) 305-0475 (Norman)
Erika.Norman@usdoj.gov
Angela.Ellis@usdoj.gov

*Attorneys for Federal Defendants*