Christopher D. Thomas (#010482)
Andrea J. Driggs (#023633)
Janet M. Howe (#034615)
Benjamin A. Longbottom (#038602)
HOLLAND & HART LLP
3110 North Central Ave., Suite D-160
Phoenix, Arizona 85012
Telephone: +1.602.316.9334
CDThomas@hollandhart.com

Michael R. Huston (#038763)
Diane M. Johnsen (#007634)
Samantha J. Burke (#036064)
Addison W. Bennett (#039801)
PERKINS COIE LLP
2525 East Camelback Road, Suite 500
Phoenix, Arizona 85016
Telephone: +1.602.351.8000
MHuston@perkinscoie.com
DJohnsen@perkinscoie.com
SBurke@perkinscoie.com
ABennett@perkinscoie.com

*Attorneys for Defendant-Intervenor*
*Resolution Copper Mining LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| San Carlos Apache Tribe, | No. CV-21-00068-PHX-DWL |
| Plaintiff, | No. CV-21-00122-PHX-DWL |
| v. | **RESOLUTION COPPER'S COMBINED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTIONS** |
| United States Forest Service, et al., | |
| Defendants. | |
| Arizona Mining Reform Coalition, et al., | |
| Plaintiffs, | |
| v. | |
| United States Forest Service, et al., | |
| Defendants. | |

TABLE OF CONTENTS

Page

Introduction ........................................................................................................1

Background.........................................................................................................4

    A.      Relevant Statutory Background ................................................4

          1.      The Exchange Act, 16 U.S.C. § 539p ...........................4

          2.      The APA .........................................................................6

          3.      NEPA, 42 U.S.C. § 4321 *et seq.*, and *Seven County*......................6

          4.      NHPA, 16 U.S.C. § 470 *et seq.* .........................................7

    B.      Procedural Background ..........................................................8

Legal Standard...................................................................................................8

Argument ...........................................................................................................9

    A.      Congress made the land exchange mandatory, so each of Plaintiffs' claims for an injunction fails at the threshold for multiple reasons. ..........9

          1.      The Exchange Act does not condition conveyance of title on completion of judicial review of Plaintiffs' challenges.................9

          2.      Plaintiffs' asserted injuries from the land exchange are not redressable through their procedural claims. ....................................14

          3.      Plaintiffs have no private right of action to seek an injunction. ......15

          4.      Even if the Court were to agree with Plaintiffs' arguments, the remedy would be a remand, not an injunction..................................19

    B.      Plaintiffs are not likely to succeed on their NEPA claims. ........................20

          1.      The FEIS and Forest Service analysis receive substantial deference.........................................................................................20

          2.      The FEIS and its underlying exhaustive analysis more than satisfy NEPA's requirements.............................................................21

               a.      The agency evaluated a reasonable range of alternatives....22

               b.      The Forest Service exhaustively evaluated water issues.....24

               c.      Plaintiffs' water arguments lack merit.................................27

               d.      The Tribe's arguments about the tailings pipeline and tailings dam engineering design criteria lack merit. ...........31

3.    There is no merit to the Tribe's contention that the government was required to publish a supplemental *draft* EIS ............................. 33

C.    AMRC fails to show any flaw in the appraisal it challenges. .................... 35

1.    The Act does not condition the Forest Service's duty to complete the exchange on judicial review of the appraisals. ........... 35

2.    AMRC's appraisal challenge misreads federal appraisal standards. ........................................................................................... 36

D.    The Tribe cannot demonstrate likely success on its consultation claim. ....................................................................................................... 40

E.    Changes to the Forest Plan are not grounds to block the land exchange. ................................................................................................... 45

F.    Plaintiffs will suffer no irreparable harm without an injunction. ............... 47

G.    The balance of equities and public interest weigh against any injunction. .................................................................................................... 49

Conclusion .......................................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alaska Wilderness League v. Jewell*,
  788 F.3d 1212 (9th Cir. 2015) ................................................. 11

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ................................................................. 16

*Alliance for the Wild Rockies v. Petrick*,
  68 F.4th 475 (9th Cir. 2023) .................................................. 32

*Apache Stronghold v. United States*,
  101 F.4th 1036 (9th Cir. 2024) (en banc),
  *cert. denied*, 145 S. Ct. 1480 (2025) ................................. 11, 47

*Appalachian Voices v. FERC*,
  139 F. 4th 903 (D.C. Cir. 2025) ............................................ 24

*Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*,
  126 F.3d 1158 (9th Cir. 1997) ............................................... 20

*Axon Enter. Inc. v. FTC*,
  452 F. Supp. 3d 882 (D. Ariz. 2020) ................................. 13, 39

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................ 6, 16

*Bolt v. United States*,
  944 F.2d 603 (9th Cir. 1991) ................................................. 38

*Boston Chamber of Com. v. Boston*,
  217 U.S. 189 (1910) ............................................................... 40

*California Cmtys Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) ................................................. 19

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ................................................. 20

*Center for Biological Diversity v. BLM*,
  141 F.4th 976 (9th Cir. 2025) ............................................. 7, 19

*Concerned Citizens & Retired Miners Coalition v. U.S. Forest Service*,
  279 F. Supp. 3d 898 (D. Ariz. 2017) ............................... 2, 15, 43

*Concerned Citizens Alliance, Inc. v. Slater*,
  176 F.3d 686 (3d Cir. 1999) ................................................... 45

*Credit Suisse Sec. (USA) LLC v. Simmonds*,
  566 U.S. 221 (2012) ............................................................... 10

*Dep't of Transp. v. Public Citizen*,
　541 U.S. 752 (2004) ................................................................... 11, 12, 30

*Desert Citizens Against Pollution v. Bisson*,
　231 F.3d 1172 (9th Cir. 2000) ...................................................... 15, 36, 48

*Earth Island Inst. v. U.S. Forest Serv.*,
　87 F.4th 1054 (9th Cir. 2023) ....................................................... 32, 34, 35

*Environmental Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
　36 F.4th 850 (9th Cir. 2022) ........................................................... 17

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Oklahoma*,
　426 U.S. 776 (1976) ........................................................................ 11

*Forbes v. Gracey*,
　94 U.S. 762 (1876) .......................................................................... 37

*Friends of the Clearwater v. Dombeck*,
　222 F.3d 552 (9th Cir. 2000) .......................................................... 34

*Friends of Clearwater v. Higgins*,
　472 F. Supp. 3d 859 (D. Idaho 2020) ............................................. 47

*Greer Coal., Inc. v. U.S. Forest Serv.*,
　470 Fed. App'x 630 (9th Cir. 2012) ................................................ 34

*Hall v. Norton*,
　266 F.3d 969 (9th Cir. 2001) .......................................................... 14

*Haro v. City of Los Angeles*,
　745 F.3d 1249 (9th Cir. 2014) ........................................................ 39

*Herb Reed Enters., LLC v. Florida Ent. Mgmt., Inc.*,
　736 F.3d 1239 (9th Cir. 2013) ........................................................ 36

*Ickes v. Virginia-Colorado Dev. Corp.*,
　295 U.S. 639 (1935) ........................................................................ 37

*Jamul Action Comm. v. Chaudrui*,
　837 F.3d 958 (9th Cir. 2016) ....................................................... 1, 11

*Kern v. BLM*,
　284 F.3d 1062 (9th Cir. 2002) ........................................................ 31

*Kleppe v. New Mexico*,
　426 U.S. 529 (1976) .......................................................................... 9

*Kleppe v. Sierra Club*,
　427 U.S. 390 (1976) ............................................................. 20, 31, 40

*Kunkes v. United States*,
　32 Fed. Cl. 249 (1994), *aff'd*, 78 F.3d 1549 (Fed. Cir. 1996) ......... 37, 38, 40

*Lamie v. U.S. Trustee,*
  540 U.S. 526 (2004) ................................................................................ 14

*League of Wilderness Defenders v. Connaughton,*
  752 F.3d 755 (9th Cir. 2014) .................................................................. 35

*Lopez v. Brewer,*
  680 F.3d 1068 (9th Cir. 2012) .................................................................. 8

*Marsh v. Oregon Nat. Res. Council,*
  490 U.S. 360 (1989) ................................................................................ 34

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ........................................................................... 2, 14

*McGreevey v. PHH Mortg. Corp.,*
  897 F.3d 1037 (9th Cir. 2018) ................................................................ 16

*Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs,*
  619 F.3d 1289 (11th Cir. 2010) .............................................................. 11

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
  551 U.S. 644 (2007) ................................................................................ 16

*Nat'l Family Farm Coal. v. EPA,*
  966 F.3d 893 (9th Cir. 2020) .................................................................. 14

*Navajo Nation v. U.S. Forest Serv.,*
  408 F. Supp. 2d 866 (D. Ariz. 2006), *overruled on other grounds,*
  479 F.3d 1024 (9th Cir. 2007) ................................................................ 41

*Northern Plains Resource Council, Inc. v. Surface Transportation Board,*
  668 F.3d 1067 (9th Cir. 2011) ................................................................ 28

*Northwest Ecosystem All. v. U.S. Fish & Wildlife Serv.,*
  475 F.3d 1136 (9th Cir. 2007) ................................................................ 41

*Ohio v. EPA,*
  603 U.S. 279 (2024) ................................................................................ 27

*Oregon Nat. Desert Ass'n v. BLM,*
  625 F.3d 1092 (9th Cir. 2010) ................................................................ 17

*Pit River Tribe v. BLM,*
  No. 04-cv-956, 2013 U.S. Dist. LEXIS 106903 (E.D. Cal. July 29, 2013) ................ 18

*Poder in Action v. City of Phoenix,*
  481 F. Supp. 3d 962 (D. Ariz. 2020) ........................................................ 8

*Protect Our Cmtys. Found. v. Lacounte,*
  939 F.3d 1029 (9th Cir. 2019) ................................................................ 34

*Reno-Sparks Indian Colony v. Haaland,*
  663 F. Supp. 3d 1188 (D. Nev. 2023) ...................................................... 43

*RESTORE: The North Woods v. USDA*,
   968 F. Supp. 168 (D. Vt. 1997) ................................................................ 13

*Russell Country Sportsmen v. U.S. Forest Serv.*,
   668 F.3d 1037 (9th Cir. 2011) ................................................................. 35

*Salmon Spawning & Recovery All. v. Gutierrez*,
   545 F.3d 1220 (9th Cir. 2008) ................................................................. 14

*San Carlos Apache Tribe v. United States*,
   417 F.3d 1091 (9th Cir. 2005) ............................................................ 8, 41

*Senior Execs. Ass'n v. United States*,
   No. 12-cv-02297, 2013 WL 1316333 (D. Md. Mar. 27, 2013) ................... 16

*Seven County Infrastructure Coalition v. Eagle County*,
   145 S. Ct. 1497 (2025) .................................................................... *passim*

*Sierra Forest Legacy v. Sherman*,
   951 F. Supp. 2d 1100 (E.D. Cal. 2013) ..................................................... 48

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ................................................................................ 36

*Tingley v. Ferguson*,
   47 F.4th 1055 (9th Cir. 2022) ................................................................. 18

*Tohono O'odham Nation v. United States Department of Interior*,
   138 F.4th 1189 (9th Cir. 2025) ............................................................... 18

*United States v. Locke*,
   471 U.S. 84 (1985) ........................................................................... 37, 38

*United States v. Oakland Cannabis Buyers' Co-op.*,
   532 U.S. 483 (2001) ............................................................................ 8, 49

*United States v. Shumway*,
   199 F.3d 1093 (9th Cir. 1999) ................................................................. 37

*Western Land Exch. Project v. BLM*,
   315 F. Supp. 2d 1068 (D. Nev. 2004) ................................................. 13, 48

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008) .............................................................................. 8, 47

## CONSTITUTION AND STATUTES

U.S. CONST., art. IV, § 3, cl. 2 ........................................................................ 4

5 U.S.C. § 702 ..................................................................................... 2, 6, 16

5 U.S.C. § 704 ............................................................................................ 46

5 U.S.C. § 706(2) .................................................................................... 6, 16

16 U.S.C. § 470 ................................................................................................................. 7

16 U.S.C. § 539p ............................................................................................................... 1

16 U.S.C. § 539p(i)(3) ............................................................................................. 10, 47

16 U.S.C. § 539p(i)(C) ............................................................................................ 39, 40

16 U.S.C. § 539p(a) ................................................................................................... 4, 10

16 U.S.C. § 539p(b)(2) ....................................................................................................... 4

16 U.S.C. § 539p(c)(1) ........................................................................... 4, 9, 10, 19

16 U.S.C. § 539p(c)(2) ..................................................................................................... 10

16 U.S.C. § 539p(c)(3)(A) ................................................................................................ 6

16 U.S.C. § 539p(c)(3)(B) ................................................................................. 6, 41, 42

16 U.S.C. § 539p(c)(4)(A) .............................................................................................. 35

16 U.S.C. § 539p(c)(4)(B)(i) .......................................................................................... 35

16 U.S.C. § 539p(c)(5)(A) ................................................................................................ 6

16 U.S.C. § 539p(c)(5)(B) ......................................................................................... 3, 36

16 U.S.C. § 539p(c)(7) ..................................................................................................... 10

16 U.S.C. § 539p(c)(8) ................................................................................................ 4, 49

16 U.S.C. § 539p(c)(9)(A) .......................................................................................... 5, 11

16 U.S.C. § 539p(c)(9)(B) .............................................................................. 5, 8, 12, 17

16 U.S.C. § 539p(c)(9)(C) ......................................................................... 12, 41, 42

16 U.S.C. § 539p(c)(9)(D) ............................................................................................... 13

16 U.S.C. § 539p(c)(10) ........................................................................................... 5, 9, 19

16 U.S.C. § 539p(e)(2) ..................................................................................................... 39

16 U.S.C. § 539p(g)(3) .............................................................................................. 10, 39

30 U.S.C. § 22 *et seq.* ..................................................................................................... 37

30 U.S.C. § 26 .......................................................................................................... 3, 37

42 U.S.C. § 4321 *et seq.* .................................................................................................. 6

54 U.S.C. § 306108 ............................................................................................................ 7

**REGULATIONS AND EXECUTIVE ACTIONS**

36 C.F.R. Part 218 ........................................................................................................... 46

36 C.F.R. Part 228 .................................................................................................... 22, 23

36 C.F.R. Part 251 ............................................................................................. 22, 23, 24

36 C.F.R. Part 261 ............................................................................ 22, 23

36 C.F.R. § 218 ........................................................................................ 46

36 C.F.R. § 218.7(c)(2)(iv) ........................................................................ 5

36 C.F.R. § 219.4 .................................................................................... 46

36 C.F.R. § 219.13(b)(3) .......................................................................... 46

36 C.F.R. § 219.16(b) .............................................................................. 46

36 C.F.R. § 251.56 .................................................................................. 23

36 C.F.R. § 254.2 .................................................................................... 38

36 C.F.R. § 254.9(b) ................................................................................ 40

36 C.F.R. § 254.9(b)(1) ............................................................................ 40

36 C.F.R. § 254.9(b)(1)(iv) ...................................................................... 38

36 C.F.R. § 254.9(c)(4) .............................................................................. 3

36 C.F.R. § 800.2(c)(2)(ii) .................................................................... 7, 41

36 C.F.R. § 800.2(c)(2)(ii)(A) .................................................................. 43

36 C.F.R. § 800.7(c) ................................................................................ 43

36 C.F.R. § 800.7(c)(4) ............................................................................ 45

40 C.F.R. § 1508.7 (2024) ........................................................................ 27

36 CFR § 251.50 ...................................................................................... 23

81 Fed. Reg. 14,829 (Mar. 18, 2016) ...................................................... 22

87 Fed. Reg. 19,775 (Mar. 31, 2022) ...................................................... 49

90 Fed. Reg. 10,610 (Feb. 25, 2025) ....................................................... 34

90 Fed. Reg. 11,001 (Feb. 25, 2025) ....................................................... 49

90 Fed. Reg. 29,632 (July 3, 2025) .......................................................... 34

Exec. Order No. 14220 ............................................................................ 49

U.S. DEP'T OF AGRIC., *Resolution Copper Project and Land Exchange*
    *Envt'l Impact Statement*, https://tinyurl.com/5frbavs3 .............................. 25

WHITE HOUSE, *Trump Administration Advances First Wave of Critical*
    *Mineral Production Projects* (Apr. 18, 2025),
    https://tinyurl.com/35vru2fy ...................................................................... 49

**OTHER AUTHORITIES**

BGC ENG'G USA, INC., *Review of Numerical Groundwater Model Construction and Approach* (Oct. 23, 2020), https://tinyurl.com/3xnebhcd ...................................................................... 24

CHRIS GARRETT, SWCA, *Process Memo. to File, Add'l Analysis of Individual Wells* (Feb. 27, 2023), https://tinyurl.com/bdvaab8p ................................ 27

CHRIS GARRETT, SWCA, *Process Memo. to File, Assessment of Cutter Basin Issues* (Feb. 16, 2023), https://tinyurl.com/mvnpb8m4 ............................... 27, 29

CHRIS GARRETT, SWCA, *Process Memo. to File, Assessment of Factual Basis for Comments on Dewatering Amounts, Water Usage, and Power Usage* (Nov. 13, 2020), https://tinyurl.com/2p9r4emn .................................................. 26

CHRIS GARRETT, SWCA, *Process Memo. to File, Clarification of Perceived Discrepancies in Water Balance Data* (June 22, 2020), https://tinyurl.com/2682tm5h ........................................................................ 26

CHRIS GARRETT, SWCA, *Process Memo. to File, Evaluation and Response to Public Comments on Groundwater Modeling Analysis* (Oct. 6, 2020), https://tinyurl.com/46zfttxu ............................................................................ 26

CHRIS GARRETT, SWCA, *Process Memo. to File, Summary and Analysis of Groundwater Dependent Ecosystems* (Oct. 11, 2018), https://tinyurl.com/y5syz7bn ........................................................................ 25

COLIN AGNER, SWCA, *Process Memo. to File, Post-DEIS Review of Updated Hydrological Data (2016-2019)*, (Sept. 8, 2020), https://tinyurl.com/5dpkj7sf ........................................................................... 26

DUKE HYDRO CHEM, *Geochemical Characterization of Resolution Tailings Update: 2014-2016* (June 8, 2016), https://tinyurl.com/4cxbj8u7 ............................. 25

EMILY NEWELL & CHRISS GARRETT, *Process Memo. to File, Water Resource Analysis: Assumptions, Methodology Used; Relevant Regulations, Laws, and Guidance; and Key Documents* (Aug. 6, 2018), https://tinyurl.com/3yc9jemw ........................................................................ 25

GABRIELE WALSER, BGC ENG'G, INC., *Review of Desert Wellfield Subsidence Analysis* (Aug. 27, 2020), https://tinyurl.com/3n4ztbu5 .......................... 26

Gannett Fleming, *Failure Modes and Effects Analysis 2020 Workshop* (Oct. 2020), https://tinyurl.com/4s73bv7a .................................................... 33

Golder, *Skunk Camp Pipelines: Pipeline Protection and Integrity Plan* (May 15, 2020), https://www.resolutionmineeis.us/documents/golder-2020 ...................... 33

HALE BARTER ET AL., MONTGOMERY & ASSOCS., *Desert Wellfield Pumping 100-year Drawdown Analysis for ADWR Evaluation in Support of the Resolution Copper EIS* (Jan. 23, 2020), https://tinyurl.com/4ajepmra ............................................................. 26

HATCH, *Final Draft Report: Prediction of Block Cave Water Chemistry* (Jan. 8, 2016), https://tinyurl.com/4x32pmat ..................................... 25

KCB Consultants, *Skunk Camp Tailings Storage Facility 'Dry' Slumping Extents* (June 2020), https://tinyurl.com/3zjr56ta ............................. 33

KCB, *Skunk Camp Site Investigation* (Nov. 2019), https://tinyurl.com/mr43tuhn ............................................................... 33

Klohn Crippen Berger, *DEIS Alternatives Failure Modes* (Jan. 2019), https://tinyurl.com/49nsdrxw ............................................................... 33

MONTGOMERY & ASSOCS., *Comparison of 2023 Phoenix AMA Groundwater Model and Resolution EIS Groundwater Model* (Nov. 14, 2023), https://tinyurl.com/ 2d5n7pne .................................................... 27

MONTGOMERY & ASSOCS., *Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells* (Dec. 7, 2022), https://tinyurl.com/jfhtu6mp; ......................................................... 27

MONTGOMERY & ASSOCS., *Numerical Groundwater Flow Model for the Skunk Camp Tailings Storage Facility* (July 17, 2020), https://tinyurl.com/2yhrpakt ..................................................... 26

MONTGOMERY & ASSOCS., *Skunk Camp Water Quality Monitoring Program* (Aug. 28, 2020), https://tinyurl.com/23mpyuzb ...................... 26

MONTGOMERY & ASSOCS., *System-wide Hydrologic Water Flow Budget*, (June 6, 2018), https://tinyurl.com/ye5vjd6j; ..................................... 25

Resolution Copper: Hearing Before the Subcomm. on Nat. Res., 112th Cong. 68-69 (2012), https://tinyurl.com/4uwswczh ........................... 4

RESOLUTION COPPER, *Survey of Surface Water Features in the Resolution Project Area and Vicinity* (Mar. 2018), https://tinyurl.com/2wnc84ff ....... 25

WESTLAND RES., *Resolution Copper Water Balance Tailings Alternatives 2,3,4,5 and 6* (Sept. 4, 2018), https://tinyurl.com/5b822h5b; ................... 25

1

**Introduction**

2        This Court should deny Plaintiffs' extraordinary motions to enjoin the execution of

3  a statute passed by Congress and signed by the President: the Southeast Arizona Land Ex-

4  change and Conservation Act, 16 U.S.C. § 539p. As this Court previously observed, the

5  Ninth Circuit has recognized what the statutory text makes plain: Congress "commands

6  that the land transfer take place not later than 60 days after" the U.S. Forest Service's pub-

7  lication of the final environmental impact statement (FEIS), and the Act "[n]owhere" grants

8  the agency discretion to halt or delay that conveyance. AMRC Dkt. 81 at 3 (cleaned up)

9  (quoting *Apache Stronghold v. United States*, 101 F.4th 1036, 1047 (9th Cir. 2024) (en

10 banc), *cert. denied*, 145 S. Ct. 1480 (2025)). That statutory text forcefully rebuts both Plain-

11 tiffs' core argument that the Forest Service cannot convey title to the federal land to Reso-

12 lution Copper unless and until Plaintiffs have fully litigated every detail of the FEIS and

13 land appraisal, and the San Carlos Apache Tribe is satisfied with the tribal-consultation

14 process. San Carlos Dkt. 106 ("Tribe Motion"); AMRC Dkt. 87 ("AMRC Motion").[1]

15       **Preliminary defects.** As demonstrated below, none of Plaintiffs' claims for injunc-

16 tive relief has merit. But even before reaching the merits, Plaintiffs' motions suffer from

17 no fewer than four preliminary problems. *First*, the statutory text unambiguously does not

18 condition the land exchange on judicial review of the adequacy of the FEIS, the appraisals,

19 or the tribal-consultation process. Congress's direction regarding the land exchange was

20 clear: the agency has no discretion; it *must* promptly convey title to the property to Reso-

21 lution no more than 60 days after publication of the FEIS. *Cf. Jamul Action Comm. v.*

22 *Chaudrui*, 837 F.3d 958 (9th Cir. 2016) (statutory deadline superseded default EIS require-

23 ments). The statute does impose various express conditions before the land exchange can

24 occur, but judicial review is not among them.

25       *Second*, Plaintiffs lack Article III standing to enjoin the land exchange because the

26 injuries they allegedly will suffer from it are not redressable. A claim of procedural injury

27

28       [1] This Response uses "AMRC" to refer to all named Plaintiffs in No. 21-cv-122-DWL.

1  requires the plaintiff to show "some possibility that the requested relief will prompt" the
2  agency to "reconsider the decision that allegedly harmed" the plaintiff. *Massachusetts v.*
3  *EPA*, 549 U.S. 497, 518 (2007). But the Forest Service has no "decision" that it could
4  "reconsider" about completing the land exchange. *Congress* made that decision. Even if
5  this Court were ultimately to conclude that the FEIS, appraisals, or tribal consultations
6  were deficient—and they were not—no amount of further study would permit the Forest
7  Service to cancel the land exchange.

8      *Third*, Plaintiffs have no private right of action to enjoin the statutory land exchange.
9  The Exchange Act itself contains no right of action, as Judge Campbell correctly deter-
10 mined in *Concerned Citizens & Retired Miners Coalition v. U.S. Forest Service*, 279 F.
11 Supp. 3d 898, 943 (D. Ariz. 2017). And the Administrative Procedure Act (APA), 5 U.S.C.
12 § 702, is no help to Plaintiffs here, because what they seek to enjoin—conveyance of the
13 federal land—is not an agency decision subject to any discretion.

14     *Fourth*, even if Plaintiffs could demonstrate any issue with the FEIS, the Supreme
15 Court recently reiterated in *Seven County Infrastructure Coalition v. Eagle County*, 145
16 S. Ct. 1497 (2025), that the remedy here would be a remand for further analysis *without*
17 *vacatur* of the FEIS—not an injunction against the land exchange. *Id.* at 1514.

18     Beyond those four preliminary problems, Plaintiffs' claims each fail on the merits:

19     **National Environmental Policy Act (NEPA).** As the Supreme Court just ex-
20 plained, the hallmark of judicial review under NEPA is "deference" to the relevant agency.
21 *Seven County*, 145 S. Ct. at 1515. The Forest Service's 2,500+ page FEIS issued on June
22 20, 2025 provided a reasoned analysis on every relevant issue. The agency's extraordinary
23 body of work here is more than sufficient to meet the highly deferential standard of review.

24     AMRC's related claim that the FEIS should have been preceded by a new draft EIS
25 and public comment lacks merit. The changes since 2021 do not involve any change in the
26 relevant action—the mandatory land exchange or the mine plan—but simply provide ad-
27 ditional support for environmental effects already previously analyzed and document ad-
28 ditional tribal consultations.

1    **Appraisals.** AMRC's claim to enjoin the land exchange based on purported defects

2    in the appraisal is flawed at the start because the Exchange Act's own "make whole" pro-

3    vision assures the government's right to receive equal value in the exchange. 16 U.S.C.

4    § 539p(c)(5)(B). Given that explicit statutory process, even if the appraisal were flawed (it

5    is not), this Court should not enjoin the land exchange. The only harm AMRC alleges based

6    on the appraisals is that the government may receive less in value than it trades away. By

7    definition that's a financial injury for which the Act provides its own remedy at law—not

8    irreparable harm to Plaintiffs that could justify injunctive relief.

9    In any event, the appraisal comports with the Exchange Act in every way. Long

10   before the Act, Resolution acquired unpatented mining claims that, under the General Min-

11   ing Law of 1872, 30 U.S.C. § 26, give it the exclusive property right to the minerals under

12   that land. Those rights encumber the Forest Service's title to the land. The appraiser thus

13   properly concluded that federal law requires the property value of those mineral rights held

14   by Resolution to be accounted for in determining the federal land's value. 36 C.F.R.

15   § 254.9(c)(4) (an appraisal must account for "all encumbrances").

16   **Tribal consultation.** The Tribe's consultation claim fails because Congress chose

17   not to condition the Forest Service's power and duty to make the land exchange on the

18   outcome of the consultation between the agency and the Tribe. The statute instead requires

19   the agency only to consult with the Tribe to identify mitigation measures that were accepta-

20   ble to Resolution. The Forest Service gave the Tribe more than a fair opportunity to share

21   its concerns; the agency consulted with the San Carlos Apache more than twice as often as

22   with any other tribe. Those consultation opportunities also satisfied the Forest Service's

23   consultation obligation under the National Historic Preservation Act (NHPA).

24   **Forest plan changes.** AMRC's argument that changes in the Tonto National Forest

25   Plan require public comment is premature, meritless, and in all events could not serve as a

26   basis to enjoin the exchange.

27   **Equitable factors.** Plaintiffs also have not demonstrated any irreparable harm if the

28   land exchange proceeds while their claims are litigated. They will not lose access to the

1   federal land after the conveyance, and it undisputedly will be months before *any* Resolution
2   activities disturb the federal land. The most serious impact on the land—subsidence—is
3   approximately a decade away and likely to be far less significant than Plaintiffs say.

4       Nor can Plaintiffs show that enjoining conveyance would be in the public interest
5   or that the balance of harms tips sharply in favor of an injunction. Plaintiffs' public-interest
6   argument is rooted in their asserted interest in ensuring that the Forest Service complies
7   with the relevant statutes. But the Act does not permit the exchange to be delayed or pre-
8   vented while their challenges are litigated. Congress already weighed the equities and
9   found that the public interest in facilitating extraction of American copper outweighs Plain-
10  tiffs' asserted rights to recreate on or otherwise use this land. An injunction would impede
11  the nation's development of domestic sources of copper—a critical material whose devel-
12  opment has been a priority of Congress and multiple presidential administrations. And an
13  injunction would inflict massive harm on Resolution to the tune of $11 million a month
14  just to maintain the mine in its current state, not counting loss of deferred revenue.

15                                  **Background**
16  **A.      Relevant Statutory Background**
17          **1.      The Exchange Act, 16 U.S.C. § 539p**

18          This Court is familiar with the Exchange Act, passed by Congress in 2014 and
19  signed by President Obama. Congress exercised its unfettered constitutional power to man-
20  age federal lands, *see* U.S. CONST., art. IV, § 3, cl. 2, to "authorize, direct, facilitate, and
21  expedite" the exchange of 2,422 acres of federal land in the Tonto National Forest to Res-
22  olution Copper, 16 U.S.C. §§ 539p(a), (b)(2), (c)(1). Congress provided that the exchange
23  will make the federal land available to Resolution "for mining and related activities subject
24  to and in accordance with applicable Federal, State, and local laws pertaining to mining
25  and related activities on land in private ownership." 16 U.S.C. § 539p(c)(8).

26          Before Congress passed the Act, it had spent nearly a decade debating the land ex-
27  change, holding six hearings and considering twelve separate bills. The Tribe and other
28  Arizona tribal leaders were invited to share their concerns. *See, e.g.*, Resolution Copper:

Hearing Before the Subcomm. on Nat. Res., 112th Cong. 68–69 (2012) (statement of Chairman Rambler, San Carlos Apache Tribe), https://tinyurl.com/4uwswczh. After weighing tribal and environmental concerns and making numerous changes to the legislation—including significantly reducing the amount of federal land to be exchanged—Congress determined that the exchange is vital to the national interest because it will facilitate domestic production of a critical resource (copper) on which the American people depend.

**Environmental review.** The Exchange Act instructs the Forest Service to "carry out the land exchange in accordance with the requirements of [NEPA]," "[e]xcept as otherwise provided in this section." 16 U.S.C. § 539p(c)(9)(A). The Forest Service shall "prepare a single environmental impact statement" (the FEIS), which serves "as the basis for all decisions under Federal law related to" development and operation of the mine "and any related major Federal actions significantly affecting the quality of the human environment." *Id.* § 539p(c)(9)(B). Federal decisions based on the FEIS may include "the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." *Id.*

Consistent with the Act, Resolution (and the Salt River Project) have applied for special use permits for various projects to support the mine, including power-transmission lines, roads, and a pipeline on national forest land. The Forest Service produced a Draft Record of Decision (ROD) alongside the June 2025 FEIS that proposes to approve those permits. That Draft ROD is now open for public objection. *See* 36 C.F.R. § 218.7(c)(2)(iv). Once those permitting decisions are final, a party with standing will be able to seek judicial review of the Forest Service's final agency actions.

By contrast, when the FEIS is published, nothing in the Exchange Act allows a challenge to the agency's conveyance of title to the federal land. The FEIS describes the Forest Service's environmental analysis and the results of its public consultations, and it triggers the prompt, non-discretionary transfer of title: The Secretary "shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper" "[n]ot later than 60 days after the date of publication" of the FEIS. 16 U.S.C. § 539p(c)(10).

1    **Appraisals.** The Exchange Act requires the value of the federal and non-federal
2    land exchanged to "be equal or … be equalized." 16 U.S.C. § 539p(c)(5)(A). To achieve
3    that, the Act requires the lands proposed for exchange to be appraised in accordance with
4    the Forest Service's appraisal regulations and the government's uniform appraisal stand-
5    ards. *Id.* § 539p(c)(4)(A). Each appraisal or a summary of it must be made public. *Id.*
6    § 539p(c)(4)(B)(iv). If the appraised value of the federal land exceeds that of the Resolution
7    land, then the Act requires Resolution to convey additional land to the Forest Service,
8    "make a cash payment," or a combination of both. *Id.* § 539p(c)(5)(B)(i).

9    **Consultation.** The Exchange Act directs the Forest Service to "engage in govern-
10   ment-to-government consultation with affected Indian tribes concerning issues of concern
11   to the affected Indian tribes related to the land exchange." 16 U.S.C. § 539p(c)(3)(A). But
12   the Act does not permit any tribes to veto the project: After tribal consultation, the Forest
13   Service is to consult with Resolution Copper and "seek to find *mutually acceptable*
14   *measures*" to address tribal concerns. *Id.* § 539p(c)(3)(B) (emphasis added).

15       **2.      The APA**

16       The APA provides a right of judicial review to persons harmed by final agency ac-
17   tion that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance
18   with law." 5 U.S.C. §§ 702, 706(2). Only *agency actions* that are both *discretionary* and
19   *final* are subject to APA review. *See Bennett v. Spear*, 520 U.S. 154, 177–178 (1997).

20       **3.      NEPA, 42 U.S.C. § 4321 *et seq*., and *Seven County***

21       NEPA sometimes "requires federal agencies to prepare an environmental impact
22   statement, or EIS, identifying significant environmental effects of [a] project[]." *Seven*
23   *County*, 145 S. Ct. at 1510. But the Supreme Court recently announced a major "course
24   correction," abrogating lower-court precedents that had "assumed an aggressive role in
25   policing agency compliance with NEPA," which had "slowed down or blocked many pro-
26   jects and, in turn, caused litigation-averse agencies to take ever more time and to prepare
27   ever longer EISs for future projects." *Id.* at 1511, 1513–1514.

28       The Supreme Court emphasized that NEPA is a "purely procedural statute" that

"imposes no substantive environmental obligations or restrictions" and does not require an "agency to weigh environmental consequences in any particular way." *Seven County*, 145 S. Ct. at 1507. It simply "helps agencies to make better decisions and to ensure good project management." *Id.* at 1510. Furthermore, an EIS must be judged in relation to the "agency final decision" for which it was prepared. "[T]he textually mandated focus of NEPA is the 'proposed action'—that is, the project at hand." *Id.* at 1515. "The ultimate question is not whether an EIS in and of itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained." *Id.* at 1514. The Supreme Court also admonished lower courts that "[t]he bedrock principle of judicial review in NEPA cases" is "[d]eference" to the relevant agency. *Id.* at 1515. When it comes to what "need[s] to be included" in an EIS, for example, "[t]he agency is better equipped to assess what facts are relevant to the agency's own decision than a court is." *Id.* at 1512. And "[b]lack-letter administrative law instructs that when an agency" decides "what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" *Id.* (citation omitted).

Even where a NEPA plaintiff shows a flaw in an environmental analysis, an injunction preventing a project from moving forward is not appropriate if the agency would not likely change its decision. "Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Id.* at 1514; *see Center for Biological Diversity v. BLM*, 141 F.4th 976, 1015–1016 (9th Cir. 2025) (remanding without vacatur in a NEPA case).

### 4.    NHPA, 16 U.S.C. § 470 *et seq.*

NHPA Section 106 requires federal agencies to "take into account the effect of [an] undertaking on any historic property," and give the Advisory Council on Historic Preservation (ACHP) "a reasonable opportunity to comment with regard to the undertaking." 54 U.S.C. § 306108. If the undertaking may affect historic property with religious significance to a tribe, the agency must consult with the tribe before proceeding. *See* 36 C.F.R. § 800.2(c)(2)(ii). The NHPA, like NEPA, is "chiefly procedural in nature"; it is "designed

1  to insure that the agency 'stop, look, and listen' before moving ahead." *San Carlos Apache*

2  *Tribe v. United States*, 417 F.3d 1091, 1097 (9th Cir. 2005) (citation omitted).

3  **B.    Procedural Background**

4          The Forest Service republished the FEIS on June 20, 2025, after spending nearly a

5  decade engaging with Plaintiffs (and others). The Forest Service also published a Draft

6  ROD that details the agency's rationale for its proposed approvals of power lines, pipelines,

7  and an access road to existing forest roads that will support the project. *See* 16 U.S.C.

8  § 539p(c)(9)(B).

9          Plaintiffs have filed renewed motions asking this Court to enjoin the statutory land

10  transfer. Plaintiffs claim that: (1) the FEIS violates the Exchange Act and NEPA (AMRC

11  Motion 15–27; Tribe Motion 18–23); (2) the appraisals are inconsistent with the Exchange

12  Act and applicable regulations (AMRC Motion 6–15); (3) the Forest Service's consultation

13  with the Tribe was inadequate under the Exchange Act and the NHPA (Tribe Motion 23–

14  24); and (4) the Forest Service unlawfully proposes to amend the Tonto National Forest

15  Plan to construct the tailings pipeline and power line (AMRC Motion 27–29).

16                                    **Legal Standard**

17          "A preliminary injunction is an extraordinary and drastic remedy, one that should

18  not be granted unless the movant, by a clear showing, carries the burden of persuasion."

19  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (cleaned up). A plaintiff "must

20  establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irrepa-

21  rable harm in the absence of preliminary relief, [3] that the balance of equities tips in his

22  favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Coun-*

23  *cil*, 555 U.S. 7, 20 (2008). That is an "exacting standard[.]" *Poder in Action v. City of*

24  *Phoenix*, 481 F. Supp. 3d 962, 967 (D. Ariz. 2020). Plaintiffs' burden is even more impos-

25  ing here because they ask this Court to enjoin not any discretionary agency action but

26  execution of the statutory provision directing the land exchange. *Cf. United States v. Oak-*

27  *land Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) ("Courts of equity cannot, in their

28  discretion, reject the balance that Congress has struck in a statute.").

**Argument**

**A.    Congress made the land exchange mandatory, so each of Plaintiffs' claims for an injunction fails at the threshold for multiple reasons.**

Plaintiffs cannot show a likelihood of success, or even serious questions, on their extraordinary requests to have this Court enjoin the statutory land transfer. None of their claims has merit. But even before reaching the merits, Plaintiffs' injunction motions fail for multiple preliminary reasons. First, the Exchange Act unambiguously does not condition the land exchange on judicial review of Plaintiffs' legal challenges. Second, Plaintiffs' claimed injuries from the land exchange are not redressable. Third, Plaintiffs lack a private right of action to block that conveyance. And fourth, the Supreme Court recently held that, even if Plaintiffs could demonstrate any flaws in the FEIS, the proper remedy would *not* be an injunction but a remand without vacatur of the FEIS.

**1.    The Exchange Act does not condition conveyance of title on completion of judicial review of Plaintiffs' challenges.**

Congress in the Exchange Act exercised its plenary power under the Property Clause of Article IV of the Constitution to determine that the best use of a small parcel of the Tonto National Forest is copper mining, and that 2,544 acres of federal land should be conveyed to Resolution Copper for that purpose. *See Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976) ("[t]he power over the public land thus entrusted to Congress [by the Property Clause] is without limitations"). Congress unambiguously directed the Forest Service to convey the federal land to Resolution. "Subject to the provisions" of the Act, the Forest Service is "authorized *and directed* to convey to Resolution Copper, all right, title, and interest of the United States in and to the Federal land." 16 U.S.C. § 539p(c)(1) (emphasis added). And Congress required the transfer to be expeditious: the agency "shall convey" all rights and title in the land to Resolution "[n]ot later than 60 days after the date of publication" of the FEIS. *Id.* § 539p(c)(10).

Plaintiffs' injunction motions rest on the theory that the Forest Service cannot convey the federal land to Resolution until all of their various legal claims and objections are

heard and rejected by the courts. Tribe Motion 18; AMRC Motion 6, 15. They assert that the Act conditions conveyance on resolution of their legal claims challenging the FEIS, the appraisals, and the tribal consultation process. But the statutory text shows that assertion is wrong. The Exchange Act does identify certain express conditions on the land exchange with Resolution. But the issues that Plaintiffs seek to litigate here are not among them:

> *Conditions on acceptance*[:] Title to any non-Federal land conveyed by Resolution Copper to the United States under this section shall be in a form that—(A) is acceptable to the Secretary …; and (B) conforms to the title approval standards of the Attorney General … applicable to land acquisitions by the Federal Government. [16 U.S.C. § 539p(c)(2) (emphasis added)]

> *As a condition of the land exchange* under this section, Resolution Copper shall agree to pay, without compensation, all costs that are (A) associated with the land exchange and any environmental review document under paragraph (9); and (B) agreed to by the Secretary. [16 U.S.C. § 539p(c)(7) (emphasis added)]

> *As a condition of the land exchange* under subsection (c), Resolution Copper shall surrender to the United States, without compensation, all rights held under the mining laws and any other law to commercially extract minerals under Apache Leap. [16 U.S.C. § 539p(g)(3) (emphasis added)]

> *As a condition of conveyance* of the Federal land, Resolution Copper shall agree to provide access to the surface of the Oak Flat Campground to members of the public, including Indian tribes, to the maximum extent practicable, … until such time as the operation of the mine precludes continued public access for safety reasons, as determined by Resolution Copper. [16 U.S.C. § 539p(i)(3) (emphasis added)]

Plaintiffs invoke none of these express conditions (each of which has been satisfied); they ask this Court to *infer* other conditions that they argue are implicit. But if Congress had intended that conveyance should also be conditioned on a judicial finding of a "compliant" FEIS, proper appraisals, or sufficient consultations, then "it most certainly would have said so." *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 228 (2012). In enacting a statute whose entire purpose is the land exchange and which mandates that the exchange promptly take place, 16 U.S.C. § 539p(a) and (c)(1), Congress deliberately (and sparingly) used explicit conditional language when it meant for the exchange to be

1   subject to conditions. It chose *not* to use such language regarding the carefully circum-

2   scribed environmental review, appraisal, and tribal-consultation requirements.

3       What's more, the unambiguous statutory obligation to transfer title within 60 days

4   of FEIS publication is irreconcilable with Plaintiffs' contention that conveyance of title

5   must wait for judicial review of its various claims. *Accord Apache Stronghold*, 101 F.4th

6   at 1047 ("Nowhere in [the Exchange Act] does Congress confer on the Government dis-

7   cretion to halt the transfer."). Neither Plaintiff mentions that important 60-day provision

8   when discussing the statute, nor explains why this Court could or should ignore it. Congress

9   certainly knew that judicial review of the FEIS could not be completed within 60 days. *See,*

10  *e.g.*, H.R. Rep. No. 113-363, pt. 1, at 5–6 (2014) (same Congress that passed the Exchange

11  Act recognizing significant "project delays due to the NEPA process," including from "lit-

12  igation challenging the documents' adequacy") (capitalization altered). The Supreme Court

13  and Ninth Circuit have both held that a statutory deadline like this supersedes any default

14  requirements surrounding preparation of an EIS. *See Flint Ridge Dev. Co. v. Scenic Rivers*

15  *Ass'n of Oklahoma*, 426 U.S. 776, 788–791 (1976) (agency excused from preparing an EIS

16  because another statute required the agency to take action (market a property) within 30

17  days); *Chaudrui*, 776 F. 3d at 971 (time limit imposed on Gaming Commission to approve

18  tribal ordinance precluded application of NEPA's lengthy EIS obligation). The only rea-

19  sonable conclusion from the statutory text is that the Act does not condition the mandatory

20  land exchange on judicial review.

21      Plaintiffs argue that the Exchange Act requires judicial review of their NEPA

22  claims, in particular, because it states that, "[e]xcept as otherwise provided in this section,

23  the Secretary shall carry out the land exchange in accordance with the requirements of

24  [NEPA]." 16 U.S.C. § 539p(c)(9)(A). But Plaintiffs' reading of that clause fails for two

25  fundamental reasons. First, "[p]rocedural statutes like NEPA do not apply when an agency

26  has no discretion to act or not to act on a given matter." *Miccosukee Tribe of Indians of*

27  *Fla. v. U.S. Army Corps of Eng'rs*, 619 F.3d 1289, 1302 (11th Cir. 2010); *see Dep't of*

28  *Transp. v. Public Citizen*, 541 U.S. 752, 770 (2004); *Alaska Wilderness League v. Jewell*,

1    788 F.3d 1212, 1225–1226 (9th Cir. 2015) (under *Public Citizen*, agency was not required

2    to comply with NEPA to consider "the environmental impact of an action it could not

3    refuse to perform"). As discussed, the Forest Service has no discretion whether to carry out

4    the land exchange.

5        Second, Plaintiffs fail to acknowledge that the clause in § 539p(c)(9)(C) on which

6    they rely is expressly qualified by the preceding phrase: "[e]xcept as otherwise provided."

7    What Congress "otherwise provided" is found, in part, in the next two provisions:

8        Prior to conveying Federal land … , the Secretary shall prepare a single [EIS]
         under [NEPA], *which shall be used as the basis for* all decisions under Fed-

9        eral law related to the proposed mine and the Resolution mine plan of oper-
         ations and any related major Federal actions significantly affecting the qual-

10       ity of the human environment, including the granting of any permits, rights-
         of-way, or approvals for the construction of associated power, water, trans-

11       portation, processing, tailings, waste disposal, or other ancillary facilities.

12

13   *Id.* § 539p(c)(9)(B) (emphasis added). The Act goes on to say that the EIS shall "assess the

14   effects of the mining and related activities on the Federal land conveyed to Resolution

15   Copper under this section on the cultural and archeological resources that may be located

16   on the Federal land," and "identify measures that may be taken, to the extent practicable,

17   to minimize potential adverse impacts on those resources, if any." *Id.* § 539p(c)(9)(C).

18       In subparagraph (9)(B), then, the Act specifies that the purpose of the FEIS is *not* to

19   determine whether to convey the property to Resolution or to build the mine, but rather to

20   make "all decisions under Federal law *related to* the proposed mine and the Resolution

21   mine plan of operations." 16 U.S.C. § 539p(c)(9)(B) (emphasis added). Subparagraph

22   (9)(C) makes the FEIS also relevant to minimizing harm to cultural and archaeological

23   resources. If, as Plaintiffs assert, Congress meant to condition conveyance on completing

24   judicial review of the adequacy of the FEIS, then it would have included conveyance of

25   the federal land among the "decisions" for which the FEIS "shall be used."

26       Subparagraph (9)(D) reinforces Congress's instruction to let the land exchange pro-

27   ceed expeditiously. Congress there provided that nothing in paragraph (9) "precludes" the

28   Forest Service from using other "environmental review documents prepared in accordance

1    with" NEPA for "activities not involving … the land exchange[] or … extraction of min-

2    erals in commercial quantities by Resolution Copper on or under the Federal land." 16

3    U.S.C. § 539p(c)(9)(D). Congress thereby made clear that, to the extent the Forest Service

4    issues "environmental review documents" through the NEPA process, it cannot use them

5    for activities "involving … the land exchange" or for the mining of minerals by Resolution.

6        AMRC invokes (Motion 17) a comment from a former Forest Service official, who

7    recommended that an earlier version of the Act "be amended to require the preparation of

8    an environmental analysis *before* the land exchange is completed." AMRC Motion, Ex. 14

9    at 59. That stray comment is not relevant to interpreting the statutory text. *See Axon Enter.*

10   *Inc. v. FTC*, 452 F. Supp. 3d 882, 893 (D. Ariz. 2020) ("It is the business of Congress to

11   sum up its own debates in its legislation, and once it enacts a statute we do not inquire what

12   the legislature meant; we ask only what the statute means.") (cleaned up) (quoting *Epic*

13   *Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018)), *rev'd and remanded on other grounds*, 598

14   U.S. 175 (2023). Regardless, an environmental analysis obviously *was* prepared before the

15   land exchange—and it was incredibly thorough, as shown below.

16       AMRC also asserts (Motion 25–26) that, "as long as there are some conditions or

17   discretion that govern the agency's review of the proposed exchange, NEPA applies" and

18   judicial review is required—perhaps until Plaintiffs have exhausted appeals all the way to

19   the Supreme Court. That is incorrect because the Exchange Act does not permit the agency

20   to review the land exchange. Rather, Congress directed the Forest Service to make the

21   exchange within 60 days of the FEIS and provided that the FEIS would be relevant—*not*

22   to any decision about the exchange—but to *other* agency decisions (like permits) *after* the

23   exchange. For that reason, the cases AMRC cites are not relevant. *See RESTORE: The*

24   *North Woods v. USDA*, 968 F. Supp. 168 (D. Vt. 1997) (NEPA applied because Congress

25   had afforded the agency some discretion to make a land exchange); *Western Land Exch.*

26   *Project v. BLM*, 315 F. Supp. 2d 1068, 1081 (D. Nev. 2004) (statute required exchange to

27   comply with "applicable law," including NEPA, with no caveats, limitations, or specific

28   directives).

1    In short, as this Court and the Ninth Circuit have both recognized, the Exchange Act

2    "commands that the land transfer take place 'not later than 60 days after'" publication of

3    the FEIS, and it "[n]owhere" grants the agency discretion to halt that conveyance. AMRC

4    Dkt. 81 at 3 (cleaned up) (quoting *Apache Stronghold*, 101 F.4th at 1047). Where, as here,

5    "the statute's language is plain, the sole function of the courts … is to enforce it according

6    to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (citation omitted).

7        **2.    Plaintiffs' asserted injuries from the land exchange are not redressable**
8             **through their procedural claims.**

9        Plaintiffs also cannot demonstrate Article III standing to enjoin the land exchange.

10   Plaintiffs assert injuries flowing from conveyance of title, but those injuries are not redress-

11   able through their claims here. Article III requires a plaintiff alleging a violation of a pro-

12   cedural right to show that "there is some possibility that the requested relief will prompt"

13   the agency "to reconsider the decision" at issue. *Massachusetts*, 549 U.S. at 518; *see Nat'l*

14   *Family Farm Coal. v. EPA*, 966 F.3d 893, 910 (9th Cir. 2020) (plaintiff must show "that

15   the relief requested—that the agency follow the correct procedures—*may* influence the

16   agency's ultimate decision of whether to take or refrain from taking a certain action.")

17   (citation omitted); *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001) (plaintiff required to

18   show agency's decision "could be influenced by" more study).

19       Plaintiffs' requests to enjoin the land exchange thus require them to demonstrate

20   that, if the various flaws they allege in the FEIS, the appraisals, or the tribal consultations

21   were corrected, then the Forest Service might decide not to convey the federal land to Res-

22   olution. But for the reasons stated above, that contention is a non-starter. Nothing in the

23   Act grants the Forest Service the power to refuse to make the exchange based on court

24   challenges to the FEIS, the appraisals, or the consultations. Even if Plaintiffs could con-

25   vince this Court that flaws in the FEIS, the appraisals, or the consultations require addi-

26   tional study or correction, Plaintiffs cannot show that the Forest Service "could be influ-

27   enced" ultimately to do anything other than comply with its duty under the Act to proceed

28   with the land exchange. *Hall*, 266 F.3d at 977; *cf. Salmon Spawning & Recovery All. v.*

1   *Gutierrez*, 545 F.3d 1220, 1226–27 (9th Cir. 2008) (finding no standing where "a court

2   could not set aside the next, and more significant, link in the chain").

3   　　　*Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000), does not

4   support Plaintiffs' standing to pursue an injunction here. (*Contra* AMRC Motion 14)

5   AMRC's cited passage from *Desert Citizens* concerns "injury in fact," not redressability.

6   231 F.3d at 1176. At issue there was an agency's "decision" to complete a discretionary

7   *administrative* land exchange—not one ordered by Congress—backed by an appraisal the

8   plaintiff alleged was inadequate. *Id.* at 1174. The exchange proponent argued that redress-

9   ability required the plaintiff to show the agency would necessarily cancel the exchange if

10  the court invalidated the appraisal. *Id.* at 1178–1179. Consistent with the authorities cited

11  above, the Ninth Circuit held that the plaintiff need not show "with absolute certainty" that

12  the agency would change its "ultimate decision" if the plaintiff prevailed. *Id.* at 1179; *id.*

13  at 1178 ("The mere fact that, on remand, the government might not grant plaintiff's request

14  does not defeat plaintiff's standing.") (cleaned up) (citation omitted). The plaintiff's injury

15  was redressable because *it was possible* that, if the plaintiff prevailed, the agency might

16  change its mind and the federal land might not "be traded away." *Id.* at 1178.

17  　　　That's not possible here. Even if the FEIS or the appraisals were found to need

18  revision, or further consultations were necessary, there is *no possibility* that the Forest Ser-

19  vice may "decide" not to make the land exchange. Because even prevailing on Plaintiffs'

20  procedural claims could not ultimately block the Forest Service's conveyance of title to

21  Resolution, Plaintiffs lack standing to preliminarily enjoin the land exchange.

22  　　　**3.　　Plaintiffs have no private right of action to seek an injunction.**

23  　　　Even if this Court were inclined to infer that the Forest Service's power and duty to

24  make the land exchange are conditioned as Plaintiffs assert *and* that the injuries they claim

25  might be redressable, Plaintiffs claims all fail for lack of a private right of action.

26  　　　The Exchange Act affords Plaintiffs no private right of action to sue, as Judge

27  Campbell has recognized and this Court has suggested. *See Concerned Citizens*, 279

28  F. Supp. 3d at 942–943 ("the Tribe has not shown that [the Exchange Act] provides a cause

1   of action for it to challenge"); AMRC Dkt. 81 at 10. Plaintiffs have not attempted to show

2   that the Exchange Act includes any rights-creating language that would authorize this suit.

3   *See Alexander v. Sandoval*, 532 U.S. 275, 286, 288 (2001); *McGreevey v. PHH Mortg.*

4   *Corp.*, 897 F.3d 1037, 1044 (9th Cir. 2018) ("[W]ithout Congress's intent to create a rem-

5   edy, no right of action can be implied.").

6          This Court has observed that, without a cause of action under the Exchange Act,

7   Plaintiffs must attempt to rely on the APA, 5 U.S.C. §§ 702, 706(2), including for their

8   NEPA and NHPA claims. AMRC Dkt. 81 at 10. But the APA concerns only *agency* action;

9   complaints about acts of Congress are not actionable under the APA. And for an agency

10  action to be reviewable under the APA, it must "mark the consummation of the agency's

11  *decision-making process*" and determine "rights or obligations" or "legal consequences."

12  *Bennett*, 520 U.S. at 177–178 (emphasis added). The Exchange Act did not delegate to the

13  agency any "decision" whether to convey this federal land. The conveyance is therefore

14  not an "agency action" reviewable through the APA. *See Senior Execs. Ass'n v. United*

15  *States*, No. 12-cv-02297, 2013 WL 1316333, at *17 (D. Md. Mar. 27, 2013) ("[A]n

16  agency's execution of a nondiscretionary, ministerial action in compliance with an express

17  statutory mandate is not agency action under the APA."); *cf. Nat'l Ass'n of Home Builders*

18  *v. Defs. of Wildlife*, 551 U.S. 644, 669–670 (2007) ("an agency cannot be considered the

19  legal 'cause' of an action it has no statutory discretion not to take").

20         Nor is the FEIS itself a reviewable "final agency action" (*contra* Tribe Motion 11–

21  15; AMRC Motion 15 n.3), as publishing it likewise was not discretionary. The Act pro-

22  vides that the FEIS informs future agency decisions about permits and rights-of-way, not

23  whether to make the land exchange. It was *Congress* that decided to transfer the federal

24  land, and it is Congress's decision from which "legal consequences will flow." *Bennett*,

25  520 U.S. at 178 (citation omitted). *Seven County* reiterated that an EIS is reviewable *only*

26  in conjunction with the agency decision for which it is prepared: "[T]he textually mandated

27  focus of NEPA is the 'proposed action'—that is, the project at hand." 145 S. Ct. at 1515.

28  The measure of an EIS is its "usefulness … to the decisionmaking process," *id.* at 1513,

1    and "[t]he ultimate question is not whether an EIS in of itself is inadequate, but whether

2    the agency's final decision was reasonable and reasonably explained," *id.* at 1514. There

3    was no Forest Service decision about whether to complete this land exchange.

4         That statutory process departs from how NEPA typically operates, and that depar-

5    ture explains why Plaintiffs' cited authorities are misplaced here. In a typical case, the

6    NEPA review process concludes either when "(1) the agency determines through an [en-

7    vironmental assessment] that a proposed action will not have a significant impact on the

8    environment and issues a [finding of no significant impact][;] or (2) the agency determines

9    that the action will have a significant impact and issues an EIS *and* [*ROD*]." *Environmental*

10   *Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 868–869 (9th Cir. 2022) (em-

11   phasis added); *see Oregon Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1118–1119 (9th Cir.

12   2010) ("Once an EIS's analysis has been solidified in a ROD, an agency has taken final

13   agency action …") (collecting cases). The Exchange Act is different. Here, Congress pro-

14   vided that the FEIS exists in service of decisions about permitting and the like that federal

15   agencies will make *after* the land exchange. *See supra* at 5–7; 16 U.S.C. § 539p(c)(9)(B).

16   Accordingly, per this statutory text and *Seven County*, judicial review of the FEIS cannot

17   support an injunction of the land exchange because no "project" or "decision" for which

18   the FEIS was prepared is yet before this Court.

19        The Tribe argues that this Court should disregard *Seven County* in favor of prior

20   Ninth Circuit cases purportedly holding that "final NEPA documents" are "final agency

21   actions" always reviewable under the APA. Tribe Motion 11 (quoting *Environmental*

22   *Defense Center*, 36 F.4th at 868). That argument mis-describes circuit precedent even

23   before *Seven County*. In the cases cited, the actions challenged were final agency actions

24   *accompanied by* a NEPA document—either an environmental assessment and finding of

25   no significant impact ("FONSI") or an EIS with a final ROD. *Environmental Defense Cen-*

26   *ter*, 36 F.4th at 868–869 (environmental assessment and FONSI); *Oregon Natural Desert*

27   *Association,* 625 F. 3d at 1106 (final ROD). The contents of the NEPA documents were

28   relevant only to the extent they bore on whether the agency's concurrent decision was

1  reasonable. The Tribe has not cited a single Ninth Circuit case holding that an EIS alone

2  was reviewable under NEPA in the absence of an accompanying agency decision.

3  In any event, any earlier suggestion that every final EIS is reviewable was abrogated

4  by the Supreme Court's holding that an EIS is reviewed only insofar as it informs the "pro-

5  ject at hand." *Seven County*, 145 S. Ct. at 1515. The Tribe claims (Motion 12) that *Envi-*

6  *ronmental Defense Center* survived *Seven County*, citing *Tingley v. Ferguson*, 47 F.4th

7  1055, 1074 (9th Cir. 2022). But as the Tribe's own Motion shows (at 12), *Tingley* consid-

8  ered whether one Supreme Court decision (involving speech by crisis pregnancy centers)

9  abrogated precedent on a distinct issue (what Plaintiffs call "conversion therapy on mi-

10  nors"). *Seven County* dealt with the same issue as *Environmental Defense Center*: judicial

11  review under NEPA. This Court should not disregard the Supreme Court's directly on-

12  point instructions about the (limited) scope of NEPA review in favor of earlier Ninth Cir-

13  cuit decisions—especially given the Supreme Court's stated intent to correct a body of

14  lower-court decisions that had misapplied NEPA in contravention of its text.

15  In the NHPA context, the Tribe invokes *Tohono O'odham Nation v. United States*

16  *Department of Interior*, 138 F.4th 1189 (9th Cir. 2025), but that case too is very different.

17  The BLM issued limited notices to proceed that authorized construction of a transmission

18  line after the agency concluded there would be no adverse effects to historic properties that

19  could not be mitigated or avoided. *Id.* at 1201. According to the court, those notices repre-

20  sented the agency's final determination that the conditions of the applicable programmatic

21  agreement had been satisfied because no historic properties were present in the area. *Id.*

22  The notices were thus reviewable under the APA because they "mark[ed] the consumma-

23  tion of the agency's decisionmaking process" and legal consequences flowed from them.

24  *Id.* at 1200 (citation omitted). The Forest Service here had no similar authority to undertake

25  a decisionmaking process about whether to make the land exchange. *See, e.g.*, *Pit River*

26  *Tribe v. BLM*, No. 04-cv-956, 2013 U.S. Dist. LEXIS 106903, at *26–27 (E.D. Cal. July

27  29, 2013) ("Just as NEPA does not apply when there can be 'no benefit from NEPA com-

28  pliance,' analysis and consultation under the NHPA are not required when a mandatory

1  statutory duty would make them superfluous." (quoting *Sierra Club v. Babbitt*, 65 F.3d
2  1502, 1512 (9th Cir. 1995)), *rev'd on other grounds*, 793 F.3d 1147 (9th Cir. 2015).

3      Last, the Tribe posits (Motion 14) that its challenge is merely to publication of the
4  FEIS, not "the decision to convey" the Federal land. But Plaintiffs are not now challenging
5  FEIS publication; they seek an injunction against execution of the statutory provisions in
6  16 U.S.C. § 539p(c)(1), (10) requiring the land transfer. Here again Plaintiffs incorrectly
7  look past the statutory text and assume the FEIS is in service of the decision to transfer the
8  land rather than, as the Act makes clear, future decisions about the mine plan.

9      **4.   Even if the Court were to agree with Plaintiffs' arguments, the remedy**
10         **would be a remand, not an injunction.**

11     Plaintiffs' motions also rest on a mistaken premise about the appropriate remedy for
12 a NEPA violation—even assuming they could establish one. Plaintiffs assert without anal-
13 ysis that this Court should vacate the FEIS and enjoin conveyance if it finds the FEIS
14 somehow flawed. But *Seven County* holds that vacatur would not be appropriate here.
15 "Even if an EIS falls short in some respects, that deficiency may not necessarily require a
16 court to vacate the agency's ultimate approval of a project, at least absent reason to believe
17 that the agency might disapprove the project if it added more to the EIS." 145 S. Ct. at
18 1514; *accord California Cmtys Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012)
19 (a "flawed" agency decision "need not be vacated," particularly when it might "thwart[]
20 'the operation'" of a federal statute) (citation omitted). Again, this Act grants the Forest
21 Service no power to "disapprove" the land exchange. Thus, even if Plaintiffs were right
22 that the FEIS is flawed, this Court at most might remand the FEIS without vacatur for
23 further analysis or consultation. *See Center for Biological Diversity*, 141 F.4th at 1015–1016
24 (remanding without vacatur in challenge to EIS issued for a drilling project where the
25 agency would "likely … adopt the same rule on remand"). But Plaintiffs' asserted proce-
26 dural injuries provide no basis for an injunction against the land exchange itself, either now
27 or at the end of their case.

28

\* \* \*

In sum, Plaintiffs' claims all are based on an incorrect construction of the Exchange Act, their claimed injuries are not redressable, they lack a private right of action to challenge the land transfer, and they have requested an improper remedy. Those preliminary fatal flaws show Plaintiffs have no likelihood of success in this action.

**B.    Plaintiffs are not likely to succeed on their NEPA claims.**

As shown above, this Court need not delve into the details of the multi-thousand-page FEIS and exhaustive NEPA process to deny Plaintiffs' motions to enjoin the land exchange. But in any event, the voluminous record proves that the Forest Service conducted a fulsome NEPA review.

**1.    The FEIS and Forest Service analysis receive substantial deference.**

"[T]he central principle of judicial review in NEPA cases is deference" to the agency. *Seven County*, 145 S. Ct. at 1511. NEPA requires only that the agency take a "hard look" at potential environmental impacts. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) (citation omitted). It "'does not mandate particular results'" or "require the agency to weigh environmental consequences in any particular way." *Seven County*, 145 S. Ct. at 1507, 1510 (citation omitted). That's because under NEPA, an expert agency necessarily makes "a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail of the resulting EIS." *Id.* at 1513.

Accordingly, as "long as the EIS addresses environmental effects from the project at issue, courts should defer to agencies' decisions about where to draw the line" and not "micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Seven County*, 145 S. Ct. at 1513–1514. A court will not "substitute its judgment for that of the agency." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). And courts are not to "'fly speck' an EIS." *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1183–1184 (9th Cir. 1997) (citation omitted).

### 2. The FEIS and its underlying exhaustive analysis more than satisfy NEPA's requirements.

Plaintiffs' cherry-picked criticisms ignore the Forest Service's vast investment of time and resources in the NEPA process. The FEIS represents the final piece of an exhaustive environmental review by the agency that began in March 2016 following months of tribal consultation. It includes three volumes of narrative totaling 1,083 pages, plus three volumes of appendices adding over 1,000 more. Tribe Motion, Exs. 23–28.[2] The agency's project website (https://www.resolutionmineeis.us/) contains hundreds of additional studies and other project documents. Of those, 848 are documents referenced in the FEIS.

Twelve cooperating and consulting federal, state, and country agencies with environmental, cultural, and natural resource expertise contributed to the FEIS, including (among others) the BLM, EPA, U.S. Fish and Wildlife Service, U.S. Army Corps of Engineers, and ACHP. Thirty-seven Forest Service employees and 73 third-party contractors—with a combined *2,353 years* of professional experience—contributed to the FEIS. Their expertise includes engineering of all types, hydrogeology, anthropology and Native American history, and environmental and mining engineering and economics. Of the contributors, 21 hold scientific doctorate degrees, and 46 more have a master's degree.

The public and Plaintiffs were fully engaged throughout the nine-year FEIS process. The Forest Service initiated government-to-government consultation with tribes on the land exchange in August 2015. In early 2016, even before the public-comment period, the Forest Service conducted interviews with 22 stakeholders, including the directors of Plaintiffs Access Fund and the Grand Canyon Chapter of the Sierra Club. U.S. FOREST SERV., *Resolution Copper Project and Land Exchange EIS Scoping Report* (March 2017) ("Scoping Report"), Ex. 1, Appx. A at 15–16. A March 2016 *Federal Register* notice invited the public to take 70 days to suggest environmental effects the Forest Service should evaluate.

---

[2] Volumes 1 through 6 of the FEIS are attached as the Tribe's Exhibits 23 through 28, respectively. This brief cites the FEIS by volume and page number, with the corresponding exhibit number in parentheses. *E.g.*, FEIS Vol. 3 (Tribe Ex. 25) at 1007–1010.

81 Fed. Reg. 14,829 (Mar. 18, 2016). The agency held five in-person scoping meetings, and *all Plaintiffs provided comments. See* Ex. 1 (Scoping Report) at 15, 39–40, 152. The Forest Service received and reviewed 133,653 submittals, 1,237 of which were unique and given particular scrutiny. The Government identified 13 issues and 28 sub-issues worthy of evaluation. U.S. DEP'T OF AGRIC., *Draft Record of Decision* (June 16, 2025) (Draft ROD), Ex. 2 at 30. Among them were tribal concerns, cultural issues, and water.

Although not required, the Forest Service conducted public stakeholder workshops between March and April 2017 to develop and analyze alternatives. Snapshots of alternatives were released for public review in 2018. The concerns identified during the scoping process were in turn evaluated in the Forest Service's draft EIS, published on August 9, 2019. *See* https://tinyurl.com/4tphhbsf. Another opportunity for public comment followed. The Forest Service held six public meetings and went beyond the statutory 45-day public-comment timeframe by accepting comments for 90 days from the public and 135 days from tribal governments (at the request of the San Carlos Apache Tribe). The Forest Service received 29,000 comments, and it gave individual attention to the 5,200 unique comments. *See* Ex. 2 (Draft ROD) at 31.

The Forest Service's responses to public comments on the draft EIS totaled 394 pages. *See* FEIS Vol. 6 (Tribe Ex. 28), Appx. R. The Forest Service responded to comments by the Tribe (*id.* at R-10–24) and AMRC, among others, and aggregated similar comments as detailed in Table R-4 of the FEIS. *Id.* at R-71 *et seq.*

*

Plaintiffs argue that the FEIS fails to evaluate a reasonable range of alternatives and is deficient as to the Project's water use and tailings pipeline and storage facility. Plaintiffs are incorrect. The FEIS addresses each of those issues in detail.

### a.   The agency evaluated a reasonable range of alternatives.

AMRC argues (Motion 18–19) that the Forest Service was unreasonable in evaluating a range of alternatives and in analyzing effects because it reviewed the Project under 36 C.F.R. Part 228 instead of 36 C.F.R. Parts 251/261. This argument misstates the Draft

1    ROD and FEIS, where the Forest Service clearly stated that the Project would be consid-

2    ered under both regulatory schemes, with 36 C.F.R. Parts 251/261 applying to activities

3    that will take place on federal land following the exchange.

4        For context, the Forest Service regulates mining and related activities on forest land

5    pursuant to 36 C.F.R. Part 228; section 228.4 requires approval of a mine plan of operations

6    where mining activity might cause "significant disturbance of surface resources" on *federal*

7    land. Activities other than mining on federal land are regulated by the special land use

8    regulations under Part 251, section 251.50. Agency approval to conduct non-mining activ-

9    ity on national forest land under Part 251 is conferred in a special use permit, not via

10   approval of a general plan of operations (as for Part 228 mining operations). Part 251 also

11   grants the Forest Service broader authority to impose protective conditions than Part 228

12   allows. 36 C.F.R. § 251.56.

13       AMRC argues (Motion 18–19) that because the FEIS purpose and need statement

14   references the Part 228 term of art "General Plan of Operations," the Forest Service must

15   have failed to review the Project under the Part 251 special use regulations. That is wrong.

16   The Draft ROD expressly states that Resolution's uses of Forest Service lands would be

17   considered "special uses [that] are regulated under *36 CFR § 251.50* because they are

18   associated with mining on private property and therefore do not involve operations con-

19   ducted under U.S. mining laws." Ex. 2 (Draft ROD) at 5 (emphasis added). As explained

20   in the Draft ROD, reviewing Resolution's special use permit application under 36 C.F.R.

21   § 251.50 permitted the Forest Service to impose "terms and conditions" to minimize dam-

22   age to the environment, protect the public interest, and require regulatory compliance. *Id.*

23       The Draft ROD is consistent with the Forest Service's FEIS decision framework,

24   which explains that the Project's alternatives and scenarios were considered under both

25   legal regimes. FEIS Vol. 1 (Tribe Ex. 23) at 19–21. This is because the FEIS evaluated

26   several Project scenarios and alternatives. Under some, the tailings facility would be

27   located on land that remained in federal ownership (regulated under Part 228). Under oth-

28   ers, the tailings storage facility would not be located on federal land, but federal land would

1  need to be crossed to reach the facility (regulated under 251). Since the Skunk Camp alter-

2  native (Alternative 6) was selected, and the tailings facility is expected to be on non-federal

3  land, the Forest Service rightly concluded its decisions "would be limited to authorization

4  of the proposed uses of [federal] land outside the exchanged land" and regulated under Part

5  251. Ex. 2 (Draft ROD) at 7–8. The Draft ROD thus reflects the agency's reasoned decision

6  to grant Resolution's special use permit application. After the exchange, the special use

7  regulations will continue to govern use of federal lands not being exchanged.

8         Contrary to AMRC's arguments, the Forest Service fully acknowledged its author-

9  ity and role under both regulatory schemes, including its authority to demand modifications

10  and set terms and conditions of Resolution's proposed pipelines, transmission lines, roads,

11  and other facilities associated with the Project. *See* FEIS Vol. 1 (Tribe Ex. 23) at 135.

12         **b.    The Forest Service exhaustively evaluated water issues.**

13         Plaintiffs' critiques of the evaluation of the Project's potential water use attack the

14  minutiae of the Forest Service's analysis—precisely the sort of fly-specking that precedent

15  prohibits. Plaintiffs' latest objections call for an endless game of NEPA whack-a-mole:

16  every time the agency addresses one purported deficiency, Plaintiffs think of another. But

17  Plaintiffs "cannot demand that [the agency] run down every rabbit hole." *Appalachian*

18  *Voices v. FERC*, 139 F. 4th 903, 927 (D.C. Cir. 2025) (Henderson, J., concurring).

19         Water has been a critical focus of the NEPA process for years. The republished FEIS

20  devotes nearly 600 pages to water quantity and quality issues. This analysis is the result of

21  consultation and input from numerous agencies and stakeholders, including cooperating

22  agencies, consulting Tribes, and local and county governments. The extensive water dis-

23  cussion in the 2025 FEIS was preceded by over 500 pages dedicated to water issues in the

24  2021 EIS and nearly 300 pages in the 2019 Draft. In all, this analysis was informed by

25  more than 15 years of study and hundreds of technical reports on the Project website.[3]

26  ───────────────

27         [3] *See, e.g.*, BGC ENG'G USA, INC., *Review of Numerical Groundwater Model Con-*
*struction and Approach* at 48 (Oct. 23, 2020), https://tinyurl.com/3xnebhcd (Forest Service

28  noting the available data sets are "robust—more extensive than those typically available

1    Moreover, the Forest Service considered comments and concerns about water *from*

2  *Plaintiffs*, among others. During the scoping phase, CBD commented that an analysis of

3  the aquifer and groundwater/surface water relationship should be conducted. Ex. 1 (Scop-

4  ing Report), Appx. F at F-2. The Sierra Club requested consideration of potential spring

5  dewatering and land subsidence. *See id.* at F-3. And the Tribe expressed general concerns

6  about acid mine drainage and groundwater resources. *See* Ex. 1 (Scoping Report) at 152.

7  In response, the Forest Service produced hundreds of pages of water quantity and quality

8  analysis, including extensive documentation of surface water conditions and a numerical

9  groundwater flow model designed to assess groundwater impacts in the region. Draft EIS

10  at 295. Dozens of technical reports were completed to support the agency's water analysis,

11  which evaluated impacts on 67 nearby springs and the potential that groundwater pumping

12  could cause land subsidence, *id.* at 312–317, 334, and addressed acid drainage and controls

13  that would prevent negative impacts to water resources, *id.* at 372–373, 411–416.[4]

14    The FEIS process also included two working groups formed to evaluate water con-

15  cerns. Tribal consultant James Wells participated extensively in both.[5] The Groundwater

---

for many other projects"); U.S. DEP'T OF AGRIC., *Resolution Copper Project and Land Exchange Envt'l Impact Statement*, https://tinyurl.com/5frbavs3 (last visited July 27, 2025) (intra-website search of meeting minutes of Water Work Group).

    [4] *See, e.g.*, MONTGOMERY & ASSOCS., *System-wide Hydrologic Water Flow Budget*, (June 6, 2018), https://tinyurl.com/ye5vjd6j; WESTLAND RES., *Resolution Copper Water Balance Tailings Alternatives 2,3,4,5 and 6* (Sept. 4, 2018), https://tinyurl.com/5b822h5b; EMILY NEWELL & CHRISS GARRETT, *Process Memo. to File, Water Resource Analysis: Assumptions, Methodology Used; Relevant Regulations, Laws, and Guidance; and Key Documents* (Aug. 6, 2018), https://tinyurl.com/3yc9jemw; HATCH, *Final Draft Report: Prediction of Block Cave Water Chemistry* (Jan. 8, 2016), https://tinyurl.com/4x32pmat; RESOLUTION COPPER, *Survey of Surface Water Features in the Resolution Project Area and Vicinity* (Mar. 2018), https://tinyurl.com/2wnc84ff; DUKE HYDRO CHEM, *Geochemical Characterization of Resolution Tailings Update: 2014–2016* (June 8, 2016), https://tinyurl.com/4cxbj8u7; CHRISS GARRETT, SWCA, *Process Memo. to File, Summary and Analysis of Groundwater Dependent Ecosystems* (Oct. 11, 2018), https://tinyurl.com/y5syz7bn.

    [5] *See, e.g.*, Ex. 3, Donna Morey, SWCA, *Meeting Minutes* (Sept. 12, 2018), https://tinyurl.com/mp9sda2x; Ex. 4, Donna Morey, SWCA, *Meeting Minutes* (Jan. 23, 2020), https://tinyurl.com/4ab38uwc; Ex. 5, Donna Morey, SWCA, *Meeting Minutes* (Mar. 26, 2020), https://tinyurl.com/yc6j3stk.

1  Modeling Workgroup convened in September 2017 and included tribal representatives,
2  Forest Service hydrologists, groundwater modeling experts, and representatives from
3  ADWR, AGFD, EPA, and Resolution Copper. *See* FEIS Vol. 2 (Tribe Ex. 24) at 383. In
4  11 meetings over 15 months, the group collaboratively reviewed the groundwater modeling
5  work for the Project, including about 98 individual action items for additional analysis,
6  modeling runs, clarifications, or data to address questions raised.[6]

7      The second group, the Water Resources Workgroup, convened in January 2020 fol-
8  lowing public comment on the draft EIS. It examined the mine site groundwater model, the
9  Desert Wellfield groundwater model, surface water analysis, and water quality issues. *See*
10  Ex. 6 (Workgroup Memorandum) at 2. Through this group, the Forest Service discussed
11  and responded to water-related comments on the draft EIS, and consultants and other con-
12  tributors prepared extensive additional technical memoranda addressing public comments
13  about the draft water analysis.[7]

14      Additionally, Forest Service contractor SWCA prepared a 55-page white paper

15  _____

16  [6] *See* Ex. 6, CHRIS GARRETT, SWCA, *Process Memo. to File, Proceedings of the
    Groundwater Modeling Workgroup and Water Resources Work Grou*p (Nov. 5, 2020)
17  ("Workgroup Memorandum"), https://tinyurl.com/v6ttuuaa; Ex. 7, White Paper on Mod-
    eling Comments Circulated June 21, 2020 to Water Resources Work Group at 10 ("Draft
18  EIS Comments White Paper"), attached to CHRIS GARRETT, SWCA, *Process Memo. to
    File, Evaluation and Response to Public Comments on Groundwater Modeling Analysis*
19  (Oct. 6, 2020), https://tinyurl.com/46zfttxu.

20  [7] *See, e.g.,* COLIN AGNER, SWCA, *Process Memo. to File, Post-DEIS Review of Up-
    dated Hydrological Data (2016-2019)*, (Sept. 8, 2020), https://tinyurl.com/5dpkj7sf; HALE
21  BARTER ET AL., MONTGOMERY & ASSOCS., *Desert Wellfield Pumping 100-year Draw-
    down Analysis for ADWR Evaluation in Support of the Resolution Copper EIS* (Jan. 23,
22  2020), https://tinyurl.com/4ajepmra; CHRIS GARRETT, SWCA, *Process Memo. to File, As-
    sessment of Factual Basis for Comments on Dewatering Amounts, Water Usage, and
23  Power Usage* (Nov. 13, 2020), https://tinyurl.com/2p9r4emn; CHRIS GARRETT, SWCA,
    *Process Memo. to File, Clarification of Perceived Discrepancies in Water Balance Data*
24
25  (June 22, 2020), https://tinyurl.com/2682tm5h; MONTGOMERY & ASSOCS., *Numerical
    Groundwater Flow Model for the Skunk Camp Tailings Storage Facility* (July 17, 2020),
26  https://tinyurl.com/2yhrpakt; MONTGOMERY & ASSOCS., *Skunk Camp Water Quality Mon-
    itoring Program* (Aug. 28, 2020), https://tinyurl.com/23mpyuzb; GABRIELE WALSER,
27  BGC ENG'G, INC., *Review of Desert Wellfield Subsidence Analysis* (Aug. 27, 2020),
28  https://tinyurl.com/3n4ztbu5.

1    responding to all 77 comments made by AMRC's expert, Dr. Bob Prucha. *See* Ex. 7 (Draft

2    EIS Comments White Paper) at 1–2. The paper provided targeted responses to comments

3    challenging various modeling decisions that the Forest Service had made after considering

4    "the judgment of the Groundwater Modeling Workgroup, a diverse group of groundwater

5    modeling professionals and hydrologists, and the "technical capabilities of the model." *Id.*

6    at 21. For example, regarding the Forest Service's decision to include mine dewatering in

7    the "No Action Alternative," SWCA noted that "the rationale for this decision" had "been

8    clearly articulated in the project record," as had the dissenting opinion. *Id.* at 18 (citations

9    omitted). Before re-publishing the 2025 FEIS, the agency issued additional technical re-

10   ports and analysis aimed at addressing water issues.[8]

11                    **c.      Plaintiffs' water arguments lack merit.**

12           Plaintiffs improperly ask the Court to "substitute its judgment [or worse, Plaintiffs'

13   judgment] for that of the agency." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted).

14           **<u>AMRC's three water arguments</u>**. AMRC first and primarily argues (Motion 21)

15   that the Forest Service failed to adequately consider the pumping impacts of a proposed

16   independent development called Superstition Vista in the FEIS's cumulative impacts anal-

17   ysis.[9] But the Forest Service did in fact evaluate the proposed subdivision to the extent the

18   subdivision had obtained necessary state water rights and was more than speculative. *See*

19

---

20          [8] *See, e.g.*, MONTGOMERY & ASSOCS., *Comparison of 2023 Phoenix AMA Groundwa-
     ter Model and Resolution EIS Groundwater Model* (Nov. 14, 2023), https://tinyurl.com/
21   2d5n7pne; MONTGOMERY & ASSOCS., *Monitoring and Mitigation Plan for Groundwater
     Dependent Ecosystems and Water Wells* (Dec. 7, 2022), https://tinyurl.com/jfhtu6mp;
22   CHRIS GARRETT, SWCA, *Process Memo. to File, Add'l Analysis of Individual Wells* (Feb.
     27, 2023), https://tinyurl.com/bdvaab8p; CHRIS GARRETT, SWCA, *Process Memo. to File,
23   Assessment of Cutter Basin Issues* (Feb. 16, 2023), https://tinyurl.com/mvnpb8m4.

24          [9] The Forest Service was required to consider only "the impact on the environment
     which results from the incremental impact of the action when added to other past, present,
25   and reasonably foreseeable future actions regardless of what agency … or person under-
     takes those actions." 40 C.F.R. § 1508.7 (2024). The agency appropriately drew the line of
26   what was a reasonably foreseeable future action here, and *Seven County* mandates that the
     Forest Service's discretion not be disturbed. Moving forward, neither NEPA itself nor the
27   interim Forest Service NEPA regulations require the consideration of cumulative impacts.

28

FEIS Vol. 3 (Tribe Ex. 25) at 977–989. The Forest Service also incorporated into its cumulative impacts groundwater model those parts of the proposed subdivision that had been auctioned to a developer and obtained a state law approval to pump groundwater. *See id.* at 986–987.[10] The agency thus provided a reasoned explanation for its treatment of the proposed subdivision. No more was required. *See Seven County*, 145 S. Ct. at 1513.

In fact, the Forest Service went beyond what NEPA requires on this issue. In response to public concern about water scarcity in the region, and because the actual future water usage could not be predicted, the Forest Service provided an additional qualitative discussion about how the entire Superstition Vista subdivision may impact regional groundwater supplies. FEIS Vol. 3 (Tribe Ex. 25) at 987.

*Northern Plains Resource Council, Inc. v. Surface Transportation Board*, 668 F.3d 1067 (9th Cir. 2011), provides no support for AMRC. There, the agency arbitrarily limited its cumulative effects analysis to a five-year period, even though doing so caused the agency to exclude the effects of a proposed project with an approved programmatic EIS. That is not the situation here. The Forest Service did not arbitrarily limit its cumulative effects assessment to exclude scheduled future development. Rather, it reviewed the subdivision plan and determined, in its professional judgment, that parts of the plan were too conceptual to warrant inclusion in the model (but were still addressed in the analysis).[11]

---

[10] AMRC incorrectly argues (Motion 21) that the Forest Service did not include portions of the Superstition subdivision in the cumulative impacts assessment because the cumulative water use maps in the FEIS are the same as those in the 2021 EIS. As explained in the FEIS, the Forest Service's cumulative impact analysis for the 2021 EIS included all AAWS determinations permitted at the time of publication. Because the portions of the Superstition Vista development that have an AAWS are actually relying on determinations that predate the 2021 FEIS, those determinations were considered in the 2021 FEIS cumulative impacts modeling. *See* FEIS Vol. 3 (Tribe Ex. 25) at 987.

[11] AMRC suggests (Motion 21–22) that *Seven County* requires the Forest Service to consider the full Superstition subdivision because pumping at the subdivision would occur "in the same area, at the same time, and from the same aquifers as the other East Salt River Valley pumping," and "likely overlap … with the [Project's] operational pumping." But *Seven County* does not apply to this issue. The Supreme Court addressed direct and indirect environmental effects caused by the project that is the subject of the EIS, not whether a

1    AMRC's second argument (Motion 22–23)—that the Forest Service improperly

2  ignored comments by other agencies such as BLM—is factually incorrect. The Forest Ser-

3  vice responded to BLM's concerns through updates in the FEIS.[12] The agency also ex-

4  changed a series of letters and provided additional analysis from third-party contractors.[13]

5  BLM's concerns were also largely raised and addressed by the Water Resources Working

6  Group. *See supra* at 26–27. Existing technical documents in the record address BLM's

7  concerns. Further, BLM's modeling concerns were about the choices the Forest Service

8  made in its professional judgment (with input from stakeholders), rather than actual errors

9  identified in the model. *See supra* at 26–27.

10    Likewise, AMRC's contention that the Forest Service ignored comments by the

11  Arizona State Land Department (ASLD) is also mistaken. The agency's responses to

12  ASLD's comments are memorialized in Appendix R of the FEIS. *See* FEIS Vol. 6 (Tribe

13  Ex. 28), Appx. R at R-43–44, 74, 167, 193, 224–225, 245, 260, 275–280, 287, 340, 351.

14    AMRC's third argument (Motion 25)—that the Forest Service arbitrarily failed to

15  take the requisite hard look at potential mitigation measures—is similarly belied by the

16  record. The agency extensively discussed mitigation measures in the FEIS and in an ap-

17  pendix devoted to that purpose. *See* FEIS Vol. 2 (Tribe Ex. 24) at 450–453; FEIS Vol. 4

18  (Tribe Ex. 26), Appx. J. Likewise unfounded is AMRC's contention (Motion 26) that the

19  agency improperly abandoned mitigation measures within its discretion. The section of

20

21  future action is "reasonably foreseeable" for purposes of a cumulative effects assessment.

22    [12] *Compare e.g.*, AMRC Motion, Ex. 1 (BLM Report) at 5 (requesting section on Ari-
zona water law), *with* FEIS Vol. 2 (Tribe Ex. 23) at 397-99 (new section on Arizona water

23  law). *See also* BLM Report at 6 (comment about model boundaries); FEIS Vol. 2 (Tribe
Ex. 23) at 386 (addressing comments about model boundaries). The Forest Service told the

24  Tribe in 2024 that, "[i]n response to [the BLM] analysis" it was making "changes" to the
FEIS, including by adding additional or potential indirect impacts to groundwater in the

25  Cutter Basin and assessing reports of possible future groundwater shortages in the East Salt

26  River Valley. Tribe Dkt. 85-8 (Attachment E to Troy Heithecker Decl.) at 3.

27    [13] *See* Email from Resolution to Cory Brunsting, U.S. Forest Serv. (Nov. 21, 2022),

28  https://tinyurl.com/mryuf66y; Letter from KCB Consultants to Resolution (Oct. 21, 2022),
https://tinyurl.com/3tprkrmy; GARRETT, *Assessment of Cutter Basin Issues*, *supra* n.8.

1    Appendix J cited by AMRC refers to *additional* mitigation measures potentially required

2    for other permits. The Draft ROD details which mitigation measures remain under Forest

3    Service jurisdiction and which will be enforceable otherwise. *See* Ex. 2 (Draft ROD) at 19–

4    29. Those additional measures do not negate the appropriate mitigation analysis provided

5    in the FEIS. As noted in Appendix J, other state and federal permits will be based on the

6    alternative selected in the FEIS, and the Forest Service will work with the coordinating

7    agencies to ensure compliance with the ROD. *See* FEIS Vol. 4 (Tribe Ex. 26), Appx. J at

8    J-50. Either way, AMRC's complaint is about the manner and delivery of proposed mitiga-

9    tion measures. But all NEPA requires is that mitigation measures be reasonably consid-

10   ered—not that they all be adopted. *See Public Citizen*, 541 U. S. at 756–757.

11       **<u>The Tribe's water arguments</u>**. The Tribe's two water-related criticisms are leveled

12   primarily by Dr. James Wells—who served on two FEIS workgroups devoted to water and

13   apparently could not persuade his experienced technical colleagues to adopt his view.

14       Dr. Wells first asserts that the Forest Service's block-cave geochemistry model un-

15   reasonably assumes that underground water quality would not be degraded by acid mine

16   drainage arising from oxidation in the block cave. *See* Tribe Motion, Ex. 33, Attach. 1 at

17   11. He implies the Forest Service acknowledged the assumption was faulty when it de-

18   scribed the issue as "[o]ne of the most uncertain aspects of the modeling." *Id.* at 11 n.5. By

19   acknowledging the assumption, the Forest Service purportedly understood it had overesti-

20   mated the quality of water that would move from the mine to the tailings processing area.

21       The full text of that section of the FEIS demonstrates that the Forest Service's

22   acceptance of this assumption was a reasoned choice:

23       One of the most uncertain aspects of the modeling is the assumption about
         oxidation in the block-cave zone. The block-cave geochemistry model used
24       as a basis for the water quality modeling represents the current conception of
         the mechanics of block caving and ventilation of the mine and how that
25       would affect the presence of oxygen in the cave zone; <u>this is considered a</u>
         <u>reasonable interpretation</u>. However, real-world conditions could differ. If
26       greater oxidation occurred in the block-cave zone, it could result in more
         oxidation products either reporting with the ore to the processing plant, or
27       rinsing into the sump and from there entering the process stream.
28

1    FEIS Vol. 2 (Tribe Ex. 24) at 473. The Forest Service further concluded that "future work

2    or additional information could reduce some of these uncertainties, [but as] the water qual-

3    ity modeling results disclosed in the EIS … are sufficiently different between alternatives[,]

4    such refinements" would not impact the agency's selection of Alternative 6. *Id.*

5    In fact, the Forest Service noted that additional post-2019 draft EIS water quality

6    modeling conducted at Skunk Camp for Alternative 6 "largely confirmed the results of the

7    [2019 draft EIS] water quality modeling"; therefore, the FEIS's conclusions are "not likely

8    to change." *Id.* This is especially true for the Skunk Camp Alternative, because modeling

9    demonstrated it met "water quality objectives" and had "substantial additional capacity to

10   do so, and flexibility to implement additional seepage controls." *Id.*[14]

11   Second, the Tribe contends (Motion 23) that the Forest Service failed to reasonably

12   consider the potential hydrogeologic impacts to the Tribe's groundwater supplies. But the

13   record shows the agency addressed these concerns in (1) its responses to comments on the

14   draft EIS, *see* FEIS Vol. 6 (Tribe Ex. 28), Appx. R at R-393 (do not anticipate noticeable

15   effect on weather patterns); and (2) expanded analysis in the FEIS, *see* FEIS Vol. 2 (Tribe

16   Ex. 24) at 437–441 (no reasonable cascading effects from additional pumping).

17   In sum, none of Plaintiffs' arguments casts doubt on the Forest Service's exhaustive

18   review of water issues in support of the FEIS. The record unmistakably demonstrates that

19   the Forest Service reasonably analyzed the evidence before it and took a "hard look" at all

20   water issues related to the Project. *Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002). That

21   is all that NEPA requires. *Kleppe*, 427 U.S. at 410 n.21.

22         **d.    The Tribe's arguments about the tailings pipeline and tailings**
23              **dam engineering design criteria lack merit.**

24   The Tribe's other technical attack pertains to the proposed Skunk Camp tailings

25    

26      [14] Dr. Wells misrepresents that the Forest Service used two completely different

27   groundwater models to evaluate water quality at Skunk Camp. As noted in the FEIS, the new numeric model is merely a "refinement" of the prior model. It was the product of additional field investigations of the area, including well drilling, aquifer tests, water qual-

28   ity samples, and geotechnical investigations. *See* FEIS Vol. 2 (Tribe Ex. 24) at 455.

facility and the pipeline that will convey tailings slurry to it. This argument relies on a declaration from Dr. Steven Emerman (Tribe Motion, Ex. 32), which in turn attaches a new letter report from Dr. Emerman to the Tribe. But the Tribe has waived these objections by failing to raise them as comments to the draft EIS. *See Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475, 489 (9th Cir. 2023) (a party bringing a NEPA challenge "must present timely and particular objections" that allow "the agency to give the issue meaningful consideration." (cleaned up)); *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1063–1064 (9th Cir. 2023) (any objections not raised during the comment process are waived).

Even if the Tribe were permitted to raise these new objections to the FEIS in an administrative-record case, they lack merit. The FEIS exhaustively analyzed various alternatives for the tailings facility. The FEIS and the draft ROD explain why the Forest Service selected Skunk Camp, located off Forest Service Land: it is "the most remote location" and "offers the best ability to control seepage and protect water quality, has the least visibility, and is located in an area with little recreation use." Ex. 2 (Draft ROD) at 35.

The Tribe's related argument that the FEIS arbitrarily understated pipeline safety risks is entirely incorrect. The FEIS devotes an entire 51-page section to tailings and pipeline safety that addresses all of Dr. Emerman's concerns. FEIS Vol.2 (Tribe Ex. 24) at 686–737. The agency undertook an exhaustive and collaborative process to assess the inherent risks in the tailings designs and a range of breach scenarios. *Id.* at 690.

Dr. Emerman argues that the Forest Service underestimated the risk of a tailings pipeline leak. But his criticism misunderstands the agency's analysis. While the FEIS cites a study that estimated the annual risk of failure for petroleum pipelines to be 0.03 failures per 1,000 miles of pipeline, FEIS Vol.2 (Tribe Ex. 24) at 687, the Forest Service used other analyses to further assess the safety of Resolution's proposed tailings pipeline. As detailed in the FEIS, the Forest Service conducted risk-based assessments of potential failures using a failures modes and effects analysis. *Id.* at 712. The agency selected this process to identify possible pipeline failures and the design measures and operational controls that will enhance the safety of the pipeline. *Id.* at 688, 712. It is an "industry-standard" practice that

1  "assure[s] that any plausible potential failure is considered and studied." *Id.* at 690. The

2  FEIS also includes an 80-page pipeline integrity-management plan at Appendix Q.[15]

3         Dr. Emerman states that he would have relied more heavily on a different analytical

4  method that estimated the pipeline failure risk to be higher, 0.62 incidents per 1,000 miles

5  of pipeline. In other words, one engineer disagreed with other engineers about the best way

6  to evaluate the risk of pipeline failures. Both *Seven County* and long-time NEPA precedents

7  unambiguously teach that this Court should decline to interject itself into disputes about

8  technical details—reached after a painstaking process fully described in the FEIS—and

9  should instead defer to the agency's well-reasoned analysis.

10        Dr. Emerman's other criticisms are addressed to the Forest Service's methodology

11  for modeling the risk of tailings dam failure, its selection of tailings dam engineering cri-

12  teria, and its alleged failure to consider international standards for tailings dam locations.

13  *See* Tribe Motion, Ex. 32 ¶ 4. The Forest Service addressed these engineering minutiae in

14  detail in the FEIS and its supporting analyses, explaining how the agency exercised its

15  judgment and referencing a massive library of technical documents supporting that judg-

16  ment. FEIS Vol. 2 (Tribe Ex. 24) at 686–737.[16] Among these are a comprehensive breach

17  (*i.e.*, total failure) analysis for each of the Project alternatives. *Id.* at 691–704, 717–720.

18  These are again simply instances of one engineer disagreeing with others. They supply no

19  basis to find the FEIS arbitrary and capricious—much less to enjoin the land exchange.

20
       **3.     There is no merit to the Tribe's contention that the government was**
21              **required to publish a supplemental *draft* EIS.**

22        The Tribe's contention (Motion 3) that the Forest Service was required to issue a

23

---

24        [15] *See* Golder, *Skunk Camp Pipelines: Pipeline Protection and Integrity Plan* (May 15,
25  2020), https://www.resolutionmineeis.us/documents/golder-2020.

26        [16] *See, e.g.*, Gannett Fleming, *Failure Modes and Effects Analysis 2020 Workshop* (Oct.
2020), https://tinyurl.com/4s73bv7a; Klohn Crippen Berger, *DEIS Alternatives Failure
27  Modes* (Jan. 2019), https://tinyurl.com/49nsdrxw; KCB Consultants, *Skunk Camp Tailings
Storage Facility 'Dry' Slumping Extents* (June 2020), https://tinyurl.com/3zjr56ta; KCB,
28  *Skunk Camp Site Investigation* (Nov. 2019), https://tinyurl.com/mr43tuhn.

1    supplemental draft EIS is meritless.[17]

2          "[A]n agency need not supplement an EIS every time new information comes to

3    light after the EIS is finalized. To require otherwise would render agency decisionmaking

4    intractable, always awaiting updated information only to find the new information outdated

5    by the time a decision is made." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373

6    (1989); *see Earth Island Institute*, 87 F.4th at 1067 (NEPA review "would never end" and

7    agencies would "balk" at modifying an EIS if they had to go through public comment for

8    every modification). Supplementation is not required unless the new information and anal-

9    ysis "relate to a change in the proposed" action. *Greer Coal., Inc. v. U.S. Forest Serv.*, 470

10   Fed. App'x 630, 633 (9th Cir. 2012).

11         Here, new material added to the 2025 FEIS does not relate to any changes in the

12   congressionally mandated land exchange or the project design that would cause new or

13   different environmental impacts. Even the Tribe acknowledges (Motion 3) that the new

14   information merely "shore[s] up" the issues already considered in the FEIS. The new ma-

15   terial offers further analysis of effects "already articulated and considered," and "confirms

16   information already in the record." *Protect Our Cmtys. Found. v. Lacounte*, 939 F.3d 1029,

17   1041 (9th Cir. 2019); *Greer Coalition*, 470 Fed. App'x at 634. In many cases, the Forest

18   Service's revisions to the FEIS simply reflect the agency's movement of explanatory ma-

19   terial from an appendix or record document to the body, often in response to public com-

20   ments. *See, e.g.*, FEIS Vol. 6 (Tribe Ex. 28), Appx. R at R-175, 176, 190, 231, 233, 262,

21   268, 274, 282, 302, 344, 355, 357, 368, 370, 394. None of the Tribe's identified changes

22   (Motion 22–23) concern material alterations to the land exchange or design of the Project.

23         Unlike in *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 558 (9th Cir. 2000),

24   the Forest Service timely "considered whether" the new information was "sufficiently sig-

25   nificant to require preparation" of a supplemental EIS. *See, e.g.*, FEIS Vol 1 (Tribe Ex. 23)

26         [17] The Council on Environmental Quality regulations cited by the Tribe (and in most
27   cases involving supplemental draft EISs) have since been rescinded. 90 Fed. Reg. 10,610
     (Feb. 25, 2025). New NEPA regulations no longer require agencies to publish a draft EIS
28   for comment. 90 Fed. Reg. 29,632, 29,637 (July 3, 2025).

at 184; FEIS Vol. 2 (Tribe Ex. 24) at 552, 716 (explaining the non-impact of additional

information on the analysis of proposed alternatives). This case is also not like *League of*

*Wilderness Defenders v. Connaughton*, 752 F.3d 755 (9th Cir. 2014), where the agency

withdrew a key part of the mitigation measures for the project, *id.* at 760–761, or *Earth*

*Island Institute*, where the plaintiffs argued (but the court disagreed) that new data showed

a "qualitatively" different or expanded environmental impact from the proposed federal

action, 87 F.4th at 1071. In short, Forest Service's changes in the 2025 FEIS are decidedly

not "substantial modifications" going to the "heart of the proposed action" or that pose

"new and previously unconsidered environmental questions." *Russell Country Sportsmen*

*v. U.S. Forest Serv.*, 668 F.3d 1037, 1049 (9th Cir. 2011).

**C.    AMRC fails to show any flaw in the appraisal it challenges.**

AMRC's claim to enjoin the land exchange based on purported flaws in the

appraisal of the Mining Claim Zone (MCZ) fails at the outset because the Exchange Act

itself specifies what should happen if the appraisal were found to be flawed. On the merits,

AMRC simply misunderstands the requirements of federal appraisal standards.

**1.    The Act does not condition the Forest Service's duty to complete the exchange on judicial review of the appraisals.**

The text of the Exchange Act refutes AMRC's contention that any challenge to the

appraisal must be resolved before conveyance of title. Congress directed how the appraisals

were to be conducted: appraise both the federal and non-federal land in "accordance with

nationally recognized appraisal standards." 16 U.S.C. § 539p(c)(4)(A), (B)(i). But Con-

gress did *not* condition the land exchange on completed judicial review of those require-

ments. As for what must occur *before* conveyance, the Act provides only that the agency

"shall make the appraisals of the land to be exchanged (*or a summary thereof*) available

for public review." *Id.* § 539p(c)(4)(B)(iv) (emphasis added). The agency has already done

so. *See* AMRC Motion, Exs. 11 & 12 (summaries of appraisals of both federal parcels).

Moreover, this claim cannot support an injunction of the land exchange because

even if AMRC could show a flaw in the appraisal, the Exchange Act itself specifies the

process to resolve the deficiency. Congress created an explicit "make whole" provision that addresses what is to happen "[i]f the final appraised value of the Federal land exceeds the value of the non-Federal land": Resolution "shall" "convey additional non-Federal land," "make a cash payment," or a combination of the two. 16 U.S.C. § 539p(c)(5)(B). The statute thus establishes its own remedy for any purported defect in the appraisal: a make-whole payment, not an injunction against conveyance. Where, as here, a statute makes it "fairly discernible" that Congress intended to preclude pre-enforcement judicial review, a court should not intervene. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 208–209, 216 (1994) (citation omitted). That make-whole remedy in the Act also constitutes an "alternative remedy" at law that precludes injunctive relief. *See Herb Reed Enters., LLC v. Florida Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (the party seeking an injunction must show that "legal remedies … are inadequate").[18]

### 2.    AMRC's appraisal challenge misreads federal appraisal standards.

Even if this Court were to find that AMRC has standing, a private right of action, and an available equitable remedy, AMRC's appraisal challenges are wrong on the merits. Per the Exchange Act, the federal estate to be conveyed to Resolution was appraised. But the mineral rights in the Mining Claim Zone ("MCZ") were not a part of that estate—Resolution already owns them.

What AMRC claims are four problems with the appraisal of the 1,655-acre MCZ are really just four variations of the same basic complaint: AMRC contends (Motion 8) that the appraiser "arbitrarily failed to include any value for the value" of the copper beneath the parcel that is covered by Resolution's mining claims. AMRC is wrong; the appraisal is correct as a matter of law. Each of AMRC's four arguments fails to properly take account of the legal fact that Resolution—not the United States—*already owns* the exclusive property right to mine the copper and other minerals in the MCZ. It acquired those rights by

---

[18] As discussed *supra* at 15, *Desert Citizens* is materially different because, under the Exchange Act, the Forest Service has no statutory authority to ultimately decline to complete the land exchange.

filing and maintaining 185 unpatented mining claims under the General Mining Law of 1872. Ex. 9 (Declaration of Victoria Peacey) ¶ 6; *see* 30 U.S.C. § 22 *et seq.*

    **a.**    AMRC first argues (Motion 8–9) that the appraisal wrongly presumes Resolution's so-called "paper mining claims" deprive the government of the right to the minerals beneath the MCZ. Under the 1872 Law, as long as the owner of a mining claim continues to perform assessment work or pay an annual fee, it holds the "*exclusive* right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth." 30 U.S.C. § 26 (emphasis added); *see United States v. Locke*, 471 U.S. 84, 104 (1985). "Although legal title to the land remains in the United States, the claimant enjoys a valid, equitable title in the claim, possessing all of the incidents of real property." *Kunkes v. United States*, 32 Fed. Cl. 249, 252 (1994), *aff'd*, 78 F.3d 1549 (Fed. Cir. 1996). An unpatented mining claim is thus "'property in the fullest sense of that term.' It is alienable, inheritable, and taxable." *Ickes v. Virginia-Colorado Dev. Corp.*, 295 U.S. 639, 644 (1935) (citation omitted).

    What's more, the holder of an unpatented mining claim may "extract and sell minerals from the claim without paying any royalty to the United States." *Locke*, 471 U.S. at 86; *see Forbes v. Gracey*, 94 U.S. 762, 763 (1876) (claim-holder can "dig out and convert to their own use the ores" without the government "exacting or receiving any compensation for those ores, and without requiring the miner to buy or pay for the land"). The MCZ appraisal thus recognizes that Resolution's unpatented claims "encumber[]" the federal property and that, "in accordance with the [1872] Mining Law," those claims are not part of the estate owned by the United States. AMRC Motion, Ex. 11 at 3.

    AMRC's real complaint is not with the MCZ appraisal but with the General Mining Law of 1872. By granting "the finder of valuable minerals on government land … exclusive possession … to all the minerals he extracts," the 1872 Law created "a powerful engine driving exploration and extraction of valuable minerals." *United States v. Shumway*, 199 F.3d 1093, 1099 (9th Cir. 1999). AMRC's argument (Motion 8) that Resolution should pay the United States for rights it already owns in the MCZ would nullify the 1872 Law and

1    150 years of Supreme Court precedent, as well as take Resolution's property. *See Kunkes*,

2    78 F.3d at 1551 (unpatented claims constitute "property protected by the Fifth Amendment

3    against uncompensated takings").

4        AMRC invokes *Locke* (Motion 8–9) to assert that the United States "undisputedly

5    still owns the mineral estate" to the MCZ because the government maintains "broad pow-

6    ers" over land subject to mining claims. *Locke* does not remotely support AMRC here. The

7    issue in *Locke* was the government's power to require compliance with annual filing re-

8    quirements by holders of unpatented mining claims. The Court upheld that statute pursuant

9    to the government's "broad powers over the terms and conditions upon which the public

10   lands can be used, leased, and acquired." *Locke*, 471 U.S. at 104. *Locke* thus stands for the

11   unremarkable proposition (irrelevant here) that while holders of unpatented claims main-

12   tain a protected property interest and do not owe royalties associated with minerals they

13   extract, the claims may be subject to "reasonable regulatory restrictions." *Bolt v. United*

14   *States*, 944 F.2d 603, 610 (9th Cir. 1991) (quoting *Locke*, 471 U.S. at 107).

15       *Locke* nowhere said that the United States reserved any part of the "mineral estate"

16   of the land for itself. And what AMRC asserts the Forest Service should do here—effec-

17   tively transfer the value of exclusive mineral rights from Resolution to the government—

18   would be the antithesis of a "reasonable regulatory restriction[]." It would be a taking.

19       **b.**    AMRC next argues (Motion 9–11) that the MCZ appraisal did not comply

20   with regulations requiring inclusion of "all values of the exchanged lands … including

21   minerals." The cited regulations define market value by reference to "lands or interest in

22   lands," and state that an appraisal must consider "the contributory value of any interest in

23   land such as water rights, minerals, or timber." 36 C.F.R. §§ 254.2, 254.9(b)(1)(iv). The

24   MCZ appraisal complied with those regulations by explaining that Resolution—not the

25   United States—owns the mineral rights in the MCZ, with the result that those rights con-

26   tribute no value to the government's interest in the land. AMRC Motion, Ex. 11 at 7–8.

27   Nothing in the regulations permits an appraisal to value the government's interest in prop-

28   erty as if it owned mineral rights that it does not.

1   AMRC resorts (Motion 9–10) to fragments from the legislative history of an earlier

2   draft bill regarding the land exchange to argue that the MCZ "*must* include the value of the

3   minerals." But legislative history "is not the law," *Axon*, 452 F. Supp. 3d at 893 (citation

4   omitted), and is unhelpful to interpret an unambiguous statute, *Haro v. City of Los Angeles*,

5   745 F.3d 1249, 1257 (9th Cir. 2014). Regardless, the Exchange Act could hardly be clearer

6   that Congress both knew about Resolution's mining claims and intended to preserve them:

> Nothing in this section shall interfere with, limit, or otherwise impair, the
> unpatented mining claims … currently held by Resolution Copper on the
> Federal land, nor in any way change, diminish, qualify, or otherwise impact
> Resolution Copper's rights and ability to conduct activities on the Federal
> land under such unpatented mining claims and the general mining laws of
> the United States.

11   16 U.S.C. § 539p(i)(C). By contrast, when Congress wanted to force a change in the status

12   of Resolution's mineral rights, it knew how to do so. *See id.* § 539p(g)(3) (requiring Reso-

13   lution to surrender "all rights [in Apache Leap] held under the mining laws"). Contrary to

14   AMRC's contention, then, the appraisal *did* "include the value of the minerals" for the

15   MCZ: it correctly determined that the value of those minerals to the United States is zero,

16   because Resolution already owns them.

17   AMRC's reference (Motion 10–11) to the Act's provision for a "value adjustment"

18   if mineral production exceeds the estimates in the appraisal, *see* 16 U.S.C. § 539p(e)(2),

19   makes no difference. That provision accounts for production from parcels *outside the MCZ*,

20   where Resolution does not own the mineral rights. It could not apply to minerals ultimately

21   recovered from the MCZ, where Resolution already holds exclusive mineral rights that are

22   expressly protected by the Act. 16 U.S.C. § 539p(i)(C).

23   **c.**   AMRC asserts (Motion 11) that the appraisal was arbitrary in finding that the

24   highest and best use of the MCZ is as "surface land use in support of a mining operation."

25   AMRC Exs. 11 & 12. This argument fails for the same essential reason. Under the Uniform

26   Appraisal Standards for Federal Land Acquisition (UASFLA), "[e]xisting legal encum-

27   brances must be considered when developing opinions of market value" for a property's

28   "highest and best use." Ex. 8 (UASFLA excerpts) § 4.11.3.1; *see id.* §§ 1.4.4, 4.6.5.2. And

a mining claim constitutes an "encumbrance on public land." *Kunkes*, 78 F.3d at 1556.
Indeed, "it is improper to disregard preexisting encumbrances and their impact on the property." Ex. 8 (UASFLA excerpts) § 4.6.5.2. The appraiser's approach is thus entirely consistent with the UASFLA—and Supreme Court law. *See Boston Chamber of Com. v. Boston*, 217 U.S. 189, 195 (1910) (Federal law does not "require a parcel of land to be valued as an unencumbered whole when it is not held as an unencumbered whole.").

    **d.**    Last, AMRC argues (Motion 12–13) that the MCZ appraisal "fail[s] to treat the exchange of the lands and minerals as a private-lands transaction" as required by 36 C.F.R. § 254.9(b). AMRC does not bother to explain how the appraisal supposedly fails in this regard, and it cites no authority for the proposition that an appraisal of private land encumbered by a third-party's rights must not take the encumbrance into account.

    Indeed, in estimating market value, this appraisal *does* assume a private-lands transaction. *See* 36 C.F.R. § 254.9(b)(1). The summary of the MCZ states that, as a "[h]ypothetical [c]ondition," the federal land was "appraised as though it is in private ownership." AMRC Motion, Ex. 11 at 3. *See* Ex. 8 (UASFLA excerpts) § 1.13 (describing private ownership requirement as a "hypothetical condition"). The appraisal goes on to explain that "[t]his hypothetical condition does not alter the facts that" the MCZ property "is encumbered by mining claims held by a party other than the United States; said mining claims … are not part of the estate owned by the United States." AMRC Motion, Ex. 11 at 3. And consistent with the Congressional mandate that "[n]othing" shall impair or interfere with Resolution's existing mining rights, 16 U.S.C. § 539p(i)(C), the appraisal states that "the United States may not prohibit the use of the surface of the [MCZ] land for mining purposes, nor may it materially interfere with such uses," AMRC Motion, Ex. 11 at 3.

    The appraisal's demonstrated adherence to the Exchange Act and UASFLA is hardly arbitrary and capricious. Even if the matter were not clear, deference to the agencies' "high level of technical expertise" is appropriate. *Kleppe*, 427 U.S. at 412.

**D.**    **The Tribe cannot demonstrate likely success on its consultation claim.**

    The Tribe's argument (Motion 23–24) that the government failed to consult with it

is also meritless. To start, this claim, too, has yet-another preliminary legal defect: The Act required the Forest Service to consult with the Tribe, but only to see if the parties could reach *mutual* agreement on mitigation measures. *See* 16 U.S.C. § 539p(c)(3)(B) ("Following the [tribal] consultations, … the Secretary shall consult with Resolution Copper and seek to find mutually acceptable measures …."). The Act does not give the Tribe the right to veto the land exchange simply because it could not persuade the agency and Resolution to accept additional voluntary mitigation measures.

Regardless, the Tribe cannot show any likelihood of success entitling it to preliminary relief. The Forest Service's consultation obligations comes from NHPA Section 106 and the Exchange Act. NHPA, like NEPA, does not mandate results. It is a procedural statute that merely "requires that federal agencies take into account the effect of their undertakings" on certain historical resources, *San Carlos Apache Tribe*, 417 F.3d at 1094 (cleaned up), and to consult with affected Tribes, *see* 36 C.F.R. § 800.2(c)(2)(ii). An agency's consultation is therefore not inadequate simply because it "did not end with a decision the tribal leaders supported." *Navajo Nation v. U.S. Forest Serv.*, 408 F. Supp. 2d 866, 879 (D. Ariz. 2006), *overruled on other grounds*, 479 F.3d 1024 (9th Cir. 2007). The standard of review of Section 106 claims is "highly deferential"; the court should affirm an agency's action if it has a reasonable basis. *Northwest Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007). The Exchange Act's consultation requirements are similarly procedural, requiring only that consultation occur, resources be identified, and mitigation measures be considered. *See* 16 U.S.C. § 539p(c)(3)(B), (9)(C).

The FEIS record amply demonstrates that the Forest Service engaged in substantial consultation. *See* FEIS Vol. 6 (Tribe Ex. 28), Appx. S (Consultation History). Since 2003, the Forest Service conducted government-to-government consultation with 15 tribes—including *434 documented consultations* with the San Carlos Apache Tribe specifically—concerning the proposed mine, the land exchange, alternate tailings locations, archeological and cultural resources, ethnographic studies, protection of Apache Leap, and other issues of Tribal concern. FEIS Vol. 3 (Tribe Ex. 25) at 867; FEIS Vol. 6 (Tribe Ex.

28), Appx. S. The agency consulted with the San Carlos Apache Tribe more than any other.

After withdrawing the 2021 EIS, the Forest Service hosted a tribal listening session and subsequent consultation and staff meetings. *Id.* at 868. For the San Carlos Apache Tribe specifically, the Forest Service engaged with the Tribal Council through correspondence and meetings, including two additional formal consultation meetings. *See* Tribe Dkt. 85-2 ¶¶ 5–16 (Declaration of Troy Heithecker). Communications are "ongoing and will continue through the life of the project." FEIS Vol. 6 (Tribe Ex. 28), Appx. S at S-1. The Forest Service's full consultation record, which contains over 100 pages of communication and consultation efforts, is in Appendix S of the FEIS.

Through this extensive consultation, the Forest Service identified, and Resolution agreed to, a host of mitigation measures described in the 50-page FEIS Appendix J. These measures—many of which will be incorporated into the final ROD—will, *inter alia*, reduce the Project's impact on historic properties, allow Tribes to salvage cultural resources, and ensure replacement water for areas where sacred springs experience draw down. *See* FEIS Vol. 3 (Tribe Ex. 25) at 890. Resolution also agreed to fund an endowment for cultural heritage, tribal education, and a tribal monitor program. *Id.* at 891; Ex. 9 (Peacey Decl.) ¶¶ 9–10. And Resolution has made significant changes to the Project in response to tribal concerns. Ex. 9 (Peacey Decl.) ¶¶ 11. That record proves the Forest Service has worked with Resolution to address tribal concerns and sought to avoid potential adverse impacts on cultural and archeological resources. 16 U.S.C. § 539p(c)(3)(B), (9)(C).

Regarding NHPA Section 106, in addition to the tribal consultation discussed above, the Forest Service initiated historic preservation consultation with the Arizona State Historic Preservation Office, the ACHP, and 15 tribes. FEIS Vol. 3 (Tribe Ex. 25) at 914, 999–1000. After years of consultation, ACHP unilaterally terminated consultation in February 2025 because mitigation could not stop the transfer of the federal land. Tribe Motion, Ex. 29. Indeed, ACHP later recommended that "USDA should work with the Administration and Congress to take immediate steps to *amend or repeal* [the Exchange Act] or otherwise prevent it from happening." *See* Tribe Motion, Ex. 31 at 7 (emphasis added). ACHP thus

1    terminated consultation because it opposed the land exchange and mine, not because of

2    any flaw in the consultation process.

3        Despite ACHP's withdrawal, the Forest Service continued consultation until April

4    17, 2025, per 36 C.F.R. § 800.7(c). *See* FEIS Vol. 3 (Tribe Ex. 25) at 1000; FEIS Vol. 6

5    (Tribe Ex. 28), Appx. S (Consultation History). The Forest Service then determined—cor-

6    rectly—that the Tribe and others had received "a reasonable opportunity to identify [their]

7    concerns about historic properties, advise on identification and evaluation of historic prop-

8    erties, … articulate [their] view on the undertaking's effect on such properties, and partic-

9    ipate in the resolution of adverse effects." 36 C.F.R. § 800.2(c)(2)(ii)(A); *see* Ex. 2 (Draft

10   ROD) at 43–44. Consistent with NHPA, the Secretary of Agriculture explained the

11   agency's decision in a letter to ACHP. *See* Tribe Dkt. 85-1, at 1–2.

12       In the face of this record, the Tribe primarily offers vague allegations that the Forest

13   Service failed to conduct meaningful consultation. It argues the Forest Service failed to

14   honor the Tribe's unilateral demands for consultation to occur through a particular process,

15   including executing a Memorandum of Understanding, allowing the Inter-Tribal Council

16   of America (a non-government organization) to participate in tribal consultation, restarting

17   the EIS process, and stopping or pausing the land exchange. *See* Tribe Dkt. 85-6 (Attach-

18   ment D to Troy Heithecker Declaration). But the Tribe is not guaranteed any specific form

19   of consultation, only a "reasonable opportunity for such consultation." *Concerned Citizens*,

20   279 F. Supp. 3d at 942; *see* 36 C.F.R. § 800.2(c)(2)(ii)(A). The Forest Service's reasoned

21   decision to not comply with these process demands does not negate the Project's substan-

22   tial consultation record, including the more than 400 consultation entries referencing the

23   San Carlos Apache specifically. FEIS Vol. 6 (Tribe Ex. 28), Appx. S; Tribe Dkt. 85-2 (Troy

24   Heithecker Decl.) ¶¶ 7,10–12, 15–16. ACHP even commended the Forest Service for im-

25   proving its consultation efforts. *See* Tribe Motion, Ex. 31 at 6.

26       "Consultation is a two-way street"; the Tribe cannot ignore "numerous and sub-

27   stantial efforts to consult" and then block an agency's "undertaking by refusing to cooper-

28   ate." *Concerned Citizens*, 279 F. Supp. 3d at 942; *see also Reno-Sparks Indian Colony v.*

1    *Haaland,* 663 F. Supp. 3d 1188, 1198 (D. Nev. 2023) (tribe was not likely to succeed on

2    its NHPA claim where it had "never responded to BLM's multiple letters, and never re-

3    quested more time for consultation until well after the ROD was issued").

4    Plaintiff's complaint, moreover, ultimately is with the land exchange itself. In testi-

5    mony before Congress, Chairman Rambler described the type of consultation provided for

6    by the Exchange Act as "a mere formality with no meaningful effect." AMRC Dkt. 74-1

7    at 100. And the Tribe uniformly objected to any alternative that would allow mining at the

8    federal land, as directed by Congress. Ex. 2 (Draft ROD) at 18. But the Tribe's position on

9    consultation ignores the extensive mitigation measures adopted as a result of the Forest

10   Service's consultation. The process is not rendered meaningless just because specific mit-

11   igation the Tribe demands is unavailable.

12   The Tribe next argues (Motion 17) that the exchange must be enjoined so that it can

13   "identify and preserve important, historic Apache properties within Oak Flat through prom-

14   ised consultation." This ignores the extensive NHPA consultation record cited above and

15   the efforts by both the Forest Service and Resolution to work with Tribes to identify im-

16   portant historic and cultural properties. Already:

17   - Fifty-two cultural resource surveys have been conducted, including across all
18     of the project alternatives, Resolution's offered lands, and proposed mitigation
19     areas. FEIS Vol. 2 (Tribe Ex. 24) at 816, 823, 826.

20   - Resolution has funded a Tribal Monitor program involving more than 30 mem-
21     bers from seven Tribes. *Id.* at 820; Ex. 9 (Peacey Decl.) ¶ 10. These Tribal
22     Monitors have worked with archaeologists and biologists to conduct pedestrian
23     surveys of nearly 61,000 acres, including the land-exchange parcels. FEIS Vol.
24     3 (Tribe Ex. 25) at 871–873; Ex. 9 (Peacey Decl.) ¶ 10.

23   - SWCA, with the FEIS cultural resources team, has conducted a records search
24     of a 2-mile buffer around all Project and alternative components and a visual
25     assessment within a 6-mile buffer. FEIS Vol. 2 (Tribe Ex. 24) at 816.

26   - Resolution funded a local ethnographic study that identified cultural resources
27     and collected oral history from Tribe members, including about places of tribal
     significance. FEIS Vol. 3 (Tribe Ex. 25), at 873; Ex. 9 (Peacey Decl.) ¶ 9.

28

- Through a land donation from Resolution, the Forest Service has developed the Apache Leap Special Management Area. This area contains one of the most extensive western Apache cultural sites in the region and will not be impacted by mining. Ex. 9 (Peacey Decl.) ¶ 8.

The Tribe does not explain how cultural resources were ignored despite this massive effort. Indeed, even the ACHP's final comment letter recognized the Forest Service's "extensive effort to identify historic properties." Tribe Motion, Ex. 29 at 3.

Finally, the Tribe's arguments about ACHP's termination of consultation are unavailing. While the Forest Service must consult with ACHP, it "is not obligated to give the ACHP's opinion so much weight that it is foreclosed from making its own decision." *Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686, 696 (3d Cir. 1999). NHPA requires only that the Forest Service "take into account" ACHP's comments, 36 C.F.R. § 800.7(c)(4), which the FEIS record proves the Forest Service did, *see* Tribe Dkt. 85-1.

In sum, overwhelming record evidence shows the Tribe had ample opportunities to consult and express its concerns. The record further shows that the Forest Service and Resolution considered those concerns, identified cultural and historic properties, and implemented meaningful mitigation measures. That is all the statutes require.

**E.    Changes to the Forest Plan are not grounds to block the land exchange.**

AMRC argues that the proposed amendment to the Tonto National Forest Plan violates the National Forest Management Act, NEPA, and the Exchange Act. This claim cannot support an injunction for multiple reasons.

First, AMRC's assertions regarding the Forest Plan amendment are irrelevant to the land exchange, because the proposed plan amendment applies only to activities that will be conducted on National Forest System lands under the special use permit *after* the land exchange is completed. AMRC's complaints regarding purported infirmities in the plan-amendment process have no bearing on the land exchange. *See* Ex. 2 (Draft ROD) at *v* ("[T]he decisions to be made by the Forest Service are limited to authorization of the proposed uses of NFS land outside of the land to be exchanged.").

Relatedly, AMRC's Forest-Plan claim is premature because the Draft ROD is not a

1   final agency action. *See* 5 U.S.C. § 704. The Forest Service's regulations include a project-

2   level predecisional review process for its proposed actions concerning projects and activi-

3   ties implementing Forest Plans. *See* 36 C.F.R. Part 218. The Forest Service must provide

4   a notice of availability of the Draft ROD and initiate an objection period, during which

5   eligible parties may request administrative review by the Forest Service line officer at the

6   next higher administrative level above the responsible official. *Id*. § 218. As the Draft ROD

7   acknowledges, the Forest Service cannot issue the Final ROD until the predecisional

8   administrative review process is completed. *See* Ex. 2 (Draft ROD) at 48–49.

9        In all events, AMRC's Forest Plan claim lacks merit. AMRC contends (Motion 28)

10  that the FEIS and Draft ROD do not explain the departure from the 2021 Draft ROD's

11  conclusion that no plan amendment would be required. To the contrary, the FEIS expressly

12  explains why an amendment was found necessary after the 2021 Draft ROD: the agency

13  adopted a revised Tonto National Forest Plan in 2023. The FEIS extensively evaluates the

14  provisions of the new plan, concluding that the special use permits will require an amend-

15  ment to address a few plan objectives. *See* FEIS Vol. 1 (Tribe Ex. 23) at 41.

16       AMRC's complaints about public notice are likewise unfounded. The public-notice

17  requirements cited by AMRC do not apply to this project-specific amendment; instead, 36

18  C.F.R. § 218 applies. *See* 36 C.F.R. § 219.16(b). Moreover, under 36 C.F.R. § 219.4, "the

19  responsible official has the discretion to determine the scope, methods, forum, and timing

20  of those [public participation] opportunities." *See also id*. § 219.13(b)(2). Here, the Forest

21  Service has provided notice of the proposed plan amendment and an opportunity for public

22  participation through the predecisional objection process. Indeed, both Plaintiffs had notice

23  and participated in the process. That satisfies the public-participation obligation.

24       AMRC's assertion (Motion 29) that the agency wrongly concluded the amendment

25  is not a significant change to the Forest Plan requiring an EIS is wrong. First, there is an

26  EIS here. Moreover, the Planning Rule cited by AMRC excludes any EIS requirement for

27  a plan amendment that applies, as here, to only one project. *See* 36 C.F.R. § 219.13(b)(3).

28       Finally, while changes to the Forest Plan await further administrative review and

1    perhaps a judicial challenge to the Final ROD, there is no doubt that the agency took a hard

2    look at the consequences of amending the Forest Plan and explained its rationale fully in a

3    37-page appendix to the FEIS. *See* FEIS Vol. 6 (Tribe Ex. 28), Appx. T.

4    **F.    Plaintiffs will suffer no irreparable harm without an injunction.**

5         Even if Plaintiffs' legal claims had merit, their injunction motions should be denied

6    for the further reason that Plaintiffs cannot demonstrate any "irreparable harm" if the Court

7    does not enjoin the land exchange while Plaintiffs' current claims are litigated. *Winter*, 555

8    U.S. at 20. Plaintiffs allege three distinct types of harm, none of which is the type of im-

9    mediate and irreparable harm necessary to warrant an injunction of the land exchange.

10        **<u>Loss of access</u>**. Plaintiffs first assert they will suffer immediate, irreparable injury

11   because, post-transfer, they will have to rely on Resolution to allow them to access and use

12   the federal lands. AMRC Motion 5; Tribe Motion 24–25. But that is merely an objection

13   to Congress's decision to convey title to the property. Even a remand of the FEIS for further

14   analysis will not reverse the mandatory land exchange directed by Congress. Because

15   Plaintiffs' alleged harm is not "legitimately relate[d]" to the claims they have asserted, it

16   cannot support their request for preliminary relief. *Friends of Clearwater v. Higgins*, 472

17   F. Supp. 3d 859, 875 (D. Idaho 2020).

18        Regardless, Resolution's President and General Manager, under penalty of perjury,

19   has committed to maintaining current recreational access to the federal land for at least the

20   next ten years. Ex. 9 (Peacey Decl.) ¶ 14. And under the Act, Resolution is required to

21   preserve access to Oak Flat Campground for as long as safely possible, 16 U.S.C.

22   § 539p(i)(3). As explained in the sworn declaration, that condition will not be triggered for

23   decades—if ever—because the Campground area will likely become unsafe only if the

24   subsidence reaches that area (which may not occur). Ex. 9 (Peacey Decl.) ¶ 18. Thus, for

25   the foreseeable future, public access to the property will not change. *Id.* ¶ 14.

26        Judge Logan's decision to grant a few-week injunction in *Apache Stronghold* does

27   not help Plaintiffs here. Judge Logan's injunction was based on *constitutional* claims,

28   which the Tribe does not raise here in support of its request for an injunction. Moreover,

1    the decision there was tied to the Supreme Court's pending review of the petition for a writ

2    of certiorari that has now been denied. The two cases Plaintiffs cite similarly do not support

3    relief. *Desert Citizens*, 231 F.3d 1172, involved an administrative land exchange, not an

4    exchange mandated by an Act of Congress. And both that case and *Western Land*

5    *Exchange*, 315 F. Supp. 2d 1068, merely found that recreational interests can support APA

6    standing to challenge a *final agency action*, which is absent here.

7         **Surface disturbance**. Plaintiffs next argue that they will be immediately and irrep-

8    arably harmed by Resolution's post-conveyance activities on the surface of the property.

9    AMRC Motion 5–6; Tribe Motion 25. But Plaintiffs fail to mention that the vast majority

10   of that work—such as construction of a new administration building and water treatment

11   plant—will occur on land that Resolution already owns. Ex. 9 (Peacey Decl.) ¶¶ 10–11.

12   There will *be no impact at all* to the surface of the federal land being conveyed to Resolu-

13   tion in the exchange until 2026. *Id*. ¶ 10; *accord* FEIS, Vol. 1 at 61 & fig. 2.2.2-3 (noting

14   there will no "construction of new facilities" for at least one year post-ROD). And even the

15   new surface disturbance planned for next year will impact only approximately 3.76 acres,

16   or 0.15% of the 2,422-acre federal parcel. Ex. 9 (Peacey Decl.) ¶ 15. That work will include

17   only the creation of four new drill pads (soil clearings), two dirt and gravel access roads,

18   and another soil clearing for medical evacuation. *Id.* None of that work will disturb any

19   area known to host tribal ceremonies. *Id.* Meanwhile, the federal land is already traversed

20   by numerous Forest Service roads and other infrastructure, including mine-exploration

21   roads and drill pads. *Id.* ¶ 14; FEIS, Vol. 1 at 61 & fig. 2.2.2-3.

22        **Loss of public land status**. Last, AMRC argues (Motion 4–6) that after the ex-

23   change occurs the land would no longer be afforded public-land protection, and Plaintiffs

24   would no longer be notified of "harmful activities" proposed on these lands. But again,

25   none of Plaintiffs' asserted claims, even if successful, could possibly remedy that asserted

26   harm. The changes in the land's status are the ultimate result mandated by Congress. In

27   addition, these allegations are not a "particularized injury to [Plaintiffs'] interests" neces-

28   sary to demonstrate irreparable harm. *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d

1  1100, 1111 (E.D. Cal. 2013). And in all events, Resolution will still be required to abide
2  by all applicable federal, state, and local laws. 16 U.S.C. § 539p(c)(8).

3  **G.     The balance of equities and public interest weigh against any injunction.**

4         On the other side of the balance, Plaintiffs' requested injunction would irreparably
5  harm the critical national security and economic interests that prompted Congress to pass
6  the Exchange Act. Congress has already weighed the equities and found the land exchange
7  "quite clearly in the public interest." Resolution Copper: Hearing Before the SubComm.
8  on Nat. Res., 112th Cong. 11 (2012) (statement of Sen. Kyl), https://tinyurl.com/yc656kyj.

9         The Exchange Act represents Congress's choice to develop domestic copper re-
10  sources—the mine has potential to supply a significant portion of the nation's demand for
11  copper, a critical mineral essential to electricity generation, distribution, and storage—
12  while also adding valuable conservation lands to the public trust. This Court should not
13  "ignore the judgment of Congress, deliberately expressed in legislation." *Oakland Canna-*
14  *bis*, 532 U.S. at 497. Multiple recent presidential administrations have also recognized the
15  urgent need for domestic investment in copper. *E.g.*, Exec. Order No. 14220, 90 Fed. Reg.
16  11,001 (Feb. 25, 2025) (domestic copper supplies are "essential to the national security,
17  economic strength, and industrial resilience of the United States"); Presidential Determi-
18  nation Pursuant to Section 303 of the Defense Production Act of 1950, 87 Fed. Reg. 19,775
19  (Mar. 31, 2022). Indeed, Resolution is one of ten "critical mineral production projects"
20  necessary "to facilitate domestic production of America's vast mineral resources to create
21  jobs, fuel prosperity, and significantly reduce our reliance on foreign nations." WHITE
22  HOUSE, *Trump Administration Advances First Wave of Critical Mineral Production Projects*
23  (Apr. 18, 2025), https://tinyurl.com/35vru2fy.

24         Moreover, the very same Congress that passed the Exchange Act recognized the
25  negative impact of NEPA litigation on timely implementation of critical projects like this
26  one. *See, e.g.*, *Hearing on H.R. 2641 Before the Subcomm. on Regul. Reform, Com. &*
27  *Antitrust L. of the H. Comm. on the Judiciary*, 113th Cong. 40 (July 11, 2013) (statement
28  of Rep. Bob Goodlatte, Chairman, H. Comm. on the Judiciary) ("Navigating this endless

1   [NEPA] review-and-litigation process can cost job creators millions of dollars when they

2   need to hire consultants and lawyers. But the cost to the economy is exponentially

3   greater."), https://tinyurl.com/3uwjznzw. Here, the mine will have significant, immediate

4   and long-term benefits for Arizona's workforce and economy. Ex. 9 (Peacey Decl.) ¶¶ 7,

5   19–21. At its peak, it will directly employ approximately 1,500 people and indirectly create

6   another 2,200 jobs. *Id.* ¶ 7. It could generate up to $61 billion in economic value for Ari-

7   zona and $288–$313 million in state, local, and federal tax revenue. *Id.*

8       In sum, an injunction would exacerbate America's shortage of domestic copper, plus

9   postpone job creation and generation of tax revenue. It would also impose substantial eco-

10  nomic harm on Resolution, which incurs $11 million every month to maintain the mine in

11  a non-operational (but operation-ready) state, including operating and maintaining thou-

12  sands of feet of underground infrastructure nearly 7,000 feet beneath the ground. Ex. 9

13  (Peacey Decl.) ¶¶ 20–21. A workforce of about 400 employees and contractors have been

14  keeping the mine operational while waiting for the land exchange, but further delay will

15  make it very difficult for Resolution to maintain the current level of employment or to

16  sustain its social investment in the surrounding copper triangle communities. *Id.* Between

17  January 2021 and June 2025, Resolution Copper spent $545 million in an operation-ready

18  holding pattern due to delays in completing the land exchange. *Id.* at ¶ 20.

19      An injunction would delay and imperil $53.5 million of funding committed by Res-

20  olution to a trust for the Project's 11 cooperating tribes. Ex. 9 (Peacey Decl.) ¶ 21. And

21  Resolution will incur yet-more costs if it is required to cancel contracts that depended on

22  the timely, mandated occurrence of the land exchange. Cancelling contracts and agree-

23  ments and imposing further delay does more than impose economic and reputational harm

24  to Resolution. It will impact people, their jobs, and their families. Congress did not permit

25  those harms to Resolution, the workforce, local contractors, and local communities. This

26  Court should not inflict them.

27                                  **Conclusion**

28      The Court should deny Plaintiffs' requested preliminary injunctions.

Dated July 28, 2025

Respectfully submitted,

**HOLLAND & HART LLP**

**PERKINS COIE LLP**

Christopher D. Thomas (#010482)
Andrea J. Driggs (#023633)
Janet M. Howe (#034615)
Benjamin A. Longbottom (#038602)
3110 North Central Ave
Suite D-160 (ground)
Phoenix, Arizona 85012

By: /s/ *Michael R. Huston*
Michael R. Huston (#038763)
Diane M. Johnson (#007634)
Samantha J. Burke (#036064)
Addison W. Bennett (#039801)
2525 E. Camelback Road
Suite 500
Phoenix, Arizona 85016

*Counsel for Defendant-Intervenor Resolution Copper Mining, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 28, 2025, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants.

*s/ Michael R. Huston*

-52-